## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OHIO CARPENTERS' PENSION FUND, on Behalf of Itself and All Others Similarly Situated,<br><br><div align="center">Plaintiff,</div><br>vs.<br><br>BANK OF AMERICA, N.A.; BANK OF AMERICA MERRILL LYNCH INTERNATIONAL DESIGNATED ACTIVITY COMPANY (F/K/A BANK OF AMERICA MERRILL LYNCH INTERNATIONAL LIMITED); MERRILL LYNCH INTERNATIONAL; NATWEST MARKETS PLC (F/K/A THE ROYAL BANK OF SCOTLAND PLC); NATWEST MARKETS SECURITIES INC. (F/K/A RBS SECURITIES INC.); and JOHN DOES 1-50,<br><br><div align="center">Defendants.</div> | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE SHERMAN ANTITRUST ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Ohio Carpenters' Pension Fund, on behalf of itself and all others similarly situated, files this Complaint against Defendants Bank of America, N.A., Bank of America Merrill Lynch Designated Activity Company (f/k/a Bank of America Merrill Lynch International Limited), and Merrill Lynch International (collectively, "Bank of America"); NatWest Markets plc (f/k/a Royal Bank of Scotland plc) and NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.) (collectively, "RBS"); and John Does 1-50 for violations of the Sherman Act, 15 U.S.C. §1. Plaintiff's allegations are made based on personal knowledge as to Plaintiff and Plaintiff's own acts and on information and belief and investigation of counsel as to all other matters.

### NATURE OF THE ACTION

1.      From at least as early as January 1, 2007 and continuing through at least December 31, 2012 (the "Class Period"), Defendants conspired to fix the prices of European

Government Bonds by agreeing to widen the bid-ask spreads they quoted to investors, thereby artificially increasing the prices investors paid for European Government Bonds or artificially decreasing the prices at which investors sold the bonds.

2.     Defendants and their co-conspirators are horizontal competitors and the dominant dealers of euro-denominated sovereign debt issued by European central governments that have adopted the euro as their official currency, including Austria, Belgium, Cyprus, Estonia, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Malta, the Netherlands, Portugal, Slovakia, Slovenia, and Spain.  The financial instruments created by this sovereign debt are referred to as "European Government Bonds" or "EGBs."

3.     Between 2007 and 2012, the average estimated annual European Government Bond volume traded in the United States was $253 billion.  At the end of 2012, the estimated value of the global European Government Bond market was approximately $8 trillion.  Major purchasers and holders of European Government Bonds include institutional investors, mutual funds, hedge funds, and pension funds in the United States.

4.     In a normally functioning market, Defendants and their co-conspirators would compete for customers based on the prices they offer for the purchase and sale of European Government Bonds.  A bond trader typically quotes bond prices to customers by providing them with their bid and ask prices.  The smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) prices, the more competitive the price.

5.     Defendants and their co-conspirators acquire European Government Bonds in auctions held by the debt management offices of European governments.  European Government Bond issuers designate select institutions that have a demonstrated ability to be market makers, provide liquidity to investors in the secondary market, and reliably purchase new European

Government Bonds in auctions as "primary dealers."  These primary dealers possess significant power and influence in the European Government Bond market because they control the supply of European Government Bonds available to investors.

6.      In exchange for the primary dealers' commitment to make markets for European Government Bonds and purchase new European Government Bonds in auctions, central governments grant primary dealers access to non-public information about new European Government Bond issuances, as well as funding needs for the central governments issuing them. In addition, primary dealers obtain valuable customer order-flow information in the run-up to the auction, which allows them to gauge investor appetite for the newly auctioned European Government Bonds that will then trade in the secondary market.  Primary dealers are also given preferential treatment when a European central government conducts other kinds of business, such as a bond syndication.  In exchange for these benefits, primary dealers are supposed to offer competitive pricing in the secondary market for European Government Bonds.

7.      However, during the Class Period, Defendants engaged in a conspiracy to widen the bid-ask spreads of European Government Bonds.   But for Defendants' conspiratorial conduct, no primary dealer could widen its bid-ask prices unilaterally without losing trading business to its competitors.   Moreover, any Defendant that unilaterally quoted wider bid-ask spreads would have risked drawing the attention of European central governments, jeopardizing the primary dealer's ability to secure new business from European Government Bond issuers in the future.

8.      Defendants' traders carried out their conspiracy through electronic communications, including instant messaging and chatrooms between traders.  Through such communications, traders at Defendant and co-conspirator banks discussed their respective

trading strategies, bid-ask spread quotations, customers' identities, and confidential information about the size and nature of Defendants' customers' orders.

9.    After an extensive investigation, on January 31, 2019, the European Commission ("the Commission") publicly announced that it issued a Statement of Objections to eight banks alleging that they:

> participated in a collusive scheme that aimed at distorting competition when acquiring and trading European government bonds ("EGBs"). Traders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies.  These contacts would have taken place mainly – but not exclusively – through online chatrooms.[1]

According to news reports, the banks subject to the Statement of Objections included Bank of America and RBS.[2]  A Statement of Objections reflects the Commission's preliminary view that the banks violated European competition laws.  If the violation is confirmed, the Commission can levy fines of up to 10% of each bank's global revenue.

10.    Defendants' and their co-conspirators' actions to fix prices in the European Bond Market has injured U.S. investors in European Government Bonds, caused Plaintiffs and the Class to purchase and sell European Government Bonds at anticompetitive prices.  Plaintiff, on behalf of members of the Class (defined below), seeks treble damages arising from Defendants' and their co-conspirators' unlawful contract, combination, or conspiracy to fix the prices of European Government Bonds sold to or bought from U.S. investors during the Class Period.

---

[1]    European Commission, Press Release, *Antitrust: Commission sends Statement of Objections in European government bonds cartel* (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[2]    *See* AFP, *EU accuses 8 banks of forming eurozone bond cartel* (Jan. 31, 2019), http://a.msn.com/01/en-us/BBT0lH0?ocid=st; Stefania Spezzati, *RBS Among Eight Banks in Euro Bond Cartel Probe*, Bloomberg (Feb. 14, 2019),    https://www.bloomberg.com/news/articles/2019-02-14/rbs-said-to-be-among-eight-banks-in-euro-bond-cartel-probe.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.  This Court also has subject matter jurisdiction under 28 U.S.C. §§1331 and 1337(a).

12.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a), 22 and 28 U.S.C. §1391(b), (c), (d) because, during the Class Period, all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

13.     Defendants Bank of America Merrill Lynch International Designated Activity Company and NatWest Markets plc conduct business in this District themselves or through their subsidiaries and affiliates as agents and through branch offices and trading hubs located in this District, as more particularly alleged below.

14.     This Court has personal jurisdiction over each Defendant, as more particularly alleged below, because these Defendants played an integral role in conducting substantial European Government Bond promotion, marketing, trading, and sales in this District and in the United States continuously throughout the Class Period and derived substantial profits from these activities.

15.     As alleged below, a substantial part of the events giving rise to Plaintiff's claims occurred in this District and the United States. Defendants and their co-conspirators conspired to fix the prices of European Government Bonds that Defendants distributed into the United States for sale to investors located in this District and throughout the United States.

16.     Defendants, both themselves and acting through their subsidiaries and affiliated entities as agents, purposefully availed themselves of this forum by, *inter alia*: (a) agreeing to widen bid-ask spreads thereby charging increased prices for purchases and decreased prices for sales of European Government Bonds in this District and throughout the United States; (b) directing European Government Bond sales and trading personnel to solicit investors for billions of dollars' worth of price-fixed European Government Bond transactions in this District and throughout the United States; and (c) collecting unlawful overcharges from investors in this District and throughout the United States.

17.     During the Class Period, the European Primary Dealers Association (the "EPDA") was the premier trade association for European Government Bond primary dealers, comprised of the 20 largest primary dealers.   As of 2012, 25 banks were designated as "AFME/Primary Dealer Members."[3]   Only the largest European Government Bond primary dealers were designated AFME/Primary Dealer Members.   Defendants are members of the EPDA and were active participants in this trade association.   As of 2008, the EPDA reported that its members cumulatively trade more than 85% of all volume in the European Government Bonds market.

18.     Most entities that are designated European Government Bond primary dealers are part of a global bank's fixed income trading and sales networks.   Banks use these networks to trade European Government Bonds with investors in major financial markets, such as New York. Of the 25 AFME/Primary Dealer Members, at least 23 had substantial fixed income trading and sales operations, including Defendant Bank of America Merrill Lynch International Designated Activity Company, either themselves or through an affiliated entity that was part of the bank's

---

[3]     In 2009, the EPDA merged with the Association for Financial Markets in Europe ("AFME").   Former principal members of the EPDA became known as "AFMA/Primary Dealer Members."

fixed income trading and sales network, in this District.  From these desks, Defendants and their co-conspirator banks promoted, marketed, and sold European Government Bonds to investors located in this District and throughout the United States.

19.     Figure 1 shows that 23 out of 25 AFME/Primary Dealer Members had U.S.-based dealer affiliates headquartered in this District that helped to promote, market, and sell sovereign bonds, including European Government Bonds, to investors located in this District and throughout the United States.

**Figure 1 – Headquarters of AFME/Primary Dealer Members'**
**U.S.-Based Dealer Affiliates**

| No. | AFME/Primary Dealer Member | U.S. Dealer Affiliate and its Headquarters |
|---|---|---|
| 1 | Banca IMI S.p.A. | Banca IMI Securities Corp., New York, NY |
| 2 | BAML International | Merrill Lynch Pierce Fenner & Smith Inc., New York, NY |
| 3 | Barclays Bank plc | Barclays Capital Inc., New York, NY |
| 4 | Banco Bilbao Vizcaya Argentaria, S.A. | BBVA Securities Inc., New York, NY |
| 5 | BNP Paribas S.A. | BNP Paribas Securities Corp., New York, NY |
| 6 | Citigroup Global Markets Limited | Citigroup Global Markets Inc., New York, NY |
| 7 | Commerzbank AG | Commerz Markets LLC, New York, NY |
| 8 | Crédit Agricole S.A. | Crédit Agricole Securities (USA) Inc., New York, NY |

| 9 | Credit Suisse AG | Credit Suisse Securities (USA) LLC, New York, NY |
|---|---|---|
| 10 | Deutsche Bank AG | Deutsche Bank Securities Inc., New York, NY |
| 11 | Goldman Sachs International Bank | Goldman Sachs & Co., LLC, New York, NY |
| 12 | HSBC Bank plc/ HSBC France S.A. | HSBC Securities (USA) Inc., New York, NY |
| 13 | ING Bank N.V. | ING Financial Markets LLC, New York, NY |
| 14 | Jefferies International Limited | Jefferies LLC, New York, NY |
| 15 | JP Morgan Securities plc | JP Morgan Securities LLC, New York, NY |
| 16 | Morgan Stanley & Co. International plc | Morgan Stanley, New York, NY |
| 17 | Natixis S.A. | Natixis Securities Americas LLC, New York, NY |
| 18 | Nomura International plc | Nomura Securities International Inc., New York, NY |
| 19 | RBC Europe Limited | RBC Capital Markets, LLC, New York, NY |
| 20 | NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) | NMSI Stamford, CT |
| 21 | Banco Santander S.A. | Santander Investment Securities Inc., New York, NY |
| 22 | Scotiabank Europe plc | Scotia Capital (USA) Inc., New York, NY |

| 23 | Société Générale S.A. | SG Americas Securities, LLC,<br>New York, NY |
| 24 | UBS AG | UBS Securities LLC,<br>Stamford, CT/New York, NY[4] |
| 25 | UniCredit Bank AG | UniCredit Capital Markets LLC,<br>New York, NY |

20.     AFME/Primary Dealer Members focused on customers in critical geographic markets by designating certain geographic locations in which they maintained significant fixed income trading and sales operations as "hubs."   As shown in Figure 2, 23 out of 25 AFME/Primary Dealer Members designated New York as a U.S. hub for their global fixed income trading and sales operations.

### Figure 2 – Locations of AFME/Primary Dealer Members' Fixed Income Trading Hubs

| No. | AFME/Primary Dealer Member | U.S. Dealer Affiliate and its Headquarters |
|-----|----------------------------|---------------------------------------------|
| 1 | Banca IMI S.p.A. | New York, London, Milan, Hong Kong |
| 2 | BAML International | New York, London, Hong Kong |
| 3 | Barclays Bank plc | New York, London, Hong Kong,<br>Singapore, Tokyo, Johannesburg |
| 4 | Banco Bilbao Vizcaya Argentaria, S.A. | New York, Mexico City, London, Madrid,<br>Hong Kong |
| 5 | BNP Paribas S.A. | New York, Sao Paulo, London, Brussels,<br>Hong Kong, Singapore, Tokyo |
| 6 | Citigroup Global Markets Limited | New York, London, Hong Kong,<br>Singapore |

---

[4]     In or around early 2011, UBS Securities LLC began moving personnel in its fixed income sales and trading business from Stamford to New York.

| 7 | Commerzbank AG | London, Frankfurt |
|---|---|---|
| 8 | Crédit Agricole S.A. | New York, London, Paris, Tokyo, Hong Kong |
| 9 | Credit Suisse AG | New York, London, Zurich, Hong Kong |
| 10 | Deutsche Bank AG | New York, London, Frankfurt |
| 11 | Goldman Sachs International Bank | New York, London, Singapore |
| 12 | HSBC Bank plc/ HSBC France S.A. | New York, London, Hong Kong |
| 13 | ING Bank N.V. | New York, Amsterdam, Brussels, Frankfurt, Madrid, Singapore and Hong Kong |
| 14 | Jefferies International Limited | New York, London, Hong Kong |
| 15 | JP Morgan Securities plc | New York, London, Tokyo, Hong Kong |
| 16 | Morgan Stanley & Co. International plc | New York, London, Tokyo |
| 17 | Natixis S.A. | New York, London, Paris, Hong Kong |
| 18 | Nomura International plc | New York, London, Hong Kong, Tokyo |
| 19 | RBC Europe Limited | New York, Toronto, London, Sydney, Tokyo |
| 20 | NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) | Stamford, London, Singapore |
| 21 | Banco Santander S.A. | New York, London, Madrid, Sao Paulo |
| 22 | Scotiabank Europe plc | New York, Toronto, London |
| 23 | Société Générale S.A. | New York, London, Paris, Hong Kong |
| 24 | UBS AG | New York, Chicago, London, Singapore, Sydney, Zurich |
| 25 | UniCredit Bank AG | New York, London, Munich, Paris, Madrid, Hong Kong, Shanghai |

21.     Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

## THE PARTIES

### A.     Plaintiff

22.     Plaintiff, Ohio Carpenters' Pension Fund ("Plaintiff"), is a Taft-Hartley multi-employer pension fund located in Ohio that provides retirement, disability, and survivor benefits to its participants and beneficiaries.  Plaintiff directly transacted in European Government Bonds with one or more of the European Government Bond cartel members, including Bank of America, N.A., Merrill Lynch International, NatWest Markets PLC, and The Royal Bank of Scotland PLC.  As a direct and proximate result of Defendants' collusive activities, Plaintiff was injured in its business or property.

### B.     Defendants

23.     Defendant Bank of America, N.A. ("BANA") is a Delaware corporation with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina.  BANA is a wholly owned subsidiary of Bank of America Corporation.

24.     Bank of America Corporation organizes its activities on a "line of business" basis. Its fixed income sales and trading operations, including its European Government Bond sales and trading operations, are organized under its "Global Banking & Markets" Business Line.

25.     Defendant Bank of America Merrill Lynch International Designated Activity Company (f/k/a Bank of America Merrill Lynch International Limited) ("BAML International") is an Irish private limited company with its principal place of business located at Two Park Place, Hatch Street, Dublin 2, Ireland.  BAML International is a wholly owned indirect subsidiary of BANA.

26.     BAML International conducts substantial activities as part of Bank of America Corporation's "Global Banking and Markets" business segment.   In this capacity, BAML International served as a European Government Bond primary dealer during the Class Period from its headquarters in London.  BAML International distributed European Government Bonds into the United States to U.S.-based affiliates that were also organized under Bank of America Corporation's Global Banking & Markets business segment, such as Merrill Lynch, Pierce, Fenner & Smith, Inc.

27.     BAML International served as a primary dealer for multiple European governments during the Class Period.  European Government Bond traders employed by BAML International determined prices charged to customers in European Government Bond transactions in the United States.

28.     Defendants BANA and BAML International conduct business in this District through their subsidiaries and affiliates as agents and through branch offices located in this District.

29.     Defendant Merrill Lynch International ("MLI") is a private unlimited company incorporated in England and Wales with its principal place of business located at 2 King Edward Street, London, X0 EC1A 1HQ, United Kingdom.  MLI is a wholly owned indirect subsidiary of Bank of America Corporation.  MLI is a broker and dealer in equities, fixed income, currency, and commodities financial instruments.  Upon information and belief, MLI served as a European Government Bond primary dealer for Austrian Government Bonds during the Class Period from its headquarters in London.

30.     Defendants BANA, BAML International, and MLI are collectively referred to as "Bank of America."  During the Class Period, Bank of America traded European Government Bonds directly with investors in the United States.

31.     Defendant NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) ("NatWest") is a U.K. public limited company with its principal place of business at 250 Bishopsgate, London, EC2M 4AA, United Kingdom.  During the Class Period, NatWest traded European Government Bonds directly with investors in the United States and distributed European Government Bonds into the United States.  NatWest served as a European Government Bond primary dealer during the Class Period.

32.     NatWest organizes its activities and those of its subsidiaries "on a divisional basis" according to function.  It conducts fixed income sales and trading, including European Government Bond sales and trading, through its "Markets" division organized under its "Global Banking and Markets" business.  NatWest's subsidiaries that undertake activities within the Markets division do so as part of a "unified service" for NatWest's corporate and institutional clients, which include pension funds and other institutional investors

33.     Defendant NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.) ("NatWest Securities") is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut.  During the Class Period, NatWest Securities sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States.

34.     European Government Bond traders at NatWest, also operating within the RBS Global Banking & Markets division, acquired European Government Bonds, distributed European Government Bonds into the United States through related-party transactions with

NatWest Securities, and determined prices for European Government Bond transactions booked by NatWest Securities with customers located in the United States.

35.     NatWest and NatWest Securities conduct business in this District through their subsidiaries and affiliates as agents.

36.     NatWest and NatWest Securities are collectively referred to as "RBS."

37.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendants' parents and wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

38.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

39.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

40.     John Does 1-50 are various entities and individuals unknown to Plaintiff at this time who participated as co-conspirators in the acts complained of, and who performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged in this Complaint.  Among the John Does are the still-to-be identified banks that received the Commission's Statement of Objections.  They are referred to as "co-conspirators."

## FACTUAL BACKGROUND

**A.     The European Monetary Union and European Government Bonds**

41.     Government entities issue debt in the form of bonds, which are typically used to fund ongoing and future operations.  Debt that governments issue is called "sovereign debt."

42.     Examples of European Government Bonds include French OATs (Obligations Assimilables du Trésor) (treasuries), Italian BOTs (Buoni Ordinari del Tesoro) (treasuries), Spanish Bonos (bonds) and Obligaciones del Tesoro (treasuries), and German Bunds (bonds).

43.     European Government Bonds are treated as a single class of debt securities due to Eurozone members' common monetary policy, common currency, common membership criteria, near-perfectly integrated financial market, high degree of economic interdependence, common governance with respect to financial regulation, common central bank, high degree of common systemic risk, and implicit backing in default.  For the same reasons, European Government Bond dealers generally organize their trading and sales businesses so that the same traders are responsible for determining pricing for European Government Bonds issued by different Eurozone members.

44.     The Eurozone is a monetary union comprised of a group of European nations that coordinate economic, fiscal, and monetary policy through a central bank, the European Central Bank, and use a common currency, the euro.

45.     Following the signing of the Maastricht Treaty in 1992, the original 11 members of the Eurozone adopted the euro in 1999.[5]  Greece joined the Eurozone in 2001, followed by Slovenia in 2007, Cyprus and Malta in 2008, Slovakia in 2009, and Estonia in 2011.  Because of the advantages that economic integration offers for Eurozone members – including greater

---

[5]     The original Eurozone members were Germany, the Netherlands, Ireland, France, Austria, Belgium, Finland, Portugal, Italy, Spain, and Luxembourg.

overall market size, improved efficiency, and higher growth – debt instruments issued by Eurozone members are attractive to investors.

46.     Following each country's adoption of the euro, the historical currencies of such countries were removed from circulation and all previously issued bonds redenominated into euros.

47.     Eurozone members developed a set of criteria known as the "Euro convergence criteria" that all prospective members must meet before joining the Eurozone.   The "Euro convergence criteria" ensure that new members meet Eurozone standards and further the goal of creating an integrated financial market.   All new Eurozone members must establish that they have a comparable: (a) degree of inflation; (b) ratio of government budget deficit to gross domestic product; (c) ratio of outstanding government debt to gross domestic product; and (d) long-term interest rates to existing Eurozone members prior to joining the Eurozone.

48.     To achieve economic integration, Eurozone members created several centralized bodies to create and implement monetary policy.   For example, the European Council is responsible for deciding on the main policy orientations for the Eurozone, while the European Central Bank is responsible for implementing monetary policy.   Through these centralized bodies, Eurozone members also agree to deficit and debt limits that apply to all Eurozone members.

49.     Eurozone members created the European Central Bank with the mission "to safeguard liquidity and promote European financial integration."   The European Central Bank defined "financial integration" as follows:

> [T]he market for a given set of financial instruments or services [is] fully integrated when all potential market participants in such market (i) are subject to a single set of rules when they decide to deal with those financial instruments or

services, (ii) have equal access to this set of financial instruments or services, and (iii) are treated equally when they operate in the market.[6]

50.     Following their economic integration, the yields on bonds from different Eurozone sovereigns began to converge closer together and the market began pricing them as closer substitutes.

51.     By March 2007, the European Central Bank reported that the European Government Bond market was "highly integrated."  It concluded that "yields in the government bond [*i.e.*, European Government Bonds] market . . . are increasingly driven by common factors."[7]  The European Central Bank also concluded that the introduction of the euro and the adoption of a common monetary policy for Eurozone members, among other factors, had caused yields offered by European Government Bonds from the different Eurozone members to "converge[] towards 1, the level of perfect integration."

52.     Global holdings of European Government Bonds were approximately $8 trillion (€6.3 trillion) as of 2012.  The United States is a prominent market for European Government Bonds, with hundreds of billions of dollars in trading volume annually.  Figure 3 below shows the market value of U.S. residents' holdings of European Government Bonds in each year of the Class Period, as well as the yearly estimated annual European Government Bonds trading volume in the United States.

---

[6]     European Central Bank, *The process of European financial integration: where do we stand?* (Jan. 13, 2006), https://www.ecb.europa.eu/press/key/date/2006/html/sp060113.en.html.

[7]     European Central Bank, *Financial Integration in Europe*, at 13 (March 2007), https://www.ecb.europa.eu/pub/pdf/fie/financialintegrationineurope200703en.pdf?1470741bc6dcc84cb69ab158c75f5a7e.

**Figure 3 – The United States European Government Bonds Market**

|  | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|---|---|
| **Market value of EGB holdings (in millions of dollars)** | 122,020 | 91,804 | 97,324 | 96,023 | 104,988 | 163,375 |
| **Annual EGB turnover volume (in millions of dollars)** | 314,492 | 227,533 | 211,394 | 204,183 | 221,975 | 339,414 |

**B.      European Government Bond Primary Market**

53.      European Government Bonds are typically sold in auctions sponsored by central governments' ministries of finance.  Although far less common, European Government Bond offerings can also be made through syndication, in which a group of banks underwrites and conducts the initial sales of European Government Bonds.  Collectively, European Government Bond auctions and syndications are referred to as the "Issuance Process."

54.      The initial placement of European Government Bonds after issuance is known as the "primary market."  The Issuance Process is designed to encourage active, competitive, and non-collusive participation in the auctions.

55.      To ensure active participation in the Issuance Process, European central governments typically select a relatively small group of banks to serve as "primary dealers." These primary dealers control a significant amount of European Government Bonds issued in auctions.  For example, the EPDA reported that its members collectively purchased between 80% to more than 90% of European Government Bonds issued in auctions during the Class Period.

56.      Often, the same banks act as primary dealers for multiple central governments' European Government Bonds.  For example, Germany, France, Italy, and Spain – the four largest Eurozone economies – each have shared (and continue to share) the following primary dealers: Barclays, BNP Paribas, Citigroup, Crédit Agricole CIB, Credit Suisse, Deutsche Bank, Goldman

Sachs, JPMorgan, HSBC, Morgan Stanley, Nomura, RBS, and Société Générale.   Bank of America is also a primary dealer in Germany, France, and Italy.[8]

57.     Even smaller Eurozone economies have shared (and continue to share) many of these same primary dealers, including:

(a)     ***Austria***: Barclays, BNP Paribas, Crédit Agricole CIB, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, MLI, Morgan Stanley, Nomura, RBS, and Société Générale;

(b)     ***Greece***: Bank of America, Barclays, BNP Paribas, Citigroup, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Société Générale;

(c)     ***Ireland***: Bank of America, Barclays, BNP Paribas, Citigroup, Crédit Agricole CIB, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Société Générale; and

(d)     ***Portugal***: Barclays, BNP Paribas, Citigroup, Crédit Agricole CIB, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS, and Société Générale.

58.     Figure 4 below depicts the banks that served as primary dealers in European Government Bonds in each Eurozone country.

---

[8]     Germany utilizes a set of bidding banks and institutions known as the "Bund Issues Auction Group," which resembles a set of primary dealers, but members have no obligation to bid at each auction and do not meet regularly with the country's debt management office.  These entities are referred to as "primary dealers" herein.

### Figure 4 – European Government Bonds Primary Dealers[9]

| | AT | BE | DE | FI | FR | GR | IE | IT | NL | PT | SK | SN | SP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Banca IMI** | | | X | | | X | | X | | | | | |
| **Bank of America** | X | | X | X | X | X | X | X | | | | | |
| **Barclays** | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **BBVA** | | | X | | | | | | | | | | X |
| **BNPP** | X | X | X | X | X | X | X | X | X | X | | X | X |
| **Citigroup** | X | X | X | X | X | X | X | X | X | X | X | | X |
| **Commerzbank** | X | | X | | X | | | X | X | | | X | X |
| **Crédit Agricole** | X | X | X | X | | | X | X | | X | | X | X |
| **Credit Suisse** | X | | X | X | | | | X | | X | | | X |
| **Deutsche Bank** | X | X | X | X | X | | | X | X | X | | X | X |
| **Goldman Sachs** | X | X | X | | X | X | X | X | | X | | X | X |
| **HSBC** | X | X | X | X | X | X | X | X | X | X | X | X | X |
| **ING** | | X | X | | | X | X | X | X | X | | X | |
| **Jefferies** | X | | X | | | | | | X | X | | X | |
| **JP Morgan** | X | X | X | X | X | X | X | X | | | | X | X |
| **Morgan Stanley** | X | X | X | X | X | X | | X | | X | X | | |
| **Natixis** | | | X | | X | | | | X | | | | X |
| **Nomura** | X | X | X | | X | X | X | X | X | X | | | X |
| **RBC** | | X | X | | X | | | | X | | | | X |
| **RBS/NatWest** | X | X | X | X | X | X | X | X | | X | | | X |
| **Santander** | X | X | X | | X | | | | X | X | | | X |
| **Scotiabank** | | | X | | X | | | | | | | | |
| **Société Générale** | X | X | X | X | X | X | X | X | | X | | X | X |
| **UBS** | X | X | X | | X | X | X | X | | | | | |
| **UniCredit** | | | X | | | X | | X | | X | X | X | |

59.     Typically, banks are selected as primary dealers based on the following criteria:

(a)     experience in trading sovereign debt and long-term commitment to participating in the sovereign debt market;

(b)     ability to make markets for investors in the post-auction or "secondary market";

(c)     financial strength, which includes credit rating, capitalization, and appetite for risk; and

---

9       Legend:  Austria (AT), Belgium (BE), Germany (DE), Finland (FI), France (FR), Greece (GR), Ireland (IE), Italy (IT), The Netherlands (NL), Portugal (PT), Slovakia (SK), Slovenia (SN), Spain (SP).

(d)      general ability to promote an active trading market for a country's European Government Bonds.

60.      Primary dealers are generally required to bid a certain minimum percentage of the full offering at each auction.  The minimum bid requirement is usually determined as the ratio of the total number of primary dealers to the full offering (*e.g.*, if there are 10 primary dealers, each must bid at least 10% (1/10) of the total offering).  This requirement ensures that the issuing country will be able to sell the full amount of European Government Bonds being auctioned.  It also ensures that primary dealers receive a continuous supply of identical, newly issued European Government Bonds to trade with investors.

61.      In exchange for serving as primary dealers, the banks obtain non-public information from the European Government Bond issuer they serve, including information concerning, among other things, the issuances themselves and the borrowing needs of the central governments.   European Government Bond issuers also give primary dealers preferential treatment for other kinds of business, such as syndications.

62.      The primary dealers also provide information to European Government Bond issuer central governments.  Primary dealers often possess a wealth of information about client demand and order flows from their role as market makers and information aggregators.  For example, prior to the Issuance Process, primary dealers often take orders from investors to acquire European Government Bonds at the auction.  By acquiring information about customer demand, primary dealers are able to judge interest in the auction and, in turn, the likely trading activity for auctioned debt securities in the secondary market.  Given the wealth of information primary dealers acquire through their clients, Eurozone countries rely heavily on primary

dealers' knowledge of investor appetite to better understand what type of European Government Bond offering will attract the most interest during the auction and in the secondary market.

### C. Trading in the European Government Bond Secondary Market

63.     Investors do not participate directly in the Issuance Process, which occurs in the primary market.  Instead, after the Issuance Process, European Government Bonds are traded among bond dealers and investors – including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments – in the over-the-counter ("OTC") secondary market.  As discussed above, there is an active secondary market for European Government Bonds in the United States.

64.     Defendants and their co-conspirators dominate the secondary market, acting as "market-makers" that provide liquidity to investors by standing ready to buy and sell European Government Bonds whenever an investor seeks to do so.

65.     In fact, European Government Bond issuers often require that primary dealers actively quote new European Government Bond issues to retain their primary dealer status.  The governments also monitor the performance of the primary dealers in terms of the volumes they trade and quote in the secondary market.  For example, France and Italy rank the performance of their primary dealers in the secondary market in part based on the volume of trades made.

66.     Some central governments also require primary dealers to provide minimum activity in the secondary market or risk losing their status.

67.     Customers seeking to buy or sell European Government Bonds typically contact one or more banks, such as Bank of America and RBS, or another primary dealer and request pricing for a particular European Government Bond.  The bank will quote the price for a European Government Bond in terms of a "bid" price and an "ask" price, which are usually set in terms of basis points (one basis point equals 1/100 of one percent).  The bid price represents the

price at which a dealer will purchase the European Government Bond; the ask price represents the price at which a dealer will sell the European Government Bond. The difference between these two values is the "bid-ask spread" (or "spread"), which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to buy or sell the European Government Bond in the future at equal or better prices than it is quoting at the time to its customer.

68.     As is typical in many OTC markets, trading of European Government Bonds is done through telephonic and, increasingly, electronic means. Orders are taken by salespersons at dealers and then relayed to bond traders at the banks' trading desks so that they can be filled.

69.     Rational investors want to buy low and sell high. In a competitive market, banks would compete for clients based on the bid and ask prices they offer, and, in turn, the spread between them. The narrower the bid-ask spread, the more competitive the price. A bank can gain business by offering narrower bid-ask spreads than its competitors. Conversely, if a bank maintains wider bid-ask spreads – by either lowering the bid price or raising the ask price – it would likely lose business to rivals offering narrower spreads. Only through collusion among banks can a dealer quote a wider spread than market conditions otherwise dictate without losing market share and profits.

### D.     Interdealer Trading

70.     Primary dealers also trade European Government Bonds with each other in "interdealer" transactions. Interdealer transactions occur in what is known as the "interdealer market." Primary dealers use the interdealer market to hedge risks arising from transactions with clients. For example, a primary dealer who makes a large purchase of European Government Bonds from a client would hedge the risk arising from the purchase by selling to other European

Government Bond primary dealers.  The hedge trade in the interdealer market brings the primary dealer back to a flat position.

71.    The overall structure of the European Government Bond market is illustrated below.

**Figure 5 – The European Government Bond Market Structure**



**E.    Structure of Defendants' European Government Bond Businesses**

72.    Defendants' European Government Bond trading and sales personnel are housed within each bank's respective fixed income division.  An entity within this division serves as a primary dealer for European Government Bonds issued by multiple Eurozone countries.  Traders employed at the primary dealer entity are also responsible for determining pricing for European Government Bond trades with investors.  Defendants NatWest and BAML International performed this function on behalf of their respective banks during the Class Period.

73.    The primary dealer entity acquires European Government Bonds from issuers through that issuer's Issuance Process.  The traders who undertake primary dealing

responsibilities are typically located in the same office, primarily in London and less often, Paris. When primary dealers acquire European Government Bonds, they place them into inventory and distribute them, as needed to fill customer orders, through the bank's sales and trading network to trading hubs located in major financial centers, including in the United States. Sales personnel at these trading hubs are responsible for interacting with investors, managing client relationships, and processing customer European Government Bond orders from trading desks. NatWest Securities and BANA performed this function in the United States during the Class Period.

74. For example, when a U.S. salesperson sells a European Government Bond to a customer, the primary dealer entity executes an internal transaction to send the European Government Bond to the bank's U.S. trading desk, which then delivers the bond to the customer. Through these internal transactions, the primary dealer entities distribute European Government Bonds into the United States through their respective U.S. desks to U.S. investors.

**F.     Pricing of European Government Bonds**

75. As with other bonds, the prices of European Government Bonds incorporate the bond's par value, coupon, maturity date, and yield. A bond's par value is its face value, payable on the bond's maturity date. A bond's coupon is the interest rate that the bond issuer must pay an investor. Coupons are paid to the bond-holder periodically – usually every six months, although that can vary – until the bond reaches maturity. Yield is a figure that shows the return that an investor receives by holding the bond to maturity.

76. Bond prices can be quoted as a function of the bond's par value or its yield. A bond with a par value of €1,000 may sell at a discount of 2% or €980. A dealer selling this bond would provide its customer a quote of "98." A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

77.    A bond's price can also be quoted in terms of its yield. Bond price and yield have an inverse relationship: lowering one will result in a rise in the other, as demonstrated by the chart below:

**Figure 6 – Relationship Between Bond Price and Yield**



78.    This inverse relationship is due to the fact that a bond's price will be higher when it pays interest that is higher than prevailing interest rates.  As market interest rates increase, bond prices decrease.  Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons and prices.

## DEFENDANTS CONSPIRED TO FIX THE PRICES
## OF EUROPEAN GOVERNMENT BONDS

79.    Defendants and their co-conspirators are among the primary dealers and the world's largest traders of European Government Bonds in both the primary and secondary markets.

80.    In a competitive market, Defendants and their co-conspirators would compete with each other for customers seeking to buy and sell European Government Bonds and would compete to acquire bonds during the Issuance Process.

81.     However, rather than compete with each other, the conspiring banks, including Bank of America and RBS, entered into an unlawful agreement to fix the bid-ask spreads for European Government Bonds that they buy from and sell to investors.

82.     Absent an agreement to fix bid and ask prices, no one bank could afford to widen its bid-ask spread unilaterally.  To do so would result in that bank losing substantial trading business to competitors offering more competitive pricing.

83.     According to the Commission, European Government Bond traders "exchanged commercially sensitive information and coordinated on trading strategies.  These conversations took place mainly – but not exclusively – through online chatrooms."[10]

84.     As was the case in other financial market cartels described below, in these communications, Defendants' and their co-conspirators' traders exchanged confidential information about their customers' identities and orders (including, among other things, size, direction, and price).  The exchange of this sensitive customer information enabled the conspiring traders to coordinate the bid and ask prices and inflate the spreads associated with the prices they offered to their respective customers.

85.     European Government Bond traders communicated with each other frequently.  The repetitious nature of Defendants' and their co-conspirators' traders' chatroom discussions enabled them to coordinate on pricing and effectively police their conspiracy.  A conspiring bank's trader who failed to adhere to agreed-upon pricing could quickly be identified when attempting to hedge in the interdealer market and be brought back into line by other traders in the chatroom.  Accordingly, the European Government Bond traders had little incentive to cheat on their agreement.

---

[10]     European Commission, Press Release, *Antitrust: Commission sends Statement of Objections in European government bonds cartel* (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

86. Given Defendants' and their co-conspirators' collective power in the European Government Bonds primary and secondary markets, their fixing of European Government Bond prices left their customers little choice but to accept non-competitive prices for their European Government Bonds transactions.

### A. The European Commission Preliminarily Found that Eight Banks Colluded in the European Government Bond Market

87. On January 31, 2019, the Commission announced that it sent a Statement of Objections informing eight banks of its preliminary view that they violated European Union antitrust rules by colluding "in periods from 2007 to 2012, to distort competition when acquiring and trading European government bonds" by exchanging "commercially sensitive information and coordinat[ing] on trading strategies" primarily in online chatrooms.[11]  The Commission also announced that the behavior it identified "would violate the EU rules that prohibit anticompetitive business practices such as collusion on prices (Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA Agreement)."

88. The press release did not name any of the banks that received a Statement of Objections, but according to news reports, Bank of America and RBS were two of the eight banks.[12]

89. According to the Commission, a Statement of Objections is issued once fact-finding is complete to "inform[s] the parties concerned in writing of the objections raised against

---

[11] European Commission, Press Release, *Antitrust: Commission sends Statement of Objections in European government bonds cartel* (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[12] *See* AFP, *EU accuses 8 banks of forming eurozone bond cartel* (Jan. 31, 2019), http://a.msn.com/01/en-us/BBT0lH0?ocid=st; Stefania Spezzati, *RBS Among Eight Banks in Euro Bond Cartel Probe*, Bloomberg (Feb. 14, 2019), https://www.bloomberg.com/news/articles/2019-02-14/rbs-said-to-be-among-eight-banks-in-euro-bond-cartel-probe.

them."[13]   Further, the Commission prepares the Statement of Objections "in view of the nature and structure of the final decision that might be adopted."[14]

90.     To investigate a potential action, the Commission's investigative powers allow it to: (a) send information requests to companies believed to have engaged in anticompetitive conduct; (b) conduct on-site inspections of a company's premises; (c) examine a company's business records; (d) remove copies of those records from the premises; and (e) ask members of staff or company representatives questions relating to the subject-matter and purpose of the inspection and record the answers.[15]

91.     The Commission's investigation process is outlined in Figure 7, below.

**Figure 7 – European Commision's Case Investigation Process**



---

[13]     European Commission, Press Release, *Antitrust: Commission sends Statement of Objections in European government bonds cartel* (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[14]     *Antitrust Manual of Procedures, Internal DG Competition working documents on procedures for the application of Articles 101 and 102*, at 4, EUROPEAN COMMISSION (Mar. 2012), htpp://ec.europa.eu/competition/antitrust/antitrust_manproc_3_2012_en.pdf.

[15]     *Statements of Objections in Article 102 Investigations*, INITIATIVE FOR COMPETITIVE ONLINE MARKETPLACE (Apr. 2015), http://i-comp.org/wp-content/uploads/2015/04/Significance-of-an-SO.pdf.

92.     If the Commission confirms the European Government Bond violation, the target banks could be subject to fines equal to 10% of the banks' global revenues.

**B.     Defendants Failed to Adequately Supervise Their Trading and Sales Businesses During the Class Period**

93.     The Commission's announcement marks the fifth time that Defendants, their co-conspirators, and affiliated entities within the same bond trading and sales divisions have been investigated for engaging in anticompetitive conduct in bond markets in recent years.   The European Government Bond market has key features in common with these other bond markets in which Defendants and their co-conspirators have engaged in similar anticompetitive conduct. These features include a lack of price transparency and a high degree of concentration by the largest dealers.  In 2017, the United Kingdom Financial Conduct Authority ("FCA") opened an investigation of several large dealers for manipulating Sovereign, Supranational and Agency ("SSA") bonds.  Also in 2017, Mexico's competition regulator announced a probe into the seven largest dealers in the Mexican government bond market.  The Department of Justice ("DOJ") Antitrust Division is presently investigating price fixing by dealers in both the U.S. Treasuries market and the market for bonds issued by Fannie Mae and Freddie Mac.

94.     Defendants and their co-conspirators engaged in multiple similar price-fixing conspiracies in various financial markets during the Class Period that led government investigators to find parallel deficiencies in oversight and control within Defendants' and their co-conspirators' trading and sales businesses.   These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

95.     These findings further support the conspiracy alleged in this Complaint because they demonstrate that Defendants and their co-conspirators used deficient compliance and oversight systems in their sales and trading businesses during the Class Period.

96.     FX:  Multiple banks, including Defendants RBS and Bank of America, failed to control or detect rampant misconduct amongst their trading staff in the FX market.  These failures allowed traders to fix bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices, and share confidential customer order information and proprietary information on trading positions with competitors in group chat rooms with names like "The Cartel."  Defendants' deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years during the Class Period.  The DOJ's Antitrust Division has obtained a guilty plea against RBS for failing to adequately monitor anticompetitive conduct in its subsidiaries' trading businesses, and for operating inadequate oversight measures that allowed trading and sales staff to engage in a years'-long conspiracy to fix FX prices during the Class Period.  RBS's parent company paid fines related to its FX trading to the Board of Governors of the Federal Reserve System ("Federal Reserve"), FCA, and U.S. Commodity Futures Trading Commission ("CFTC").  Bank of America's parent company also paid fines related to its FX trading to the Federal Reserve and the Office of the Comptroller of the Currency.

97.     LIBOR/Euribor/Yen LIBOR/Swiss franc LIBOR: Government investigations and civil lawsuits revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR) during the Class Period.  These investigations have led to dozens of fines and settlements for price-fixing by Bank of America Corporation (the parent of Defendants BANA and BAML International) and the corporate parent of RBS.  Regulators found that trading staff within these

banks engaged in widespread misconduct during the Class Period, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

98.     ISDAfix:  The CFTC issued Orders Instituting Proceedings Pursuant to Section 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposition Remedial Sanctions with Bank of America, N.A. and The Royal Bank of Scotland plc for operating deficient compliance and oversight functions that allowed traders to systematically manipulate the U.S. dollar ISDAfix benchmark during the Class Period to boost trading profits.

99.     SSA Bonds:  A DOJ investigation into price-fixing in the SSA bond market became public in December 2015.  It quickly prompted simultaneous cartel investigations by the FCA.  The Commission, and the filing of private lawsuits.  The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks (originally filed against five) and hundreds of redacted chats and transcripts that demonstrated that these banks failed to oversee collusive communications by trading and sales staff in their bond businesses.  In August 2017, Deutsche Bank AG and Bank of America Corp. agreed to settle for a total of $65.5 million.

100.     Mexican Government Bonds:  The Mexican antitrust regulator, the Comisión Federal de Competencia Económica, announced in April 2017 that it uncovered evidence of anticompetitive conduct among dealers in the Mexican Government Bond market, including subsidiaries of Bank of America Corp.  At least one bank was accepted into its cartel leniency program after admitting to participation in a conspiracy to fix Mexican Government Bond prices.

101.     Swiss Franc Interest Rate Derivatives:  The Commission fined four banks a total of €32.4 million euros, and RBS's parent company received leniency for its fine of around

€5 million, for conspiring to fix bid-ask spreads in the market for interest rate derivatives denominated in Swiss francs. The Swiss franc interest rate derivatives conspiracy operated similarly to the conspiracy alleged in this Complaint and involved an agreement among horizontal competitors in the OTC market for derivatives to charge inflated bid-ask spreads to customers. RBS failed to detect and deter collusive communications among traders at these banks.

## THE EUROPEAN GOVERNMENT BOND MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A EUROPEAN GOVERNMENT BOND CARTEL

102.    Many features of the European Government Bond market support the inference of concerted action by Defendants to fix, raise, maintain, stabilize, or manipulate the prices of European Government Bonds.

103.    *First*, the European Government Bond market is highly concentrated. Defendants and their co-conspirators wield enormous power in the European Government Bond market because most European Government Bonds are bought in the auction process by a small number of dealers. The 20 members of the EPDA purchase between 80% to more than 90% of bonds issued in European Government Bond auctions.

104.    With power concentrated in the hands of a small number of dealers, the conspiring banks were able to form and maintain a cartel. Defendants' and their co-conspirators' dominance of the primary market concentrates new European Government Bond supply, which allows Defendants and their co-conspirators to control the secondary market.

105.    *Second*, the European Government Bond market has high barriers to entry. Other entities cannot easily enter the primary dealer market because serving as a primary dealer for European Government Bonds is capital-intensive – requiring dealers to bid at auctions and hold European Government Bonds until they are sold to investors. A dealer must have a large balance

sheet and sufficient capital reserves to absorb new European Government Bond inventory as it becomes available for purchase by investors. This is significant because banks are required to maintain minimum capital ratios to ensure solvency in case any of the bank's assets suffer a devaluation, and therefore are selective about where they deploy capital.

106. The Bank for International Settlements, a policy and research organization owned by 60 of the world's leading central banks, explained that barriers to entry for prospective dealers in OTC markets like the European Government Bond market include:

> a sufficiently large client base to get a good view of the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets, including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities.[16]

107. *Third*, the European Government Bond market is highly opaque. During the Class Period, Defendants successfully defeated transparency measures in the European Government Bond market through their trade association, the EPDA. As a result, European Government Bond transactions between dealers and investors were not publicly reported and investors lacked access to real-time pricing data. This further limited Plaintiff's and the Class's ability to search for superior, non-cartel prices and enhanced the efficacy of Defendants' conspiracy.

108. Without access to reliable pricing information, investors like Plaintiff were forced to turn to Defendants when transacting in European Government Bonds and rely on the Defendants to provide competitive European Government Bond pricing. The EPDA noted during the Class Period that, in trades between European Government Bond primary dealers and customers, trade information is "only available to direct counterparties to the trade."

---

[16]     BIS Quarterly Review, *International banking and financial market developments*, at 99 (March 2015).

109.    Transparency enables investors to identify dealers that offer superior prices, allowing them to seek out those dealers.  Thus, transparency helps the most competitive dealers attract market share.  However, price transparency would have been a risk to Defendants' and their co-conspirators' cartel because it would have allowed investors to see prices other European Government Bond dealers charged.  Keeping the status quo enabled Defendants and their co-conspirators to continue dictating anti-competitive prices to uninformed investors handicapped by an inability to observe prices for European Government Bond transactions.

110.    Defendants and their co-conspirators banded together to advocate against transparency in the European Government Bond market during the Class Period.  For example, in 2008, the EPDA rallied against a proposal by the Italian Treasury that would have made trading prices between Defendants and their customers for Italian European Government Bonds accessible to investors.

111.    Similarly, the Commission considered new transparency measures in 2007 that would have disclosed pricing to European Government Bond customers.  Again, Defendants and their co-conspirators opposed these measures.

112.    ***Fourth***, artificially widening bid-ask spreads would be contrary to any single primary dealer's economic self-interest.  If a conspiring bank unilaterally widened its bid-ask spread to customers and maintained that spread over time, while others failed to do similarly, few customers would continue trading with that bank.  This, in turn, would jeopardize a conspiring bank's privileged status as a primary dealer with Eurozone central banks.  Consistently failing to keep competitive spreads or make markets for customers could potentially lead to a bank's removal as a primary dealer.  If a bank loses its primary dealer status, it would no longer have privileged access to information from Eurozone central banks and would no

longer be considered for lucrative syndications.  This will, in turn, make that conspiring bank's services less attractive to European Government Bond customers.

113.    Similarly, the sharing of customer order information would be perilous absent an agreement among competitors.  Customers expect banks to maintain the confidentiality of their order information.  If a customer were to find out that its information was being shared with another bank, the customer would view it as a breach of trust, and would refrain from placing orders with that bank in the future.

114.    ***Fifth***, Defendants and their co-conspirators had common motives to conspire. Defendants' and their co-conspirators' individual trading and sales staff are compensated primarily based on their ability to generate profits from dealing European Government Bonds with investors.  Upwards of 50% of total compensation for sales and trading staff within Defendants' and their co-conspirators' European Government Bond trading and sales businesses is determined according to the amount of profits/losses generated, both collectively (*i.e.*, based on the profitability of the European Government Bond trading and sales business as a whole) and individually (*i.e.*, based on the profit derived from the European Government Bond transactions entered into by the individual).  Promotions are similarly determined according to the amount of profits/losses derived from European Government Bond transactions.

115.    ***Sixth***, sharing proprietary trading information is an act against any bank's self interest in the absence of a conspiracy.  Defendants directly acknowledged that sharing trading and pricing information would have been dangerous in the hands of true competitors during the Class Period because it would allow rival dealers to "trade ahead" of the dealer in the dealer to dealer market.  "Trading ahead" occurs where a dealer learns that another market participant will execute a trade ahead of time, and then establishes a position that will benefit from the

anticipated trade.  This causes the market price to move against the other market participant, benefitting the dealer who engaged in "trading ahead."  The EPDA wrote the following in one of its position papers during the Class Period:

> [T]he dealer (and indeed its customer) will be very concerned about other market participants being able to react ahead of the dealer trying to liquidate its position which it may have obtained in a transaction with a customer.  A dealer concerned about this situation will either not provide liquidity or widen his quote in order to compensate for the increased risk.  Either will lead to further decrease in liquidity.[17]

116.    Defendants would not have engaged in such conduct absent a conspiracy because sharing this information with a true competitor would risk losing market share to competitors and incurring losses when hedging risk.

117.    **Seventh**, there was a high level of communications among Defendants and their co-conspirators.  Traders' use of online chatrooms to exchange confidential customer order information is unnecessary for the purposes of making markets.  Its only function is to encourage collusion among competing traders.

118.    Defendants also failed to monitor these trader communications.  These oversight failures allowed employees in Defendants' European Government Bond trading and sales businesses to fix prices, share sensitive customer information, and coordinate trading strategies throughout the Class Period.

119.    **Eighth**, Defendants and their co-conspirators had the opportunity to collude through their involvement in industry trade associations, such as the AFME and EDPA.

120.    Within the AFME is the primary dealers board (the "Board"), which "addresses developments affecting the European government market specifically and aims to build consensus within the industry and acts as a bridge between financial market participants and

---

[17]    SIFMA/EPDA/EHYA/LIBYA/ASSOSSIM, *Response to CESR May 2007 Consultation Paper on Non-Equity, Markets Transparency*, at 4 (June 8, 2007).

policymakers."   Part of the Board's priorities is to "[a]ctively participate in industry events which focus on rates issues."[18]  Defendants and their co-conspirators had ample opportunities to discuss issues affecting the European Government Bond market, including matters affecting the primary and secondary markets for these products.

121.    Defendants and their co-conspirators were also members of the EPDA.  European Government Bond primary dealers founded the EPDA to "advocate on behalf of eurozone government bond primary dealers with relevant government and regulatory bodies through dialogue and market best-practices recommendations."   The EPDA was responsible for setting industry standards applicable to Defendants' European Government Bond trading and sales businesses.

122.    High-ranking European Government Bond sales and trading personnel employed by Defendants and their co-conspirators regularly met in person at conferences, meetings, and other events hosted by the EPDA.  These meetings provided another forum for Defendants' European Government Bond trading and sales personnel to establish closer relationships while discussing sensitive subjects such as European Government Bond pricing.  For example, the EPDA held annual conferences beginning in 2006 at locations throughout Europe.  These conferences were attended by European Government Bond trading and sales personnel from Defendants.

**DEFENDANTS' UNLAWFUL CONDUCT INJURED PLAINTIFF AND THE CLASS**

123.    Plaintiff and members of the Class purchased and sold tens, if not hundreds of billions of dollars' worth of European Government Bonds directly from Defendants in the United States.   Defendants' and their co-conspirators' unlawful price manipulation of European

---

[18]        AFME, *Primary Dealers*, https://www.afme.eu/en/divisions-and-committees/primary-deals-rates/.

Government Bonds deprived Plaintiff and members of the Class of a competitive and transparent marketplace free from collusion.

124.    Defendants and their co-conspirators have also harmed investors by artificially inflating the cost of their European Government Bond transactions – either by inflating the bid price or depressing the ask price.  In doing so, Defendants and their co-conspirators were able to extract supracompetitive profits from their dealings with Plaintiff and the Class.   Absent Defendants' and their co-conspirators conspiracy, Plaintiff and the Class would have paid less money for their European Government Bond purchases and would have received more money for their European Government Bond sales.

125.    Accordingly, Defendants' and their co-conspirators' anticompetitive conduct has injured investors in the United States, including Plaintiff and members of the Class in their business or property.

## CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who purchased or sold European Government Bonds in the United States directly from Defendants from at least as early as January 1, 2007 through at least December 31, 2012 (the "Class Period").

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

127.    Plaintiff believes that there are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class members is impracticable.

128.   There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)   whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for European Government Bonds in violation of the Sherman Act;

(b)   the identity of the participants in the conspiracy;

(c)   the duration of the conspiracy;

(d)   the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(e)   whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)   whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the Class; and

(g)   the appropriate measure of damages sustained by Plaintiff and the Class.

129.   Plaintiff's claims are typical of the claims of the other Class members.  Plaintiff and Class members sustained damages arising out of Defendants' and their co-conspirators' common course of conduct in violation of the law as described in this Complaint.  The injuries and damages of each Class member were directly caused by Defendants' and their co-conspirators' wrongful conduct.

130.   Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of

absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

131.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

132.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

133.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail.  The Class is readily definable and is one for which records should exist in the files of Defendants, Class members, or the public record.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including antitrust claims. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT

134.    Defendants and their co-conspirators concealed their wrongdoing in manipulating the prices of European Government Bonds sold to investors.  Thus, the statutes of limitations relating to the claims for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

135.   Defendants' and their co-conspirators' success in concealing their collusion was facilitated by their tremendous control over the market for European Government Bonds.

136.   Neither Plaintiff nor Class members knew of Defendants' and their co-conspirators' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, prior to the Commission's announcement that it sent eight banks a Statement of Objections concerning collusion in the European Government Bond market.  To date, the Commission has not publicly revealed the identities of the offending banks.  Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.  In fact, Defendants' collusive activities were so well-hidden that regulators in Europe and elsewhere were unaware of such conduct for years.

137.   Only after recent public reports disclosed the Commission's Statement of Objections concerning the European Government Bond market did Plaintiff have a sufficient basis to investigate Defendants' possible collusion in the European Government Bond market.

138.   Reasonable due diligence could not have uncovered the conspiracy because: (a) Defendants' trading positions and trading strategies in the European Government Bond market are not publicly available; (b) the bilateral, non-exchange traded nature of European Government Bond transactions make observing anticompetitive behavior in that market exceedingly difficult; (c) the highly specialized and esoteric nature of the different aspects of the European Government Bond market makes it exceedingly difficult for an ordinary person to assess improprieties; and (d) neither Bank of America nor RBS nor any of their co-conspirators told Plaintiff or other Class members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of European Government Bonds.

139.    Defendants and their co-conspirators also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, government regulators, and the public by, among other things: (a) holding out their activities in the European Government Bond market as good-faith market-making conduct; (b) maintaining the secrecy of their price-fixing scheme; (c) avoiding any discussion in public fora regarding their collusive activities and manipulation of European Government Bond prices; and (d) using non-public electronic communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies.

140.    In addition, Defendants and their co-conspirators also failed to have the proper internal controls in place to detect misconduct concerning price-fixing of European Government Bonds.  Such internal failures made it all the more difficult for Plaintiff, the Class, government regulators, and the public to become aware of Defendants' and their co-conspirators' misconduct.

141.    As a result of Defendants' and their co-conspirators' affirmative steps to conceal their improper conduct; their willful decisions not to put in place proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about material aspects of the conspiracy, the statutes of limitations were tolled for Plaintiff's claims.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF 15 U.S.C. §1
### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

142.    Plaintiff incorporates the preceding paragraphs by reference.

143.    Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq*.

144.    During the Class Period, Defendants entered into an agreement to fix and manipulate European Government Bond prices sold in the United States and elsewhere.

145.    This conspiracy to manipulate European Government Bond prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive European Government Bond prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

146.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the European Government Bond market.  There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct.  Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

147.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

148.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged in this Complaint.

## **RELIEF REQUESTED**

Accordingly, Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as a class representative, that Plaintiff's counsel be appointed as counsel for the Class, and that the Court direct that reasonable

Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate Section 1 of the Sherman Act;

C.      That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest at the highest legal rate;

D.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

E.      That the Court directs such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  March 22, 2019

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s*/ Christopher M. Burke
CHRISTOPHER M. BURKE (CB-3648)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

DAVID R. SCOTT
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
david.scott@scott-scott.com

DONALD A. BROGGI (DB-9661)
KRISTEN ANDERSON (KA-1965)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
dbroggi@scott-scott.com
kanderson@scott-scott.com

Vincent Briganti
Geoffrey M. Horn
Christian Levis
Roland R. St. Louis, III
Ian W. Sloss
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile:  914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
clevis@lowey.com
rstlouis@lowey.com
isloss@lowey.com

Charles Kopel
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: 215-399-4770
Facsimile:  610-862-9777
ckopel@lowey.com

*Attorneys for Plaintiff Ohio Carpenters' Pension
Fund*