**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | |
| ) | |
| **IN RE EUROPEAN GOVERNMENT BONDS** ) | Lead Case No. 1:19-cv-2601 |
| **ANTITRUST LITIGATION** ) | |
| ) | Hon. Victor Marrero |
| ) | |
| ) | <u>JURY TRIAL DEMANDED</u> |
| ) | |
| ) | |
| ) | |

**<u>SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

Plaintiffs Ohio Carpenters' Pension Fund, Boston Retirement System, and Electrical Workers Pension Fund Local 103 I.B.E.W., on behalf of themselves and all others similarly situated, file this Complaint against Defendants Bank of America, N.A., Bank of America Merrill Lynch International Designated Activity Company (f/k/a Bank of America Merrill Lynch International Limited), Merrill Lynch International (collectively, "Bank of America"); NatWest Markets plc (f/k/a Royal Bank of Scotland plc), NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.) (collectively, "RBS"); Nomura Securities International Inc., Nomura International PLC (collectively, "Nomura"); and UniCredit Bank AG, UniCredit Capital Markets LLC (collectively, "UniCredit"). Plaintiffs' allegations are made on personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters.

## I.      NATURE OF THE ACTION

1.       Plaintiffs' claim arises from Defendants' and their co-conspirators' anticompetitive scheme to fix, raise, maintain, stabilize, or otherwise manipulate the price of Euro-denominated bonds issued by European governments ("European Government Bonds") and sold and purchased throughout the United States from at least as early as January 1, 2007 through at least December 31, 2012 (the "Class Period").

2.       European Government Bonds are sovereign debt issued by European central governments that have adopted the Euro as their official currency, including Austria, Belgium, Finland, France, Germany, Italy, Portugal, Greece, Ireland, the Netherlands, and Spain, among others (collectively, the "Eurozone"). As of 2012, the global holdings of European Government Bonds were around $8 trillion. Major purchasers and holders of European Government Bonds include U.S. institutional investors, mutual funds, hedge funds, pension funds, and insurance companies.

1

3.     Defendants are among the world's largest dealers of European Government Bonds. Defendants compete with each other and other dealers to acquire European Government Bonds in the "primary market" – *i.e.*, the auction process that European governments use to issue new European Government Bonds.  These institutions are known as "primary dealers," and they hold significant power and influence in the European Government Bond market.  Defendants operate as primary dealers with respect to European Government Bonds.

4.     Bond dealers also compete for customers based on the prices they quote for the purchase and sale of European Government Bonds in the post-auction (*i.e.*, secondary) market. The smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) quoted to the customer, the better and more competitive the prices are for customers.

5.     In exchange for the primary dealers' commitment to make markets for European Government Bonds and purchase new European Government Bonds in auctions, European Government Bond issuers grant primary dealers access to non-public information about new European Government Bond issuances, as well as the funding needs of the issuers.  In addition, primary dealers obtain valuable customer order-flow information – *e.g.*, customer identity, order size, and price – in the run-up to the auction, which allows the dealers to gauge investor appetite for the newly-auctioned European Government Bonds that will then trade in the post-auction, secondary market.

6.     European Government Bond issuers rank the primary dealers in terms of their level of participation in the auctions and their ability to provide liquidity in the secondary market. Primary dealers can improve their ranking by obtaining large quantities of European Government Bonds at each auction.  These rankings are important because European Government Bond issuers

reward high-ranking primary dealers with, among other things, lucrative underwriting and derivatives trading business.

7.     Defendants and their co-conspirators collusively bid above the market price for the bonds issued at auction, guaranteeing themselves a dominant share of supply (and thus control over the price) for each newly auctioned European Government Bond.  An analysis of European Government Bond prices at and around the time of the auctions supports the persistent overpricing of bonds at the auctions.  Defendants profited from this misconduct by selling the bonds they purchased in the auction at artificially inflated prices to investors like pension funds, insurance companies, and mutual funds, who routinely bought, sold, and held European Government Bonds.

8.     Defendants' and their co-conspirators' collusive bidding also maintained or increased their rankings among primary dealers, which in turn gave Defendants and their co-conspirators access to more lucrative business from European Government Bond issuers.  In essence, Defendants and their co-conspirators were willing to trade the short-term costs of overbidding in European Government Bond auctions for increased trading profits when they sold those bonds to investors in the secondary market and the chance to reap even larger rewards from highly profitable government contracts.

9.     Economic analysis further shows that Defendants extracted additional, illicit gains, from the European Government Bond market by agreeing to fix the bid-ask spreads they quoted to customers, thereby increasing the prices investors paid for the European Government Bonds or decreasing the prices at which investors sold the bonds.  No primary dealer could widen its bid-ask prices unilaterally without losing trading business to its competitors.  Such action also could jeopardize a primary dealer's ability to secure new underwriting business from European

Government Bond issuers in the future. Thus, Defendants conspired to widen the bid-ask prices – a sort of "safety in numbers" approach (albeit an unlawful one).

10.     Defendants' traders orchestrated and maintained their conspiracy via regular electronic communications, including instant messaging and chatrooms. Through such communications, these traders discussed their respective customers' identities and confidential information about the size and nature of their orders before agreeing to the bids they would place and the prices that they would quote to their customers for European Government Bonds.

11.     After an extensive investigation, European regulators discovered Defendants' misconduct. The investigation resulted in the European Commission ("the Commission") issuing a Statement of Objections in January 2019 to eight banks that "participated in a collusive scheme that aimed at distorting competition when acquiring and trading European government bonds ('EGBs')."[1] The Commission found that "[t]raders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies. These contacts would have taken place mainly – but not exclusively – through online chatrooms."

12.     According to reports and Defendants' own filings, the banks subject to the Statement of Objections include Defendants.[2] A Statement of Objections reflects the Commission's preliminary view that the evidence collected during its investigation shows that the

---

[1]     European Commission, Press Release, "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[2]     Bank of America: *See* Ludovic Marin, *EU accuses 8 banks of forming European Government Bond cartel*, AFP (Jan. 31, 2019), http://a.msn.com/01/en-us/BBT0lH0?ocid=st. RBS: *See* Stephania Spezzati, *RBS Said to Be Among Eight Banks in Euro Bond Cartel Probe*, BLOOMBERG (Feb. 14, 2019), https://www.bloomberg.com/news/articles/2019-02-14/rbs-said-to-be-among-eight-banks-in-euro-bond-cartel-probe. Nomura: *See* Michael Acton & Nicholas Hirst, *Nomura received antitrust charges in EU bond probe (correct*)*, MLEX (May 28, 2019). UniCredit: *See* Gianluca Semeraro & Silvia Aloisi, *Italy's UniCredit says it is among banks accused of running bond cartel*, REUTERS (APR. 11, 2019), https://www.reuters.com/article/us-eu-antitrust-banks-unicredit/italys-unicredit-says-it-is-among-banks-accused-of-running-bond-cartel-idUSKCN1RN0UW.

banks violated competition laws.  If the violation is confirmed, the Commission can levy fines of up to 10% of each bank's global revenue.

13.     Defendants' misconduct injured investors in European Government Bonds. Defendants have inflated the prices at which they sold European Government Bonds to investors and reduced the prices at which they purchased these products from investors, including Plaintiffs and members of the Class (defined below).  Thousands of investors have transacted billions of dollars' worth of European Government Bonds in the United States directly with Defendants. Plaintiffs, on behalf of themselves and all others similarly situated, seek damages as a result of the unlawful conduct, trebled as provided by law.

## II.        JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26).  This Court also has subject matter jurisdiction under 28 U.S.C. §§1331 and 1337(a).

15.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a), 22 and 28 U.S.C. §1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.     Defendants Bank of America Merrill Lynch International Designated Activity Company, Merrill Lynch International, NatWest Markets plc, Nomura International PLC, and UniCredit Bank AG conduct business in this District themselves or through their subsidiaries and affiliates as agents and through branch offices and trading hubs located in this District, as more particularly alleged below.

17.     This Court has personal jurisdiction over each Defendant, as more particularly alleged below, because these Defendants played an integral role in conducting substantial European Government Bond promotion, marketing, trading, and sales in this District and in the United States continuously throughout the Class Period and derived substantial profits from these activities.

18.     As alleged below, a substantial part of the events giving rise to Plaintiffs' claim occurred in this District and the United States.  Defendants and their co-conspirators agreed to fix the prices of European Government Bonds that Defendants distributed into the United States for sale to investors located in this District and throughout the United States.

19.     Defendants, both themselves and acting through their subsidiaries and affiliated entities as agents, purposefully availed themselves of this forum by, *inter alia*: (a) agreeing to widen bid-ask spreads, thereby charging investors increased prices for purchases and paying investors decreased prices for sales of European Government Bonds in this District and throughout the United States; (b) directing European Government Bond sales and trading personnel to solicit investors for billions of dollars' worth of price-fixed European Government Bond transactions in this District and throughout the United States; and (c) collecting unlawful overcharges from investors in this District and throughout the United States.

20.     During the Class Period, the European Primary Dealers Association (the "EPDA") was the premier trade association for European Government Bond primary dealers, comprised of the 20 largest primary dealers.  As of 2012, 25 banks were designated as Association for Financial Markets in Europe ("AFME") Primary Dealer Members.[3]  Only the largest European Government

---

[3]     In 2009, the EPDA merged with the AFME.  Former principal members of the EPDA became known as "AFME Primary Dealer Members."

Bond primary dealers were designated AFME Primary Dealer Members.  Defendants are members of the EPDA and were active participants in this trade association.  As of 2008, the EPDA reported that its members cumulatively traded more than 85% of all volume in the European Government Bonds market.

21.    Most entities that are designated European Government Bond primary dealers are part of a global bank's fixed income trading and sales networks.  These networks include fixed income sales employees who manage relationships with customers and provide market information and trade recommendations, as well as traders who determine prices quoted to investors for specific categories of fixed income products.  Large global banks also employ staff members responsible for ensuring that the bank meets regulatory requirements so that it can execute fixed income transactions with customers located in different jurisdictions and ensuring that these transactions are accompanied by the appropriate trade documentation.  Banks use these networks to trade European Government Bonds with investors in major financial markets, including New York.

22.    Defendants Bank of America Merrill Lynch International Designated Activity Company, Merrill Lynch International, NatWest Markets plc, Nomura International PLC, and UniCredit Bank AG ("Primary Dealer Defendants") were designated European Government Bond primary dealers during the Class Period.  Traders employed by the Primary Dealer Defendants were responsible for determining prices quoted to investors in European Government Bond transactions, including hundreds of millions, if not billions of dollars' worth of transactions that these entities executed directly with investors in the United States.

23.    Each of the Primary Dealer Defendants purposefully exploited the U.S. market for European Government Bonds in at least five ways.  ***First***, when a sales person employed by a

Defendant or affiliated entity received an order from a customer to purchase or sell a European Government Bond, the sales person requested a price quote from a Primary Dealer Defendant's trader. When traders made pricing decisions, they knew the identity and location of the customer requesting a quote. Thus, when the Primary Dealer Defendants' traders quoted fixed prices for European Government Bonds to investors in the U.S. market as more particularly alleged below, they intentionally restrained the U.S. market for European Government Bonds. The economic analysis of market prices referenced in this Complaint includes prices that each Primary Dealer Defendant quoted to investors in the United States market during United States trading hours.

24.     *Second*, unlike an exchange-based market like a stock exchange, the European Government Bond market is an opaque, over-the-counter market in which Defendants must interact with customers directly to secure business. Each Primary Dealer Defendant purposefully availed itself of the U.S. market for European Government Bonds by sending trade recommendations, trade ideas, targeted price levels at which to execute trades, research, and information about the Primary Dealer Defendant's inventory to sales personnel assigned to cover the United States market. Because these same traders were simultaneously carrying out a conspiracy to fix the prices of European Government Bonds, these acts constituted purposeful availment of the United States market. Specific examples of efforts to exploit the U.S. market for European Government Bonds are alleged for each Defendant in the "Parties" section, below.

25.     *Third*, each Primary Dealer Defendant acquired European Government Bonds in the primary market, colluded on the prices at which these bonds were sold to Plaintiffs and the Class in the secondary market, and distributed these bonds into the United States.

26.     *Fourth*, each Primary Dealer Defendant collected funds, including overcharges from their price-fixing conspiracy, from customer accounts located in the United States.

27.     *Fifth*, each Primary Dealer Defendant charged fixed prices in the United States market to investors located here.  For example, the analysis described in Section VI.B., below, includes prices that each Primary Dealer Defendant quoted in the United States.  By quoting fixed prices in the United States market and collecting the resulting overcharges from investors located here, each Primary Dealer Defendant purposefully availed itself of the United States market for European Government Bonds.

28.     The Primary Dealer Defendants, either themselves or through an affiliated entity that was part of the bank's fixed income trading and sales network, had substantial fixed income trading and sales operations in this District.  From these desks, Defendants' banks promoted, marketed, and sold European Government Bonds to investors located in this District and throughout the United States.

29.     Figure 1 below shows that Defendants had U.S.-based dealer affiliates headquartered in this District that helped to promote, market, and sell sovereign bonds, including European Government Bonds, to investors located in this District and throughout the United States.

**Figure 1 – Headquarters of AFME Primary Dealer Members'**
**U.S.-Based Dealer Affiliates**

| AFME Primary Dealer Member | U.S. Dealer Affiliate and its Headquarters |
| --- | --- |
| BAML International | Merrill Lynch Pierce Fenner & Smith Inc. New York, NY |
| Nomura International plc | Nomura Securities International Inc. New York, NY |
| NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) | NMSI Stamford, CT |

| AFME Primary Dealer Member | U.S. Dealer Affiliate and its Headquarters |
|---|---|
| UniCredit Bank AG | UniCredit Capital Markets LLC<br>New York, NY |

30.     Defendants also focused on customers in critical geographic markets by designating certain geographic locations in which they maintained significant fixed income trading and sales operations as hubs.  As shown in Figure 2, Defendants designated the New York metro area as a U.S. hub for their global fixed income trading and sales operations.

**Figure 2 – Locations of AFME Primary Dealer Members' Fixed Income Trading Hubs**

| AFME Primary Dealer Member | Fixed Income Trading and Sales Hubs |
|---|---|
| BAML International | New York, London, Hong Kong |
| Nomura International plc | New York, London, Hong Kong, Tokyo |
| NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) | Stamford, London, Singapore |
| UniCredit Bank AG | New York, London, Munich, Paris, Madrid, Hong Kong, Shanghai |

31.     Accordingly, Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

## III.        THE PARTIES

**A.     Plaintiffs**

32.     Plaintiff Ohio Carpenters' Pension Fund ("Ohio Carpenters") is a Taft-Hartley multi-employer pension fund located in Ohio that provides retirement, disability, and survivor benefits to its participants and beneficiaries.  Ohio Carpenters transacted in European Government

Bonds issued by France, Germany, Greece, Ireland, and Portugal directly with one or more of the European Government Bond cartel members, including Merrill Lynch International, Bank of America N.A., NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.), and NatWest Markets plc (f/k/a The Royal Bank of Scotland plc).  As a direct and proximate result of Defendants' collusive activities, Ohio Carpenters was injured in its business or property.

33.     Plaintiff Boston Retirement System ("Boston Retirement") is a government-defined benefit plan located in Boston, Massachusetts.  Established in 1923, it is governed by Massachusetts law.  Boston Retirement manages more than $5 billion in assets on behalf of more than 34,000 members and beneficiaries associated with the City of Boston, Boston Redevelopment Authority, Boston Housing Authority, Boston Water and Sewer Commission, Boston Public Health Commission, and others.  During the Class Period, Boston Retirement transacted in European Government Bonds issued by Germany and Belgium directly with one or more of the European Government Bond cartel members, including Merrill Lynch International.  As a direct and proximate result of Defendants' collusive and manipulative activities, Boston Retirement was injured in its business or property.

34.     Plaintiff Electrical Workers Pension Fund Local 103 I.B.E.W. ("IBEW Local 103") is a defined-benefit plan located in Dorchester, Massachusetts.  IBEW Local 103 manages more than $1 billion in assets on behalf of over 8,000 members and beneficiaries.  During the Class Period, IBEW Local 103 transacted in European Government Bonds issued by Italy and France directly with one or more of the European Government Bond cartel members, including Merrill Lynch International, Nomura, and RBS.  As a direct and proximate result of Defendants' collusive and manipulative activities, IBEW Local 103 was injured in its business or property.

B.     **Defendants**

       a.     **Co-Conspirators**

35.     Various entities and individuals unknown to Plaintiffs at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged in this Complaint.  Among the co-conspirators are the still-to-be identified banks that received the Commission's Statement of Objections.

       b.     **The Bank of America Defendants**

36.     Defendant Bank of America, N.A. ("BANA") is a Delaware corporation with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina.  BANA is a wholly owned subsidiary of Bank of America Corporation.

37.     Bank of America Corporation organizes its activities on a "line of business" basis. Its fixed income sales and trading operations, including its European Government Bond sales and trading operations, are organized under its "Global Banking & Markets" Business Line.

38.     Employees within the Global Banking & Markets Business Line market, price, and sell fixed income products, including European Government Bonds, to clients such as large global corporations, financial institutions, and U.S. based businesses.[4]

39.     Defendant Bank of America Merrill Lynch International Designated Activity Company (f/k/a Bank of America Merrill Lynch International Limited) ("BAML International") is a multinational private limited company with its principal place of business located at Two Park Place, Hatch Street, Dublin 2, Ireland.  BAML International is a wholly owned indirect subsidiary of BANA.

---

[4]     Bank of America Corp., 2018 ANNUAL REPORT 52, 178 (2019), http://media.corporate-ir.net/media_files/IROL/71/71595/BOAML_AR2018.pdf.

40.     Defendant Merrill Lynch International ("MLI") is a private unlimited company incorporated in England and Wales with its principal place of business located at 2 King Edward Street, London, X0 EC1A 1HQ, United Kingdom.  MLI is a wholly owned indirect subsidiary of Bank of America Corporation.  MLI is a broker and dealer in equities, fixed income, currency, and commodities financial instruments.  MLI served as a European Government Bond primary dealer for European Government Bonds during the Class Period from its headquarters in London.  During the Class Period, MLI priced and executed European Government Bond transactions directly with investors in the United States, including Plaintiffs.

41.     As described in more detail below, throughout the Class Period, MLI purposefully availed itself of the United States market for European Government Bonds.

42.     MLI traders located in MLI's London headquarters were responsible for determining European Government Bond prices charged to investors located in the United States, including transactions that MLI entered into with Plaintiffs.

43.     MLI conducts substantial activities as part of Bank of America Corporation's "Global Banking and Markets" business segment.  In this capacity, MLI served as a European Government Bond primary dealer during the Class Period from its headquarters in London.  MLI distributed European Government Bonds into the United States to U.S.-based affiliates that were also organized under Bank of America Corporation's Global Banking & Markets business segment, such as Merrill Lynch, Pierce, Fenner & Smith, Inc.

44.     MLI also distributed promotional materials and research concerning European Government Bonds to investors in the United States to attract business in the U.S. market.  MLI acted throughout the Class Period to cultivate European Government Bond business in the United States.  For example, MLI's "European Rates Research" team supported MLI's U.S. trading and

sales efforts by conducting research, supplying trade ideas, and publishing analysis of European Government Bonds for MLI's customers and distributed these materials to customers in the U.S. market.  This team reported to Bank of America Corporation's "Global Research" division within its "Global Banking & Markets" business segment, which was based in the United States.

45.      As another example, MLI tailored research publications concerning European Government Bonds for investors in the United States market.   MLI listed U.S.-based sales employees as contacts through which domestic investors could request European Government Bond prices and execute European Government Bond transactions.  The May 4, 2011 edition of "World at a Glance," published under the brand name for Bank of America Corporation's "Global Banking & Markets" business segment,[5] contains a dedicated section with trade ideas, projections, and analysis of the European Government Bond market for customers to consider when making investment decisions.  This section was prepared by Max Leung, an MLI employee based in London, and expressly notes that some of the securities discussed in the publication may only be purchased by "Qualified Institutional Buyers" as defined under U.S. law.

46.      The examples alleged above were not isolated occurrences, but instead illustrate MLI's continuous successful efforts to attract customers for its European Government Bonds business in the United States, leading to substantial volumes of sales, including to Plaintiffs and the Class.  MLI employees regularly contributed to and helped to distribute similar research on European Government Bonds in the United States market throughout the Class Period, while MLI traders supported these efforts by providing pricing for European Government Bond transactions that MLI executed with domestic customers.

---

[5]      "Bank of America Merrill Lynch" is not a legal entity.  It is a brand name that Bank of America Corporation uses to reflect the globally integrated business structure of its fixed income trading and sales business under a single brand.

47.     Defendants BANA, BAML International, and MLI conduct European Government Bond-related business in this District.  For example, BANA, BAML International, and MLI price and execute European Government Bond transactions with investors located in this District.

        **c.**      **The RBS Defendants**

48.     Defendant NatWest Markets plc (f/k/a The Royal Bank of Scotland plc) ("NatWest") is a U.K. public limited company with its principal place of business at 250 Bishopsgate, London, EC2M 4AA, United Kingdom.  During the Class Period, NatWest traded European Government Bonds directly with investors in the United States and distributed European Government Bonds into the United States.  During the Class Period, NatWest served as a European Government Bond primary dealer.

49.     NatWest organizes its activities and those of its subsidiaries "on a divisional basis" according to function.  It conducts fixed income sales and trading, including European Government Bond sales and trading, through its "Markets" division organized under its "Global Banking and Markets" business.  NatWest's subsidiaries that undertake activities within the Markets division do so as part of a "unified service" for NatWest's corporate and institutional clients, which include pension funds and other institutional investors.

50.     NatWest operates three U.S. branches in San Francisco, California, San Jose, California, and Stamford, Connecticut.

51.     NatWest reports that it operates three global trading "hubs," one of which is located in Stamford, Connecticut.  NatWest also reports that it operates "sales offices across key locations in the UK, EU, US and Asia."  Through its trading hub in Stamford and its sales offices in the United States, NatWest markets, prices, and executes European Government Bond trades with investors located in the United States.

52.     European Government Bond traders at NatWest, also operating within the Global Banking & Markets division, acquired European Government Bonds, distributed European Government Bonds into the United States to investors, and determined prices for European Government Bond transactions executed with customers in the United States.

53.     NatWest purposefully acted in the United States to attract investors in the United States' fixed income markets.  For example, NatWest regularly publishes and distributes marketing materials providing existing and prospective customers with market updates, trade recommendations, and reports on fixed income products, including European Government Bonds. It reports that its sales team assigned to the United States market has "had real success building client trust by consistently and proactively providing them with relevant market colour, content and ideas, backed up by seamless trade execution and delivery of innovative solutions."[6]  These materials include updates, market information, and trade recommendations for European Government Bond transactions.

54.     NatWest's success at exploiting the United States market is the result of sustained marketing and promotional efforts throughout the Class Period.  For example, NatWest publishes periodical research called "European Rates Weekly" that almost always features analysis and trade recommendations for European Government Bonds.  NatWest discloses that it prepared the publication for, and distributed it to, "major institutional investors" in the United States market (*i.e.*, Plaintiffs and the Class).  The publication always closed with an invitation for interested investors in the United States to contact fixed income sales employees located in Stamford,

---

[6]     NatWest Markets PLC, 2018 ANNUAL RESULTS 2 (2019), https://investors.rbs.com/~/media/Files/R/RBS-IR/results-center/15-02-2019/natwest-markets-annual-results-15-02-2019.pdf.

Connecticut, at NatWest Markets Securities Inc., who were tasked with managing customer relationships and arranging European Government Bond trades with NatWest.

55.     These examples are not exhaustive, but illustrative of the substantial and continuing acts that NatWest took to develop a customer base for European Government Bonds in the United States throughout the Class Period.  These efforts led to significant sales of European Government Bonds to customers in the United States, including Plaintiff Ohio Carpenters.

56.     Defendant NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.) ("NatWest Securities") is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901.  During the Class Period, NatWest Securities sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States, including Plaintiff Ohio Carpenters.

57.     NatWest Markets Securities Inc. is a registered broker dealer with the SEC and is the RBS Group's primary U.S.-based broker dealer.[7]

58.     NatWest and NatWest Securities conduct business in this District, including by executing European Government Bond transactions directly with investors located in this District.

### d.     The Nomura Defendants

59.     Defendant Nomura International PLC is a multinational financial services company with its principal place of business at Nomura House, 1 St. Martin's-Le-Grand London, United Kingdom EC1A 4NP.  Nomura International PLC, together with its subsidiaries, operates as a securities broker internationally and in the United Kingdom.  The company trades in and sells fixed income and equity products, including related derivatives, and provides investment banking,

---

[7]     RBS Group plc Resolution Plan 2015, https://fdic.dov/regulations/reform/resplans/plans/rbs-165-1512.pdf.

corporate finance, and private equity services.  During the Class Period, Nomura International PLC sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States.

60.     Nomura International PLC was a European Government Bond primary dealer for multiple Eurozone countries during the Class Period.  It purposefully availed itself of the United States market for European Government Bonds by making substantial sales here, quoting fixed prices to U.S. investors, and cultivating a domestic European Government Bond customer base here on its own behalf and through its U.S. broker-dealer affiliate, Nomura Securities International Inc. ("Nomura Securities").

61.     Nomura Securities is a financial services company with its principal place of business at Worldwide Plaza, 309 West 49th Street, New York, New York 10019.  During the Class Period, Nomura Securities sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States.

62.     Nomura International PLC and Nomura Securities conduct business in this District, including by executing European Government Bond transactions with investors in this District.

63.     Both Nomura International PLC and Nomura Securities are subsidiaries of Nomura Holdings Inc.  Nomura Holdings publishes annual reports and issues regulatory disclosures on a consolidated basis.  In these reports and disclosures, it refers to itself and its subsidiaries as the "Nomura Group."  It reports that it sells government bonds, which include European Government Bonds, to institutional investor clients through its Wholesale Division.  The Wholesale Division functions as a single business unit, though it consists of fixed income trading and sales staff employed by both Nomura Securities and Nomura International PLC.  The Wholesale Division's clients include institutional investors in the United States market.

64.     For example, Nomura Securities Managing Director, Gregory Cignarella, sold European Government Bonds to asset managers, commercial banks, insurance companies, and hedge funds from Nomura Securities' New York offices from July 2010 until the end of the Class Period.  Jill Scalisi specialized in Global Credit and Structured Credit for Nomura Securities in New York from October 2009 until June 2011.

65.     Nomura Securities employed an economist, Jens Nordvig, as a Head of Fixed Income Research from October 2009 until the end of the Class Period.  The economist, who was based in New York, regularly provided commentary and research on European Government Bonds to U.S. investors, in Nomura Securities' name, to financial media in this District and throughout the United States, including the *Wall Street Journal*, *New York Times*, *Businessweek*, CNBC, and Bloomberg TV.

66.     These employees are among many other full-time staff within Nomura's Wholesale Division that interacted with customers and promoted European Government Bonds from Nomura International PLC's inventory to investors in this District and throughout the United States. Nomura International PLC traders were responsible for determining the prices at which these domestic European Government Bond transactions occurred.

67.     Nomura Holdings states that its Wholesale Division includes a "robust international platform, a global client base across more than 30 countries, and facilitates cross-border transactions worldwide."  A key strength of the Wholesale Division is its "underwriting and sales capabilities" for fixed income products, which include European Government Bonds.

68.     Part of the Nomura Group management's vision includes strengthening its business within the United States.  In a recent annual report, the Nomura Group wrote that "Nomura aims to connect Asia including Japan to Europe, the United States and South America to obtain a

competitive edge that sets Nomura apart from its peers."[8]  Nomura describes its core business as "connecting Markets East & West" and wrote to investors that the United States is a "key strategic region for Nomura."

69.     Nomura Holdings employs senior executives in its New York office that are responsible for overseeing the Nomura Group's business activities in the Americas region.  For example, the Executive Managing Director and Group Co-COO (Head of the Americas), the Head of Global Markets, the Co-Head of the Americas, and the Executive Chairman for the Americas region for Nomura Holdings, Inc. are all based at Worldwide Plaza, 309 West 49th Street, New York, New York 10019-7316.

### e.     The UniCredit Defendants

70.     UniCredit S.p.A. is a multinational banking institution headquartered at Piazza Gae Aulenti 3 – Tower A, 20154 Milan, Italy.

71.     Defendant UniCredit Bank AG is a wholly owned, multinational subsidiary of UniCredit S.p.A., with its principal place of business located at Arabellastr. 12, 81925 Munich, Germany.  During the Class Period, UniCredit Bank AG sold European Government Bonds directly to investors in the United States and distributed European Government Bonds into the United States to its New York branch and its wholly owned, domestic subsidiary, UniCredit Capital Markets LLC.

72.     Defendant UniCredit Capital Markets LLC is a wholly owned subsidiary of UniCredit S.p.A., incorporated in New York, with its principal place of business located at 150 East 42nd Street, New York, New York.

---

[8]      Nomura Holdings, Inc., NOMURA REPORT 2018, at 14 (2019), https://www.nomuraholdings.com/investor/library/ar/2018/pdf/nomura_report_all.pdf.

73.     UniCredit S.p.A. organizes itself and its subsidiaries (which it refers to collectively as "UniCredit Group" in its annual reports and required regulatory disclosures) as an "organizational and business model which maintains a divisional structure."[9]  This divisional structure segments UniCredit S.p.A.'s subsidiaries into certain business units based on the type of business activity that the division undertakes.

74.     UniCredit Group's European Government Bond trading and sales business is part of a business division it calls "Corporate & Investment Banking" (the "CIB Division").  The CIB Division's main operating entity is UniCredit Bank AG, which carries out certain "global product lines" in jurisdictions where the CIB Division is active through locally incorporated subsidiaries and branch offices.  One of these "global product lines" within the CIB Division is the Markets product line, which engages in European Government Bond trading and sales with customers in major financial centers where UniCredit Bank AG maintains a branch office, including in New York.  UniCredit Group describes the CIB Division's business model as serving as a "strategic long-term partner that meets clients' needs and delivers access to Western, Central, and Eastern Europe" to investors located outside of those regions, including investors located in the United States.  Pursuant to this business model, the CIB Division (operating through UniCredit Bank AG and UniCredit Capital Markets LLC) offers European Government Bond trading and sales to customers, including in this District and throughout the United States, as alleged in more detail below.

75.     One of the key geographic markets for UniCredit Group's CIB Division is the United States.  Defendant UniCredit Bank AG has an office located in this District at 150 East

---

[9]     https://www.unicreditgroup.eu/en/unicredit-at-a-glance/organizational-structure.html?topmenu= INT-TM_ABO2_en054.

42nd Street, New York, New York.  UniCredit Bank AG's New York branch solely undertakes activities for the CIB Division (*i.e.*, the division that engages in European Government Bond trading and sales activities).  UniCredit Bank AG's New York branch is so significant to UniCredit Bank AG's overall business that it describes this branch as an additional company "headquarters."[10]

76.     Because it conducts substantial business in the United States both on its own behalf and through UniCredit AG and UniCredit Capital Markets LLC, UniCredit S.p.A. is required to submit annual resolution plans to the Federal Reserve Bank under the Dodd-Frank Act.  In its annual resolution plan, UniCredit S.p.A. refers to "itself and its subsidiaries" collectively as "UniCredit" and reports that "UniCredit operates through US subsidiaries and branches of such entities."[11]  UniCredit S.p.A. is required under the Dodd-Frank Act to identify and report on its "Core Business Lines" operating in the United States.  "Core Business Lines" are defined as "those business lines of the covered company [*i.e.*, UniCredit S.p.A. and UniCredit Bank AG], including associated operations, services, functions and support, that, in the view of the covered company, upon failure would result in a material loss of revenue, profit, or franchise value."  12 C.F.R. §381.2(d).

77.     UniCredit S.p.A. operates Core Business Lines in the United States that engage in European Government Bond trading and sales with investors located here.  One of these Core Business Lines is "Integrated Credit Trading," which engages in European Government Bond trading and sales activities with investors in the United States.  UniCredit Bank AG conducts these activities from offices located in Europe, as well as through its New York Headquarters.

---

[10]     https://www.unicreditgroup.eu/en/worldwide/our-worldwide-presence/americas/united-states/unicredit-bank-ag-branch.html.

[11]     https://www.federalreserve.gov/.../resolution-plans/unicredit-bk-3g-20181231.pdf.

78.     UniCredit Bank AG's New York-based European Government Bond trading and sales activities are highly integrated with its European operations.  For example, in its resolution plan for 2013, UniCredit S.p.A. reported that its "US branches and subsidiaries are so integrated into [UniCredit S.p.A. and UniCredit Bank AG] that the ability to separately divest or reorganize them apart from [UniCredit S.p.A. and UniCredit Bank AG] is highly unlikely."  As part of this integration, UniCredit Bank AG's New York Headquarters engages in European Government Bond transactions using inventory acquired in the primary market.

79.     UniCredit Bank AG offers European Government Bond pricing quotes and engages in European Government Bond transactions directly with investors in the U.S. market.  To ensure access to the domestic European Government Bond investor base, UniCredit Bank AG distributes European Government Bond price quotes through various channels, including the Bloomberg Terminal, one of the two most popular sources for European Government Bond pricing information for institutional investors in the United States, as well as over the telephone and through other electronic means.  By using the Bloomberg Terminal and other distribution channels that U.S. investors use to access European Government Bond pricing information and execute European Government Bond trades, UniCredit Bank AG distributes European Government Bonds to investors located in the United States.

80.     To further target the United States market for fixed income products, including European Government Bonds, UniCredit Bank AG operates a U.S.-based domestic dealer subsidiary, UniCredit Capital Markets LLC.[12]  UniCredit Capital Markets is registered with the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), and reports that one of its key business activities is "Fixed Income distribution of

---

[12]     https://www.federalreserve.gov/supervisionreg/resolution-plans/unicredit-bk-3g-20181231.pdf.

foreign securities to US institutional qualified investment buyers [*i.e.*, U.S. investors like Plaintiffs]."[13]  These foreign securities include European Government Bonds.

81.     UniCredit Bank AG has knowledge of, benefits from, and exercises some control over UniCredit Capital Markets LLC's fixed income trading and sales activities in the United States, which includes its European Government Bond-related activities conducted from its headquarters located in this District.  UniCredit Capital Markets LLC is headquartered in the same office as UniCredit Bank AG's New York Headquarters.  UniCredit Bank AG's New York headquarters has its own legal and compliance personnel.  These personnel also monitor and control the activities of UniCredit Capital Markets LLC employees.  The Head of Legal and Compliance simultaneously serves as UniCredit Capital Markets' President & Chief Compliance Officer and is authorized to sign documents filed with the Securities and Exchange Commission on UniCredit Capital Markets LLC's behalf.  UniCredit Capital Markets LLC lists three directors in its disclosures with the Financial Industry Regulatory Authority, a self-regulatory organization for U.S.-based broker-dealers.  These directors are all high-ranking officers with leadership positions at UniCredit Bank AG's New York headquarters.

82.     UniCredit Bank AG also employs sales teams within its "credit" business line to build relationships with fixed income investors in the United States, including European Government Bond investors.

83.     Accordingly, UniCredit Bank AG and UniCredit S.p.A purposefully availed themselves of the United States market for European Government Bonds.

*                *                *                *

---

[13]      *Id.*

84.     "Defendant" or "Defendants" as used in this Complaint, includes, in addition to those named specifically above, all Defendants' predecessors, including those merged with or acquired by the Defendants and each Defendant's parents and wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

85.     Each Defendant named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein, including in the United States.

86.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## IV.      FACTUAL BACKGROUND

### A.      European Government Bond Market

87.     The Eurozone is a monetary union comprised of a group of European nations that coordinate economic, fiscal, and monetary policy through a central bank, the European Central Bank, and use a common currency, the euro.

88.     Government entities in the Eurozone issue debt in the form of bonds, which are typically used to fund ongoing and future operations.

89.     Examples of European Government Bonds include French OATs (Obligations Assimilables du Trésor) (bonds), Italian BTPs (Buoni del Tesoro Poliannuali) (bonds), and German Bundesanleihen or short Bunds (10-30 year bonds).

90.     European Government Bonds are treated as a single class of debt securities due to Eurozone members' common monetary policy, common currency, common membership criteria, highly integrated financial market, high degree of economic interdependence, common

governance with respect to financial regulation, common central bank, high degree of common systemic risk, and implicit backing in default.  For the same reasons, European Government Bond dealers generally organize their trading and sales businesses so that the same team of traders are responsible for determining pricing for European Government Bonds issued by different Eurozone members.  Each Defendant organized its European Government Bond business in this manner. For example, MLI traders located at MLI's London headquarters were responsible for making pricing decisions and determining bids for European Government Bonds issued by different European Union countries.  Nomura International PLC, NatWest, and UniCredit Bank AG organized their European Government Bond trading desks in a similar manner.

91.    Eurozone members developed a set of criteria known as the "Euro convergence criteria" that all prospective members must meet before joining the Eurozone to ensure that new members meet Eurozone standards and to further the goal of creating an integrated financial market.  All new Eurozone members must establish that they have a comparable: (a) degree of inflation; (b) ratio of government budget deficit to gross domestic product; (c) ratio of outstanding government debt to gross domestic product; and (d) long-term interest rates to existing Eurozone members prior to joining the Eurozone.

92.    To achieve economic integration, Eurozone members established several centralized bodies to create and implement monetary policy.  For example, the European Council is responsible for deciding on the main policy orientations for the Eurozone, while the European Central Bank is responsible for implementing monetary policy.  Eurozone members also agree to deficit and debt limits that apply to all Eurozone members through these centralized bodies.

93.     Eurozone members created the European Central Bank with the mission "to safeguard liquidity and promote European financial integration."  The European Central Bank defined "financial integration" as follows:

> [T]he market for a given set of financial instruments or services [is] to be fully integrated when all potential market participants in such market (i) are subject to a single set of rules when they decide to deal with those financial instruments or services, (ii) have equal access to this set of financial instruments or services, and (iii) are treated equally when they operate in the market.[14]

94.     Following their economic integration, the yield on bonds, or return that an investor receives from a bond, from different Eurozone sovereigns began to converge closer together and the market began pricing them as closer substitutes.

95.     By March 2007, the European Central Bank reported that the European Government Bond market was "highly integrated."  It concluded that "yields in the government bond [*i.e.*, European Government Bond] market . . . are increasingly driven by common factors."[15] The European Central Bank also concluded that the introduction of the euro and the adoption of a common monetary policy for Eurozone members, among other factors, had caused yields on European Government Bonds from the different Eurozone members to "converge[] towards 1, the level of perfect integration."

96.     Global holdings of European Government Bonds were approximately $8 trillion (€6.3 trillion) as of 2012.  The United States is a prominent market for European Government Bonds, with hundreds of billions of dollars in trading volume annually.  Figure 3 below shows the

---

[14]     European Central Bank, *The process of European financial integration: where do we stand?* (Jan. 13, 2006), https://www.ecb.europa.eu/press/key/date/2006/html/sp060113.en.html.

[15]     European Central Bank, *Financial Integration in Europe*, at 13 (March 2007), https://www.ecb.europa.eu/pub/pdf/fie/financialintegrationineurope200703en.pdf?1470741bc6dcc84cb69 ab158c75f5a7e.

market value of U.S. residents' holdings, stated in millions of U.S. dollars, of European Government Bonds in each year of the Class Period.

**Figure 3 – European Government Bonds Held by U.S. Investors**

|  | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|---|---|
| **Market Value of EGB Holdings** | $412,632 | $316,240 | $402,966 | $394,223 | $428,561 | $534,150 |

## B.   European Government Bond Primary Market

97.    European Government Bonds are typically sold in auctions sponsored by European governments' ministries of finance within the Eurozone.   Although less common, European Government Bond offerings can also be made through syndication, in which a group of banks underwrites and conducts the initial sales of European Government Bonds.

98.    The sale of European Government Bonds during the auction (or syndication) is known as the "primary market."   Depending on the country, these auctions either allocate bonds at a single price to all those who bid above a certain level (known as "single price auction") or to each bidder in descending price order until the supply in that offering runs out (known as "multi-price" auctions).   For example, in the single price auctions used for 10-year Italian bonds, the bonds are allocated to the primary dealer that bids the highest price first and then continues in descending order until the supply in that issuance is exhausted.   The bid at which supply runs out sets the price known as the "stop out price" – and this is the price paid by every bidder allocated bonds in the auction.   Multi-price auctions (such as those for French OATs), in contrast, do not set a single price for all auction participants but rather allocate bonds to dealers in descending price order at the price they bid.

99.    To ensure active participation in their auctions, European Government Bond issuers typically select a relatively small group of banks to serve as "primary dealers" of the European

Government Bonds.  These primary dealers control a significant amount of European Government Bonds issued in auctions.  For example, during the Class Period, the EPDA, discussed above in the venue allegations, reported that its members collectively traded more than 80% of all volume in the European Government Bonds market.  Often, the same banks act as primary dealers for multiple issuers' European Government Bonds.

100.     Figure 4 below identifies each Eurozone country and the Defendants that served as primary dealers of European Government Bonds in that country during the Class Period.  Figure 4 shows that there is a significant amount of overlap among Defendants that serve as primary dealers.  In fact, several Defendants are primary dealers in multiple countries, including Germany, Italy, France, Greece, Portugal, and Austria.

**Figure 4 – European Government Bonds Primary Dealers**

| | Austria | Belgium | Germany | Finland | France | Greece | Ireland | Italy | The Netherlands | Portugal | Slovakia | Slovenia | Spain |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bank of America | X | | X | X | X | X | X | X | | | | | |
| Nomura | X | X | X | | X | X | X | X | X | X | | | X |
| RBS/NatWest | X | X | X | X | X | X | X | X | X | X | | | X |
| UniCredit | | | X | | | X | | X | | X | X | X | |

101.     Typically, the banks are selected as primary dealers based on the following criteria:

(a)     their experience in trading sovereign debt and long-term commitment to participating in the sovereign debt market;

(b)     their ability to make markets for investors in the post-auction or "secondary market";

(c)     their financial strength, which includes their credit rating, capitalization, and appetite for risk; and

(d)      their general ability to promote an active trading market for a country's European Government Bonds.

102.    Primary dealers are generally required, at each auction, to bid a minimum percentage of the full offering.  The minimum bid requirement is usually determined as the ratio of the total number of primary dealers to the full offering – *e.g.*, if there are 10 primary dealers, each primary dealer must bid at least 10% (1/10) of the total offering.  This is to ensure that in the event that no one outside of the primary dealer group bids in a given auction, all of the auctioned European Government Bonds will still be purchased by the primary dealers.  It also ensures that primary dealers receive a continuous supply of newly issued European Government Bonds to trade with investors.  Primary dealers are not, however, guaranteed to win that portion of bonds for which they bid.  The allocation depends on the prices they submitted at auction, as discussed above.

103.    Prior to each European Government Bond auction, there is a relatively active forward market – known as the "when issued" market – where dealers (and to a much lesser extent, customers) can offer price quotes to buy or sell the to-be auctioned European Government Bond.  One to two weeks prior to an auction, a European Government Bond issuer will announce a date for the upcoming bond auction, along with all the characteristics of the bonds to be offered, *e.g.*, ISIN, coupon, maturity, amount.  The bonds can then be quoted and traded immediately in the when issued market.  A dealer or customer buying the when issued European Government Bond is obligated to take delivery of the newly issued bond and pay the price under the terms of the transaction.  A dealer or customer selling the when issued European Government Bond is obligated to make delivery of the newly issued bond and accept payment.  Trading in the when issued market takes place up until the time of the auction.

104.    European Government Bond customers typically do not have access to real time pricing in the when issued market.  As a result, customers only see static, non-executable bids and offers.  Dealers, by contrast, are able to see real time bids and offers and thus are able to learn the demand for, and how other dealers value, the new issue.  Dealers can learn the market yield, which in a normally functioning market would form the basis for the auction-determined yield.

105.    The primary dealers provide valuable information to European Government Bond issuers.  Primary dealers often acquire and possess significant amounts of information about client demand and order flows in their roles as market makers.  Certain investors, including pension funds and life insurance companies, have long-dated liabilities on their balance sheet, which they need to hedge.  European Government Bonds have longer durations and lower credit risk than corporate bonds and therefore can more effectively hedge certain forms of long-term liabilities.  As these bonds mature, and as the assets under management grow, there is a constant need for bond proceeds to be re-invested to keep the average maturity of the portfolio constant, month-in, month-out.

106.    Through the information primary dealers receive about customer demand, primary dealers are able to judge interest in the auction, and in turn, the likely trading activity for auctioned securities in the secondary market.  Given the wealth of information primary dealers acquire through their customers, European Government Bond issuers rely heavily on primary dealers' knowledge of investor appetite to better understand what type of offering will attract the most interest in the issuance.  Indeed, often prior to the auction, the European Government Bond issuers will discuss with primary dealers how the market is evaluating an offering.

107.    European Government Bond issuers monitor the performance of primary dealers in the auctions, ranking them based on how aggressively they bid in the auction – *i.e.*, whether

primary dealers will bid large amounts of the auctioned bonds at high prices.  Each issuer's debt management office publishes a ranking of primary dealers according to how well they are deemed to have met the obligations of that primary dealership.  Primary dealers that consistently obtain the largest portions of auctioned European Government Bonds are ranked higher than dealers that do not.

108.    Primary dealers are economically incentivized to maintain a high ranking because it gives them opportunities to participate in even more lucrative transactions with the issuer.  One such lucrative opportunity for top-ranked primary dealers is serving as a lead manager of a syndicated issuance.  In France, for example, lead syndicate managers are appointed based on expertise, rank, and contribution to the planning and preparation of the transaction.  Syndicate managers then have the responsibility and opportunity for market-making in the secondary market for the security.  Top-ranked primary dealers also receive preference in derivative transactions, including entering into interest rate swap transactions with the issuers to hedge risk in the government's portfolio.  Primary dealers are also incentivized to increase or maintain their primary dealer ranking to acquire investment bank advisory projects from issuers.  In addition, from time to time, issuers write call options for primary dealers, the value of which increases as the auction-clearing price increases.  Dealers exercising these options are able to obtain additional supply of the newly auctioned securities, which they could then hold or resell in the secondary market.

109.    While primary dealers are incentivized to sacrifice capital in the auctions in order to secure greater profits later, either through reselling inflated European Government Bonds in the secondary market or preserving preferential status in gaining more lucrative business – Defendants and their co-conspirators colluded so that they could consistently secure the potential rewards without over-risking capital.

**C.** **Trading in the European Government Bond Secondary Market**

110. After the initial issuance of European Government Bonds in the primary market, these bonds are further traded among bond dealers and investors – including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments in the over-the-counter ("OTC") secondary market. There is an active secondary market for European Government Bonds in the United States.

111. Defendants dominate the secondary market, acting as market makers by providing liquidity to investors and standing ready to buy and sell European Government Bonds whenever an investor seeks to do so.

112. In fact, Eurozone governments often require that primary dealers actively quote new European Government Bond issues to retain their primary dealer status. The governments also monitor the performance of the primary dealers in terms of the volumes they trade and quote in the secondary market. For example, France and Italy rank the performance of their primary dealers in the secondary market in terms of the number and quality of bid and ask quotes and the volume of trades made. It is not uncommon for central governments to demand that primary dealers provide minimum amounts of activity in the secondary market. If a primary dealer fails to do so, it risks receiving a lower ranking or being dropped as a primary dealer altogether.

113. Customers seeking to buy or sell European Government Bonds may contact one or more banks, such as Defendants or another primary dealer, and request pricing for a particular European Government Bond. The bank will quote the price for a European Government Bond in terms of a "bid" or an "ask," which are usually set in terms of basis points (one basis point equals 1/100 of one percent). The bid represents the price at which a dealer will purchase the European Government Bond; the ask represents the price at which a dealer will sell the European Government Bond. The difference between these two values is the "bid-ask spread" (or "spread"),

which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to buy or sell the European Government Bond in the future at better prices than it is quoting at the time to its customer.

114.    As is typical in many financial markets, trading of European Government Bonds is done through telephonic and, increasingly, electronic means.  Salespersons at the dealer banks take orders and then relay them to bond traders at the banks' trading desks so that they can be filled.

115.    Rational customers want to buy low and sell high.  Banks, including Defendants and their bond traders, compete for customers based on the bid and ask prices they offer, and, in turn, the spread between them.  The narrower the bid-ask spread, the more competitive the prices. A bank can gain customers and business by offering a narrower bid-ask spread than its competitors. Conversely, if a bank widens the bid-ask spread – by either lowering the bid or raising the ask (or both) – it would likely lose customers to rivals offering narrower spreads.  Only through collusion can a dealer quote a wider spread than market conditions otherwise dictate without losing market share and profits.

### D.    Structure of Defendants' European Government Bond Businesses

116.    Defendants' European Government Bond trading and sales personnel are housed within each bank's respective fixed income division.  An entity within this division serves as a primary dealer for European Government Bonds issued by multiple Eurozone countries.  Traders employed at the primary dealer entity are also responsible for determining pricing for European Government Bond trades with investors.  Defendants performed this function on behalf of their respective banks during the Class Period.

117.    The primary dealer entity acquires European Government Bonds from issuers in the primary market.  The traders who undertake primary dealing responsibilities are typically located in the same office, primarily in London and less often, Paris.  When primary dealers acquire

European Government Bonds, they place them into inventory and distribute them, as needed, to fill customer orders, through the bank's sales and trading network to trading hubs located in major financial centers, including in the United States.  Sales personnel at these trading hubs help their respective European Government Bond primary dealers by interacting with investors, managing client relationships, and processing customer European Government Bond orders from trading desks.  As described above, Defendants' U.S. entities performed this function in the United States during the Class Period.

118.    For example, when a salesperson in the United States sells a European Government Bond to a customer, a trader at the primary dealer entity is responsible for determining the price charged to the customer and executes an internal transaction to send the European Government Bond to the bank's U.S. trading desk, which then delivers the bond to the customer.  Through these internal transactions, the primary dealer entities distribute European Government Bonds into the United States through their respective U.S. desks to U.S. investors.

119.    Defendants' primary dealer entities transacted European Government Bonds directly with customers located in the United States.  On other occasions, Defendants also distributed European Government Bonds to United States customers through their United States-based broker-dealer affiliates.

**E.**     **Pricing of European Government Bonds**

120.    As with other bonds, the prices of European Government Bonds are stated in terms of the bond's par value, coupon, maturity date, and yield.  A bond's par value is its face value, payable on the bond's maturity date.  A bond's coupon is the interest rate that the bond issuer must pay an investor.  Coupons are paid to the bond-holder periodically – usually every six or 12 months – until the bond reaches maturity.  Yield is a figure that shows the return that an investor receives by holding the bond to maturity.

121.     Bond prices can be quoted as a function of the bond's par value or its yield.  A bond with a par value of €1,000 may sell at a discount of 2%, or €980.  A dealer selling this bond would provide its customer a quote of "98."  A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

122.     A bond's price can also be quoted in terms of its yield.  Bond price and yield have an inverse relationship: lowering one will result in a rise in the other, as demonstrated by Figure 5 below:

**Figure 5 – Relationship Between Bond Price and Yield**



123.     This inverse relationship is due to the fact that a bond's price will be higher when it pays a coupon that is higher than prevailing interest rates.  As market interest rates increase, bond prices decrease.  Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons, prices, and terms to maturity.

### V.     DEFENDANTS' WRONGFUL CONDUCT

124.     Defendants and their co-conspirators are among the world's largest dealers of European Government Bonds in the primary market and market makers in the secondary markets.

In a competitive market, they would compete with one another for customers seeking to buy and sell European Government Bonds.  They would also compete with each other to acquire bonds during European Government Bond auctions.

125.    However, rather than compete with one another, Defendants and their co-conspirators entered into an unlawful agreement to manipulate the European Government Bond auctions and fix the bid-ask spreads for European Government Bonds that they bought from and sold to investors.

126.    Specifically, with respect to the European Government Bond auctions, Defendants conspired to raise bond prices (depress yields) of the European Government Bonds they acquired at auction.  To do this, Defendants shared confidential, commercially sensitive information about their bidding interest and customer orders through multi-dealer electronic chatrooms, among other means.   Sharing this information allowed Defendants and their co-conspirators to gain an understanding of overall interest in the auction and outbid their rivals, often by raising their bids above then-prevailing market prices in the pre-auction market.  This conduct both shut out rivals and artificially inflated the auction-clearing prices for European Government Bonds, which then became the benchmark price for those securities in the secondary market.

127.    Despite the relatively large, short-term cost of bidding up prices at European Government Bond auctions, Defendants were willing to bid up prices for two reasons.  First, Defendants gained significant control over the supply of newly issued, in-demand European Government Bonds that they could then resell at a premium to investors in the post-auction, secondary market.  Second, by obtaining consistently large shares of bond auctions, Defendants were able maintain or increase their rankings with European Government Bond issuers, which in turn gave Defendants access to more lucrative syndications and derivatives deals, including

interest rate swaps, with European Government Bond issuers.  Thus, Defendants and their co-conspirators were willing to trade off large, albeit short-term, costs for the chance to secure even more lucrative rewards and colluded to ensure they obtained these rewards.

128.    Defendants' misconduct was not limited to the primary market.  They also fixed bid-ask spreads on customer orders for European Government Bonds in the post-auction, secondary market.  Defendants orchestrated their bid-ask spread fixing primarily through multi-dealer electronic chatrooms, where Defendants' traders discussed customer orders and the bid and ask prices offered to customers seeking a quote.  Defendants' traders then agreed on the prices quoted to those customers.

129.    Absent an agreement to manipulate the auctions or fix bid and ask prices, no individual bank could afford to engage in such conduct.  Because of the high risks and costs associated with misjudging demand at an auction, no individual bank would attempt to unilaterally manipulate European Government Bond auction prices.  If a Defendant bid for too much supply at too high of a price at an auction, it would be left with inventory that could not be sold except at a steep discount.  And if a Defendant bid for too little supply at too low of a price at an auction, it would be potentially shut out, either partially or entirely.  Both acts are costly in the short run.  Bidding too much unnecessarily risks capital with little chance for profit (this is especially true in multi-price auctions, where the price bid is the price paid).  Bidding too little causes a Defendant to lose allocation in the auction, forcing it to acquire supply in a potentially more expensive secondary market.

130.    Either circumstance – over-bidding or under-bidding – could risk a dealer's ranking (and potentially its primary dealer status), thereby jeopardizing its ability to gain more lucrative deals.  Auction prices that move too high could cause prices to collapse in the secondary market,

generating excessive volatility and making that issuer's European Government Bonds less attractive relative to other fixed income assets.  If a dealer misses out on an auction by failing to place sufficiently competitive bids, it could affect the dealer's ranking with the issuer.

131.    Similarly, no individual bank would widen its bid-ask spread unilaterally.  To do so would result in that bank losing substantial trading business to competitors offering more competitive pricing.  Further, consistently quoting non-competitive bid and ask prices would risk the bank's lucrative position as a primary dealer in European Government Bonds.

132.    According to the European Commission, European Government Bond traders "exchanged commercially sensitive information and coordinated on trading strategies.  These contacts would have taken place mainly – but not exclusively – through online chatrooms."[16]

133.    As was the case in other financial market cartels, in these communications, Defendants' traders exchanged confidential information about their customers' identities and orders (including, among other things, size, direction, and price).  By exchanging this sensitive customer information, the conspiring traders could coordinate the prices they submitted at primary market auctions and the bid and ask prices they offered to their respective customers in the secondary market.

134.    Defendants' European Government Bond traders communicated with each other frequently.  The repetitious nature of Defendants' traders' chatroom discussions enabled them to both coordinate on pricing and effectively police their conspiracy.  A conspiring bank's trader who failed to adhere to agreed-upon pricing could quickly be identified and barred from any further

---

[16]    European Commission, Press Release "Antitrust: Commission sends Statement of Objections in European government bonds cartel" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

participation in the chatrooms.  Accordingly, the European Government Bond traders had little incentive not to adhere to their agreement.

135.    By communicating with one another about aligning the prices and spreads they quoted to investors, Defendants also discouraged investors from comparing prices.  Shopping around for better pricing was ultimately a pointless endeavor because the quotes received from one cartel member would be substantially similar to those offered by the other cartel member. From the customer's perspective, the matching quotes suggested that the prices offered by any one cartel member were competitive.  Unbeknownst to the customer, however, these prices were actually the product of collusion between conspiring banks' European Government Bond traders.

136.    As a result of Defendants' price-fixing agreement, investors, including Plaintiffs and the Class, either paid artificially high prices for European Government Bonds they bought or received artificially low prices for the European Government Bonds they sold, causing Plaintiffs and the Class injury to their business or property.

## VI.    ECONOMIC ANALYSES ARE CONSISTENT WITH THE EUROPEAN COMMISSION'S FINDINGS THAT DEFENDANTS CONSPIRED TO FIX EUROPEAN GOVERNMENT BOND PRICES

137.    Consistent with the European Commission's findings, Plaintiffs have uncovered statistically significant evidence of collusion among Defendants and their co-conspirators in both the primary and secondary markets for European Government Bonds.

### A.    Defendants and Their Co-Conspirators Rigged European Government Bond Auctions in Their Favor

138.    Plaintiffs uncovered anomalous pricing in the European Government Bond market around auctions during the Class Period by analyzing the price of French and Italian 10-year bonds. This analysis showed that primary dealers abused their market share to control the supply (and

thus the price) of newly issued European Government Bonds in the secondary market by coordinating their bidding in government-run auctions.

139.    French and Italian 10-year bonds are among the largest Eurozone government debt offerings by size of outstanding debt.  In 2012, France and Italy had 23% and 24% of the total outstanding debt in the Eurozone, respectively.  Together, France and Italy constitute nearly half of the 10-year maturity sector in the European Government Bond market.

**Figure 6 – Outstanding Government Debt Percentage in the Eurozone**

| Country | Government debt in percentage |
|---------|------------------------------|
| Germany | 25% |
| Italy | 24% |
| France | 23% |
| Spain | 9% |
| Belgium | 5% |
| Netherlands | 5% |
| Other | 9% |
| **Total** | **100%** |

140.    The 10-year maturity is used as the benchmark in the Eurozone and is also the most liquid in the European government debt market.  As the most liquid maturity of European Government Bonds, the 10-year bond market is the most difficult to manipulate.

141.    Plaintiffs' allegations and claims are not limited to collusion in France and Italy, but include all Eurozone countries during the Class Period.  The allegations relating specifically to France and Italy are merely illustrative.  The other Eurozone countries hold similar auction processes organized by a central debt management office, in which only a small and select group of primary dealers participate.  The incentives and privileges offered by other Eurozone countries to primary dealers for achieving a high ranking are the same or similar to the incentives offered by France and Italy, as discussed above.  And the bonds of other Eurozone countries are traded by the same trading desks of Defendants to the same customers using the same platforms.

142.    Plaintiffs' analysis started by converting the price of each bond traded in the "when issued" market – where Defendants and other dealers can trade bonds in advance of their issuance – from percentage price terms (*e.g.*, 101.05%) to reflect its Yield-To-Maturity (or "YTM").  A bond's YTM reflects the total return on that bond if it is held to maturity as an annual percentage (*e.g.*, 4.73%) and allows bonds to be compared on an apples-to-apples basis with each other.

143.    Next, Plaintiffs examined the market behavior for each of the more than 150 Italian and French 10-year bond auctions during the Class Period around the specific auction time.

144.    Figure 7 below is an example showing the evolution of the YTM before, during, and after an auction for one of the 10-year Italian bonds in the sample.  On the plot, the series (1) represents the market yield of the bond with ISIN IT0004164775, coupon of 4%, which was auctioned on June 11, 2010.  The timescale is two days: the day preceding the auction (5) and the day of the auction (6).  The plot shows the yield at which the bond was auctioned as the horizontal line (2), and the vertical line (3) marks the exact time of the auction.  Additionally, (4) denotes the market yield of the bond at the time it is being auctioned, which is referred to as "Market Yield" on the graph (3.391), and subtracting this from (2), the "Auction Yield" (3.32), results in the difference between the two (-0.071).



**Figure 7:** Evolution of yield for an Italian 10-year bond

145.    As Figure 7 shows, when trading begins at 8:00 a.m. on the auction day, the YTM for this bond is significantly higher (meaning the price is lower) than the day before.  The YTM then suddenly begins to drop and prices rise until around 10:00 a.m. when there is a sudden change in direction in the hour prior to the start of the auction.  Despite this reversal the Auction Yield is significantly below (meaning the price is higher than) the fair market value for that bond in the when issued market.

146.    Identical, anomalous market behavior was also observed around auctions for 10-year French government bonds, as illustrated by Figure 8 below.



**Figure 8:** Evolution of yield for a French 10-year bond

147.     The observations in the examples above were not the product of any change in macroeconomic conditions affecting European Government Bond markets generally.   These movements were specific to these bonds.

148.     This pattern in which primary dealers act against their short-term economic self-interest by overbidding for European Government Bonds occurred in the vast majority of the more than 150 Italian and French 10-year bonds auctions during the Class Period and is consistent with a conspiracy to rig the auction process so that Defendants and their co-conspirators can control supply to the secondary market by receiving a dominant share of the newly issued bonds.

149.     Defendants profit from this conspiracy in at least two ways.  First, as Figures 7 and 8 show, following the auction, bond prices increase considerably (and yields decrease), as the YTM moves past the Auction Yield and prices remain higher throughout the trading day. Significantly, this price increase is highly correlated with the amount Defendants and their co-conspirators overbid during the auction.   Thus, by coordinating bids during the auction to

guarantee they receive a high allocation of these newly issued bonds, Defendants and their co-conspirators profit by selling those bonds at artificially inflated prices reflecting the amount they overbid during the auction to investors in the secondary market.

150.    Second, as explained above, Defendants and their co-conspirators generate additional illicit profits by working together to maintain or increase their performance rankings, which in turn, determine their eligibility for additional business from the issuers.  This presents a win-win situation for Defendants and their co-conspirators, notwithstanding the high cost of submitting inflated bids at the auctions: profits immediately following the auction and long-term gains from additional business awarded as a result of their ranking.

151.    While the charts above present individual examples, this same pattern is observed in aggregate across the different 10-year French and Italian bonds auctioned during the Class Period.  For this analysis, Plaintiffs compared the prevailing market YTM for each bond at the time of the auction to the prevailing market YTM at seven different points during the day of the auction and previous trading day.

152.    Figure 9 below displays these results for all 10-year Italian bonds issued during the Class Period.



**Figure 9:** Evolution of $X_t$ for Italian 10-year bonds

153.    As Figure 9 above shows, there is a sharp reversion following the auction in which

the average YTM for 10-year Italian bonds retraces back to where it was before the auction.  This

is indicative of collusion because, if the price established by the auction truly reflected the fair

market value of that bond, then the sharp inverted "V" pattern would not be observed.

154.    Figure 10 below, which depicts the French bond market, shows the same reversion

pattern seen in the 10-year Italian bonds.



**Figure 10:** Evolution of $X_t$ for French 10-year bonds

155.    As explained above, this reversion pattern is not what is expected in a competitive market and indicative of collusion because, if the price of 10-year French bonds at the time of the auction were the fair value, then a mean-reversion in yield/price immediately after the auctions would not be observed.

156.    Defendants' manipulation of European Government Bond auctions artificially raised the auction-clearing prices.  The auction-clearing price sets the benchmark price for the newly issued ("on-the-run") European Government Bond trading in the secondary market after the auctions.  Accordingly, as a direct result of Defendants' manipulation of the European Government Bond auctions, investors, including Plaintiffs and Class members, purchasing European Government Bonds post auction paid supracompetitive prices for their European Government Bonds.

**B.**    **Defendants Conspired to Fix Bid-Ask Spreads in the Secondary Market**

157.    Defendants' conspiracy was not limited to restraining the European Government Bond market in and around auctions.  As noted above, the European Commission's Statement of Objections found that Defendants' conspiracy involved ***both*** acquiring ***and*** trading European Government Bonds.   Plaintiffs identified statistical evidence consistent with Defendants' conspiracy to fix prices in the secondary market.

158.    Defendants' collusion in and around auctions depended on their ability to also restrain the secondary market because primary dealers, including MLI, NatWest, Nomura International PLC, and UniCredit Bank AG, are also responsible for generating profits from their primary dealerships by collecting trading revenues from customers in the secondary market.  For their European Government Bond business to be profitable, each Defendant needed to, and did, recoup the costs of colluding in the European Government Bonds auctions by charging collusively set and artificially inflated prices to investors in the secondary market.

159.    Offsetting the costs of participating in auctions by charging fixed prices in the secondary markets was especially important for the Primary Dealer Defendants' traders because their compensation and advancement was based in substantial part on trading revenues.  *See* Section VIII, below.  Moreover, charging supracompetitive prices to customers in the secondary market became increasingly important to Defendants during the middle of the Class Period, when European governments began issuing record amounts of bonds that Defendants were required to absorb in inventory to fulfill their obligations as primary dealers.  *See* Section VIII, below.

160.    Plaintiffs analyzed all available price quotes for European Government Bonds issued by Italy during the Class Period for which it was possible to identify the dealer who supplied the quote.  Plaintiffs selected European Government Bonds issued by Italy for several reasons.

161.   **First**, the data for European Government Bonds issued by Italy was especially robust, containing more than one billion individually identifiable price quotes.  This is likely due to the Italian Treasury's implementation of certain transparency measures over Defendants' concerted objections, namely a mandatory post-trade reporting system that collected information about secondary market bond transactions.  As discussed below, Defendants' joint lobbying efforts successfully defeated numerous other similar pro-transparency measures proposed by other countries and the European Union during the Class Period.  As a result, publicly available data for European Government Bonds issued by other Eurozone members is much more limited, and in most cases anonymous.

162.   **Second**, all four Defendants are primary dealers of Italian government bonds. Accordingly, the data included millions of price quotes specifically attributable to Defendants during the period covered by the analysis, *i.e.*, January 1, 2004 through December 31, 2015.  This made it possible to reliably compare Defendants' pricing behavior to that of other dealers for European Government Bonds issued by Italy, providing a sound basis for measuring the impact of Defendants' conduct on prices paid by European Government Bond investors during the Class Period.

163.   Plaintiffs began their analysis by adjusting the bid-ask quotes in the sample to account for the different amounts of bonds (*e.g.*, €100,000 vs. €10,000,000) reflected in each quote.  Using this "relative bid-ask spread" ensures that differences in the value of bonds quoted do not affect the analysis.  Next, Plaintiffs compared the relative bid-ask spread in Defendants' price quotes to those of non-Defendant dealers before, during, and after the Class Period.

164.    Figure 11 displays these results, with the red bars representing the average relative bid-ask spread quoted by Defendants and the green bars representing the average relative bid-ask spread for quotes by non-Defendant dealers on Italian government bonds.



165.    Figure 11 shows that the bid-ask spread quoted by Defendants during the Class Period was more than 15 basis points – or ***more than 40% – wider*** than the bid-ask spread quoted by non-Defendant primary dealers during the Class Period, when the European Commission reported that it found evidence of collusion among dealers in the secondary market for European Government Bonds.

166.    The significance of Defendants' pricing behavior during the Class Period is only highlighted by the stark contrast between their conduct during the pre- and post-Class Period.  For example, prior to the start of the Class Period, the bid-ask spread quoted by Defendants for Italian government bonds was 7.4 basis points – or ***more than 32% – narrower*** than the bid-ask spread quoted by non-Defendants' primary dealers.   The relatively narrow bid-ask spreads observed

during the pre-Class Period are consistent with competition in the European Government Bond market as Defendants and other primary dealers offered better prices to investors to win their business.

167.    The same pattern is observed following the end of the Class Period, when the European Commission's investigation suggests that Defendants' conspiracy ended.  At this point, the bid-ask spread quoted by Defendants collapses by ***almost 25%*** from 54.8 to 41.2 basis points.

168.    Plaintiffs also analyzed the changes in bid-ask spreads reflected in individual Primary Dealer Defendant's quotes between 2012 and 2013.  Next, Plaintiffs calculated the change in bid-asks spreads in quotes by non-Defendant Italian primary dealers.  Plaintiffs then compared the change in the average bid-ask spread in each Defendant's quotes with the change in the bid-ask spreads in non-Defendants' quotes.  These results are displayed in Figure 12, below.



169.    This analysis showed that each Defendant for which quotes were available between 2012 and 2013 quoted substantially ***narrower*** (*i.e.*, more than 25%) bid-ask spreads in 2013 than in 2012.[17]   Figure 12, above, shows these differences for BAML (the blue bar), Nomura (the red bar), and UniCredit (the green bar).   This observation is inconsistent with the quoting behavior of non-Defendant European Government Bond dealers, which quoted wider bid-ask spreads after the Class Period.   *See* Figure 12, above.

170.    The analysis also shows that the significant change in bid-ask spreads in Defendants' quotes was highly abnormal.   The bid-ask spread changes affecting all primary dealers cannot be explained by the structural changes that occurred between 2012 and 2013.   As the purple bar in Figure 12 illustrates, the average change in bid-ask spreads in quotes from 2012 to 2013 from non-Defendant Italian primary dealers is barely perceptible – only 0.57%.

171.    Accordingly, this analysis shows that at the end of the Class Period, BAML, Nomura, and UniCredit each substantially, and collectively narrowed their pricing for European Government Bonds.

172.    This parallel change in quoting behavior by each of these Defendants after the end of the Class Period suggests that Defendants conspired to maintain artificially wide bid-ask spreads during the Class Period, the time during which the European Commission found that the conspiracy was in effect.

173.    Accordingly, Defendants' conspiracy caused Plaintiffs and the Class to pay artificially higher prices when purchasing European Government Bonds (represented by the "ask" price quoted by Defendants) and receive artificially lower prices when selling European Government Bonds (represented by the "bid" price quoted by Defendants) during the Class Period.

---

[17]    Quote data was available for Nomura, UniCredit, and BAML during 2012 and 2013.   Quote data was not available for NatWest during this time period.

## VII.     INVESTIGATIONS INTO EUROPEAN GOVERNMENT BOND MARKET CARTEL

174.   For years, the Commission has been investigating potential cartel behavior in various sectors of the financial market, including the European Government Bond market.

175.   On January 31, 2019, the Commission issued a Statement of Objections, which is a charging instrument that reflects the Commission's preliminary view that an entity (or group of entities) violated the European competition laws.  In a press release describing the Statement of Objections, the Commission alleged that "eight banks participated in a collusive scheme that aimed at distorting competition when acquiring and trading European government bonds ('EGBs'). Traders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies.  These contacts would have taken place mainly – but not exclusively – through online chatrooms."[18]

176.   The Commission's press release noted that if its "preliminary view were confirmed, such behaviour would violate EU rules that prohibit anticompetitive business practices such as collusion on prices (Article 101 of the Treaty on the Functioning of the European Union and Article 53 of the EEA [European Economic Area] Agreement)."[19]

177.   Both Article 101 and Article 53, in their respective provisions on price collusion, prohibit "all agreements between undertakings, decisions by associations of undertakings and concerted practices which . . . directly or indirectly fix purchase or selling prices or any other trading conditions."

---

[18]     European Commission, Press Release, "*Antitrust: Commission sends Statement of Objections in European government bonds cartel*" (Jan. 31, 2019), http://europa.eu/rapid/press-release_IP-19-804_en.htm.

[19]     *Id.*

178.    Although the Statement of Objections did not identify the targets of the Commission's investigation, media and other reports have disclosed that Defendants Bank of America, RBS, Nomura, and UniCredit were four of the eight banks that received the Commission's Statement of Objections.

179.    According to the Commission, a Statement of Objections is issued once fact-finding is complete to "inform[] the parties concerned in writing of the objections raised against them."[20] Further, the Commission prepares the Statement of Objections "in view of the nature and structure of the final decision that might be adopted."[21]

180.    To investigate a potential action, the Commission's investigative powers allow it to: (a) send information requests to companies believed to have engaged in anticompetitive conduct; (b) conduct on-site inspections of a company's premises; (c) examine a company's business records; (d) remove copies of those records from the premises; and (e) ask members of staff or company representatives questions relating to the subject matter and purpose of the inspection and record the answers.[22]

181.    The Commission's investigation process is outlined in Figure 13, below.

---

[20]     *Id.*

[21]     *Antitrust Manual of Procedures, Internal DG Competition working documents on procedures for the application of Articles 101 and 102 TFEU*, at 4, EUROPEAN COMMISSION (Mar. 2012), htpp://ec.europa.eu/competition/antitrust/antitrust_manproc_3_2012_en.pdf.

[22]     European Commission, Article 20(2) of Regulation No. 1/2003, ¶4 (Sept. 11, 2015) http://ec.europa.eu/competition/antitrust/legislation/explanatory_note.pdf.

**Figure 13 – European Commission's Case Investigation Process**



182.     If the Commission confirms the violation, the target banks could be subject to fines equal to 10% of the banks' global revenues.

## VIII.    THE EUROPEAN GOVERNMENT BOND MARKET STRUCTURE SUPPORTS THE EXISTENCE OF A EUROPEAN GOVERNMENT BOND CARTEL

183.     Additional features of the European Government Bond market support the inference of concerted action by Defendants to fix, raise, maintain, stabilize, or otherwise manipulate the prices of European Government Bonds.

184.     ***First***, Defendants, as primary dealers for European Government Bonds, wield enormous power in the European Government Bond market because "most bonds in the auctions are bought by a relatively small number of primary dealers."[23] European central governments and other market participants rely on Defendants to make markets and provide liquidity for European

---

[23]     Roel Beetsma, et al., *Price Effects of Sovereign Debt Auctions in the Euro-Zone: The Role of the Crisis*, at 6, Working Paper Series (No. 1595) (Sept. 2013), https://www.ecb.europa.eu/pub/pdf/scpwps/ecbwp1595.pdf.

Government Bonds – *i.e.*, to stand ready to trade European Government Bonds with anyone, at any time.

185.    With power concentrated in the hands of a relatively small number of dealers and significant financial incentives for conspiring, the conspiring banks were able to form and maintain their cartel.

186.    **Second**, the European Government Bond market has high barriers to entry.  Other entities cannot easily enter the primary dealer market because serving as a primary dealer is capital-intensive – requiring dealers to bid at auctions and hold European Government Bonds until they are sold to investors and to conduct market-making activities in the secondary market.  A dealer must have a large balance sheet and sufficient capital reserves to absorb new European Government Bond inventory as it becomes available for purchase by investors.  This is significant because banks are required to maintain minimum capital ratios to ensure solvency in case any of the bank's assets devalue, and therefore are selective about where they deploy capital.

187.    The Bank for International Settlements, a policy and research organization owned by 60 of the world's leading central banks, explained that barriers to entry for prospective dealers in OTC markets like the European Government Bond market include:

> a sufficiently large client base to get a good view of the flow of orders; the capacity to take on large principal positions; continuous access to multiple markets, including funding and hedging markets; the ability to manage risk, especially the risk of holding assets in inventory; and market expertise in providing competitive quotes for a range of securities.[24]

188.    **Third**, the structure of the primary and secondary markets for European Government Bonds was susceptible to collusion.  As the largest players among the exclusive group

---

[24]    BIS Quarterly Review, *International banking and financial market developments*, at 99 (March 2015), https://www.bis.org/publ/qtrpdf/r_qt1503.pdf.

of entities qualified to bid at auctions for European Government Bonds, Defendants and their co-conspirators possessed significant power over the supply of bonds to the market and the prices they were sold at.  Defendants and their co-conspirators knew that there would be a new supply of bonds in the market and that together they would own the entire supply of these bonds.  They also knew that investors, like Plaintiffs and the Class, would be forced to buy European Government Bonds from them in the secondary market because investors do not have direct access to the interbank market.  By virtue of their positions as market makers in the secondary market as well, Defendants and their co-conspirators controlled the pricing of European Government Bonds before, during, and after the auctions.

189.    The European Government Bond market is also characterized by very large, relatively infrequent customer transactions.  For example, the average size of a customer transaction during the Class Period reached a record high of 18 million euros (up from 10 million euros in 2006).  This is significantly larger than the typical transaction size in other fixed income markets.  Researchers reported that European Government Bond trading was "dominated by large players executing large transactions" during the Class Period.[25]  Further, the relatively lower volume of transactions, as compared to other fixed income products, allowed Defendants to more easily monitor and police the quoting behavior of their co-conspirators.

190.    Additionally, investor participation in the European Government Bond market is marked by fairly routine, predictable trading schedules.  Certain U.S. pension and investment funds holding European Government Bonds have investment mandates that require periodic rebalancing of fixed income portfolios to address fluctuations in the credit and interest rate risk of their investments.  This rebalancing can include, among other things, the purchase of newer (*i.e.*, on-

---

[25]    Hassen Chtourou, *Analysis of the European Government Bonds and Debt after the European Financial Crisis*, J. OF CENTRUM CATHEDRA: THE BUS. AND ECON. RES. J., Vol. 8 Issue: 2, at 148 (2015).

the-run) European Government Bond issues and the sale of older (*i.e.*, off-the-run) European Government Bond issues.  Rebalancing generally occurs at regular monthly or quarterly intervals.  These predictable trading patterns by investors facilitated Defendants' coordination of prices to investors seeking to buy and sell European Government Bonds.

191.    By virtue of their positions as market makers in the secondary market as well, Defendants and their co-conspirators controlled the pricing of European Government Bonds before, during, and after the auctions.

192.    **Fourth**, price discovery for non-dealers in the European Government Bond market is difficult.  There is no central, all-to-all, exchange where dealers and non-dealers alike can see bid and ask quotes in real-time, as there is for other asset classes.  Customers do not have access to the real-time price feeds available to dealers on interdealer broker platforms, like MTS or BrokerTec.  Rather, customers need to request quotes from individual dealers (including Defendants) – either electronically or through phone communication.

193.    During the Class Period, Defendants also successfully defeated transparency measures in the European Government Bond market through their trade association, the EPDA.  For example, in 2007, Defendants and their co-conspirators successfully opposed new transparency measures proposed by the European Commission that would have disclosed pricing to European Government Bond customers.  Later, in 2008, the EPDA rallied against a proposal by the Italian Treasury that would have made trading prices between Defendants and their customers for Italian European Government Bonds accessible to investors.  Acting through the EPDA, Defendants and their co-conspirators argued that "imposing more transparency could be harmful."  Defendants recommended that regulators should "leave further transparency initiatives to the industry" and argued that information asymmetries (such as the inability of investors to see pricing

and trading information) with respect to European Government Bond trading were a sign of an efficient European Government Bond market.

194.   Defendants claimed that an opaque European Government Bond market was necessary to incentivize them to continue operating as European Government Bond primary dealers.  Thus, Defendants raised the implicit threat that transparency in the European Government Bond market would cause them to retreat from their market-making obligations and withhold liquidity.   But this threat masked Defendants' true motive – to protect their information asymmetry, and when advantageous, collude on prices to customers.

195.   Without access to reliable pricing information, investors like Plaintiffs were forced to turn to Defendants when transacting in European Government Bonds and to rely on Defendants to provide competitive European Government Bond pricing.  The EPDA noted during the Class Period that, in trades between European Government Bond primary dealers and customers, trade information is "only available to direct counterparties to the trade."

196.   Transparency enables investors to identify dealers that offer superior prices, allowing them to seek out those dealers.  Thus, transparency helps the most competitive dealers attract market share.  However, price transparency was a risk to Defendants' and their co-conspirators' cartel because it would have allowed investors to see prices charged by European Government Bond dealers not participating in the cartel.   Keeping the status quo enabled Defendants and their co-conspirators to continue dictating anti-competitive prices to uninformed investors handicapped by an inability to observe prices for European Government Bond transactions.  Had Plaintiffs and the Class been able to observe market-wide pricing, it would have been readily apparent that Defendants and their co-conspirators were charging uniform, supra-competitive prices.

197.   **Fifth**, Defendants' conduct was contrary to their individual economic interests.  For example, if a Defendant unilaterally widened its bid-ask spread prices to customers on a consistent basis, while others failed to do similarly, few would trade with that conspiring bank.  Moreover, consistently failing to keep competitive spreads or make markets for customers would jeopardize a conspiring bank's privileged status as a primary dealer with European Government Bond issuers, potentially leading to its removal as a primary dealer.  If a conspiring bank lost its primary dealer status, it would no longer have privileged access to information from Eurozone central banks.  This would, in turn, make that conspiring bank's services less attractive to European Government Bond customers.  Further, as explained above, it was also against an individual Defendant's individual economic self-interest to manipulate the outcome of European Government Bond auctions.

198.   **Sixth**, Defendants had strong incentives to collusively bid-up the prices at European Government Bond auctions, even if the cost of doing so was high.  Strong performances at the auction – as determined by the amount a dealer is ultimately able to secure at an auction – improves a dealer's ranking.  Rankings are then used as the basis for selecting a primary dealer to participate in more lucrative transactions, such as lead-managing a syndicate deal, interest rate swap transactions, and investment banking advisory projects.  The better a dealer's ranking, the better its chances of securing these more lucrative deals.  Conspiring to bid up the auctions placed Defendants in a better position to secure these prized deals for themselves.

199.   Avoiding competition also enabled Defendants to artificially widen bid-ask spreads and retain supra-competitive profits on their European Government Bond trades with Plaintiffs and members of the Class.  Defendants, by virtue of their privileged position as primary dealers of European Government Bonds, had a wealth of knowledge about the offerings themselves, as well as customer identities, demand, trading habits, and order flow in both the primary and secondary

markets.  Sharing this information enabled the conspiring banks to coordinate on bid and ask prices to the detriment of Plaintiffs and members of the Class.

200.    In addition, upwards of 50% of total compensation for sales and trading staff within Defendants' and their co-conspirators' European Government Bond trading and sales businesses was determined according to the amount of profits/losses generated, both collectively (*i.e.*, based on the profitability of the European Government Bond trading and sales business as a whole) and individually (*i.e.*, based on the profit derived from the European Government Bond transactions entered into by the individual).  Job promotions were similarly determined according to the amount of profits/losses derived from European Government Bond transactions.

201.    ***Seventh***, sharing proprietary trading information was contrary to Defendants' individual economic interests in the absence of a conspiracy.  Defendants directly acknowledged that sharing trading and pricing information would have been dangerous in the hands of true competitors during the Class Period because it would allow rival dealers to "trade ahead" of the dealer's disclosed trade in the dealer-to-dealer market.  Trading ahead occurs where a dealer learns ahead of time that another market participant intends to execute a trade, and then establishes a position that will benefit from the move in the market caused by the anticipated trade.  This causes the market price to move against the other market participant, benefitting the dealer who engaged in "trading ahead."  Accordingly, no one Defendant would share confidential order information because an opportunistic trader at a rival dealer could capitalize on the information to the detriment of the sharing Defendant.

202.    Defendants themselves acknowledged that sharing proprietary information about planned trades and customer orders is against the economic self-interest of any rational, non-conspiring dealer and harms customers by causing inferior prices.  In a position paper on price

transparency that the EPDA submitted to a European regulator during the Class Period, the EPDA wrote that "the dealer (and indeed its customer) will be very concerned about other market participants being able to react ahead of the dealer trying to liquidate its position which it may have obtained in a transaction with a customer."

203.   **Eighth**, the same traders are involved in both the primary and secondary market for European Government Bonds, and these traders operate in a tightly knit community.  Many traders have worked at multiple dealer banks during their careers and have had repetitive dealings with each other, as European Government Bond auctions were held frequently.

204.   These traders built friendships and networks with other primary dealer traders that extended beyond the office and into their respective personal lives.  It was not uncommon for rival European Government Bond traders to go out for dinners or drinks arranged by interdealer brokers. Familiarity with each other and the friendships built over time facilitated each conspiring trader's willingness to exchange confidential, business-sensitive information and collaborate, rather than compete.

205.   **Ninth**, there was a high level of communications among Defendants and their co-conspirators.  During the Class Period, Defendants' traders routinely discussed sensitive trading and order information directly with each other in electronic platforms and through communications with interdealer brokers.  As previously discussed, traders' exchange of confidential customer order information in online chatrooms is unnecessary for the purposes of making markets and is contrary to their individual self-interest.

206.   Defendants also failed to monitor these trader communications.  These oversight failures allowed employees in Defendants' European Government Bond trading and sales

businesses to fix prices, share sensitive customer information, and coordinate trading strategies throughout the Class Period.

207.    **Tenth**, Defendants and their co-conspirators had the opportunity to collude through their involvement in industry trade associations, such as the AFME and EPDA.

208.    Within the AFME is the primary dealers board (the "Board"), which "addresses developments affecting the European government market specifically and aims to build consensus within the industry and acts as a bridge between financial market participants and policymakers." One of the Board's priorities is to "[a]ctively participate in industry events which focus on rates issues."[26]  Defendants and their co-conspirators had ample opportunity to discuss issues affecting the European Government Bond market, including matters affecting the primary and secondary markets for these products.  During the Class Period, several of the largest European Government Bond primary dealers had representatives on the Board, including William Scott of Bank of America, Renos Dimitriou of RBS, Paul Spurin of Nomura, and Karl-Heinz Riehm of UniCredit.

209.    Before the creation of the AFME in 2009, Defendants and their co-conspirators were members of the EPDA.  European Government Bond primary dealers founded the EPDA to "advocate [ ] on behalf of eurozone government bond [p]rimary [d]ealers with relevant government and regulatory bodies through dialogue and market best-practices recommendations."[27]  During the Class Period, the EPDA set industry standards applicable to Defendants' European Government Bond trading and sales businesses.

210.    Defendants' high-ranking European Government Bond sales and trading personnel regularly met in person at conferences, meetings, and other events hosted by the AFME and the

---

[26]       AFME, *Primary Dealers*, https://www.afme.eu/en/divisions-and-committees/primary-deals-rates/.

[27]       AFME, *Primary Dealers Handbook* (2015), ¶178: https://www.afme.eu/globalassets/downloads/publications/afme-primary-dealers-handbook-q4-2015.pdf at i.

EPDA.  These meetings provided another forum for Defendants' European Government Bond trading and sales personnel to establish closer relationships while discussing sensitive subjects such as European Government Bond pricing.  For example, the EPDA held annual conferences beginning in 2006 at locations throughout Europe.  Defendants' European Government Bond trading and sales personnel attended these conferences.

211.    The AFME/EPDA held an Annual European Government Bond Conference in each year of the Class Period.  Defendants' European Government Bond trading and sales personnel attended these conferences and afforded Defendants an opportunity to meet in-person behind closed doors in bars, restaurants, hospitality suites, and hotel rooms adjoining the conference space.

212.    Promotional materials for the Annual European Government Bond Conference state that it as the "ONLY event of its kind!," where attendees could "[j]oin 200 senior representatives from debt management offices (DMOs), government bond investors, central banks, regulators, primary dealers, trading platforms and brokers . . . ."[28]  Each conference included speeches, roundtable and moderated panel discussions, presentations, break-out sessions, lunches, dinners, and networking sessions.

213.    The AFME's 7th Annual European Government Bond Conference was held on November 8-9, 2012 in Brussels, Belgium.  Confirmed speakers at that year's conference included representatives from the following Defendant banks:[29]

    a.   **Bank of America Defendants:** Yunho Song, identified as Managing Director and Head of EMEA [Europe, Middle East, and Africa] Global Rates & Currencies (GRC) at Bank of America Merrill Lynch.  In that role Song was "responsible for managing the EMEA foreign exchange, government bonds, interest rate swaps,

---

[28]    https://www.etfexpress.com/event/hedge-funds/afme-6th-annual-european-government-bond-conference.

[29]    https://web.archive.org/web/20150115212949/http:/afme.eu/Events/2012/Government-Bonds/Speakers.

interest rate options, structured products, repo-financing, and financial futures and options businesses." Earlier in the Class Period, Song worked for Merrill Lynch in New York.

b. **Nomura:** Paul Spurin, Managing Director of EMEA Flow Rates Trading for Nomura International PLC. In that role Spurin "r[an] the European Primary Dealership business and business strategy for EMEA flow rates Trading."

214. Bank of America Merrill Lynch was also a named general sponsor of the 7th Annual European Government Bond Conference and the sole sponsor of the conference's main "Networking Lunch" event, held on November 9, 2012.[30]

## IX. SIMILAR WRONGDOING IN OTHER MARKETS SUPPORTS THE PLAUSIBILITY OF DEFENDANTS' MANIPULATION OF EUROPEAN GOVERNMENT BONDS

215. The Commission's announcement marks the fifth time that Defendants, their co-conspirators, and affiliated entities within the same bond trading and sales divisions have been investigated for engaging in anticompetitive conduct in bond markets in recent years. The European Government Bond market has key features in common with these other bond markets in which Defendants and their co-conspirators have engaged in similar anticompetitive conduct. These features include a lack of price transparency and a high degree of concentration by the largest dealers. In 2017, the United Kingdom Financial Conduct Authority ("FCA") opened an investigation of several large dealers for manipulating Sovereign, Supranational and Agency ("SSA") bonds. Also in 2017, Mexico's competition regulator announced a probe into seven of the largest dealers in the Mexican government bond market. The Department of Justice ("DOJ") Antitrust Division is presently investigating price-fixing by dealers in both the U.S. Treasuries market and market for bonds issued by Fannie Mae and Freddie Mac.

---

[30]    https://web.archive.org/web/20150120042611/http://afme.eu/Events/2012/Government-Bonds/Programme/.

216.   Defendants and their co-conspirators engaged in multiple similar price-fixing conspiracies in various financial markets during the Class Period, which led government investigators to find parallel deficiencies in oversight and control within Defendants' and their co-conspirators' trading and sales businesses.  These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

217.   These findings further support the conspiracy alleged in this Complaint because they demonstrate that Defendants and their co-conspirators had deficient compliance and oversight systems in their sales and trading businesses during the Class Period.

218.   <u>FX</u>:  Multiple banks, including Defendants RBS and Bank of America, failed to control or detect rampant misconduct amongst their trading staff in the FX market.  These failures allowed traders to fix bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices, and share confidential customer order information and proprietary information on trading positions with competitors in group chatrooms with names like "The Cartel." Defendants' deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years during the Class Period.  The DOJ's Antitrust Division has obtained a guilty plea from RBS for failing to adequately monitor anticompetitive conduct in its subsidiaries' trading businesses and operating inadequate oversight measures that allowed trading and sales staff to engage in a years'-long conspiracy to fix FX prices during the Class Period.  RBS's parent company paid fines related to its FX trading to the Board of Governors of the Federal Reserve System (the "Federal Reserve"), FCA, U.S. Commodity Futures Trading Commission ("CFTC"), and most recently, the Swiss competition authority, WEKO.  Bank of America's parent company also paid fines related to its FX trading to the Federal Reserve and the Office of the Comptroller of the Currency.

219.   <u>LIBOR/Euribor/Yen LIBOR/Swiss franc LIBOR</u>:  Government investigations and civil lawsuits revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (U.S. dollar LIBOR, Euribor, Yen LIBOR, Swiss franc LIBOR) during the Class Period.  These investigations have led to dozens of fines and settlements for price-fixing by Bank of America Corporation (the parent of Defendants BANA and BAML International) and the corporate parent of RBS.  Regulators found that trading staff within these banks engaged in widespread misconduct during the Class Period, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

220.   <u>ISDAfix</u>:  The CFTC issued Orders Instituting Proceedings Pursuant to §§6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposition Remedial Sanctions with Bank of America, N.A., and The Royal Bank of Scotland plc for operating deficient compliance and oversight functions that allowed traders to systematically manipulate the U.S. dollar ISDAfix benchmark during the Class Period to boost trading profits.

221.   <u>SSA Bonds</u>:  A DOJ investigation into price-fixing in the SSA bond market became public in December 2015.  It quickly prompted simultaneous cartel investigations by the FCA and the Commission, and the filing of private lawsuits.  The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks and hundreds of redacted chats and transcripts that demonstrated that these banks failed to detect and deter collusive communications by trading and sales staff in their bond businesses.  In August 2017, Deutsche Bank AG and Bank of America Corporation agreed to settle for a total of $65.5 million.

222.   <u>Mexican Government Bonds</u>:  The Mexican antitrust regulator, the Comisión Federal de Competencia Económica, announced in April 2017 that it uncovered evidence of

anticompetitive conduct among dealers in the Mexican government bond market, including subsidiaries of Bank of America Corporation.  At least one bank was accepted into its cartel leniency program after admitting to participation in a conspiracy to fix Mexican government bond prices.

223.    <u>Swiss Franc Interest Rate Derivatives</u>:  The Commission fined four banks a total of €32.4 million, and RBS's parent company received leniency for its fine of around €5 million, for conspiring to fix bid-ask spreads in the market for interest rate derivatives denominated in Swiss francs.  The Swiss franc interest rate derivatives conspiracy operated similarly to the conspiracy alleged in this Complaint and involved an agreement among horizontal competitors in the OTC market for derivatives to charge inflated bid-ask spreads to customers.  RBS failed to detect and deter collusive communications among traders at these banks.

## X.        CLASS ACTION ALLEGATIONS

224.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who purchased or sold European Government Bonds in the United States directly from Defendants from at least as early as January 1, 2007 through at least December 31, 2012 (the "Class Period").

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

225.    Plaintiffs believe that there are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

226.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)      whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for European Government Bonds in violation of the Sherman Act;

(b)      the identity of the participants in the conspiracy;

(c)      the duration of the conspiracy;

(d)      the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)      whether the Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the Class;

(f)      whether Defendants fraudulently concealed the conspiracy's existence from Plaintiffs and the Class; and

(g)      the appropriate measure of damages sustained by Plaintiffs and the Class.

227.    Plaintiffs' claims are typical of the claims of the other Class members.  Plaintiffs and Class members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint.  The injuries and damages of each Class member were directly caused by Defendants' wrongful conduct.

228.    Plaintiffs will fairly and adequately protect the interests of Class members.  Plaintiffs are adequate representatives of the Class and have no interests adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

229.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

230.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

231.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation would entail.  The Class is readily definable and is one for which records should exist in the files of Defendants, Class members, or the public record.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## XI.    DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT

232.    Defendants concealed their wrongdoing in manipulating the prices of European Government Bonds sold to investors.  Thus, the statutes of limitations relating to the claim for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private unregulated conduct.

233.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the market for European Government Bonds.

234.    Neither Plaintiffs nor Class members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing the Commission's Statement of Objections concerning the European Government Bond market.  Plaintiffs and the Class also

lacked any basis for identifying the wrongdoers or calculating damages before that date. To date, the four other co-conspirators that received a Statement of Objections from the Commission remain undisclosed to the public. In fact, Defendants' collusive activities were so well-hidden that regulators in Europe and elsewhere were unaware of such conduct for years.

235.   Only after the Commission publicly announced its preliminary findings of price collusion in the European Government Bond market on January 31, 2019, did Plaintiffs have a sufficient basis to investigate Defendants' possible collusion. Even now, most details of the Commission's proceedings remain confidential and undisclosed.

236.   Reasonable due diligence could not have uncovered the conspiracy because: (i) Defendants' trading positions and trading strategies in the European Government Bond market are not publicly available; (ii) the bilateral, non-exchange traded nature of European Government Bond transactions make observing anticompetitive behavior in that market exceedingly difficult; (iii) the highly specialized and esoteric nature of the different aspects of the European Government Bond market makes it exceedingly difficult for an ordinary person to assess improprieties; (iv) neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of European Government Bonds; and (v) Plaintiffs and members of the Class were not parties to Defendants' and their co-conspirators' communications in private chatrooms in which they agreed to fix the prices of European Government Bonds.

237.   Defendants also took active steps to conceal evidence of their misconduct from Plaintiffs, the Class, government regulators, and the public by holding out their activities in the European Government Bond market as good-faith market-making conduct. Indeed, each

Defendant's codes of conduct represented that their operations were above board, providing a false sense of security to unwitting investors:

(a)    ***Bank of America***.  Bank of America's Code of Ethics stated that it "is more than just words on a page.  It is a living and breathing document that provides us with basic guidelines of business practice and how we, as Bank of America associates, are expected to act both personally and professionally."[31]  Bank of America expected its employees to "deal fairly with [its] customers, competitors, vendors and teammates" and refrain from taking "unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of facts or any other unfair-dealing practice."[32]

(b)    ***Merrill Lynch***.  Merrill Lynch's Code of Conduct stated that "[e]very Merrill Lynch person must deal fairly with Merrill Lynch's clients, vendors, competitors and fellow employees.  No Merrill Lynch person may take advantage of anyone through unethical or illegal measures, such as manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practices."  In addition, the Code of Conduct stated that "All Merrill Lynch persons must guard against unfair competitive practices and exercise extreme caution to avoid conduct that might violate antitrust laws or other rules prohibiting anti-competitive activities. . . .  Employees must avoid any discussion with competitors of proprietary or confidential information, business plans or topics such as pricing or sales policies

---

[31]    Bank of America Corporation, Code of Ethics, at 3 (2010), http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MjU0Mzh8Q2hpbGRJRD0tMXxUeXBlPTM=&t=1.

[32]    Bank of America Corporation, Code of Ethics, at 2, https://www.banktrack.org/download/code_of_ethics_20/190318code_of_ethics_dec2013.pdf.

– the discussion of which could be viewed as an attempt to make joint rather than independent business decisions."[33]

(c)    ***RBS***.  RBS's Code of Conduct was designed to promote, among other things "honest and ethical conduct" and "compliance with applicable laws, rules and regulations."[34]  The Code of Conduct stated that RBS was "strongly committed to conducting [its] business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations.  No Group employee shall commit an illegal or unethical act, or instruct others to do so for any reason."[35]

(d)    ***Nomura***.  Nomura's Code of Ethics stated that "Nomura People must respect fair business practices in jurisdictions where they operate and endeavor to deal fairly with Nomura Group's customers, suppliers, competitors and employees.  Nomura People should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other unfair-dealing practice."[36]  Moreover, under the Code of Ethics, all Nomura financial professionals must comply "with the letter and spirit of all applicable laws, rules and regulations[.]"[37]

(e)    ***UniCredit***.  UniCredit's Code of Ethics stated that its employees "are required to comply with rules applicable in all countries in which the Bank operates and/or in

---

[33]    Merrill Lynch Guidelines for Business Conduct, at 7, https://www.sec.gov/Archives/edgar/data/65100/000095012306002318/x16704exv14w1.htm.

[34]    RBS Code of Conduct, at 14, http://www.rbsworldwide.com/downloads/pdf/about_rbs/RBS_Group_Code_Conduct.pdf.

[35]    *Id*.

[36]    Nomura, Basic Principles & Code of Conduct | Code of Ethics (2010), at §7(a), http://www.nomuraholdings.com/investor/library/ar/csr/data/2010.pdf.

[37]    *Id*.

which they (for example in the case of third parties) provide their work on behalf and/or in the interest of the Bank."  Likewise all employees "are required to conduct their business in full compliance with any applicable competition laws and regulations."[38]

(f)     Defendants also concealed their conduct by: (i) maintaining the secrecy of their price-fixing scheme; (ii) avoiding any discussion in public fora regarding their collusive activities and manipulation of European Government Bond prices; and (iii) using non-public proprietary electronic communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies.

238.    Defendants failed to implement the proper internal controls to detect misconduct concerning price-fixing of European Government Bonds.  Such internal failures made it more difficult for Plaintiffs, the Class, government regulators, and the public to discover Defendants' misconduct.

239.    As a result of Defendants' affirmative steps to conceal their improper conduct; their willful decision not to implement proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about the entities and the material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations were tolled for Plaintiffs' and the Class's claims.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF 15 U.S.C. §1**
**CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE**

240.    Plaintiffs incorporate the preceding paragraphs by reference.

---

[38]     UniCredit S.p.A., Code of Ethics (2018), at 3, https://www.unicreditgroup.eu/content/dam/ unicreditgroup-eu/documents/en/governance/supervisory-body/Code-of-Ethics-231.pdf.

241.    Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

242.    During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating the prices of European Government Bonds sold in the United States.

243.    This conspiracy to manipulate European Government Bond prices caused injury to both Plaintiffs and the Class by depriving them of the benefit of competitive European Government Bond prices reflecting true market fundamentals for some period during and following Defendants' unlawful conduct, and thus, Plaintiffs and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

244.    The conspiracy is a *per se* violation of §1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the European Government Bond market.  There is no legitimate business justification for, nor pro-competitive benefits from, Defendants' conduct.  Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

245.    As a direct and proximate result of Defendants' violation of §1 of the Sherman Act, Plaintiffs and the Class have been injured in their business and property throughout the Class Period.

246.    Plaintiffs and the Class are entitled to treble damages for the violations of the Sherman Act alleged in this Complaint.

## XII.    RELIEF REQUESTED

Accordingly, Plaintiffs demand relief as follows:

(A)     That the Court certify this lawsuit as a class action under Fed. R. Civ. P. 23(a) and (b)(3), that Plaintiffs be designated as Class Representatives, that Plaintiffs' counsel be appointed as counsel for the Class, and that the Court directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to each and every member of the Class;

(B)     That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate §1 of the Sherman Act;

(C)     That the Court award Plaintiffs and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest at the highest legal rate;

(D)     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(E)     That the Court directs such further relief as it may deem just and proper.

## XIII.     DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: September 6, 2019

| **LABATON SUCHAROW LLP** | **SCOTT+SCOTT ATTORNEYS AT LAW LLP** | **LOWEY DANNENBERG, P.C.** |
|---|---|---|
| *s/ Gregory S. Asciolla* | *s/ Christopher M. Burke* | *s/ Vincent Briganti* |
| GREGORY S. ASCIOLLA | CHRISTOPHER M. BURKE | VINCENT BRIGANTI |
| JAY L. HIMES | 600 W. Broadway, Suite 3300 | GEOFFREY M. HORN |
| KARIN E. GARVEY | San Diego, CA 92101 | CHRISTIAN LEVIS |
| MATTHEW J. PEREZ | Telephone: 619-233-4565 | ROLAND R. ST. LOUIS, III |
| 140 Broadway | Facsimile:  619-233-0508 | IAN W. SLOSS |
| New York, NY 10005 | cburke@scott-scott.com | 44 South Broadway, Suite 1100 |
| Telephone: 212-907-0700 | | White Plains, NY 10601 |
| Facsimile:  212-818-0477 | | Telephone: 914-997-0500 |
| gasciolla@labaton.com | DAVID R. SCOTT | Facsimile:  914-997-0035 |
| jhimes@labaton.com | **SCOTT+SCOTT** | vbriganti@lowey.com |
| kgarvey@labaton.com | **ATTORNEYS AT LAW LLP** | ghorn@lowey.com |
| | 156 South Main Street | |

mperez@labaton.com

P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4422
david.scott@scott-scott.com

DONALD A. BROGGI
KRISTEN ANDERSON
MICHELLE E. CONSTON
JUSTIN W. BATTEN
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
dbroggi@scott-scott.com
kanderson@scott-scott.com
mconston@scott-scott.com
jbatten@scott-scott.com

clevis@lowey.com
rstlouis@lowey.com
isloss@lowey.com

CHARLES KOPEL
**LOWEY DANNENBERG,
P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: 215-399-4770
Facsimile:  610-862-9777
ckopel@lowey.com

*Interim Co-Lead Counsel for the Class*

DAVID A. SLOSSBERG
JEFFREY P. NICHOLS
**HURWITZ SAGARIN SLOSSBERG
& KNUFF, LLC**
147 North Broad Street
Milford, CT 06460
Telephone: 203-877-8000
Facsimile:  203-878-9800
dslossberg@hssklaw.com
jnichols@hssklaw.com

JASON A. ZWEIG
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: 212-752-5455
Facsimile:  917-310-2980
jasonz@hbsslaw.com

*Additional Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 s/ Christopher M. Burke
Christopher M. Burke