UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   :
IN RE EUROPEAN GOVERNMENT BONDS    :    19 Civ. 2601 (VM)
ANTITRUST LITIGATION               :
                                   :    **DECISION AND ORDER**
                                   :
-----------------------------------X
**VICTOR MARRERO, United States District Judge.**

Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), Boston Retirement System ("BRS"), and Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103," and collectively with Ohio Carpenters and BRS, "Plaintiffs") bring this putative antitrust class action, on behalf of themselves and all others similarly situated, against defendants Bank of America Merrill Lynch International Designated Activity Company ("BAML International"), Merrill Lynch International ("MLI"), Natixis S.A. ("Natixis"), NatWest Markets plc ("Natwest Markets"), Nomura International plc ("Nomura International"), UBS AG, UBS Europe SE ("UBS Europe"), UniCredit Bank AG ("UniCredit Bank," and collectively with the foregoing defendants, "Foreign Defendants," and collectively with all foregoing defendants except UBS AG, "Primary Dealer Defendants"), Bank of America, N.A. ("BANA"), NatWest Markets Securities Inc. ("NMSI"), Nomura Securities International Inc. ("NSI"), UBS Securities LLC

("UBS Securities"), and UniCredit Capital Markets LLC ("UCM," and collectively with all foregoing defendants, "Defendants"). Plaintiffs purport to represent a class of all persons or entities who purchased or sold European Government Bonds ("EGBs") in the United States directly from Defendants between January 1, 2007 and December 31, 2012 (the "Class Period"), with the exception of Defendants, their employees and affiliates, and the United States government. In their Third Amended Consolidated Class Action Complaint, Plaintiffs claim that Defendants conspired to fix EGB prices during the Class Period, in violation of 15 U.S.C. Section 1 (the "Sherman Act"). (See "TAC," Dkt. No. 87.)

By letter dated February 26, 2020, Defendants notified Plaintiffs of their intent to move to dismiss the TAC pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) ("Rule 12(b)(2)" and "Rule 12(b)(6)," respectively). (See "Letter Motion," Dkt. No. 110.) Defendants argue that the TAC is untimely, fails to plead personal jurisdiction over the Foreign Defendants, and fails to adequately plead either antitrust standing or an antitrust conspiracy as to all Defendants. By letter dated March 11, 2020, Plaintiffs responded to the Letter Motion

and opposed all four potential grounds for dismissal. (See "Opposition," Dkt. No. 114.)

The Court now construes Defendants' Letter Motion as a motion to dismiss the TAC pursuant to Rules 12(b)(2) and 12(b)(6).[1] For the reasons set forth below, the Letter Motion is GRANTED as to BAML International, MLI, BANA, NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, UniCredit Bank and UCM, and DENIED as to Natixis, Nomura International, and NSI. Plaintiffs are directed to inform the Court within twenty days of this Order whether they have cause to amend the TAC or will instead proceed against the remaining defendants: Natixis, Nomura International, and NSI.

## I.   BACKGROUND[2]

### A.   FACTUAL BACKGROUND

EGBs are sovereign debt securities issued by European central governments that have adopted the Euro as their official currency, including Austria, Belgium, Finland, France, Germany, Italy, Portugal, Greece, Ireland, the

---

[1] Kapitalforeningen Lægernes Invest v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (Mem.) (affirming district court ruling deeming exchange of letters as motion to dismiss).

[2] Except as otherwise noted, the factual background below derives from the TAC and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See infra Section II.A. Except where specifically quoted, no further citation will be made to the TAC.

Netherlands, and Spain, among others (collectively, the "Eurozone"). EGBs are treated as a single class of debt securities because Eurozone members share common currency, certain "convergence criteria" that aim at the development of an integrated financial market for the Eurozone, and centralized institutions that set common monetary policy, such as the European Central Bank. The European Central Bank observed that the EGB market was highly integrated by March 2007, as yields for Eurozone issuers' bonds converged due to common monetary policy and other shared factors. As of 2012, global EGB holdings approximated $8 trillion, and the EGB holdings of United States investors consistently amounted to hundreds of billions of dollars throughout the Class Period. Individual EGB transactions were also sizeable, averaging up to €18 million per customer transaction during the Class Period.

EGB markets consequently rely upon large financial institutions like the Defendants to act as dealers and market makers. Defendants generally conduct EGB business through their respective fixed income divisions, which are global in nature and often include employees of multiple entities within a given corporate family. Defendants play multiple roles in the EGB markets. Most notably, Primary

Dealer Defendants acquire EGBs from government issuers in the "Primary Market," and Defendants trade those EGBs with other investors in the "Secondary Market." Plaintiffs claim that Defendants participated in a price-fixing conspiracy encompassing both of these markets.

1. The Primary Market

European government issuers first distribute their EGBs to institutions including Primary Dealer Defendants in the "Primary Market." Distribution typically occurs via auction, though the details of distribution may vary to some extent by government issuer. Primary dealers bid on EGBs based on price and the volume of EGBs to acquire, and issuers typically favor dealers that pay higher prices and commit to acquiring large volumes of EGBs for resale. As a result, the primary dealers that consistently acquire EGBs in the Primary Market are not particularly numerous. The premier trade association for EGBs, the Association for Financial Markets in Europe ("AFME"), listed twenty-five "Primary Dealer Members" including Primary Dealer Defendants in 2012. In 2008, members of the AFME's predecessor trade organization collectively traded 85 percent of all volume in the EGB market. Furthermore, because the EGB market is highly integrated, Primary Dealer

Defendants structure their EGB business so that the same set of traders oversees activity in the various Eurozone auctions that constitute the Primary Market.

Plaintiffs allege that Primary Dealer Defendants colluded when bidding for EGBs in the Primary Market. Because EGB issuers favor dealers who purchase greater amounts of EGBs at greater prices and then successfully resell those bonds to other investors, Primary Dealer Defendants allegedly agreed to submit bids above competitive market prices and thus secure greater EGB inventories (or other lucrative forms of business) from the Eurozone governments. Primary Dealer Defendants allegedly reached this agreement through the use of private online chatrooms, in which their traders would share confidential and commercially sensitive information about bidding interest and customer orders.

Plaintiffs use multiple statistical analyses to illustrate how the alleged anticompetitive coordination in the Primary Market occurred. Plaintiffs analyzed disparities between primary dealers' collective bids for Italian and French government bonds, which constituted roughly 47 percent of the Eurozone's outstanding government debt in 2012, and compared them to the prices that

customers indicated they would be willing to pay or receive for the same bonds in a pre-auction "When-Issued Market."[3]

Plaintiffs allege that their analysis of the EGBs' yield-to-maturity,[4] which is inversely related to the bonds' prices, revealed an apparently anomalous trend. The yields for EGBs to be auctioned would drop significantly during the early morning of the day of the auction, and though they would sharply rise again in the hour before the auction commenced, the final auction yield would still be significantly lower than the fair market yield reflected in the When-Issued Market. (TAC ¶¶ 161–73, Figures 7 & 8.) In other words, the final auction price would be significantly higher than the contemporaneous market price reflected in the When-Issued Market. Market prices for the EGBs would then rise throughout the trading day to more closely approximate the higher auction prices. According to Plaintiffs, these ensuing increases in price are highly

---

[3] The When-Issued Market is active in the weeks between a European government issuer's announcement of an auction for specified bonds and the auction itself, and it reflects prospective bilateral transactions for the corresponding EGBs between primary dealers and other investors. According to Plaintiffs, the When-Issued Market would reflect normal market demand for the EGBs to be auctioned. Plaintiffs further allege that Defendants would have shared information on market yields, as reflected in the When-Issued Market, with each other in order to bid higher prices at the ensuing auctions.

[4] A bond's yield-to-maturity "reflects the total return on that bond if it is held to maturity as an annual percentage . . . and allows bonds to be compared on an apples-to-apples basis with each other." (TAC ¶ 165.)

correlated with the extent to which dealers overbid in the auctions. Plaintiffs claim this pattern can be observed across the majority of Italian and French ten-year government bond auctions during the Class Period.

Plaintiffs allege that when the trends in individual Italian and French bond auctions are aggregated, they reflect a distinctive "inverted V"-shaped curve: yields increase until the time of the auctions, only to sharply decrease towards their previous levels after the auctions. This "auction cycle" pattern, observed in both the French and Italian markets, is allegedly inconsistent with a competitive market for EGBs and instead reflects artificial manipulation by the Primary Dealer Defendants. The artificial auction prices would then set the benchmark for future trading of the EGBs in the Secondary Market. (Id. at ¶¶ 174-79, Figures 9 & 10.)

    2.   The Secondary Market

While the alleged conspiracy above might earn Primary Dealer Defendants more EGBs or other lucrative business, it would not directly lead to greater profits, because Primary Dealer Defendants allegedly paid above-market prices to acquire those greater inventories. Plaintiffs thus allege that Defendants recouped the costs of overpaying government

issuers for EGBs by charging other investors inflated prices for those EGBs in the Secondary Market. In short, while Defendants incurred short term losses by overbidding for EGBs in the Primary Market, this overbidding secured a substantial share of EGBs that Defendants could sell for a profit at the expense of investors in the Secondary Market.

As noted above, the Secondary Market is defined by infrequent, large transactions averaging €18 million per transaction during the Class Period. These transactions are made bilaterally over the counter, rather than through a public exchange. As a result, information on EGB trades in the Secondary Market is generally not publicly available, though Defendants are allegedly able to acquire information on EGB supply and demand through certain interdealer platforms and their relationships with EGB issuers. And as with the Primary Market, Plaintiffs allege that Defendants shared confidential information regarding their secondary trading through online chatrooms in order to coordinate their pricing.

According to Plaintiffs, the conspiracy across both Primary and Secondary Markets was possible because the same employees that determined auction bids also set the prices at which EGBs would be sold in the Secondary Market,

whether by Primary Dealer Defendants themselves or affiliated entities in the same corporate family. Plaintiffs suggest that this conspiracy was also facilitated by the structure of Defendants' EGB trading business, in which employees of multiple entities in a corporate family would frequently work together to sell the EGBs acquired by the primary dealer. For example, employees of American-based broker-dealer affiliates would solicit interest from investors in the United States, and the primary dealers would execute internal transactions to transfer the EGBs to an affiliated American trading desk for further distribution to American investors.

As evidence of anticompetitive coordination in the Secondary Market, Plaintiffs analyzed the difference in price between the "bids" at which Defendants would purchase EGBs and the "asks" at which Defendants would sell EGBs (the "bid-ask spread"). Plaintiffs allege that because the prices at which a party buys and sells the same good should be nearly the same in a competitive market, a "wider" bid-ask spread suggests Defendants anticompetitively charged much more for EGBs than they themselves paid. While most European markets do not provide information on secondary trading (allegedly due to lobbying efforts by trade

10

associations including Defendants), Plaintiffs were able to analyze quotes for Italian government bonds before, during, and after the Class Period for Defendants and non-defendants. Plaintiffs' results, which they allege are statistically significant, reflect that Defendants' bid-ask spreads were meaningfully wider during the Class Period than they were before and after it. While Defendants' bid-ask spreads were collectively narrower than non-defendants' spreads by close to thirty percent both before and after the Class Period, they were collectively wider than non-defendants' spreads by over 15 percent during the Class Period. (See id. at ¶¶ 180-90, Figure 11.)

Plaintiffs add another chart showing that while non-defendants' bid-ask spreads narrowed by less than one percent from 2012 to 2013, when the conspiracy allegedly ended, some of the Defendants' bid-ask spreads decreased by between 28 to 66 percent. Because it would be economically infeasible for one dealer to sell at higher prices and buy at lower prices than its competitors in a truly competitive market, Plaintiffs allege that these defendants' significantly wider bid-ask spreads suggest anticompetitive conduct during the Class Period. (See id. at ¶¶ 191-96, Figure 12.)

11

3.   The European Commission's Statement of Objections

Although this conspiracy allegedly ended before 2013, Plaintiffs allege that they learned of it only after the European Commission issued a Statement of Objections on January 31, 2019 (the "Statement of Objections"). In the Statement of Objections, the European Commission published its preliminary view that "eight banks participated in a collusive scheme that aimed at distorting competition when acquiring and trading [EGBs]. Traders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies. These contacts would have taken place mainly -- but not exclusively -- through online chatrooms." (Id. at ¶ 198.) The European Commission did not specify which eight banks were under investigation, but Plaintiffs identified Defendants based on various media reports and Defendants' own filings.

B.   PROCEDURAL BACKGROUND

Ohio Carpenters filed an initial complaint in this putative class action on March 22, 2019. (See Dkt. No. 1.) Following the consolidation of related actions and multiple amendments to the initial complaint, Plaintiffs filed the operative TAC on December 3, 2019. (See Dkt. No. 87.)

Consistent with the Court's Individual Practices, Defendants notified Plaintiffs of perceived deficiencies in the TAC by letter dated February 26, 2020. (<u>See</u> Letter Motion.) Defendants raise four grounds for dismissing the TAC: (1) failure to plead antitrust conspiracy; (2) failure to plead antitrust standing; (3) failure to timely file this action; and (4) failure to plead personal jurisdiction over the Foreign Defendants.

Plaintiffs responded to the Letter Motion on March 11, 2020, challenging all four asserted grounds for dismissal. (<u>See</u> Opposition.)

## II.  <u>DISCUSSION</u>

A.  <u>GENERAL STANDARDS FOR MOTIONS TO DISMISS</u>

The Court addresses Defendants' four proposed grounds for dismissal in the following order: (1) personal jurisdiction; (2) timeliness; (3) antitrust standing; and (4) antitrust conspiracy. Because the Letter Motion is made pursuant to Rule 12(b)(6) for all grounds except for personal jurisdiction, the Court begins by noting the general standards for that rule, which will apply throughout the analysis in Sections II.C through II.E.

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

The requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678. In adjudicating a Rule 12(b)(6) motion, a court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v.

14

<u>Israel Disc. Bank of N.Y.</u>, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

B.   <u>PERSONAL JURISDICTION</u>

In the Letter Motion, the eight Foreign Defendants claim that the TAC does not provide an adequate basis for this Court to assume personal jurisdiction over them. (Letter Motion at 3.) The Court agrees that it does not have personal jurisdiction over BAML International or NatWest Markets, but it otherwise concludes that Plaintiffs' allegations suffice to allow the exercise of personal jurisdiction over the other six defendants.

1. <u>General Legal Standards</u>

Rule 12(b)(2) provides for the dismissal of complaints for lack of personal jurisdiction. At the motion to dismiss stage, Plaintiffs need only make a prima facie showing of personal jurisdiction. This showing requires "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." <u>Penguin Grp.</u> <u>(USA) Inc. v. Am. Buddha</u>, 609 F.3d 30, 34-35 (2d Cir. 2010) (internal quotation marks omitted). To establish personal jurisdiction, Plaintiffs must show proper service on the defendants, a statutory basis for personal jurisdiction,

and that the exercise of jurisdiction comports with the constitutional doctrine of due process. See Licci ex rel Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59-60 (2d Cir. 2012). Foreign Defendants do not contest the adequacy of service here.

     a. Statutory Basis for Jurisdiction

Plaintiffs allege two potential statutory bases for jurisdiction. (See Opposition at 3 n.6.) First, Federal Rule of Civil Procedure 4(k)(2) ("Rule 4(k)(2)") provides that service of a summons or waiver of service establishes personal jurisdiction over a defendant if the claim arises under federal law, the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the United States Constitution and laws. Fed. R. Civ. P. 4(k)(2).

Second, New York C.P.L.R. Section 302(a) ("Section 302(a)") provides for jurisdiction over a non-domiciliary defendant if the defendant "in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state" and the plaintiff's claim arises from those transactions. Section 302(a)(1). A claim arises from the defendant's transactions if there is "a relatedness between the transaction and the

16

legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." Licci ex rel Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168-69 (2d Cir. 2013). Section 302(a) "does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." Id. at 169.

    b. Constitutional Basis for Jurisdiction

    Personal jurisdiction comports with constitutional due process if a plaintiff can establish either general or specific jurisdiction. Plaintiffs allege only the latter. Specific jurisdiction exists where the defendant's suit-related conduct creates a substantial connection with the forum state. See Walden v. Fiore, 571 U.S. 277, 284 (2014). There are two primary methods of demonstrating the requisite "minimum contacts" in this regard: (1) "purposeful availment," in which "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there," Licci, 732 F.3d at 170 (internal quotation

marks omitted); and (2) "purposeful direction," also known as the "effects test," which establishes personal jurisdiction when "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," id. at 173.

Generally, a defendant that directly transacts financial instruments in a forum has purposefully availed itself of the forum, and may thus be subject to personal jurisdiction for claims arising from those transactions. See Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82-83 (2d Cir. 2018). Even a defendant that indirectly transacts financial instruments in a forum may have purposefully availed itself of the forum if the transactions were effected by the defendant's agent. The standard for agency in this context, which is the same under Section 302(a), allows for jurisdiction where "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principle." Id. at 85 (internal quotation marks omitted).

18

If the minimum contacts required for specific jurisdiction exist by virtue of purposeful availment or direction, a court must next consider "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985) (internal quotation marks omitted). A court must consider five factors in connection with this analysis: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. Asahi Metal Indus. Co. v. Sup. Ct. of Cal., Solano Cty., 480 U.S. 102, 113-14 (1987).

c. Conspiracy Jurisdiction

Finally, antitrust plaintiffs may alternatively establish "conspiracy jurisdiction" over a defendant by adequately alleging that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-

conspirator to jurisdiction in that state. Charles Schwab, 883 F.3d at 87.

   2. Analysis

   Plaintiffs allege three grounds for personal jurisdiction: (1) each defendant purposefully availed itself of the forum by marketing, pricing, and trading EGBs directly with United States investors; (2) each defendant purposefully directed its EGB price-fixing conduct at the forum; and (3) any defendant's overt act in furtherance of the price-fixing conspiracy in this forum would subject all co-conspirators to personal jurisdiction under a theory of conspiracy jurisdiction. (Opposition at 3.)

   The Court is persuaded that Plaintiffs have made a prima facie case for personal jurisdiction as to all Foreign Defendants except for BAML International and NatWest Markets. Broadly speaking, Plaintiffs allege that Foreign Defendants either directly transacted EGBs through their New York trading hubs or indirectly transacted EGBs through New York-based broker-dealer affiliates, who sold the EGBs from Foreign Defendants' inventories at prices set by Foreign Defendants. Those defendants clearly transacted business in New York within the meaning of Section 302(a) and purposefully availed themselves of the forum under the

rationale set forth in Charles Schwab. See 883 F.3d at 82-83, 85. Because Foreign Defendants allegedly fixed the prices of these transactions to the detriment of Plaintiffs, Plaintiffs' claims clearly arise from the same conduct that reflects purposeful availment of the forum. Finally, the Court is persuaded that exercising jurisdiction comports with fair play and substantial justice, as the interests of Plaintiffs and the forum appear to outweigh any burden to Defendants.

While the general observations above apply to most Foreign Defendants, the Court nevertheless must assess each defendant's contacts separately. Doing so reveals that the Court cannot properly exercise personal jurisdiction over two of the Foreign Defendants. First, Plaintiffs' allegations against BAML International are minimal, and they do not clearly plead an agency relationship with other entities that would be subject to personal jurisdiction. Second, Plaintiffs do not appear to have established a statutory basis for jurisdiction over NatWest Markets, because they have not sufficiently alleged that it either transacts business in New York or is otherwise not subject to the jurisdiction of other states' courts of general jurisdiction, as required by Rule 4(k)(2). The Court sets

forth its conclusions as to each of the eight Foreign Defendants in further detail below.

    a. <u>MLI</u>

The TAC contains a variety of detailed allegations about MLI. Plaintiffs allege that MLI traded EGBs with United States investors both directly and through its New York-based broker-dealer affiliate Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"). (TAC ¶ 43.) MLI allegedly determined the prices for EGBs traded in the United States, and its "European Rates Research" team drafted promotional materials aimed at United States purchasers. (<u>Id.</u> at ¶¶ 42, 44-45.) These promotional materials noted that some EGBs could be purchased only by qualified institutional buyers as defined by United States laws, and they directed potential customers to reach out to designated American sales employees to request pricing details and execute EGB transactions. (<u>Id.</u> at ¶ 45.)

Overall, the Court is persuaded that Plaintiffs have made a prima facie showing of personal jurisdiction over MLI. The TAC's allegations reflect that New York-based affiliate Merrill Lynch sold EGBs that were sourced by MLI, with MLI's knowledge, at prices determined by MLI. These sales would benefit MLI both by virtue of the profits

22

accrued and by showing Eurozone issuers that the primary dealer could make a market for the EGBs acquired at auction. At this stage, these allegations suffice to indicate an agency relationship between MLI and Merrill Lynch. The TAC further alleges that MLI tailored promotional advertisements to investors in the United States and then directed those investors to transact with affiliated employees in the United States, who were likely based in the New York trading hub.

These allegations are enough to demonstrate that MLI transacted business in New York and purposefully availed itself of the forum for that purpose, either by directly buying and selling EGBs or by doing so through its New York-based agent. Plaintiffs' claim directly relates to those EGB transactions, which were allegedly the subject of illegal price fixing. The Court is also persuaded that exercising personal jurisdiction here would comport with fair play and substantial justice, as the interests of Plaintiffs and the forum appear to outweigh any burden to MLI, which appears to regularly do business in New York. Accordingly, the Court denies MLI's motion to dismiss the TAC for lack of personal jurisdiction.

b. <u>BAML International</u>

By contrast, the Court will dismiss the TAC as against BAML International for lack of personal jurisdiction. The TAC contains almost no allegations about BAML International, apart from one general statement that it prices and executes EGB transactions with investors in the forum. (<u>Id.</u> at ¶ 47.) While Plaintiffs might argue that BAML International is an agent of either BANA or MLI, they plead virtually no facts to support that relationship.

The TAC does note that Merrill Lynch is a broker-dealer affiliate of BAML International, but that is again the extent of the allegations. (<u>See</u> <u>id.</u> at Figure 1.) It is certainly possible that Merrill Lynch employees acted on behalf of BAML International in much the same way that they allegedly did for MLI, but Plaintiffs have not actually pleaded as much. And though BAML International, Merrill Lynch, and MLI all appear to be members of the same corporate family, the Court cannot so readily conflate formally separate corporate entities. Barring a clearer showing by Plaintiffs, the TAC does not adequately plead that BAML purposefully availed itself of the forum.

As the Court notes below in Section II.E.3.a., the TAC also fails to allege a conspiracy involving BAML

24

International. Conspiracy jurisdiction is thus unavailing, and the Court lacks personal jurisdiction over BAML International.

   c. Natixis

Turning to Natixis, the Court is persuaded that Plaintiffs have made a prima facie showing of personal jurisdiction. Plaintiffs allege that Natixis has both a fixed income trading hub in New York and a New York-based broker-dealer affiliate. (Id. at Figures 1 & 2.) Natixis allegedly traded EGBs directly with U.S. consumers, and over a three-month span during the Class Period, Natixis allegedly made fifteen appointments to the New York-based team responsible for selling EGBs to investors in the United States. (Id. at ¶¶ 49, 52.) These New York-based sales employees, organized under Natixis's Fixed Income, Commodities, and Treasury Americas team, allegedly marketed EGBs to United States investors and arranged EGB trades at prices determined by Natixis's European traders. (Id. at ¶¶ 52-53.)

These allegations, taken as a whole, adequately demonstrate that Natixis transacted EGB business in New York and purposefully availed itself of the privilege of doing so. As with MLI, the Court also concludes that

25

assuming personal jurisdiction here would comport with fair play and substantial justice. The Court thus concludes that it may exercise personal jurisdiction over Natixis.

### d. NatWest Markets

Plaintiffs have not made a prima facie showing of personal jurisdiction over NatWest Markets, though. While Plaintiffs certainly allege a number of details regarding NatWest Markets' EGB business in the United States, their allegations do not appear sufficient to demonstrate a statutory basis for personal jurisdiction. First, there is very little indication that Section 302(a) can serve as the basis for jurisdiction over NatWest Markets. Unlike most of the other defendants in this case, Plaintiffs allege that NatWest Markets' American affiliate NMSI is based in, and conducts business out of, Stamford, Connecticut. (Id. at ¶¶ 58-59, Figures 1 & 2.) None of Plaintiffs' allegations regarding NatWest Markets demonstrate with any specificity that it transacts business in New York.

Plaintiffs make a variety of allegations that NatWest Markets trades EGBs in the United States more broadly, which suggests Rule 4(k)(2) would provide a statutory basis for jurisdiction. See Dennis v. JPMorgan Chase & Co., 343 F. Supp. 3d 122, 201 (S.D.N.Y. 2018) (indicating courts may

look to nationwide contacts to assess personal jurisdiction where claim arises under federal law and federal statute authorizes nationwide service of process). However, Rule 4(k)(2) applies only where "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2). While NatWest Markets may not be subject to jurisdiction in any state's courts of general jurisdiction, the TAC lacks sufficient clarity for the Court to draw that inference. Because the Court sees no clear statutory basis for personal jurisdiction, the Court concludes that the TAC must be dismissed with respect to NatWest Markets.[5]

### e. Nomura International

The Court may appropriately exercise personal jurisdiction over Nomura International. Plaintiffs allege that both Nomura International and its New York-based broker-dealer affiliate, NSI, are subsidiaries of Nomura Holdings, which buys and sells EGBs through its Wholesale Division. (TAC ¶ 71.) The Wholesale Division has employees of both Nomura International and NSI. (Id.) Nomura International allegedly made substantial sales, quoted

---

[5]  The Court further notes that conspiracy jurisdiction would be inappropriate here, because the TAC fails to state a claim for an antitrust conspiracy involving NatWest Markets or its potential agent NMSI. See infra Section II.E.3.c.

fixed prices, and cultivated a domestic customer base for
EGBs both on its own behalf and that of NSI. (Id. at ¶ 68.)
The TAC names several New York-based NSI employees who
allegedly "promoted [EGBs] from [Nomura International's]
inventory to investors in this District and throughout the
United States. Nomura International [] traders were
responsible for determining the prices at which these
domestic [EGB] transactions occurred." (Id. at ¶¶ 72-74.)

As with MLI and Merrill Lynch, the Court is persuaded
that the TAC alleges an agency relationship between Nomura
International and its New York-based affiliate NSI: New
York-based NSI employees (several of whom are specifically
identified) sold EGBs sourced by primary dealer Nomura
International from a shared inventory in the Wholesale
Division, at prices determined by Nomura International
employees. Nomura International clearly knew of, benefitted
from, and had some control over NSI's sales of the EGBs
that it acquired at auction. The TAC also alleges that
Nomura International directly transacted EGBs in the forum.
Nomura International thus plainly transacted business in
New York within the meaning of Section 302(a), and
Plaintiffs' claims regarding price-fixed EGBs substantially
arise from such transactions. Nomura International's direct

and indirect EGB transactions reflect purposeful availment along the lines contemplated in <u>Charles Schwab</u>, and the Court sees no reason why exercising jurisdiction here would contravene fair play and substantial justice. Accordingly, the Court concludes that it has personal jurisdiction over Nomura International.

### f. <u>UBS AG and UBS Europe</u>

The Court also has personal jurisdiction over UBS AG and UBS Europe in light of the TAC's substantial allegations. According to the TAC, UBS Europe is a direct, wholly-owned subsidiary of UBS AG, is the successor to two prior UBS entities that served as primary dealers of EGBs, and determined the prices at which EGBs would be sold in the United States. (<u>Id.</u> at ¶¶ 85-86, 92.) Like MLI, Natixis, and Nomura International, UBS Europe treats New York as a fixed income trading hub and has a New York-based broker-dealer affiliate, UBS Securities. (<u>Id.</u> at Figures 1 & 2.)

UBS AG similarly is alleged to have significant overlap with both UBS Europe and UBS Securities, and it allegedly directly transacted EGBs with United States investors including all three of the named plaintiffs. (<u>Id.</u> at ¶ 79.) UBS AG has a New York branch, and its senior EGB

salesperson was stationed in the New York branch at the start of the Class Period. (Id. at ¶ 84.) UBS AG allegedly arranged the EGB trades sourced by UBS Europe and its predecessors and also oversaw the operations of UBS Securities. (Id. at ¶ 84.) According to Plaintiffs, UBS Securities' operations were part of UBS AG's Investment Banking line of business; UBS AG had full knowledge of and oversaw all of UBS Securities' EGB trading, and it was responsible for UBS Securities' staffing decisions. (Id. at ¶ 89.) UBS AG included UBS Securities' income in its financials, and it allegedly held UBS Securities out as its agent by noting that "[s]ecurities activities in the US are conducted through UBS Securities LLC, a registered broker-dealer." (Id. at ¶¶ 90-91.)

For much the same reasons discussed above with respect to MLI, Natixis, and Nomura International, the Court is persuaded that these allegations suffice to demonstrate personal jurisdiction over UBS Europe and UBS AG. Both entities clearly knew of and benefitted from UBS Securities' sales of EGBs, and they exercised control over those sales in various ways. UBS AG is also alleged to have directly transacted EGBs with American investors, including all three Plaintiffs. UBS Europe and UBS AG plainly

transacted business in New York and purposefully availed themselves of the privilege, and the Court is again persuaded that exercising personal jurisdiction would not run afoul of fair play or substantial justice.

      g. <u>UniCredit Bank</u>

The Court likewise has personal jurisdiction over UniCredit Bank. According to the TAC, "UniCredit Bank sold [EGBs] directly to investors in the United States and distributed [EGBs] into the United States to its New York branch and its wholly owned, domestic subsidiary, [UCM]." (<u>Id.</u> at ¶ 94.) UniCredit Bank's New York branch allegedly undertook activities solely for the Corporate & Investment Banking Division, which is responsible for EGB trading. (<u>Id.</u> at ¶¶ 97-98.) The New York branch allegedly conducted EGB transactions from the inventory acquired in the Primary Market, and UniCredit Bank determined the prices for these transactions. (<u>Id.</u> at ¶¶ 101-02.) Furthermore, UniCredit Bank and UCM share the same New York office, with significant overlap between senior employees, and UniCredit Bank's legal and compliance personnel oversee the activities of UCM employees. (<u>Id.</u> at ¶ 104.)

These allegations collectively establish a prima facie case for personal jurisdiction over UniCredit Bank, whether

through its direct activities in New York or through an agency relationship with its New York-based affiliate UCM. Either basis suffices to demonstrate the purposeful availment necessary for personal jurisdiction to comport with due process, and the Court again concludes that exercising personal jurisdiction would comport with fair play and substantial justice.

C.    <u>TIMELINESS AND FRAUDULENT CONCEALMENT</u>

Defendants next argue that Plaintiffs' suit is barred by the four-year statute of limitations applicable to the Sherman Act. <u>See</u> 15 U.S.C. § 15b. Because Plaintiffs first filed this action in 2019 but allege that Defendants' conspiracy ended no later than December 31, 2012, their action is apparently untimely. However, Plaintiffs argue that the statute of limitations was tolled by Defendants' fraudulent concealment. The Court concludes that Plaintiffs have adequately alleged fraudulent concealment.

Fraudulent concealment has three elements, which the Second Circuit has framed in two ways. Under one formulation, the statute of limitations is tolled if an antitrust plaintiff establishes "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action

until some point within four years of the commencement of
his action, and (3) that his continuing ignorance was not
attributable to lack of diligence on his part." <u>State of
N.Y. v. Hendrickson Bros. Inc.</u>, 840 F. 2d 1065, 1083 (2d
Cir. 1988). Under the other formulation, fraudulent
concealment applies where a plaintiff shows (1) wrongful
concealment by the defendant; (2) which prevented discovery
of the nature of the claim within the limitations period;
and (3) due diligence in pursuing the discovery of the
claim. <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F. 3d
56, 60 (2d Cir. 1998). A claim of fraudulent concealment
must be pled with particularity, in accordance with the
heightened pleading standards of Federal Rule of Civil
Procedure 9(b) ("Rule 9(b)"). <u>Hinds Cty., Miss. v. Wachovia
Bank N.A.</u>, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("<u>Hinds
I</u>").

In the Second Circuit, plaintiffs may prove the first
element of concealment by showing either "that the
defendants took affirmative steps to prevent plaintiffs'
discovery of the conspiracy, or that the conspiracy itself
was inherently self-concealing." <u>In re Nine W. Shoes
Antitrust Litig.</u>, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000).
"[P]rice-fixing conspiracies are inherently self-

33

concealing." In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., No. 00 Civ. 7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004) (citing Hendrickson Bros., 840 F.2d at 1084).

Under either formulation, Plaintiffs adequately plead the first two elements of fraudulent concealment. They satisfy the first element by pleading that Defendants engaged in an inherently self-concealing conspiracy to fix EGB prices, and they satisfy the second element by pleading that they remained ignorant of the conspiracy's existence until the European Commission's Statement of Objections put them on notice in early 2019. (See TAC ¶¶ 255-58.)

The third element presents a closer call. Plaintiffs do not appear to have explicitly alleged that they conducted due diligence, though they do allege that their diligence would not have uncovered the fraud. (See id. at ¶ 259.) Defendants argue that Plaintiffs' allegations are consequently inadequate, noting this Court's previous dismissal of a complaint as untimely in Hinds I, 620 F. Supp. 2d at 521. (See Letter Motion at 2-3.) There, this Court held that it could not "find that a brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception directed towards the first prong

34

of fraudulent concealment, satisfie[d] the Named
Plaintiffs' burden under Rule 9(b) to plead the third prong
of fraudulent concealment with particularity." Hinds I, 620
F. Supp. 2d at 522. The Court held that to rule otherwise
under the circumstances of that case would essentially
render the first and third prongs of the fraudulent
concealment inquiry identical. See id. at 521-22.

While a conspiracy's self-concealing nature alone
cannot excuse a plaintiff's failure to plead any exercise
of due diligence at all, the Court nevertheless concludes
that Plaintiffs have pled enough to satisfy the third
element of diligence here. Though this Court dismissed the
complaint in Hinds I, it later provided guidance on the
level of diligence that might satisfy the pleading
requirements of Rule 9(b). See Hinds Cty., Miss. v.
Wachovia Bank N.A., 700 F. Supp. 2d 378, 400 (S.D.N.Y.
2010) ("Hinds II"). In Hinds II, plaintiffs sufficiently
alleged due diligence by noting that the defendants with
whom they transacted consistently certified that the
defendants' bids were "determined without regard to an
agreement with another issuer," and that the plaintiffs
"allegedly relied on [the certifications] and thus did not
undertake further inquiry." Id. Their pleading of reliance

35

on alleged misrepresentations related to the conduct at issue sufficed to make resolution of the fact-laden fraudulent concealment inquiry inappropriate at the motion to dismiss stage.

Certainly, plaintiffs cannot simply rely on the inherently self-concealing nature of a conspiracy to satisfy the first and third elements of fraudulent concealment. But here, Plaintiffs do not rely on the conspiracy alone. Like the plaintiffs in Hinds II, Plaintiffs here allege reliance on Defendants' affirmative representations in their codes of conduct, which consistently disavow that Defendants engage in any unfair competitive practices with respect to their EGB trading. For example, the codes of conduct note that traders should "exercise extreme caution to avoid conduct that might violate antitrust laws or other rules prohibiting anti-competitive activities. . . . Employees must avoid any discussion with competitors of proprietary or confidential information, business plans or topics such as pricing or sales policies -- the discussion of which could be viewed as an attempt to make joint rather than independent business decisions"; that employees are bound by prohibitions on transactions that "secure, by a person, or

persons acting in collaboration, the price of one or several financial instruments at an abnormal or artificial level"; and that employees "act in the interest of fair and effective competition and respect all the laws, rules and regulations that are designed to create a level playing field for all -- including antitrust and competition laws." (TAC ¶ 260.)

Moreover, a plaintiff must allege only that degree of diligence which would be reasonable in light of the allegedly concealed fraud. As the Second Circuit has observed, "[f]raudulent concealment does not lessen a plaintiff's duty of diligence; it merely measures what a reasonably diligent plaintiff would or could have known regarding the claim." Stone v. Williams, 970 F.2d 1043, 1048-49 (2d Cir. 1992). Accordingly, if a plaintiff has sufficient access to information that would likely reveal a conspiracy, that plaintiff cannot simply rest on the allegedly self-concealing nature of the conspiracy without pleading any diligence at all. See Rosenshein v. Meshel, 688 F. App'x 60, 64-65 (2d Cir. 2017). Conversely, a plaintiff's failure to exhaustively turn over every stone that might conceal illicit conduct would not foreclose a finding of fraudulent concealment if the relevant facts and

circumstances indicate that such efforts would be impractical or fruitless.

While Plaintiffs' allegations of due diligence here are certainly not extensive, they are adequate at the pleading stage. Defendants argue that Plaintiffs were on inquiry notice of the alleged conspiracy based only on the availability of general statistical evidence that Plaintiffs cite, such as the auction cycles in the Primary Market. (See Letter Motion at 2-3.) However, Defendants themselves claim that these statistical trends could be innocent rather than nefarious (see id. at 1-2), and the general statistics must be considered in light of the TAC's allegations as a whole. Plaintiffs allege that Defendants coordinated their alleged conspiracy on private online chatrooms, that the Secondary Market where Plaintiffs traded is highly opaque due to its bilateral, non-exchange nature, and that Plaintiffs lacked public information on specific defendants' trading strategies. (TAC ¶ 259.)

Faced with substantially the same arguments from defendants in a similar case regarding alleged price fixing of government-sponsored bonds, another court in this District stated that "requiring potential plaintiffs to conduct exhaustive statistical analysis of millions of

transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd." In re GSE Bonds Antitrust Litigation, 396 F. Supp. 3d 354, 367-68 (S.D.N.Y. 2019). The Court finds this reasoning persuasive, as Plaintiffs would have had little basis to believe thorough statistical analysis would be worthwhile without the context and corroboration later provided by the Statement of Objections. Bearing in mind that Plaintiffs have also pled the type of reliance deemed adequate in Hinds II, the Court is persuaded that Plaintiffs have sufficiently alleged fraudulent concealment at this time.

D.   ANTITRUST STANDING

Defendants next challenge that the three named Plaintiffs have antitrust standing. To have antitrust standing, a private antitrust plaintiff must demonstrate that (1) it has suffered "a special kind of antitrust injury," and (2) it is an "efficient enforcer" of the antitrust laws. Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 94 (2d Cir. 2019). In determining antitrust standing, a court assumes the existence of an antitrust violation. See Harry v. Total Gas & Power N. A., Inc., 889 F.3d 104, 115 (2d Cir. 2018).

39

All three Plaintiffs allege the requisite antitrust injury, and they are efficient enforcers as to defendants with whom they traded either directly or indirectly through broker-dealer affiliate agents. However, the Court is not presently persuaded that Plaintiffs would be efficient enforcers as to the defendants with whom they did not transact. Because Plaintiffs do not allege that they transacted EGBs with BAML International (over which the Court also lacks personal jurisdiction), UniCredit Bank, or UCM, the Court will dismiss the TAC as against those three defendants for lack of antitrust standing.

1. Antitrust Injury

There are three steps to determine whether a plaintiff has suffered a "special kind of antitrust injury": (1) "identify the practice complained of and the reasons such a practice is or might be anticompetitive"; (2) "identify the actual injury the plaintiff alleges by look[ing] to the ways in which the plaintiff claims it is in a worse position as a consequence of defendant's conduct"; and (3) "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." Id. (internal quotation marks omitted).

40

All three steps are readily satisfied here. First, Plaintiffs allege a horizontal price-fixing conspiracy, which has long been held per se illegal. See Gelboim v. Bank of Am. Corp., 823 F.3d 759, 773-74 (2d Cir. 2016). Second, Plaintiffs have adequately pleaded how Defendants' alleged misconduct put them in a worse position: all three plaintiffs directly traded EGBs with named Defendants at prices that had been artificially altered as a result of the price-fixing conspiracy. The injury that they allege flows from classic anticompetitive conduct that the antitrust laws aim to prevent, satisfying the third element as well. See id. at 772 ("Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." (internal quotation marks omitted)). In short, Plaintiffs have "sustained their burden of showing injury by alleging that they paid artificially fixed higher prices." Id. at 777.

Defendants nevertheless challenge that Plaintiffs have sufficiently alleged antitrust injury because Plaintiffs did not plead any specific transactions that were affected

by Defendants' anticompetitive conduct. They rely primarily
on decisions from In re SSA Bonds Antitrust Litigation for
this purported requirement. See No. 16 Civ. 3711, 2018 WL
4118979, at *6 (S.D.N.Y. Oct. 28, 2018); 420 F. Supp. 3d
219, 242 (S.D.N.Y. 2019). Respectfully, the Court is not
persuaded that Plaintiffs must plead facts regarding
specific transactions to allege antitrust standing in this
case. The SSA Bonds court derived its requirement in large
part from Harry v. Total Gas & Power N.A., Inc., 244 F.
Supp. 3d 402, 415–16 (S.D.N.Y. 2017). However, the Harry
Court did not state that specific transactions must
necessarily be pled in every antitrust case. It required
the pleading of specific transactions under the particular
circumstances presented in that case because the plaintiffs
did not purchase financial instruments with prices tied to
the regional hubs where the anticompetitive practices
allegedly occurred, but instead alleged that the
anticompetitive practices at those hubs indirectly affected
the competitive conditions of the hub the plaintiffs
actually frequented. See id. at 413–14. When the plaintiffs
in that case cited other cases for the proposition that
they need not plead specific transactions, the Harry court
distinguished the cases by noting that "the allegations of

damages were based on direct manipulation of the price of the instruments that the plaintiffs transacted in." Id. at 415.

All of the Plaintiffs allege that they traded the bonds of specified Eurozone members during the Class Period with specific named Defendants, and that those same Defendants directly manipulated the prices of the EGBs that were traded. (See TAC ¶¶ 32-34.) This case consequently falls outside of the context in which the Harry court required transaction-specific allegations. By contrast, Plaintiffs here have alleged antitrust injury because they allege "that the injury they suffered was in the very market that the defendants restrained." Eastman Kodak, 936 F.3d at 95; see also GSE Bonds, 396 F. Supp. 3d at 366-67 (rejecting challenge to antitrust standing based on failure to allege specific transactions affected where "the complaint alleges that plaintiffs participated in GSE Bond transactions during the class period with at least several of the defendants").

Because Plaintiffs allege they were directly injured by the quintessentially anticompetitive act of price fixing, pleading the details of particular purchases will not impact whether they have pled a "special kind of

antitrust injury." <u>See</u> <u>Hendrickson Bros.</u>, 840 F.2d at 1079 ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act . . . ."); <u>see</u> <u>also</u> <u>Allianz Global Investors GmbH v. Bank of Am. Corp.</u>, No. 18 Civ. 10364, 2020 WL 2765693, at *3 (S.D.N.Y. May 28, 2020) ("Defendants are incorrect that an antitrust injury requires pleading the 'actual transactions' that harmed Plaintiffs. . . . [T]he Complaint plausibly alleges that Plaintiffs traded to their detriment in currencies the prices of which were tied to artificially manipulated . . . bid/ask spreads.").

    2. <u>The Efficient Enforcer Factors</u>

    Plaintiffs may be efficient enforcers of the antitrust laws as to the defendants with whom they transacted. The four efficient enforcer factors are: (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking plaintiffs' asserted injury and the Banks' alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which plaintiffs' damages claim is "highly speculative"; and (4) the importance of

avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." Gelboim, 823 F.3d at 778. While the first factor, requiring proximate causation, "must be met in every case," the last two factors need not carry as much weight; the "potential difficulty in ascertaining and apportioning damages is not . . . an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." In re Interest Rate Swaps Antitrust Litig., 261 F. Supp. 3d 430, 491 (S.D.N.Y. 2017) (internal quotation marks and citations omitted).

Plaintiffs allege a direct injury as to most defendants because they purchased instruments whose prices were artificially altered by either the very same defendants or their agents. Ohio Carpenters claims to have purchased EGBs from MLI, BANA, Natixis, NatWest Markets, NMSI, and all three UBS defendants; BRS claims to have directly transacted with MLI and UBS AG; and Local 103 directly transacted with MLI, Nomura International, NatWest Markets, and UBS AG. (TAC ¶¶ 32-34.) As direct consumers of the artificially priced instruments, they are also clearly

the direct victims of the foregoing defendants' assumed conspiracy in the Secondary Market. Under these circumstances, Plaintiffs' claimed damages do not appear to be necessarily speculative or involve any more complexity than similar antitrust cases. Accordingly, the Court concludes that Plaintiffs are efficient enforcers as to the Defendants with whom they directly transacted.

However, the Court is not presently persuaded that Plaintiffs would be efficient enforcers as to three defendants with whom they did not allegedly transact, either directly or indirectly: BAML International, UniCredit Bank, and UCM. Even assuming that these defendants participated in the alleged conspiracy, as the Court must in the antitrust standing context, their misconduct appears indirect; the higher prices paid by Plaintiffs were ultimately charged by other defendants, who directly received the profits of the alleged misconduct. And if BAML International, UniCredit Bank, and UCM did engage in misconduct, the parties with whom they or their agents directly transacted would be more direct victims than the named Plaintiffs. In light of the indirect nature of the injuries alleged here, allowing Plaintiffs to proceed as efficient enforcers against BAML International,

UniCredit Bank, and UCM might risk speculative assessments of injury or complex apportionment of damages.

Indeed, most decisions in this District have tended to conclude that plaintiffs are not efficient enforcers against defendants with whom they did not transact. See, e.g., Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG, 277 F. Supp. 3d 521, 558-59 (S.D.N.Y. 2017) ("the Direct Transaction Plaintiffs claim to have transacted only with the Credit Suisse Defendants and UBS, and the Complaint has alleged a plausible conspiracy only against RBS. Accordingly, Count Two fails to state a claim because plaintiffs have not alleged an antitrust violation by any defendant for which they have antitrust standing to sue."); cf. FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A., No. 16 Civ. 5263, 2018 WL 4830087, at *5 (S.D.N.Y. Oct. 4, 2018) (allowing plaintiff's claims to proceed only against defendants that allegedly manipulated the benchmark rates incorporated into plaintiff's swap transactions, rather than defendants that allegedly manipulated rates not incorporated into the transactions). This Court agrees with the reasoning of those decisions and concludes that the TAC should thus be dismissed against BAML International, UniCredit Bank, and UCM for lack of antitrust standing.

E.   ANTITRUST CONSPIRACY

Defendants finally challenge that Plaintiffs have stated a claim of antitrust conspiracy under the Sherman Act. For the reasons set forth below, the Court agrees that the TAC must be dismissed as to all Defendants except for Natixis, Nomura International, and NSI.[6]

1. Legal Standard

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To state a claim under Section 1 of the Sherman Act, a plaintiff's complaint must contain sufficient factual matter that, if taken as true, would support an inference

---

[6] As a threshold matter, Defendants argue that Plaintiffs' claims with respect to the Primary Market are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. Section 6a. (See Letter Motion at 2 n.6.) The Court is not persuaded, as it understands Plaintiffs to allege only one Sherman Act claim, in which both foreign conduct and domestic conduct caused Plaintiffs' domestic injuries. Indeed, the case cited by Defendants strongly suggests that the FTAIA does not bar Plaintiffs' suit more generally. The Supreme Court described its case as one concerning "(1) significant foreign anticompetitive conduct with (2) an adverse domestic effect" -- specifically, "vitamin sellers around the world that agreed to fix prices, leading to higher vitamin prices in the United States." F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 159 (2004). The Court "conclude[d] that, in this scenario, a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury . . . ." Id. As alleged by Plaintiffs, this case involves EGB sellers in Europe that agreed to fix prices, leading to higher EGB prices in the United States. Consistent with F. Hoffman-La Roche, United States purchasers of EGBs such as Plaintiffs can bring their Sherman Act claim under the FTAIA based on their domestic injuries.

that a conspiracy actually existed. See In re Mexican
Government Bonds Antitrust Litig., 412 F. Supp. 3d 380,
387-88 (S.D.N.Y. 2019). To do so, a plaintiff may assert
either (1) "direct evidence that the defendants entered
into an agreement in violation of the antitrust laws"; or
(2) circumstantial evidence of interdependent parallel
conduct, supported by "plus factors" indicative of
conspiracy, such as "a common motive to conspire, evidence
that shows that the parallel acts were against the apparent
individual economic self-interest of the alleged
conspirators, and evidence of a high level of interfirm
communications." Mayor & City Council of Baltimore v.
Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).

"To survive dismissal, the plaintiff need not show
that its allegations suggesting an agreement are more
likely than not true or that they rule out the possibility
of independent action, as would be required at later
litigation stages such as a defense motion for summary
judgment, or a trial." Gelboim, 823 F.3d at 781 (internal
quotation marks omitted). Indeed, Rule 12(b)(6) "does not
impose a probability requirement at the pleading stage; it
simply calls for enough fact to raise a reasonable
expectation that discovery will reveal evidence of illegal

agreement." <u>Twombly</u>, 550 U.S. at 556. However, "[p]ost-
<u>Twombly</u> authorities overwhelmingly hold that a complaint
that provides no basis to infer the culpability of
the *specific* defendants named in the complaint fails to
state a claim." <u>Mexican Government Bonds</u>, 412 F. Supp. 3d
at 388 (emphasis in original).

2. <u>General Allegations of Conspiracy</u>

As Defendants note, many of Plaintiffs' allegations of
conspiracy are not specific to particular defendants, but
instead more generally reflect conspiratorial behavior
across the Primary and Secondary Markets during the Class
Period. (Letter Motion at 1.) Plaintiffs counter that
courts routinely accept analyses based on averages and
market-wide data at the pleading stage, and that they
allege misconduct by specific defendants in any event.
(Opposition at 1.)

Because the generality or specificity of Plaintiffs'
allegations is a major point of contention, the Court first
analyzes Plaintiffs' market-wide or collective allegations
and then turns to the evidence against specific defendants.
As the Court explains further below, allegations based on
market-wide or collective analyses need not be entirely
disregarded, as long as a plaintiff can adduce further

facts to tie specific defendants to the conspiracy more broadly alleged. The Court ultimately concludes that Plaintiffs have alleged enough facts to suggest a conspiracy to fix EGB prices, but their allegations are inadequate to tie any specific defendants to that conspiracy beside Natixis, Nomura International, and NSI.

Plaintiffs undisputedly do not allege any direct evidence of conspiracy. While they cite the Statement of Objections for the proposition that Defendants explicitly conspired through the use of online chatrooms, they do not set forth any direct evidence of the alleged agreement. Instead, Plaintiffs must rely on circumstantial evidence.

The starting point for Plaintiffs' claims is the European Commission's Statement of Objections, which alleged that eight banks "participated in a collusive scheme that aimed at distorting competition when acquiring and trading [EGBs]" during the Class Period. (TAC ¶ 198.) It is well settled that "government investigations may bolster [Sherman Act] allegations, [though] they may not constitute the entirety of nonconclusory allegations against [] defendants." Hinds Cty., Miss. v. Wachovia Bank N.A., 708 F. Supp. 2d 348, 361 (S.D.N.Y. 2010). Plaintiffs

51

thus supplement the Statement of Objections with statistics suggesting suspicious parallel conduct.

As to the Primary Market, Plaintiffs proffer the results of statistical analyses which are allegedly statistically significant; these results reflect that the market prices for French and Italian ten-year bonds in the When-Issued Market moved in consistent and predictable patterns before and after the relevant auctions, and that the auction prices paid by primary dealers were consistently higher than the contemporaneous market prices reflected in the When-Issued Market. (TAC ¶¶ 161-73, Figures 7 & 8.) Plaintiffs further show graphs indicating that when the activity for individual French and Italian auctions is aggregated, it reveals a predictable pattern of inversions in the yield of French and Italian bonds around the time of the auctions. This distinctive "auction cycle" would allegedly not happen in a competitive market. (Id. at ¶¶ 174-79, Figures 9 & 10.) As to the Secondary Market, Plaintiffs include a chart indicating that Defendants' collective bid-ask spreads were significantly higher than those of non-defendants during the Class Period and significantly lower than those of non-defendants outside of the Class Period, raising an inference that they were

deviating in parallel from the true market price for EGBs in the Secondary Market during the Class Period. (See id. at ¶¶ 180–90, Figure 11.)

Plaintiffs then allege multiple plus factors to support their allegations of parallel conduct in the EGB Markets. First, they note all of the Defendants had a common motive to conspire: overbidding in Primary Market auctions allowed traders to secure large volumes of EGBs that they could then sell at inflated prices in the opaque, over-the-counter Secondary Market, both directly profiting Defendants and also increasing their likelihood of receiving lucrative business in the future. (Id. at ¶¶ 221–23.)

Second, Plaintiffs allege that Defendants' collective actions would not be in their economic self-interest if undertaken individually. Entering bids that are above the market price at auction would mean that dealers pay more for the bonds than consumers would, and the dealers would consequently have to sell the bonds at a loss in a truly competitive market. (Id. at ¶¶ 152–53.) Similarly, a defendant that unilaterally widens its bid-ask spread would, all else equal, stand to lose customers to competitors that buy and sell bonds at prices that are much

closer to their fair market value. (Id. at ¶¶ 138, 154, 220.)

Third, Plaintiffs allege high interfirm communications by virtue of Defendants' collective membership in the lead trade organizations for primary dealers of EGBs, which regularly met to discuss industry developments. (Id. at ¶¶ 231–37.)

Finally, Plaintiffs allege that the structure of the EGB market is conducive to collusion. Because there is no public exchange for EGBs and consumers cannot readily compare dealers' prices or strategies, the market is opaque rather than transparent. Because EGB transactions are large and infrequent, averaging €18 million per transaction during the Class Period, only a limited number of dealers could meaningfully compete as market-makers for EGBs. Similarly, the infrequency of transactions would also enable a conspirator to monitor its co-conspirators' activity in the Secondary Market more easily, given that primary dealers have more access to information on market-wide trading than the average consumer. (Id. at ¶¶ 206–19.)

Defendants raise a number of issues with Plaintiffs' allegations in this regard. For example, they note that the scholarship cited by Plaintiffs shows that auction cycles

are not necessarily attributable to collusion. They also question whether oddities in the French and Italian Primary Markets would plausibly reflect collusion across all Eurozone auctions (particularly considering not all Primary Dealer Defendants participated in each Eurozone member's auctions), and whether the widening of Defendants' bid-ask spreads for Italian bonds necessarily reflects collusion across all other Eurozone members' bonds in the Secondary Market. Defendants also question why non-defendants' bid-ask spreads appear to be wider than those of Defendants outside of the Class Period. (Letter Motion at 1-2.)

These are valid questions, and it may well be that Defendants' arguments are better-founded in the final analysis. But resolution of the questions requires deeply fact-bound findings, and Plaintiffs' claims are not facially implausible despite the concerns raised. For example, Plaintiffs correctly note that the Court cannot pick and choose between inferences at this stage, such as whether the auction cycles are attributable to collusion or not. Instead, the Court must consider whether the auction cycles could plausibly suggest collusion; because they occurred during a period in which the European Commission suspects collusion occurred, and because multiple other

plus factors increase the plausibility of collusion, the Court has no trouble crediting Plaintiffs' allegations at this early stage. As the scholarship cited by Plaintiffs observes, "[i]n an efficient market, one would . . . expect no predictable bond price or yield movements around auctions." Roel Beetsma et al., Price Effects of Sovereign Debt Auctions in the Euro-Zone: The Role of the Crisis, 25 J. Fin. Intermediation 1 (cited at TAC ¶ 207 n.22). While such expectations might ultimately be unfounded, the Court cannot simply decide so at this stage.

Similarly, Plaintiffs correctly note that "the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period." Masters v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2003 WL 145556, at *5 (S.D.N.Y. Jan. 17, 2003). Whether Plaintiffs' illustrative use of French and Italian auctions and trading reflects collusion with respect to all other EGBs is likely not susceptible to proof at this early stage, particularly given the allegations that most Eurozone members do not publish information on secondary trading of their bonds. But considering Plaintiffs' allegations that the market for EGBs is highly integrated, as the European Central Bank itself observed, that

Defendants employed the same set of traders to oversee all EGB auctions and trading, and that those traders shared confidential and commercially sensitive information with each other, the Court cannot conclude that a conspiracy involving EGBs besides those issued by France and Italy is implausible. (See TAC ¶¶ 113, 118, 155–57, 226.) The Court thus declines to limit the scope of the alleged conspiracy at this time.

At the motion to dismiss stage, the main question is whether Plaintiffs have pleaded to enough to plausibly suggest an agreement, such that they are entitled to discovery. Plaintiffs' allegations and analysis suggest coordinated action that is at least apparently irrational, and Plaintiffs cite a number of plus factors that tend to support an inference of conspiracy under established law. Accordingly, it would be inappropriate to dismiss the TAC based only on the considerations reflected in Defendants' foregoing arguments.

Potentially more troubling is that none of the allegations above provide a basis to infer the culpability of any specific named defendant. The Primary Market statistics do not distinguish the primary dealers, while the Secondary Market statistics in Figure 11 group

Defendants together without specifying the extent to which any particular Defendant contributed to the anomalous variations in their collective bid-ask spreads. These are also often average statistics, which may flatten or hide trends that might tell different stories. See Mexican Government Bonds, 412 F. Supp. 3d at 389-90; GSE Bonds, 396 F. Supp. 3d at 364-65. These concerns might counsel that such evidence simply should not be considered when determining whether a plaintiff has stated a claim for antitrust conspiracy against a defendant.

However, while the Mexican Government Bonds and GSE Bonds courts noted these considerations might raise concerns, they nevertheless held that aggregate statistics are not consequently irrelevant or altogether uninformative. The underlying issue is rather that aggregate statistics do not *alone* suffice to impute wrongful conduct to any particular defendant. See Mexican Government Bonds, 412 F. Supp. 3d at 390 (noting that "aggregated statistics are not irrelevant to Plaintiffs' claim that a conspiracy existed . . . [but] in the absence of any other allegations that would allow the Court to infer the participation of the individual Defendants . . . the group statistical pleadings cannot carry the day); GSE

<u>Bonds</u>, 396 F. Supp. 3d at 364-65 (noting that plaintiffs' group statistics "generally support the allegation of a price-fixing conspiracy . . . [and were] sufficient to plausibly imply that defendants, as a group, were charging higher prices than non-defendants. But the Court cannot infer, from this, that each individual defendant was charging higher prices.").

Following the reasoning of these two courts, which considered similar claims of price fixing in government bond markets, the Court thus concludes that the market-wide statistics above need not be disregarded. They are suggestive of a conspiracy in the EGB markets. But the Court must still determine whether Plaintiffs have further alleged that any of Defendants might have been culpable participants in such a conspiracy. "The conspiracy could well have involved some of [Defendants], or none of them, or a mix of the named defendants and other [EGB] dealers." <u>GSE Bonds</u>, 396 F. Supp. 3d at 365. The TAC will state a claim of antitrust conspiracy only if it pleads further facts that suggest Plaintiffs should be allowed to seek discovery from the named Defendants in order to substantiate their claims.

59

### 3. Allegations Tying Specific Defendants to Conspiracy

"[T]here must be something in the complaint that ties each defendant to the conspiracy." Id. at 364. Here, Plaintiffs rely essentially on two sets of allegations. First, they filed this suit against Defendants based on either news reports or particular defendants' public statements revealing that Defendants or their affiliates were among the eight banks under investigation by the European Commission. These allegations are relevant, but as noted above, they cannot form the entirety of the nonconclusory allegations of Defendants' participation in the conspiracy. After all, the European Commission is still investigating and has not formally alleged wrongdoing by any defendant.

Second, as additional evidence of anticompetitive agreement in the Secondary Market for Italian bonds, Plaintiffs separate the change in bid-ask spreads for four entities identified as "BAML," "Natixis," "Nomura," and "UniCredit" from the corresponding changes of non-defendants. This more particularized analysis in Figure 12 reveals that the bid-ask spread of these four entities narrowed by between 28 to 66 percent between 2012 and 2013, whereas the bid-ask spreads of all non-defendant dealers

narrowed by less than one percent during the same period. (See TAC ¶¶ 191-96, Figure 12.) Figure 12 thus reflects parallel conduct on the part of four identified entities: widening their bid-ask spreads during the Class Period and then dramatically narrowing them in parallel, in stark contrast to the essential lack of such conduct by non-defendants. The existence and end of this parallel conduct coincides with the end of the conspiracy alleged by the European Commission in its Statement of Objections. And as noted above, unilaterally widening bid-ask spreads would be against the economic self-interest of a dealer in a competitive market. Finally, as Plaintiffs note more generally, dealers would have an incentive to conspire in this fashion because it would guarantee more business from government issuers and more profits from less sophisticated counterparties.

These statistics allow the Court to infer a conspiracy involving specific defendants, based on specific conduct that appears suspicious in light of the Statement of Objections and other more general statistics reflecting plausibly collusive behavior in the Primary and Secondary Markets for EGBs. But the statistics can only state a claim as to some Defendants, as explained further below.

a. <u>BANA, BAML International, and MLI</u>

The statistics cited above indicate suspicious pricing behavior by an entity named "BAML"; however, at no point in the complaint do Plaintiffs clearly identify any defendant with this acronym. The most natural assumptions would be one of BANA, BAML International, MLI, or some combination of them. But the TAC does not provide enough specificity to determine which of these entities Plaintiffs are referencing, and the Court cannot simply group the three together without stronger allegations of an agency relationship between them.

While the statistics discussed above might reasonably be understood to refer to BAML International, the TAC must be dismissed against that defendant for lack of personal jurisdiction or antitrust standing in any event.

And though Plaintiffs plead much to indicate MLI trades EGBs, there is little to indicate it had an agency relationship with any Bank of America entity besides Merrill Lynch. There is simply no basis to clearly infer that "BAML" refers specifically to MLI, rather than one of the other Bank of America entities with which it does not apparently have an agency relationship. The Court will not conclude that MLI is a conspirator based on allegations

that largely establish only that MLI is a market participant.

Similarly, Plaintiffs offer no evidence that "BAML" should be construed to refer to BANA; indeed, the TAC contains almost no individualized allegations about BANA at all. As currently pleaded, the TAC appears to use "BAML" as a generic term that impermissibly fails to distinguish between the various Bank of America entities. Accordingly, the Court will dismiss the TAC as to BANA, BAML International, and MLI for failure to adequately plead their involvement in a price-fixing conspiracy.

b. Natixis

In contrast, the Court has no trouble determining which Defendant the statistics for "Natixis" correspond to. Only one Natixis entity is a defendant, and Plaintiffs have adequately alleged that its New York-based broker-dealer affiliate is its agent with respect to EGB trading regardless. Accordingly, the TAC alleges that Natixis's bid-ask spreads decreased by over 66 percent at a time when non-defendants' spreads decreased by less than one percent, and which corresponds to the end of the conspiracy being investigated by the European Commission. (See TAC Figure 12.)

The Court notes one observation that might potentially weigh against finding Plaintiffs' allegations against Natixis sufficient. While Natixis sold Italian bonds in the secondary market, it was not a Primary Dealer participating in the Italian government bond auctions. (See id. at Figure 4.) However, that is not necessarily preclusive of a conspiracy. As noted above, it is well established that not all defendants need to participate in all aspects of a conspiracy. Based on the allegations that Defendants relied on the same set of traders to participate in the various Eurozone auctions, that those traders shared confidential information on EGBs with each other, and that Primary Dealer Defendants then determined the prices for trading in the Secondary Market, it is facially plausible that a defendant could conspire to quote artificial prices for bonds that it did not acquire directly from the issuer itself. Accordingly, the Court concludes that Plaintiffs' allegations state a claim for relief against Natixis.

> c. NatWest Markets and NMSI

However, there is nothing at all in Figure 12 that could be attributed to any NatWest entity. Because the TAC does not otherwise contain any nonconclusory allegations indicating an agreement involving NatWest Markets or NMSI,

it must be dismissed against those two defendants (as it already must be for lack of personal jurisdiction over NatWest Markets).

        d. <u>Nomura International and NSI</u>

The 28 percent narrowing of the bid-ask spread for "Nomura" also suffices to state a claim against Nomura International and NSI. Admittedly, the reference to "Nomura" here conflates both Nomura International and NSI; however, Plaintiffs' allegations of an agency relationship between the two render this issue excusable under the circumstances. As discussed in Section II.B.2.e., Nomura Holding's EGB business is conducted through a Wholesale Division that includes employees of both Nomura International and NSI, and NSI sells EGBs sourced by primary dealer Nomura International from a shared inventory at prices determined by Nomura International traders. Because the EGB business of Nomura International and NSI itself seems to elide a neat distinction, and because Plaintiffs' allegations suggest that the two defendants work closely in the Secondary Market, the Court is persuaded that the agency relationship alleged permits a reasonable inference that the statistics for "Nomura" in Figure 12 may be attributed to Nomura International and

NSI. And because those statistics could plausibly suggest anticompetitive behavior for the same reasons highlighted for Natixis, the Court concludes that the Letter Motion must be denied as to Nomura International and NSI.

### e. UBS AG, UBS Europe, and UBS Securities

As with NatWest Markets and NMSI, the statistics in Figure 12 provide no basis to infer the culpability of UBS AG, UBS Europe, or UBS Securities. Because there are no other specific allegations in the TAC alleging wrongdoing by any of the three UBS entities, Plaintiffs' claims against them must be dismissed.

The Court notes that because both MLI and UBS AG have been dismissed, BRS would not be an efficient enforcer as to any of the remaining defendants. Because BRS accordingly lacks antitrust standing, it cannot proceed with this action based only on the allegations contained in the TAC. However, the Court will order the Plaintiffs to show cause within twenty days of this Order whether an amended complaint might cure BRS's lack of antitrust standing.

### f. UniCredit Bank and UCM

As with Nomura, the statistics in Figure 12 that reflect a narrowing of "UniCredit['s]" bid-ask spread might appropriately be attributed to both UniCredit Bank and UCM

66

based on the agency relationship between them. Whether Plaintiffs have stated an antitrust conspiracy as to UniCredit Bank and UCM is moot, though, because Plaintiffs lack antitrust standing as to both entities, as noted above in Section II.D.2.

### III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion so deemed by the Court as filed by defendants Bank of America Merrill Lynch International Designated Activity Company ("BAML International"), Merrill Lynch International ("MLI"), Natixis S.A. ("Natixis"), NatWest Markets plc ("Natwest Markets"), Nomura International plc ("Nomura International"), UBS AG, UBS Europe SE ("UBS Europe"), UniCredit Bank AG ("UniCredit Bank"), Bank of America, N.A. ("BANA"), NatWest Markets Securities Inc. ("NMSI"), Nomura Securities International, Inc. ("NSI"), UBS Securities LLC ("UBS Securities"), and UniCredit Capital Markets LLC ("UCM") to dismiss (Dkt. No. 110) the Third Amended Consolidated Class Action Complaint of Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), Boston Retirement System ("BRS"), and Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103," and collectively with

Ohio Carpenters and BRS, "Plaintiffs") (see "TAC," Dkt. No. 87) is **DENIED** as to Natixis, Nomura, and NSI and **GRANTED** as to BAML International, MLI, BANA, NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, UniCredit Bank, and UCM. The TAC is hereby dismissed without prejudice against defendants BAML International, MLI, BANA, NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, UniCredit Bank, and UCM (collectively, the "Dismissed Defendants"); and it is further

    **ORDERED** that the TAC is dismissed as to the claims of plaintiff BRS for lack of antitrust standing; and it is finally

    **ORDERED** that Plaintiffs are directed to inform the Court within twenty days of this Order whether they have cause to amend the TAC to replead BRS or the Dismissed Defendants, or whether the remaining plaintiffs will instead proceed against the remaining defendants.

**SO ORDERED.**

Dated:    New York, New York
            23 July 2020

                                            Victor Marrero
                                             U.S.D.J.