**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EUROPEAN GOVERNMENT BONDS ANTITRUST LITIGATION | Lead Case No. 1:19-cv-2601 (VM) <br><br> Hon. Victor Marrero |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER THIS COURT'S DECISION DENYING DEFENDANTS NATIXIS S.A., NOMURA INTERNATIONAL PLC AND NOMURA SECURITIES INTERNATIONAL INC.'S MOTION TO DISMISS THE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 5

ARGUMENT ........................................................................................................................ 6

I.     THE COURT OVERLOOKED CONTROLLING LAW AND OTHER
MATTERS INDICATING THAT PLAINTIFFS LACK ANTITRUST
STANDING (Op. at 39-47; § II.D) .............................................................................. 6

     A.     Plaintiffs Did Not Plead Antitrust Standing as to Natixis and NIP (Op. at
40-44; § II.D.1) ............................................................................................... 6

     B.     The TAC Does Not Plead Sufficient Facts To Demonstrate that Plaintiffs
Are Direct Purchasers (Op. at 41-46, §§ II.D.1, II.D.2) ............................... 8

     C.     Plaintiffs Cannot Establish Antitrust Standing as to NSI in the Absence of
Specific Allegations that NSI Engaged in Any Alleged Conspiracy or
Transacted with Plaintiffs (Op. at 44-47; § II.D.2) ...................................... 9

II.     THIS COURT SHOULD RECONSIDER ITS FINDING THAT PLAINTIFFS'
ALLEGATIONS ESTABLISH PERSONAL JURISDICTION OVER FOREIGN
DEFENDANTS NATIXIS AND NIP (Op. at 20-32, § II.B.2) ................................ 12

     A.     The Court Should Reconsider Its Finding That the TAC Establishes
Specific Personal Jurisdiction Over Natixis and NIP (Op. at 25-29,
§§ II.B.2.c, 2.e) ............................................................................................ 13

     B.     The Court Should Reconsider Its Finding That There Is a Statutory Basis
To Exercise Personal Jurisdiction over NIP (Op. at 27-29; § II.B.2.e) ....... 16

III.     THE COURT SHOULD RECONSIDER ITS RULING THAT PLAINTIFFS'
SHERMAN ACT CLAIMS ARE NOT TIME-BARRED (Op. at 32-39; § II.C) ......... 19

IV.     THE COURT SHOULD RECONSIDER ITS HOLDING THAT PLAINTIFFS
STATED A CLAIM FOR CONSPIRACY (Op. at 50-67; § II.E.2-3) ........................ 21

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019) .........................................................24

*Abrams v. Life Med. Techs., Inc.*, 135 F. Supp. 3d 185 (S.D.N.Y. 2015)........................................3

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016) ................................................................................................................22

*Allianz Global Investors GmbH v. Bank of Am. Corp.*, 2020 WL 2765693 (S.D.N.Y. May 28, 2020).................................................................................6, 7

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011)........................................8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................22

*Assoc. General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ................................................................................................................10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................2, 18, 22, 24

*Bristol-Myers Squibb v. Superior Court*, 137 S. Ct. 1773 (2017) ................................................12

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 62 (2d Cir. 2018).......................... passim

*Compare LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148 (2d Cir. 2003) ................................................................................................................20

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ............................................................................13

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005) ............................................17

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018)......................... passim

*Expoconsul Intern., Inc. v. A/E Systems, Inc.*, 711 F. Supp. 730 (S.D.N.Y. 1989) ......................17

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681 (S.D.N.Y. 2019)................................................................................................................23

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)................................................................................16

*Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp 3d. 402 (S.D.N.Y. 2017) ........................6

*Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104 (2d Cir. 2018) ...................................6, 8

*Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ............................11

*Hinds County v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010) ......................20, 21

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ...........................................................................9

*In re Aluminum Warehousing Antitr. Litig.*, 2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) ........................................................................................................................................4

*In re Aluminum Warehousing Antitr. Litig.*, 833 F.3d 151 (2d Cir. 2016) ...............................1, 10

*In re Currency Conversion Fee Antitr. Litig.*, 773 F. Supp. 2d 351 (S.D.N.Y. 2011) ......................................................................................................................................22

*In re ICE LIBOR Antitr. Litig.*, 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020).....................23, 24

*In re LIBOR-Based Fin. Instrument Antitr. Litig.*, 2015 WL 6243526 (S.D.N.Y Oct. 20, 2015) .........................................................................................................................13

*In re LIBOR-Based Fin. Instruments Antitr. Litig.*, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019)......................................................................................................................15

*In re Mexican Gov't Bonds Antitr. Litig.*, 412 F. Supp. 3d 380 (S.D.N.Y. 2019) .................11, 12

*In re NASDAQ Mkt.-Makers Antitr. Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996)................................9

*In re Parmalat Sec. Litig.*, 377 F. Supp. 2d 390 (S.D.N.Y. 2005)................................................10

*In re SSA Bonds Antitr. Litig.*, 420 F. Supp. 3d 219 (S.D.N.Y. 2019) ................................. passim

*In re Text Messaging Antitr. Litig.*, 630 F.3d 622 (7th Cir. 2010)................................................22

*In re Vitamin C Antitr. Litig.*, 2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012).............................17

*In re Vitamin C Antitr. Litig.*, 2012 WL 2930109 (S.D.N.Y. July 18, 2012) .............................18

*In re Vitamin C Antitr. Litig.*, 279 F.R.D. 90 (E.D.N.Y. 2012) ...................................................9

*Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1998)...........................................................18

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017)......................................................................................................................15

*Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015)............................15

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) .....................16

*LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547 (S.D.N.Y. 2017), *aff'd*, 922 F. 3d 136 (2d Cir. 2019).................................................................................................24

iii

*Lorely Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160 (2d Cir. 2015) ................................................................................................................6

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) ...............2, 21, 25

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012)...............................................................11

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255 (2d Cir. 1995) ..............................................5

*Simon v. KeySpan Corp.*, 694 F.3d 196 (2d Cir. 2012) ..................................................9

*Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019).........................................2, 19, 20, 21

*Small v. Nobel Biocare USA*, 2012 WL 952396 (S.D.N.Y. Mar. 21, 2012)....................5

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521 (S.D.N.Y. 2017) ............................................................................................12

*Strougo v. Barclays PLC*, 334 F. Supp. 3d 591 (S.D.N.Y. 2018)...................................5

*Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .......................16

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004)..............................13, 17

*United States v. Scophony Corp. of Am.*, 333 U.S. 795 (1948) ....................................18

*United States v. Watchmakers of Switzerland Info. Ctr.*, 133 F. Supp. 40 (S.D.N.Y. 1955) ................................................................................................17

*Walden v. Fiore*, 571 U.S. 277 (2014)...........................................................13, 16

*Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) .......................2, 14

## Statutes & Rules

15 U.S.C. § 22.........................................................................................12, 17

Local Civil Rule 6.3...................................................................................1, 5

Rule 56.........................................................................................................22

## Other Authorities

AFME, Primary Dealers Handbook (2015), *available at* https://www.afme.eu/globalassets/downloads/publications/afme-primary-dealers-handbook-q4-2015.pdf ...................................................................3

iv

Roel Beetsma, et al., *Price Effects of Sovereign Debt Auctions in the Euro-Zone: The Role of the Crisis*, Working Paper Series (No. 1595) (Sept. 2013) ..................................24

## PRELIMINARY STATEMENT

Pursuant to Local Civil Rule 6.3, Defendant Nomura Securities International Inc. ("NSI") and Foreign Defendants Natixis S.A. ("Natixis") and Nomura International plc ("NIP") (collectively, "Moving Defendants") respectfully submit this memorandum in support of their motion for reconsideration of the Court's July 23, 2020 decision and order ("Decision" or "Op."). As set forth below, the Decision, which the Court issued after the parties submitted three-page pre-motion letters, overlooks controlling Second Circuit authority and other matters compelling dismissal of all Moving Defendants and, as to Foreign Defendants Natixis and NIP, on threshold personal jurisdiction grounds as well.

*First*, critical omissions in the Third Amended Complaint ("TAC") render Plaintiffs' antitrust standing allegations as to all Moving Defendants inadequate. *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104 (2d Cir. 2018); *In re Aluminum Warehousing Antitr. Litig.*, 833 F.3d 151 (2d Cir. 2016). As to NSI, Plaintiffs do not allege it was part of or aware of any alleged conspiracy or functioned as an agent of NIP for any conspiratorial purpose. Nor do Plaintiffs allege that they directly transacted with NSI, as required by this Court's Decision. As to Natixis and NIP, Plaintiffs allege unspecified transactions with Ohio Carpenters and I.B.E.W., respectively, but do not allege that any such transactions occurred at a time when Plaintiffs could have been harmed (rather than benefited) under Plaintiffs' conspiracy theory or involved unmediated direct dealings with Natixis or NIP. As to Natixis, Plaintiffs do not even allege that any transaction occurred during the Class Period.

*Second*, the TAC does not plead any contacts with the forum that constitute suit-related contacts necessary to establish personal jurisdiction over Foreign Defendants Natixis and NIP. The marketing and sales activities the Court found sufficient cannot support jurisdiction under controlling Second Circuit authority. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d

62 (2d Cir. 2018); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016).  In analyzing the statutory basis for exercising jurisdiction as to NIP, the Court also overlooked the requirement that jurisdictional pleadings must contain factual corroboration.  Because the TAC lacks such corroboration, it likewise lacks a statutory basis for exercising personal jurisdiction as to NIP.

*Third*, the Second Circuit has held that statements contained in a corporate code of ethics, like those on which the Court relied to find Plaintiffs' fraudulent concealment allegations adequate, "do not invite reasonable reliance," *Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019).  Thus, the Court should have dismissed the TAC as to all Moving Defendants on statute of limitations grounds.

Finally, the TAC does not plead facts sufficient to establish that any Moving Defendant participated in any antitrust conspiracy.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Contrary to the Court's Decision, Figure 12 of the TAC (the sole allegation the Court found that purportedly connected Moving Defendants to the alleged conspiracy) provides no basis to infer Moving Defendants' participation in any conspiracy.  That figure, a purported analysis of changes in average quotes in the secondary market for Italian European Government Bonds ("EGBs"), on its face does not show any parallel conduct by Moving Defendants and is otherwise inadequate because:  (1) it does not address obvious alternative explanations for the data patterns identified therein, (2) does not plead facts indicating that it can be credited, and (3) cannot support claims against Natixis or NSI because Natixis is not alleged to be a primary dealer in Italian EGBs and NSI is not alleged to be a primary dealer of any EGBs.

## BACKGROUND[1]

In the TAC, Plaintiffs bring a putative class action against a number of mostly foreign financial institutions that allegedly colluded in Europe to fix the prices of EGBs issued in Europe.  According to the TAC, foreign defendants acted as both primary dealers and market makers for EGB transactions.  They acquired EGBs from European governments in an alleged "Primary Market" and resold them to investors in an alleged "Secondary Market."

Plaintiffs seek to plead a price fixing conspiracy with respect to all auctions and secondary market trading in EGBs issued by 13 different European governments over the six-year period of 2007 to 2012, alleging that during this period all Defendants—just six out of over 60 approved primary dealers for EGBs—conspired to fix, raise, maintain, stabilize or otherwise manipulate the prices of EGBs.  (TAC ¶¶ 1-2); AFME, Primary Dealers Handbook (2015) at 17.21-17.23, *available at* https://www.afme.eu/globalassets/downloads/publications/afme-primary-dealers-handbook-q4-2015.pdf.  Moving Defendants Natixis and NIP are just two of this large group of dealers and were not primary dealers in every EGB identified in the TAC. (*See, e.g.*, TAC ¶ 123.)  As the Court noted, Plaintiffs' alleged conspiracy worked as follows: Defendants colluded to inflate the prices of EGBs when participating in auctions for those bonds in Europe through overbidding, then sought to recoup their losses by overcharging investors for those EGBs in the alleged secondary market by reselling those bonds at a premium.  Op. at 8-9; (*see also* TAC ¶¶ 147-159 (summarizing Plaintiffs' alleged conspiracy).)  There is no allegation in the TAC that any Defendant colluded in setting bid-ask spreads in the secondary market for EGBs for which it was not a primary dealer.

---

[1] The facts recited herein are based on the allegations of the TAC as well as the materials referenced and relied upon in the TAC, and matters of public record, all of which may be considered in ruling on a motion to dismiss.  *See Abrams v. Life Med. Techs., Inc.*, 135 F. Supp. 3d 185, 191 (S.D.N.Y. 2015).

NIP is organized under the laws of the United Kingdom, with its headquarters and principal place of business in London.  NSI is a financial services company with its principal place of business in New York.  NSI is not alleged to have purchased EGBs in any primary market.  (TAC ¶ 22.)  No Plaintiff alleges that it traded bonds with NSI.  Only one of the Plaintiffs, I.B.E.W., alleges, in conclusory fashion, that it traded EGBs with NIP.  (TAC ¶ 34.) The TAC does not provide any corroborating facts regarding this trade, such as:  when I.B.E.W. allegedly traded with NIP; where the trade occurred (*i.e.*, in Europe or in the U.S.); whether any activity occurred in the U.S. in connection with the trade; which EGB was traded; whether the transaction was a purchase or a sale, and if a purchase, whether I.B.E.W. purchased in the post-auction secondary market; and whether NIP participated in auctions for that EGB.  There is no allegation that NSI was involved in the alleged trade.

Natixis is a French financial services company that has its principal place of business in Paris.  (TAC ¶ 48).  During the Class Period, all employees responsible for determining and submitting Natixis's bids in the primary market for EGB allocations and for determining the bid and ask quotes that Natixis posted in the secondary market to buy or sell EGBs were resident at Natixis's Paris office.  *See* Decl. of Wouter Bod ¶¶ 4-5 (Natixis) ("Bod Decl.").[2]  No U.S. employees of Natixis had such responsibilities, and the TAC does not allege otherwise.  In fact, the TAC acknowledges that traders who undertake primary dealing responsibilities for EGBs typically are located in Europe.  (TAC ¶ 140.)  Nor does the TAC allege that any material proportion of Natixis's secondary market trading activity in EGBs was with U.S. customers— which is consonant with the fact that during the Class Period the vast majority of Natixis's

---

[2] Natixis respectfully requests permission to submit the Bod declaration filed with this motion, as on a Rule 12(b)(2) motion, the Court may "look beyond the pleadings to affidavits and supporting materials submitted by the parties."  *In re Aluminum Warehousing Antitr. Litig.*, 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015).

secondary market customers in EGBs were located outside of the U.S. while customers in the U.S. represented a very small fraction of such customers.  *See* Bod Decl. ¶ 6.

Only Ohio Carpenters alleges, in conclusory fashion, that it traded EGBs with Natixis. (TAC ¶ 32.)  The TAC provides no corroborating facts regarding this trade, such as:  when Ohio Carpenters allegedly traded with Natixis; where the trade occurred (*i.e.*, in Europe or the U.S.); whether any activity occurred in the U.S. in connection with the transaction; which EGBs were traded; whether Natixis participated in primary auctions for those EGBs; whether the transaction was a purchase or a sale and if a purchase transaction, whether Ohio Carpenters purchased in the post-auction secondary market; and whether Ohio Carpenters engaged in unmediated dealings with Natixis in connection with the trade.  (*See id.*)  The TAC does not even allege any transaction with Natixis occurred during the putative Class Period.  (*See id.*)  Natixis has been unable to locate any record of any EGB trade with Ohio Carpenters.  *See* Bod. Decl. ¶ 8.

## STANDARD OF REVIEW

Reconsideration pursuant to Local Civil Rule 6.3 is appropriate where "the moving party can point to controlling decisions or data that the Court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court," or "to correct a clear error or prevent manifest injustice."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *accord Small v. Nobel Biocare USA*, 2012 WL 952396, at *1, 2 n.5 (S.D.N.Y. Mar. 21, 2012) ("The purpose of a motion for reconsideration . . . is to draw a court's attention to its prior missteps, whatever they may have been."); *see also Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 597 (S.D.N.Y. 2018) (Marrero, J.) (granting reconsideration where defendants drew the Court's attention to an absence of facts in the record required to establish their culpable conduct, not previously considered during the three-page pre-motion letter process).

Reconsideration is appropriate here with respect to the Moving Defendants, as discussed below.[3]

## ARGUMENT

I.     **THE COURT OVERLOOKED CONTROLLING LAW AND OTHER MATTERS INDICATING THAT PLAINTIFFS LACK ANTITRUST STANDING (Op. at 39-47; § II.D)**

In holding that Plaintiffs adequately alleged antitrust standing, the Court overlooked deficiencies in the TAC demonstrating that Plaintiffs have not sufficiently pled antitrust injury, that they are efficient enforcers or that they are direct purchasers as required under controlling authority and this Court's Decision.  Plaintiffs' conclusory allegations of harm are insufficient to establish antitrust standing.

### A.     **Plaintiffs Did Not Plead Antitrust Standing as to Natixis and NIP** (Op. at 40-44; § II.D.1)

In holding that "the Court is not persuaded that Plaintiffs must plead facts regarding specific transactions to allege antitrust standing," Op. at 42, this Court sought to distinguish the district court's decision in *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp 3d. 402 (S.D.N.Y. 2017), and rely on *Allianz Global Investors GmbH v. Bank of Am. Corp.*, 2020 WL 2765693 (S.D.N.Y. May 28, 2020).  However, the ruling in *Allianz—i.e.* "Defendants are incorrect that an antitrust injury requires pleading the 'actual transactions' that harmed Plaintiffs"—must be viewed in the factual context of that case.  2020 WL 2765693, at *3.  The Second Circuit's holding in *Harry* that requires Plaintiffs to show that they traded at artificial prices, 889 F.3d at 116, should be the rule, not the exception, as this Court held.  Op. at 42.

In *Allianz*, plaintiffs alleged that defendants collusively manipulated the foreign exchange

---

[3] Moving Defendants raise only a subset of arguments that formed the basis of the Court's Decision as to them, but reserve the right to raise additional arguments not otherwise fully briefed during the limited pre-motion letter process.  *See Lorely Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 190 (2d Cir. 2015).

("FX") benchmark, which "had a significant impact on all FX transactions" due to defendants' "aggregate market share of over 90%" during the relevant period.  2020 WL 2765693, at *2.  Significant to the *Allianz* court's holding that plaintiffs sufficiently alleged an injury—"paying artificially high prices when buying, and getting artificially low prices when selling"—was the fact that plaintiffs alleged that the manipulation was "pervasive" and essentially impacted all FX transactions and that they had "entered into a significant number of FX transactions during the relevant period."  *Id.* at *2, 4.  The court reasoned that, because defendants controlled so much of the market and plaintiffs entered into a significant number of trades in that market, pleading specific transactions was unnecessary as it was plausible that plaintiffs ultimately suffered a net harm due to the fact that a vast majority of trades may have been tainted by the conspiracy.  In other words, "[e]ven if any specific transaction may have benefited a particular [p]laintiff, a cognizable allegation of an antitrust injury can exist where [d]efendants conspired to take actions that generally profited themselves at the expense of [p]laintiffs." *Id.* at *4.  Therefore, in circumstances where plaintiffs allege that manipulation was so pervasive that pricing on essentially all transactions was artificial, plaintiffs could be harmed whether they purchased or sold, and plaintiffs engaged in a significant number of trades with defendants that control a vast majority of the market, pleading actual transactions is not required to show actual injury.

Here, the conspiracy Plaintiffs allege does not have any of these exceptional features.  Plaintiffs do not allege that the conspiracy tainted all EGB transactions or that Defendants controlled the vast majority of the secondary market for EGBs.  Indeed, Defendants comprise just six out of over 60 primary dealers, with each European country having a different composition of primary dealers (most of which do not include all six Defendants as primary dealer).  *See* AFME, Primary Dealers Handbook, at 17.21-17.23.  Under Plaintiffs' theory,

whether or not Plaintiffs were harmed depends on several critical factors, including whether they were purchasing or selling, the timing of the transaction (*i.e.*, in the post-auction secondary market) and from which Defendant.  Therefore, the TAC fails to allege facts necessary to establish that the alleged conspiracy caused antitrust injury because it omits allegations (among others) as to:  (i) when Plaintiffs allegedly traded EGBs with Natixis or NIP and in what volume; (ii) whether the transactions were purchases or sales; and (iii) if purchases, whether they occurred during the post-auction secondary market—*i.e.*, the types of transactions Plaintiffs allege were impacted by the alleged conspiratorial conduct.  (*See* TAC ¶ 179.)  These omissions are fatal to Plaintiffs' claims.  Unlike in *Allianz*, here it is plausible under the TAC's allegations that Plaintiffs executed only a handful of trades with NIP and Natixis, all of which benefitted them, resulting in no antitrust injury.  The TAC is therefore deficient under the Second Circuit's *Harry* rule.  889 F.3d at 115-16.  *See also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147-48 (2d Cir. 2011) (where allegation that all transactions were impacted was merely "speculative and conjectural," failure to plead "specific details concerning the frequency of its transactions" rendered plaintiff's allegations of injury implausible).

As to Natixis, the TAC does not even allege that Ohio Carpenters' purported EGB transaction(s) with it occurred during the Class Period.  (TAC ¶ 32).  In light of Plaintiffs' allegation that EGBs were artificially priced only during the Class Period (*see* TAC ¶ 196), and the Court's holding that Plaintiffs are efficient enforcers only as to Defendants with whom they transacted, Op. at 45-46, Plaintiffs cannot allege antitrust injury or that they are efficient enforcers as to Natixis.

B.   **The TAC Does Not Plead Sufficient Facts To Demonstrate that Plaintiffs Are Direct Purchasers** (Op. at 41-46, §§ II.D.1, II.D.2)

The Court overlooked that the TAC does not plead sufficient facts to demonstrate that

Plaintiffs are direct purchasers with standing to pursue claims under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  In *Illinois Brick*, the Supreme Court held that, subject to certain exceptions not applicable here, "only direct purchasers have standing to bring civil antitrust claims."  *Simon v. KeySpan Corp.*, 694 F.3d 196, 201-02 (2d Cir. 2012).  A "direct purchaser" is a plaintiff that purchased an allegedly price-fixed product directly from an alleged co-conspirator defendant. *See, e.g.*, *In re NASDAQ Mkt.-Makers Antitr. Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996) (investors that transacted with brokers have antitrust standing only where "those brokers did not function as a distinct economic entity in the chain of purchase or sale"); *In re Vitamin C Antitr. Litig.*, 279 F.R.D. 90, 100-01 (E.D.N.Y. 2012) (holding that a plaintiff who purchased from "a subsidiary of defendant . . . rather than a defendant itself" was not a direct purchaser under *Illinois Brick*).  Plaintiffs that acquired EGBs from Defendants through transactions with third parties are not direct purchasers and their claims should be dismissed.  The TAC pleads that Plaintiffs Ohio Carpenters and I.B.E.W. transacted in EGBs directly with "one or more" Defendants, including Natixis and NIP respectively, but the TAC alleges no corroborating facts indicating that the purported transactions with Natixis or NIP were *direct*.  (*See* TAC ¶¶ 32, 34.) Because Plaintiffs allege that Defendants "distributed [EGBs] to U.S. customers through their U.S. based broker-dealer affiliates" (TAC ¶ 142) and that interdealer brokers may be involved in EGB transactions (TAC ¶¶ 215, 227-28), Plaintiffs' allegations are inadequate to establish that Ohio Carpenters' or I.B.E.W.'s claims survive *Illinois Brick*'s bar on claims by indirect purchasers.  The claims as pled against Natixis and NIP should be dismissed.

      C.      **Plaintiffs Cannot Establish Antitrust Standing as to NSI in the Absence of Specific Allegations that NSI Engaged in Any Alleged Conspiracy or Transacted with Plaintiffs** (Op. at 44-47; § II.D.2)

The Court held that Plaintiffs adequately alleged antitrust injury as to NSI because Plaintiffs allege an agency relationship between NIP and NSI.  Op. at 28.  The Court held that

such an agency relationship existed because NSI employees sold EGBs sourced by NIP from a shared inventory in the Wholesale Division, at prices determined by NIP. *Id.* However, Plaintiffs fail to allege that NSI was an agent of NIP in any conspiratorial conduct or part of any alleged conspiracy. At most, Plaintiffs allege that NSI was a mere sales agent and this somehow confers standing as to NSI. This is not the law. To allege standing, Plaintiffs must allege that they were "'directly harmed by the defendants' unlawful conduct.'" *In re Aluminum Warehousing Antitr. Litig.*, 833 F.3d 151, 159 (2d Cir. 2016) (quoting *Assoc. General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 n.19 (1983)).

Here, Plaintiffs fail to meet this standard because they never allege that NSI purchased EGBs in a primary market auction, that NSI conspired to fix prices of EGBs or that NSI was aware of any allegedly conspiratorial conduct. *See In re Parmalat Sec. Litig.*, 377 F. Supp. 2d 390, 408-09 (S.D.N.Y. 2005) (dismissing conspiracy claim against U.S. affiliate where complaint failed to allege affiliate knew of the conspiracy). Plaintiffs allege only one NSI employee—Gregory Cignarella—actually sold EGBs, either as part of the Wholesale Division or otherwise. (TAC ¶¶ 72-74.) Plaintiffs do not allege that any other NSI employee, including the two other named individuals—Jill Scalisi and Jens Nordvig—ever sold EGBs. (TAC ¶¶ 71-73.) And they do not allege that Mr. Cignarella participated in the EGB price-fixing conspiracy or sold any EGBs to them.

Plaintiffs never allege that NSI was engaged in or aware of any alleged conspiratorial conduct. Rather, Plaintiffs impermissibly group NSI with NIP and suggest that any alleged conspiracy as to NIP may be imputed to NSI because one employee of NSI allegedly sold EGBs and because the Wholesale Division, a financial reporting segment, included staff employed by NSI and NIP. (TAC ¶¶ 71-72.) But Plaintiffs may not allege standing as to NSI simply because

10

NSI and NIP both have operations reported by the ultimate parent as part of the Wholesale

Division.  "[G]rouping corporate families impermissibly ignores corporate separateness and

therefore fails to state a viable antitrust claim against those entities." *Precision Assocs., Inc. v.*

*Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *14 (E.D.N.Y. Jan. 4,

2011), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012)

(internal quotations omitted).  That Nomura Holdings—not even a defendant in this case—

reports revenue by segments that aggregate results from different subsidiaries is not sufficient to

allege that either subsidiary was a co-conspirator.

Rather, Plaintiffs must allege that NSI joined the conspiracy and played some role in

it.  *See Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009)

("*Hinds I*") (Marrero, J.) ("Named Plaintiffs must make allegations that plausibly suggest that

*each Defendant* participated in the alleged conspiracy." (internal quotations and citation omitted)

(emphasis added)).  Here, the sole allegation that one employee of NSI sold EGBs is insufficient

to allege that NSI was part of any conspiracy with any other defendant because Plaintiffs fail to

"plead facts plausibly suggesting a meeting of the minds among any of the[] Joint

Defendants."  *See id.*

Though Plaintiffs allege that their statistical analysis of bid-ask spreads evidences a

conspiracy, they fail to specify that this analysis includes NSI.  As the Court recognizes,

Plaintiffs conflate NIP and NSI in Figure 12.  Op. at 65.  But the Court should not excuse such

conflation where Plaintiffs do not coherently explain NSI's participation in the alleged

conspiracy.  As Judge Oetken held in *In re Mexican Gov't Bonds Antitr. Litig.*, "without 'a

coherent explanation for each defendant's participation in the alleged conspiracy, an antitrust

claim can only stand against those defendants as to whom the complaint offers some specific,

individual showing of' anticompetitive conduct." 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019)

(quoting *Sonterra Cap. Master Fund Ltd.* v. *Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 556

(S.D.N.Y. 2017)). Here, there is not even an allegation that NSI participated in EGB auctions.

Moreover, by the Court's own ruling, Plaintiffs are not efficient enforcers as to NSI

because Plaintiffs do not allege that they ever transacted with it. Here, I.B.E.W. alleges only that

it transacted with NIP, not NSI. (TAC ¶ 34.) Even if Plaintiffs argue that NSI was a sales agent

of NIP, they never specify that they actually purchased any EGBs from NSI as such an agent,

and in fact, expressly exclude NSI as one of the entities from whom they purchased EGBs.

(TAC ¶¶ 32-34.) Accordingly, the Court should dismiss NSI for lack of antitrust standing.

## II. THIS COURT SHOULD RECONSIDER ITS FINDING THAT PLAINTIFFS' ALLEGATIONS ESTABLISH PERSONAL JURISDICTION OVER FOREIGN DEFENDANTS NATIXIS AND NIP (Op. at 20-32, § II.B.2)

The Court overlooked controlling authority when it held that Moving Defendants Natixis

and NIP are subject to specific personal jurisdiction on a purposeful availment theory based on

allegations that they either directly or indirectly (through broker-dealer affiliates) marketed or

transacted in EGBs in the forum. Op. at 17-18, 25-29. Whether a defendant purposefully

availed itself of the forum is only part of the jurisdictional analysis; it does not address the

separate and necessary requirement that a defendant have *a relevant, suit-related* connection to

the forum. *Bristol-Myers Squibb v. Superior Court*, 137 S. Ct. 1773, 1781 (2017). The Second

Circuit's *Schwab* and *Waldman* rulings make clear that allegations of such in-forum trading

activity are not suit-related and thus do not give rise to personal jurisdiction where the alleged

conduct in furtherance of the alleged conspiracy—collusion in the primary market auction

process and collusion in setting bid-ask spreads in the secondary market—all occurred abroad.

Moreover, Section 12 of the Clayton Act provides the statutory basis for addressing

whether the exercise of personal jurisdiction is appropriate here, and the TAC does not allege

corroborating facts to show that NIP "transacts business" in this district, as required by the Clayton Act. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 197 (S.D.N.Y. 2018) (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004)).  Because the TAC fails to satisfy both the constitutional and statutory requirements of personal jurisdiction, this Court should reconsider its holding that it has personal jurisdiction over Natixis and NIP.

A.     **The Court Should Reconsider Its Finding That the TAC Establishes Specific Personal Jurisdiction Over Natixis and NIP** (Op. at 25-29, §§ II.B.2.c, 2.e)

In reaching its Decision, this Court overlooked a core jurisdictional deficiency in the TAC:  Plaintiffs do not allege that Natixis or NIP had any "suit-related" contacts with the forum and thus cannot establish "minimum contacts necessary to support such jurisdiction." *Schwab*, 883 F.3d at 82.  To establish specific jurisdiction over a defendant, the suit must "arise[] out of or relate to the defendant's contacts with the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014) (internal quotation marks, brackets and citations omitted).  To confer jurisdiction, a defendant's contacts must be "with the forum State itself, not . . . with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  Regardless of the extent of a defendant's contacts with the forum, the Second Circuit requires at a minimum a "'but for' connection between the defendant's forum-directed activities and the claim." *In re LIBOR-Based Fin. Instrument Antitr. Litig.* ("*LIBOR IV*"), 2015 WL 6243526, at *28 (S.D.N.Y Oct. 20, 2015).  Because the TAC contains no allegations of suit-related contacts with the U.S., the Court should reconsider its conclusion that it can exercise specific personal jurisdiction over Natixis and NIP.

Plaintiffs do not allege that Natixis or NIP traders engaged in any manipulative or conspiratorial acts in the U.S.  Nor could they.  All employees responsible for determining and submitting Natixis's bids in the primary market for EGB allocations and for determining the bid and ask quotes that Natixis posted in the secondary market to buy or sell EGBs were resident at

Natixis's Paris office.  Bod Decl. ¶¶ 4-5.  As to NIP, there is no allegation that it engaged in any conspiratorial activity regarding either the primary market or secondary trading in the U.S., and Plaintiff I.B.E.W. does not even allege that its unspecified trading with NIP took place in the U.S.  Instead, the core of Plaintiffs' jurisdictional allegations is that foreign defendants purposefully availed themselves of the forum by generally promoting, marketing, trading and selling EGBs within the U.S. and had substantial fixed income trading and sales operations in New York.  (*See* TAC ¶¶ 17, 28.)  Under controlling Second Circuit precedent, such allegations are insufficient to establish specific personal jurisdiction.

In *Schwab*, the Second Circuit recently confirmed that allegations of ordinary business activity conducted by foreign entities in the U.S., with no causal relationship to a plaintiff's claims—like the allegations here—do not constitute "suit-related" conduct.  883 F.3d at 83. While the plaintiffs in *Schwab*, like Plaintiffs here, alleged that foreign defendants and their affiliates also traded allegedly manipulated financial instruments in the U.S. (in that case, instruments linked to USD LIBOR), the Second Circuit held that such allegations were insufficient to establish personal jurisdiction for "claims premised solely on Defendants' false LIBOR submissions in London."  *Id.*  Building on the Second Circuit's holding in *Waldman* that suit-related conduct is limited to the conduct that gives "rise to the episode-in-suit," 835 F.3d at 331, 337 (requiring that "defendants participated in" alleged misconduct in the forum "or that their liability . . . resulted from their actions that did occur" there), *Schwab* confirmed that a defendant's activities that lack a causal connection to the alleged misconduct are not suit-related and, therefore, not relevant.  883 F.3d at 84.  Thus, *Schwab* held that alleged trading of billions of dollars of USD BBA LIBOR-based instruments in the forum "did not cause [d]efendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give

rise to claims seeking to hold [d]efendants liable for those submissions." *Id.*

Courts applying *Schwab* have found jurisdiction lacking over antitrust claims where defendants allegedly traded price-fixed instruments in the U.S. but the alleged antitrust conspiracy took place outside the U.S.  *See, e.g.*, *Dennis*, 343 F. Supp. 3d at 205-06 (*Schwab* "precludes a finding of personal jurisdiction . . . over plaintiffs' federal claims on the basis of the Foreign Defendants' transactions in BBSW-Based Derivatives in the United States" including transactions directly with plaintiffs); *In re LIBOR-Based Fin. Instruments Antitr. Litig.*, 2019 WL 1331830, at *4 (S.D.N.Y. Mar. 25, 2019) ("*LIBOR VIII*") (*Schwab* "did not disturb [the court's] general ruling that, unless plaintiffs can plausibly allege that 'a defendant determined, or transmitted, a false LIBOR submission' from the United States," personal jurisdiction was lacking for claims based on the alleged manipulation of USD BBA LIBOR).  *In re SSA Bonds* is directly on point.  There, Judge Ramos dismissed for lack of personal jurisdiction a complaint alleging that foreign defendants marketed SSA bonds to U.S. investors, conveyed SSA bond prices to U.S.-based salespeople, and distributed the bonds to the U.S., but which were not alleged to be suit-related.  *In re SSA Bonds*, 420 F. Supp. 3d at 232-33.  Pre-*Schwab* case law is in accord.  *See, e.g.*, *Laydon* v. *Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *5 (S.D.N.Y. Mar. 10, 2017) (brokering trades between a trader and U.S. counterparties is insufficient, and "[t]he fact that some of Lloyds' counterparties in derivatives transactions . . . were located in the United States is insufficient to establish minimum contacts with the United States"); *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358, at *5-6 (S.D.N.Y. Mar. 31, 2015).

To the extent the Court's jurisdictional holding hinges on the notion that NSI acted as NIP's agent and thus its actions should be imputed to NIP, this too is unavailing.  Plaintiffs do not allege any transactions with NSI nor do they allege that NSI participated in any alleged

15

conspiracy.  It thus follows that NSI cannot be the jurisdictional lynchpin for NIP because NSI has no "suit-related" contacts with the forum.  *See Schwab*, 883 F.3d at 83; s*ee also Sullivan v. Barclays PLC*, 2017 WL 685570, at *45-46 (S.D.N.Y. Feb. 21, 2017).

The TAC's jurisdictional pleadings effectively boil down to allegations that investors in the U.S. were allegedly harmed by alleged price-fixing and overbidding activity in Europe.  (*See* TAC ¶¶ 23, 133, 141-42), which, by themselves, are insufficient to establish forum-related conducts.  *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").  The Court should reconsider its holding that it has specific personal jurisdiction over Natixis or NIP.[4]

B.    **The Court Should Reconsider Its Finding That There Is a Statutory Basis To Exercise Personal Jurisdiction over NIP** (Op. at 27-29; § II.B.2.e)

Because this Court overlooked the requirement that jurisdictional facts must be pled with specificity and must be supported with allegations containing corroborating facts, this Court

---

[4] Because the Court did not address the purposeful direction theory of personal jurisdiction or conspiracy jurisdiction in reaching its conclusion as to Moving Defendants, Moving Defendants do not address those theories here and assume for purposes of this motion that the Court's Decision did not rest on these theories.  Moving Defendants reserve the right to address those theories.  In any event, the TAC does not plead facts establishing that Natixis or NIP "purposefully directed their activities at residents of the United States" or "singled out the United States as their target".  *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017).  Mere allegations—like those made by Plaintiffs here—that defendants knew or reasonably should have known that injury from alleged misconduct would be felt in the forum are not sufficient.  *Schwab*, 883 F.3d at 88 (confirming that the mere fact that "the effects of LIBOR manipulation were likely to reach [the forum] does not mean that [d]efendants' conduct in London was 'expressly aimed' at that [forum]").

In addition, *Schwab*, its progeny and other Second Circuit authority make it clear that Plaintiffs' allegations are insufficient to plead conspiracy-based jurisdiction.  Plaintiffs do not plausibly allege that Moving Defendants participated in any conspiracy or engaged in conduct in the forum in furtherance of any conspiracy.  In addition, Plaintiffs do not plausibly allege an agency relationship between Natixis or NIP and any co-conspirators alleged to have acted in the forum in furtherance of the conspiracy, which the Second Circuit requires before attributing the in-forum actions of one conspirator to another.  *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972) (declining to find conspiracy jurisdiction absent evidence of direction or control even where alleged co-conspirators were members of the same firm), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).

should reconsider its finding that there is a statutory basis to exercise personal jurisdiction over NIP. *See In re SSA Bonds*, 420 F. Supp. 3d at 232; *Dennis*, 343 F. Supp. 3d at 200. "In a federal question case, where the defendant resides outside the forum state," as NIP does, "federal courts apply the forum state's personal jurisdiction rules [only] *if* the applicable federal statute does not provide for national service of process." *Sunward Elecs., Inc.*, 362 F.3d at 22 (emphasis added). Because Plaintiffs' private right of action to pursue Sherman Act violations arises from Section 12 of the Clayton Act, s*ee In re Vitamin C Antitr. Litig.*, 2012 WL 12355046, at *5 (E.D.N.Y. Aug. 8, 2012), and the Clayton Act provides for nationwide service of process, 15 U.S.C. § 22,[5] the Clayton Act's jurisdictional rules apply here as to NIP. But in finding a statutory basis to exercise personal jurisdiction over NIP, the Court concluded that Plaintiffs adequately "allege[d] an agency relationship between [NIP] and . . . NSI" for purposes of the New York long-arm statute. Op. at 28. The Court should reexamine this conclusion because the TAC's conclusory allegations do not establish that NIP "transacted business" under the Clayton Act's applicable jurisdictional rules.[6] *See In re SSA Bonds*, 420 F. Supp. 3d at 230 (S.D.N.Y. Oct. 4, 2019).

"Transacts business" under the Clayton Act requires the business to carry out "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *Dennis*, 343 F. Supp. 3d at 198-99 (quoting *United States v.*

---

[5] "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22.

[6] Under the Clayton Act, this Court can exercise personal jurisdiction only where venue is proper, *i.e.*, a judicial district in which a defendant is an "inhabitant," "may be found" or "transacts business". *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 424-30 (2d Cir. 2005); *see also In re SSA Bonds*, 420 F. Supp. 3d at 229-30. NIP cannot be said to be an "inhabitant" of New York because it is not alleged to be incorporated under the laws of New York. *See, e.g.*, *Expoconsul Intern., Inc. v. A/E Systems, Inc.*, 711 F. Supp. 730, 732-733 (S.D.N.Y. 1989). To "be found" in a district requires more than "transact[ing] business" there. *United States v. Watchmakers of Switzerland Info. Ctr.*, 133 F. Supp. 40, 42 (S.D.N.Y. 1955) (citation omitted). As Plaintiffs do not adequately allege that NIP transacts business in this district, it also is not found here.

*Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948)).  Here, the Court held that Plaintiffs

established that NIP "transacted business" in the forum in two ways:  (1) through agency, with

NSI as NIP's agent, and (2) by "directly transact[ing] in EGBs in the forum".  Op. at 28.

      The Decision overlooked precedent that forecloses these theories.  *First*, with respect to

the agency theory, Circuit precedent makes clear that, for actions of an alleged agent to be

imputed to a principal, such pleadings must be *specific* and *contain factual corroboration* to

support allegations in a complaint that "show that the subsidiary does all the business which [the

parent corporation] could do were it here by its own officials." *Jazini v. Nissan Motor Co.*, 148

F.3d 181, 184 (2d Cir. 1998) (internal quotations and citations omitted); *see also In re SSA

Bonds*, 420 F. Supp. 3d at 231.  This rule requires Plaintiffs to plead that, absent the alleged

agent's existence, the alleged principal would carry out the very task of engaging in the relevant

transactions that Plaintiffs claimed harmed them.  *See In re Vitamin C Antitr. Litig.*, 2012 WL

2930109, at *5, 7 (S.D.N.Y. July 18, 2012).

      The TAC does not meet these requirements.  Plaintiffs do not plead any corroborating

facts or cite any supporting documents that show that NSI was NIP's agent, and that absent

NSI's presence in the forum, NIP would be conducting the very business NSI allegedly conducts

to execute EGB trades in New York.  Plaintiffs do not allege when any of NSI's purported New

York-based EGB transactions took place, who they were with, or how frequent those

transactions were.  Without corroborating facts, this is the type of "legal conclusion couched as

factual allegation" that should not survive a motion to dismiss.  *See Twombly*, 550 U.S. at 555.

      *Second*, Plaintiffs apparently allege that NIP "directly transacted EGBs in the forum."

*See* Op. at 28.  This is likewise insufficient to support that Plaintiffs "transacted business."  The

extent of Plaintiffs' non-agency related allegations are that NIP "sold [EGBs] directly to

investors in the [U.S.] and distributed [EGBs] into the [U.S.]" and made "substantial sales [],

quot[ed] fixed prices to U.S. investors, and cultivat[ed] a domestic [EGB] customer base."  (*See*

TAC ¶¶ 67-68.)  To meet the "transacts business" standard directly (*i.e.* through a non-agency

theory), however, Plaintiffs must plead with specificity that NIP engaged in activity in the forum

that constituted NIP's core business.  *Dennis*, 343 F. Supp. 3d at 200.  Plaintiffs' bare allegations

alone lack the requisite specificity to support jurisdictional pleadings.  *Id.*; *see also In re SSA*

*Bonds*, 420 F. Supp. 3d at 231 (holding that the "transacts business" test was not met because

"Plaintiffs' allegations do not provide factual corroboration for the alleged New York-based

bond transactions").  While selling bonds with continuity in New York could potentially meet

the "transacts business" standard, Plaintiffs' allegations essentially repackage the legal standard

that a party must be engaged in "business of any substantial character" as a conclusory

allegation—"substantial sales [], quot[ed] fixed prices to U.S. investors, and cultivat[ed] a

domestic [EGB] customer base."  (TAC ¶ 68.)  Plaintiffs provide no facts whatsoever about the

alleged sales or the alleged prices that NIP allegedly made or fixed in New York.  There are no

specific allegations that shed any light on the nature of the contacts that establish that any alleged

sales were anything other than sporadic or discrete.  Without factual corroboration, Plaintiffs'

allegations are insufficient to meet the "transacts business" standard.  *In re SSA Bonds*, 420

F. Supp. 3d at 231.

III. **THE COURT SHOULD RECONSIDER ITS RULING THAT PLAINTIFFS'**
**SHERMAN ACT CLAIMS ARE NOT TIME-BARRED (Op. at 32-39; § II.C)**

In holding that Plaintiffs appropriately relied on Defendants' Codes of Ethics to satisfy

the due diligence requirement of fraudulent concealment, Op. at 36-39, the Court overlooked

controlling precedent in *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019).  There is no dispute

that, absent successfully pleading fraudulent concealment, Plaintiffs' claims would be untimely

under the Sherman Act's four-year time bar.  Nor is there any dispute that in attempting to plead fraudulent concealment, Plaintiffs conducted none of the requisite due diligence. Op. at 34 (citing TAC ¶ 259).  Nevertheless, relying upon its past opinion in *Hinds County v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010) ("*Hinds II*"), this Court excused Plaintiffs' lack of diligence because they "allege[d] reliance on Defendants' affirmative representations in their codes of conduct, which consistently disavow that Defendants engage in any unfair competitive practices with respect to their EGB trading."  Op. at 36.

In doing so, this Court overlooked *Singh* and the generic nature of the representations contained in Defendants' Codes of Ethics.  *See id.*; (TAC ¶ 260).  The Codes of Ethics cited in the TAC contain no specific averments or even any references to EGBs.  *Singh* held that "banal and vague corporate statements affirming the importance of regulatory compliance . . . do not invite reasonable reliance."  *Singh*, 918 F.3d at 60.  In the Second Circuit's view, a company's "Code of Ethics are a textbook example of 'puffery,'" such that "general statements about reputation, integrity, and compliance with ethical norms are inactionable . . . meaning that they are too general to cause a reasonable investor to rely upon them."  *Id.* at 63.

Although *Singh* measured whether the plaintiff adequately alleged reliance in the securities fraud context, the Second Circuit employed the same standard in the fraudulent concealment context because investors can claim reliance on defendants' statements only if a reasonable investor would rely upon them in purchasing a security or foregoing diligence. *Compare LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (declining to excuse plaintiffs' lack of due diligence and toll the limitations period; "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's

concern"), *with Singh*, 918 F.3d at 63 ("An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock."). Because Defendants' Codes of Ethics "amount to general declarations about the importance of acting lawfully and with integrity," *Singh*, 918 F.3d at 63, Plaintiffs' alleged reliance on them was unreasonable and does not excuse their lack of diligence.

*Hinds II* is inapposite: there, the SCAC alleged "several specific averments of fact regarding the inquiries undertaken by Named Plaintiffs," 700 F. Supp. 2d at 400, and that Broker Defendants repeatedly assured Named Plaintiffs that they were soliciting fair and competitive bids that complied with IRS rules and regulations, *id*. As the Court noted, Named Plaintiffs "pled with particularity the inquiries that were made, to whom, regarding what, and with what response." *Id*. There is no such pleading here. Nor do Plaintiffs suggest that they made any specific inquiries here. As a result, Plaintiffs' admitted failure to conduct due diligence means that they have failed to plead fraudulent concealment and thus their claims are time-barred.

## IV. THE COURT SHOULD RECONSIDER ITS HOLDING THAT PLAINTIFFS STATED A CLAIM FOR CONSPIRACY (Op. at 50-67; § II.E.2-3)

Plaintiffs do not allege any direct evidence of a conspiracy. Op. at 51. In such circumstances, "a horizontal agreement . . . may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Citigroup, Inc.*, 709 F.3d at 136 (internal citation omitted). The Court held that the statistical analysis in Figure 12 of the TAC was sufficient to connect Moving Defendants to the alleged conspiracy. Op. at 60-61. However, the Court overlooked material in the TAC demonstrating that Plaintiffs' allegations fall short of the requisite legal standard that could plausibly tie Natixis, NIP and NSI to any alleged conspiracy.

*First*, Figure 12 does not constitute a "nonconclusory factual allegation of parallel

behavior" and this alone requires dismissal of Moving Defendants. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Twombly*, 550 U.S. at 565-66). To allege parallel conduct, Plaintiffs must at least provide factual allegations purporting to establish uniform pricing by alleged conspirators and similarities in the size and timing of price changes. *See, e.g.*, *In re Text Messaging Antitr. Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (dismissing allegations under Rule 56 that defendants "*agreed to uniformly charge an unprecedented common per-unit price* of ten cents for text messaging services") (emphasis added).[7] The TAC lacks such allegations.

Figure 12, which this Court held suggests parallel conduct tying Moving Defendants to the alleged conspiracy, Op. at 60-61, purports to present "the [average] changes in bid-ask spreads reflected in individual [Primary Dealer] Defendant's quotes between 2012 and 2013" for Italian bonds, and to compare those changes to the corresponding average change for non-Defendant dealers. (TAC ¶ 191.) Plaintiffs, however, include Natixis in the analysis even though it was *not* a primary dealer in Italian EGBs, and also exclude from the analysis two of the five Defendants that *were* primary dealers in Italian EGBs. Even if the Court were to credit this figure, Figure 12 says nothing about the actual bids and asks that Defendants (and non-Defendants) achieved given that Plaintiffs rely only on quote data, and thus nothing about parallelism in bids or asks in the secondary market. All it shows is that average *quotes* supposedly decreased for Moving Defendants from one year to the next. In other words, Figure 12 does not reflect the actual competitive dynamics of the market as it does not reflect actual achieved prices. And even as to the purported quotes (not prices), Figure 12 shows significant

---

[7]  *See also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 54 (S.D.N.Y. 2016) (alleging that defendants made ISDAFix submissions reflecting the "exact same bid/ask spread" nearly every day for multiple years); *cf. In re Currency Conversion Fee Antitr. Litig.*, 773 F. Supp. 2d 351, 367-73 (S.D.N.Y. 2011) (at summary judgment, jury reasonably could find a two-and-a-half-year period during which the defendants met, and each implemented the same foreign currency conversion fee).

*differences* among Defendants, as average changes among the few defendants varied by between 27.97% for "Nomura" (without distinguishing between NIP and NSI) and 66.42% for "Natixis." Such allegations cannot demonstrate parallel conduct. *See In re ICE LIBOR Antitr. Litig.*, 2020 WL 1467354 at *4, *6 (S.D.N.Y. Mar. 26, 2020) (dismissing conspiracy allegations premised on statistical analyses purportedly demonstrating parallel conduct as implausible where "Plaintiffs fail to assert any evidence of parallel conduct among Defendants to demonstrate that on any particular day, they acted in conjunction" and where allegations left it "difficult to determine whether or not there was parallel pricing among Defendants in the first instance").

In addition, while the Court held that the time period in Figure 12 "coincides with the end of the conspiracy alleged by the European Commission in its Statement of Objections" and thus is sufficient to infer a conspiracy, Op. at 61, the Court overlooked precedent in this Circuit finding alleged statistical analysis for a small subset of the alleged conspiratorial period inadequate to state a claim for conspiracy for the full period. *See Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 698 (S.D.N.Y. 2019) (chart purporting to establish that defendants held more CDOR-Based Derivatives than CDOR-Based Loans in 2014 not probative of alleged conspiracy to manipulate CDOR-Based Derivatives from 2007-2014). Indeed, Figure 12 provides alleged changes in average quotes only for Italian EGBs and for a period largely after the end of the Class Period (which is alleged to terminate in 2012).

*Second*, the TAC does not disclose the data source used to create Figure 12, explain why the data is complete or reliable, or even provide basic information about the assumptions underlying the analysis. Such allegations are akin to pleading bald conclusions rather than well-pled facts. *In re ICE LIBOR Antitr. Litig.*, 2020 WL 1467354 at *6 (plaintiffs' assertions that certain rates should exhibit certain relationships absent collusion, or that statistical test is

reliable, cannot be credited without citation to empirical sources); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) (opaque and unreliable data that merely "flag[] the possibility of a conspiracy" are "not sufficient to meet the plausibility test under *Iqbal*"), *aff'd*, 771 F. App'x 498 (2d Cir. 2019).

*Third*, even if Figure 12 suggested collusive parallelism among Moving Defendants, Plaintiffs fail to address "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567.  The Court correctly noted that Defendants point out that "the scholarship cited by Plaintiffs shows that auction cycles are not necessarily attributable to collusion," Op. at 54-55, but nevertheless held that it cannot address these "valid questions" at this stage of litigation.  *Id.* at 55-56.  In so doing, the Court overlooked Second Circuit precedent applying *Twombly* that makes it clear that Plaintiffs must address "obvious alternative explanations" *in their allegations* at the motion to dismiss stage.  *See LLM Bar Exam, LLC* v. *Barbri, Inc*., 271 F. Supp. 3d 547, 578 (S.D.N.Y. 2017) ("An inference of conspiracy will not arise when . . . there are obvious alternative explanations."), *aff'd*, 922 F. 3d 136 (2d Cir. 2019).  This is distinct from "pick[ing] and choos[ing] between inferences.  *See* Op. at 55.  Moving Defendants averred that bid-ask spreads could have narrowed for other reasons unrelated to the alleged collusion given that the Class Period was one of pronounced volatility because of the European sovereign debt crisis.[8]  For example, individual banks may have had risk management motives for quoting more or less aggressively, reflecting their appetite for taking on new positions or been motivated by considerations related to their existing inventory of bonds.  Plaintiffs' conclusory allegation that "[t]he bid-ask spread changes affecting all primary dealers cannot be explained by the structural

---

[8] *Cf.* Roel Beetsma, et al., *Price Effects of Sovereign Debt Auctions in the Euro-Zone: The Role of the Crisis*, at 6, Working Paper Series (No. 1595) (Sept. 2013) (analyzing post-2007 price/yield trends in Italian government bonds) (cited at TAC ¶ 207 n.22).

changes that occurred between 2012 and 2013," (TAC ¶ 193), pleads no facts addressing the foregoing obvious alternative explanations.

*Fourth*, for additional reasons, Figure 12 does not support Plaintiffs' claims against Natixis and NSI.  Plaintiffs do not allege that Defendants who were not primary dealers in the auction market nevertheless colluded with primary dealer Defendants in the secondary market, and Plaintiffs concede that Natixis was not a primary dealer in Italian EGBs (TAC ¶ 123, Fig. 4).  It is also unsupportive of Plaintiffs' claims against NSI because Plaintiffs never allege that NSI was a primary dealer of any EGBs (TAC ¶¶ 22, 69, 71).  Thus, Plaintiffs do not (and cannot) allege that either Natixis or NSI obtained any Italian EGBs in the primary market that it could re-sell in the secondary market at supracompetitive prices, and thus cannot allege that Natixis or NSI would have any motive, incentive or even ability to collude in the secondary market for Italian EGBs.  This is fatal to Plaintiffs' claims against Natixis and NSI, given that the heart of Plaintiffs' alleged conspiracy is that Defendants reaped supracompetitive profits from investors in the secondary market *on EGBs they acquired in the primary market*.  (TAC ¶ 150); *see Citigroup, Inc.*, 709 F.3d at 138-139.

## CONCLUSION

For the reasons discussed above, Moving Defendants respectfully request that the Court reconsider its Decision denying Moving Defendants' motion to dismiss the TAC, and upon reconsideration, grant such motion; and grant such other and further relief as the Court deems just and proper.

Dated:  August 6, 2020

_____ _/s/ Fiona A. Schaeffer___
Fiona A. Schaeffer
James G. Cavoli
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 530-5172
Facsimile:  (212) 822-5172
fschaeffer@milbank.com
jcavoli@milbank.com

Mark D. Villaverde
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067-3019
Telephone:  (424) 386-4343
Facsimile:  (213) 892-4743
mvillaverde@milbank.com

*Attorneys for Natixis S.A.*

_____ _/s/ John D. Buretta_____
John D. Buretta
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
jburetta@cravath.com

*Attorney for Nomura International plc*

_____ _/s/ Aidan Synnott_____
Aidan Synnott
Rachel J. Corrigan
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
asynnott@paulweiss.com
rcorrigan@paulweiss.com

*Attorneys for Nomura Securities International Inc.*