**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | |
| ) | |
| IN RE EUROPEAN GOVERNMENT BONDS ) | Lead Case No. 1:19-cv-2601 |
| ANTITRUST LITIGATION ) | |
| ) | Hon. Victor Marrero |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**PLAINTIFFS' OPPOSITION TO MOTION TO RECONSIDER THIS COURT'S
DECISION DENYING DEFENDANTS NATIXIS S.A., NOMURA INTERNATIONAL
PLC, AND NOMURA SECURITIES INTERNATIONAL INC.'S MOTION TO DISMISS
THE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

STANDARD .......................................................................................................... 2

ARGUMENT ......................................................................................................... 3

    I.    THE COURT DID NOT ERR IN HOLDING THAT PLAINTIFFS HAVE ANTITRUST STANDING ................................................................. 3

        A.    Plaintiffs Have Antitrust Standing to Pursue Their Sherman Act Claims Against Natixis and NIP ................................................................. 3

        B.    Plaintiffs Are Direct Purchasers of EGBs ............................................. 7

        C.    Plaintiffs Have Standing to Pursue Their Antitrust Claims Against NSI .......... 9

    II.    THE COURT DID NOT ERR IN RULING THAT DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION ........................................ 12

        A.    The TAC Alleges that Defendants Undertook Suit-Related Conduct in the Forum ........................................................................... 13

        B.    New York State's Long-Arm Statute Provides a Statutory Basis for Personal Jurisdiction over NIP ............................................. 15

    III.  THE COURT DID NOT ERR IN RULING PLAINTIFFS HAVE SUFFICIENTLY ALLEGED FRAUDULENT CONCEALMENT .......... 18

    IV. THE COURT DID NOT ERR WHEN IT HELD THAT THE TAC PLAUSIBLY ALLEGES A CONSPIRACY INVOLVING DEFENDANTS ............... 20

        A.    The Court Correctly Applied Controlling Law to the TAC's Factual Allegations in Finding a Plausible Conspiracy ................................. 20

        B.    Defendants Do Not Point to Any Controlling Law that the Court Overlooked ..................................................................... 21

        C.    The Court Did Not Err When It Considered and Rejected Defendants' Counterfactual Arguments ................................................. 22

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allianz Global Investors GmbH v. Bank of Am. Corp.*,
  18 Civ. 10364 (LGS), 2020 WL 2765693 (S.D.N.Y. May 28, 2020) ..................................3, 5

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011).................................................................................................6

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).........................................................................6, 21, 22, 24

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  899 F.3d 87 (2d Cir. 2018).......................................................................................22, 23

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)........................................................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................................22

*Bogosian v. Gulf Oil, Co.*,
  561 F.2d 434 (3d Cir. 1977), *abrogated on other grounds by Bell Atlantic
  Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................12

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)...................................................................12, 14, 15, 17

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010)............................................................................................17

*Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*,
  415 F. Supp. 3d 371 (S.D.N.Y. 2019) (Marrero, J.) ...............................................15

*Daniel v. Bd. of Emergency Med*,
  428 F.3d 408 (2d Cir. 2005)......................................................................................17, 18

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018)..........................................................................12

*Dennis v. JPMorgan Chase & Co.*,
  No. 16-cv-6496 (S.D.N.Y. Aug. 4, 2020)......................................................................3

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)..............................................................................................7

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   No. 16-cv-5263, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)...........................................8, 11

*FrontPoint Asian Event Driven Fund LP v. Citibank, N.A.*,
   2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ...................................................................11, 15

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016)...................................................................................20, 23, 24

*Glob. View Ltd. Venture Capital v. Great Cent. Basin Expl., L.L.C.*,
   288 F. Supp. 2d 482 (S.D.N.Y. 2003)...................................................................................2, 18

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005)...................................................................................................16

*Harry v. Total Gas & Power N. Am., Inc.*,
   889 F.3d 104 (2d Cir. 2018)...........................................................................................3, 4, 5

*Hinds Cty., Miss v. Wachovia Bank N.A.*,
   700 F. Supp. 2d 378 (S.D.N.Y. 2010)...................................................................................20

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)..................................................................................................................1

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-MDL-1175 (JG), 2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ...........................10

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481, 2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) ...............................................8

*In re Blood Reagents Antitrust Litig.*,
   756 F. Supp. 2d 623 (E.D. Pa. 2010) ...................................................................................24

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL No. 1917, 2016 WL 7805628 (N.D. Cal. Aug. 4, 2016)..................................................8

*In re CRM Holdings, Ltd. Sec. Litig.*,
   No. 10 Civ. 00975 (RPP), 2013 WL 787970 (S.D.N.Y. Mar. 4, 2013)..................................13

*In re Currency Conversion Fee Antitrust Litig.*,
   264 F.R.D. 100 (S.D.N.Y. 2010) .........................................................................................12

*In re Currency Conversion Fee Antitrust Litig.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011)...................................................................................12

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)...................................................................................................6

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  13 Civ. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..........................................6

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015)..........................................................................................5

*In re GSE Bonds Antitrust Litig.*,
  396 F. Supp. 3d 354 (S.D.N.Y. 2019)..............................................................................21, 24

*In re: LIBOR-Based Fin. Inst. Antitrust Litig.*,
  No. 11 MDL 2262, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ..........................................8

*In re Libor-based Fin. Instr. Antitrust Litig.*,
  No. 17-1569 (L) .....................................................................................................................15

*In re Mercedes-Benz Anti-Trust Litig.*,
  157 F. Supp. 2d 355 (D.N.J. 2001) ..........................................................................................9

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019)................................................................................10, 21

*In re NASDAQ Mkt-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................................8, 11

*In re Parmalat Securities Litigation*,
  377 F. Supp. 2d 390 (S.D.N.Y. 2005).....................................................................................10

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012).......................................................................................................21

*In re SSA Bonds Antitrust Litig.*,
  420 F. Supp. 3d 219 (S.D.N.Y. 2019)................................................................................13, 17

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ..................................................................................................21

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) ................................................................................................8

*In re Vitamin C Antitrust Litig.*,
  No. 06-MD-1738 (BMC), 2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012) .............................16

*Jazini v. Nissan Motor Co.*,
  148 F.3d 181 (2d Cir. 1998)....................................................................................................17

*Knopf v. Esposito*,
  803 Fed. App'x 448 (2d Cir. 2020).........................................................................................6

*Masters v. Wilhelmina Model Agency, Inc.*,
  No. 02 Civ. 4911 (HB), 2003 WL 145556 (S.D.N.Y. Jan. 17, 2003).......................................9

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)...............................................................................................22

*Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*,
  281 F.3d 629 (7th Cir. 2002) ............................................................................................12

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  No. 08 cv 42 (JG), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *report and*
  *recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).............................10

*R.F.M.A.S., Inc. v. Mimi So*,
  640 F. Supp. 2d 506 (S.D.N.Y. 2009).................................................................................2

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019).................................................................................2, 18, 19, 20

*Sonterra Capital Master Fund v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)...........................................................................11, 14

*State of N.Y. v. Hendrickson Bros., Inc.*,
  840 F.2d 1065 (2d Cir. 1988)...............................................................................................6

*Sunward Elecs., Inc. v. McDonald*,
  362 F.3d 17 (2d Cir. 2004).............................................................................................14, 16

*Tachiona ex rel. Tachiona v. Mugabe*,
  186 F. Supp. 2d 383 (S.D.N.Y. 2002) (Marrero, J.) ..........................................................7, 18

*Texas Indus., Inc. v. Radcliffe Materials, Inc.*,
  451 U.S. 630 (1981).........................................................................................................11

*U.S. v. Rutigliano*,
  No. 11 CR. 1091(VM), 2016 WL 2727317 (S.D.N.Y. Apr. 26, 2016) ......................2, 3, 7, 18

*U.S. v. Trenton Potteries Co.*,
  273 U.S. 392 (1927)..........................................................................................................14

*Walden v. Fiore*,
  571 U.S. 277 (2014)......................................................................................................12, 17

**Statutes, Rules, and Regulations**

15 U.S.C.
  §22.................................................................................................................................18

Federal Rules of Civil Procedure
    Rule 9(b) ........................................................................................................................10
    Rule 12(b)(6)..................................................................................................7, 8, 22, 23
    Rule 23(a)(4) ................................................................................................................12

Local Civil Rules
    Rule 6.3 ................................................................................................................. *passim*

N.Y. C.P.L.R.
    §302(a) ..........................................................................................................................15

## INTRODUCTION

Defendants Nomura Securities International Inc. ("NSI"), Nomura International plc ("NIP" and together with "NSI," "Nomura"), and Natixis S.A.'s ("Natixis") (collectively, "Defendants") motion for reconsideration fails to advance any controlling law or factual matters that the Court overlooked in its July 23, 2020 Decision and Order ("July 23 Order" or "Or."). The motion also argues new theories that Defendants failed to previously raise and attempts to relitigate issues already addressed by the Court. This is impermissible under Local Civil Rule 6.3. Substantively as well, each of their arguments fails and should be rejected.

*First*, the Court correctly found that the TAC alleges that Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters") and Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103," and collectively with Ohio Carpenters, "Plaintiffs") have antitrust standing against each Defendant. As to Natixis and NIP, because Plaintiffs allege that they directly transacted with these Defendants, Plaintiffs presumptively have standing to pursue federal antitrust claims. Further, because Plaintiffs directly purchased EGBs from Natixis and NIP, *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*") does not apply. As to NSI, although Plaintiffs do not plead direct dealings, having pleaded NSI's participation in the conspiracy – which this Court held was sufficient – NSI is jointly liable for damages Plaintiffs suffered. Defendants' attempt to introduce additional pleading requirements is based on a misreading of applicable law, and accordingly, should be rejected.

*Second*, the July 23 Order correctly held that the TAC pleads a *prima facie* showing of personal jurisdiction over Natixis and NIP. The Court found that Plaintiffs' allegations satisfy both the New York long-arm statute and constitutional due process under a purposeful availment theory. Defendants' argument seeks to relitigate issues already considered at length by the Court, contradicts longstanding Second Circuit precedent, and applies the wrong test for in-forum agency.

1

*Third*, the Court did not err in holding that the TAC adequately pleaded that the Sherman Act's statute of limitations was tolled by fraudulent concealment.  Defendants' case, *Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019), did not address fraudulent concealment.  It therefore cannot alter the analysis in the July 23 Order.

*Fourth*, the July 23 Order properly applied governing law to the extensive factual allegations in the TAC.  The TAC alleges facts supporting five forms of circumstantial evidence that have been expressly recognized by the Second Circuit and uses analysis of quote data specifically attributable to Defendants to infer their involvement in the alleged conspiracy.  Such allegations are sufficient to withstand a motion to dismiss.

As explained in further detail below, Defendants failed to meet their high burden on reconsideration.  Accordingly, their motion should be denied.

## <u>STANDARD</u>

Reconsideration is an "'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  *Glob. View Ltd. Venture Capital v. Great Cent. Basin Expl., L.L.C.*, 288 F. Supp. 2d 482, 483 (S.D.N.Y. 2003).[1]  A reconsideration motion under Rule 6.3 "must advance controlling law or factual matters that the movant believes the Court overlooked in its decision on the underlying matter and that might reasonably be expected to alter the conclusion reached by the Court."  *U.S. v. Rutigliano*, No. 11 CR. 1091(VM), 2016 WL 2727317, at *2 (S.D.N.Y. Apr. 26, 2016); *see also R.F.M.A.S., Inc. v. Mimi So*, 640 F. Supp. 2d 506, 509 (S.D.N.Y. 2009) ("'A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court.'").  A dissatisfied party cannot use a motion for

---

[1]        Unless otherwise noted, citations are omitted and emphasis is added.

reconsideration to advance arguments previously rejected.  *See Dennis v. JPMorgan Chase & Co.*, No. 16-cv-6496, ECF No. 394 (S.D.N.Y. Aug. 4, 2020) (denying motion for reconsideration where arguments raised were "no more persuasive now than they were the first time, and defendants have failed to point to any controlling decisions or data that the Court overlooked").  Rule 6.3 is to be narrowly construed and strictly applied "so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used either to advance different theories not previously argued."  *Rutigliano*, 2016 WL 2727317, at *2.

## ARGUMENT

### I.   THE COURT DID NOT ERR IN HOLDING THAT PLAINTIFFS HAVE ANTITRUST STANDING

#### A.   Plaintiffs Have Antitrust Standing to Pursue Their Sherman Act Claims Against Natixis and NIP

Defendants contend that this Court erred in not following the Second Circuit's ruling in *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104 (2d Cir. 2018), which they claim "requires Plaintiffs to show that they traded at artificial prices" in order to establish antitrust standing.  Defs. Br. at 6.  They also contend that the Court mistakenly relied on *Allianz Global Investors GmbH v. Bank of Am. Corp.*, 18 Civ. 10364 (LGS), 2020 WL 2765693 (S.D.N.Y. May 28, 2020), because the plaintiffs there established standing by pleading defendants' domination of the market, the pervasiveness of their manipulation, and the plaintiffs' sizeable transaction volume.  Defs. Br. at 7.  Neither contention is sound or otherwise provides a basis for the Court to reconsider its well-reasoned ruling.

The Court considered *Harry* at length in its July 23 Order.  Or. at 42-43.  In *Harry*, the plaintiffs were traders of natural gas futures, the prices of which were based exclusively on the prices of physical natural gas traded at the Henry Hub in Louisiana.  889 F.3d at 108.  The defendants were alleged to have manipulated physical natural gas prices not at the Henry Hub, but

at four other regional hubs.  *Id.* at 109.  Significantly, however, none of the plaintiffs allegedly traded the manipulated natural gas contracts with defendants, and none of "the derivatives that Plaintiffs traded were . . . indexed to the natural gas traded at th[e] regional hubs" that the defendants allegedly manipulated.  *Id.* at 107.  Without any facts connecting defendants' actions in one market (the regional hubs) to the injury plaintiffs allegedly suffered in another (the Henry Hub), the *Harry* plaintiffs could not establish that they suffered antitrust injury.  *Id.* at 116; *accord* Or. at 42 (recognizing that the *Harry* plaintiffs "did not purchase financial instruments with prices tied to the regional hubs where the anticompetitive practices allegedly occurred, but instead alleged that the anticompetitive practices at those hubs indirectly affected the competitive conditions of the hub the plaintiffs actually frequented").  Thus, the Second Circuit's observation that plaintiffs had "not even pleaded that they traded at 'artificial prices,'" was just the final nail in the coffin, leading to the conclusion that "[t]here is no actual injury the Plaintiffs allege, let alone a connection between Defendants' unlawful conduct and that non-injury."  *Id.*, 889 F.3d at 116.

Plaintiffs' allegations here present no such disconnect between the defendants' alleged anticompetitive conduct and plaintiffs' alleged injury because Plaintiffs traded the ***same*** products that Defendants are alleged to have price-fixed, and did so directly with Defendants.  Plaintiffs here alleged that:  (1) Natixis and NIP directly fixed the prices of EGBs; and (2) Plaintiffs were directly injured when they transacted in these same instruments with Natixis and NIP.  ¶¶32, 34. And even if actual artificial prices were required to be shown, as Defendants suggest, Plaintiffs have done so here in demonstrating that EGB auction yields were manipulated and bid-ask spreads

were made artificially wide as a result of the alleged conspiracy.[2]  ¶¶164-96, & Charts 11-12.  *See also* ¶¶7, 142, 211, 218.  *Harry* demands nothing more.[3]

Defendants similarly overread *Allianz*, 2020 WL 2765693, arguing that the decision "must be viewed in the factual context of that case."  Defs. Br. at 6.  But Defendants' rigid interpretation should be rejected.  In *Allianz*¸ Judge Schofield did not demand the pleading specificity Defendants seek to inject here – *e.g.*, that Plaintiffs must plead the timing and volume of their transactions with Defendants, whether their transactions were purchases or sales, whether they occurred in the primary or secondary market, etc.  Defs. Br. at 8.  In fact, while the *Allianz* plaintiffs' injury was "alleged with greater specificity than [the plaintiffs] . . . in the *In re Foreign Exchange Benchmark Rates Antitrust Litigation* . . . class action," the court noted that in the class case it "***twice found the allegations of injury to be sufficient for antitrust standing***."  *Allianz*, 2020 WL 2765639, at *3 (citing *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015) ("*Forex I*") and *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 13 Civ. 7789 (LGS), 2016 WL 5108131, at *6 (S.D.N.Y. Sept. 20, 2016) ("*Forex II*")).  In each of the *Forex* class cases, the court upheld the standing of plaintiffs who alleged they directly dealt with the price-fixing defendants without regard to the specifics Defendants demand here.  *See Forex I*, 74 F. Supp. 3d at 596 ("In this case, the plaintiffs are purchasers of the defendants' product who allege being

---

[2]  By contrast, the only statistical analysis cited by the *Harry* plaintiffs indicated that any causal relationship between prices at the regional hubs and prices at the Henry Hub was in fact in the ***opposite*** direction than the one asserted in their complaint.  889 F.3d at 115 ("The studies and expert analysis that Plaintiffs point to do not alter our reasoning.  While the studies do find high cointegration of prices across regions, both seem to attribute this relationship to the outsize effect that Henry Hub prices have on every other regional hub in the United States and not vice versa.").

[3]  Defendants contend that because Ohio Carpenters did not allege that it transacted in EGBs with Natixis "during the Class Period," it is not an efficient enforcer.  Defs. Br. at 8.  While Plaintiffs did not explicitly plead that they transacted with Natixis "during the Class Period," a fair reading of the TAC, drawing all inferences in Plaintiffs' favor – as the Court must – demonstrates that Ohio Carpenters' transactions and injury occurred ***during the Class Period***.

forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an inquiry plainly is 'of the type the antitrust laws were intended to prevent.'") (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)); *Forex II*, 2016 WL 5108131, at *6-*7 (plaintiffs who directly dealt with defendants have standing).

Reliance on *Allianz* is also well supported by other authorities the Court cited in the July 23 Order, which Defendants fail to address, much less distinguish. *See* Or. at 43-44 (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988) and *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 366-67 (S.D.N.Y. 2019)). Indeed, as the Supreme Court recently held, in "[a]pplying §4 [of the Clayton Act], we have consistently stated that 'the immediate buyers from the alleged antitrust violators' may maintain a suit against the antitrust violators." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). Defendants' speculation that Plaintiffs may not have been injured on their transactions (Defs. Br. at 8) is an insufficient basis to dismiss: "On a motion to dismiss district courts may not simply disregard allegations in the complaint and credit instead an alternative narrative advanced by defendants." *Knopf v. Esposito*, 803 Fed. App'x 448, 453 (2d Cir. 2020); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (reversing dismissal); *see also* Or. at 14.[4]

The Court correctly applied these principles in determining that Plaintiffs have standing against Natixis and NIP. Accordingly, Defendants' request to reconsider the Court's ruling on this ground must be denied.

---

[4]     *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147-148 (2d Cir. 2011), which Defendants cite (Defs. Br. at 8), is inapposite. There, the plaintiff alleged the defendant improperly disclosed plaintiff's transaction data to the government in response to a subpoena. The court, however, found plaintiff's injury "hypothetical and conjectural" because there were no plausible facts demonstrating that the defendant turned over its "entire database to the government" and plaintiff provided no basis to otherwise conclude that its transactions were inadvertently disclosed.

B.      **Plaintiffs Are Direct Purchasers of EGBs**

Defendants argue that the Court overlooked that the TAC does not plead sufficient facts to demonstrate that Plaintiffs are direct purchasers with standing to pursue claims under *Illinois Brick*. Defs. Br. at 8-9.  Because Defendants failed to raise this argument in their pre-motion letter (ECF No. 110 at 2), the Court should not consider it now.  *See Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 384-85 (S.D.N.Y. 2002) (Marrero, J.) (Local Rule 6.3 "does not grant license for a party to 'advance new facts, issues or arguments not previously presented to the Court'").  Moreover, Defendants advance no controlling law or factual matters that the Court overlooked in its July 23 Order on this issue.  *See Rutigliano*, 2016 WL 2727317, at *2.  Instead, Defendants misread the TAC's allegations and invite the Court to accept their interpretation, which is impermissible at the pleading stage (*see* Or. at 14), and further speculate regarding the manner in which Plaintiffs traded EGBs.

As the Court recognized in the July 23 Order, "Plaintiffs allege that they traded the bonds of specified Eurozone members during the Class Period **with specific named Defendants**, and that those same Defendants directly manipulated the prices of the EGBs that were traded."  Or. at 43 (citing ¶¶32-34).  Despite the specific allegations in the TAC, Defendants surmise that Plaintiffs traded EGBs with their U.S.-based broker-dealer affiliates and argue that "Plaintiffs that acquired EGBs from Defendants through transactions with third parties are not direct purchasers and their claims should be dismissed."  Defs. Br. at 9.  To the contrary, as the TAC states, and the Court accepted as true, Ohio Carpenters traded EGBs directly with Natixis and IBEW Local 103 traded EGBs directly with NIP.  ¶¶32, 34.[5]  Direct transactions with a named defendant confer antitrust

---

[5]      Natixis' statement that it has been unable to locate any record of an EGB trade with Ohio Carpenters (Bod Decl., ECF No. 121, ¶8) cannot be considered on a Rule 12(b)(6) motion.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts

standing and do not raise any *Illinois Brick* concerns. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263, 2017 WL 3600425, at *12 (S.D.N.Y. Aug. 18, 2017) ("It is difficult to think of a more direct victim than [plaintiff], given that it entered into transactions directly with two of the defendants.").[6]

Ohio Carpenters and IBEW Local 103 conducted their EGB transactions through an asset manager who purchased and sold EGBs on each Plaintiff's behalf. Transactions through agents are considered direct and are not precluded by *Illinois Brick*. *NASDAQ Mkt-Makers*, 169 F.R.D. at 505 ("[W]here a particular industry structure includes a principal-agent relationship between the indirect and direct purchasers such that the two are not distinct economic entities in the purchase chain, the indirect purchaser has standing under *Illinois Brick*."); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 7805628, at *14-*15 (N.D. Cal. Aug. 4, 2016) ("A principal has standing to sue . . . because it is, as a matter of agency law, a direct purchaser, not an

alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Even in the case Natixis cites, *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015), the court declined to consider declarations submitted by the parties "when addressing defendants' Rule 12(b)(6) argument." *See* Defs. Br. at 4 n.2. Ohio Carpenters' trading records contain an EGB transaction with Natixis during the Class Period, which served as the basis for the TAC's allegations (¶¶32, 51), and Natixis' statement to the contrary must be rejected at this stage.

[6]     Defendants misread the case law regarding the standing of plaintiffs that traded with a broker subsidiary of an alleged price fixer. In *In re NASDAQ Mkt-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996), the court only considered the standing implications of transactions conducted through **non-defendant** owned brokers. In fact, the defendants "concede[d] that investors who purchased securities through brokers who are commonly-owned affiliates of Defendants have standing under *Illinois Brick*." *Id.* at 505 n.11. *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 100-01 (E.D.N.Y. 2012) is inapposite because, unlike here, the plaintiffs there were "rely[ing] simply on the existence of a parent-subsidiary relationship" to establish standing. In any event, transactions with a defendant's subsidiaries and affiliates may confer antitrust standing. *In re: LIBOR-Based Fin. Inst. Antitrust Litig.*, No. 11 MDL 2262, 2019 WL 1331830, at *40 (S.D.N.Y. Mar. 25, 2019) ("In other words, if the subsidiaries and affiliates played the role of a broker by simply 'execut[ing] the purchases and sales requested by' OTC plaintiffs for panel bank issuances, then antitrust standing attaches.").

indirect purchaser.  The agent, in contrast, is merely an extension of the principal."); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, (D.N.J. 2001) (stating that "the rationale of *Illinois Brick's* bar to indirect purchaser suits does not apply where the supposed intermediary is controlled by one or the other of the parties" even "where the control exists through the contractual relationship of agency").

Additionally, Defendants' contention that interdealer brokers may be involved in Plaintiffs' EGB transactions is unsupported by their TAC cites.  Defs. Br. at 9 (citing ¶¶215, 227-28).  Paragraph 215 alleges that price discovery in the EGB market is difficult because customers do not have access to the real-time prices that dealers have on interdealer broker platforms.  ¶215.  Paragraphs 227 and 228 allege that EGB traders went to dinners arranged by interdealer brokers (¶227) and communicated with each other through interdealer brokers (¶228).  None of these paragraphs allege that interdealer brokers are involved in any of Plaintiffs' EGB transactions.

For these reasons, the Court did not err in the July 23 Order by finding that Ohio Carpenters and IBEW Local 103 have antitrust standing against Defendants.

### C.    Plaintiffs Have Standing to Pursue Their Antitrust Claims Against NSI

Defendants contend that this Court erroneously concluded that Plaintiffs had established standing against NSI because they established an agency relationship between NSI and NIP.  Defs. Br. at 9-10.  But Defendants' argument itself largely rests on their contrary interpretation of Plaintiffs' well-pleaded allegations demonstrating that NSI and NIP worked hand-in-glove in the EGB market.

As explained in Plaintiffs' pre-motion letter, "[it] is well-settled that 'the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period.'"  ECF No. 114 at 2 (quoting *Masters v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (HB), 2003 WL 145556, at *5 (S.D.N.Y. Jan. 17, 2003)).  Therefore, Plaintiffs are not

required to allege that "NSI purchased EGBs in a primary auction market" or that "NSI was aware of any alleged conspiratorial conduct" or that certain other NSI employees referenced in the TAC "ever sold EGBs." Defs. Br. at 10. A complaint need not identify "exactly who did what and when," so long as "it states a plausible claim that there was a conspiracy, and that it was joined by all of the [] defendants." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1175 (JG), 2010 WL 10947344, at *8 (E.D.N.Y. Sept. 22, 2010).[7]

As this Court correctly held, Plaintiffs have done that. Plaintiffs pleaded the following facts supporting NSI's role in the conspiracy:

- NSI is also part of Nomura Holdings' "Wholesale Division" through which Nomura transacts in EGBs. ¶71.

- NIP, which is part of the Wholesale Division, markets EGBs for NSI to be sold in the United States. ¶68.

- NSI employed several EGB traders that "promoted [EGBs] from [NIP's] inventory to investors" domestically. ¶¶72-74.

These facts establish an agency relationship between NIP and NSI, which sufficiently connects NSI to the conspiracy, as the Court correctly held. Or. at 65. By contrast, the plaintiffs in Defendants' authorities did not plead segregable conduct attributable to the individual defendants. *See, e.g.*, *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389-90 (S.D.N.Y. 2019) (relying on aggregate statistics that "lump together market makers"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 cv 42 (JG), 2011 WL 7053807, at *14 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, 2012 WL 3307486

---

[7] Defendants' reliance on *In re Parmalat Securities Litigation*, 377 F. Supp. 2d 390, 408-09 (S.D.N.Y. 2005), is misplaced because it is a securities action governed under Rule 9(b), where scienter is an element of the claim.

(E.D.N.Y. Aug. 13, 2012) (finding plaintiffs lumped corporate defendants together without distinguishing the separate acts of their respective employees).

Finally, Defendants contend that under this Court's ruling, no Plaintiff is an efficient enforcer as to NSI because none is alleged to have transacted EGBs with it.  Although this Court dismissed certain Defendants because there was no Plaintiff who traded with them (Or. at 46-47), Plaintiffs respectfully submit that the efficient enforcer analysis does not turn on establishing a direct link between each Plaintiff and each Defendant.[8]  Because all antitrust conspirators are jointly and severally liable without any right of contribution, *Texas Indus., Inc. v. Radcliffe Materials, Inc.*, 451 U.S. 630 (1981), the efficient enforcer requirement is satisfied when one plaintiff directly transacts with one conspirator, regardless of whether it also dealt with any other. *See NASDAQ Mkt.-Makers*, 169 F.R.D. at 508 ("[I]n order to establish standing against all the named Defendants, Plaintiffs need not have included among their proposed Class Representatives one individual who traded with each Defendant.  Because antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of the conspiracy has standing to represent a class of

---

[8]     Neither *Sonterra Capital Master Fund v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521 (S.D.N.Y. 2017) nor *FrontPoint Asian Event Driven Fund LP v. Citibank, N.A.*, 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ("*SIBOR II*") – which the Court cited – dismissed plaintiffs who sufficiently pleaded that they transacted price-fixed products directly with a defendant that was plausibly alleged to have joined the conspiracy.  In *FrontPoint*, the plaintiff alleged that the defendants conspired to manipulate three separate benchmark rates, but only alleged trades based on one of these benchmarks.  *Id.*, at *5.  The court held that the plaintiff's direct transactions with *two* defendants were sufficient to make it an efficient enforcer against *all* defendants who were plausibly alleged to have participated in the conspiracy to manipulate the benchmark underlying the plaintiff's trades, but did not confer standing to proceed with claims related to the other two benchmarks.  *See id.  Sonterra* dismissed one plaintiff's claims because it did not transact directly with *any* defendant that was plausibly alleged to have participated in the conspiracy – the plaintiff's only trades were with defendants that were dismissed on antitrust conspiracy grounds. 277 F. Supp. 3d at 559.

individuals injured by any of the Defendant's co-conspirators.").[9]  Ohio Carpenters and IBEW Local 103 have established that here, so each is an efficient enforcer as to the remaining Defendants.

Defendants' request to reconsider the July 23 Order on this ground should be denied.[10]

## II.    THE COURT DID NOT ERR IN RULING THAT DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION

In arguing for reconsideration of the Court's personal jurisdiction ruling, Defendants rely primarily on the cases that the Court cited and considered at length.  Defendants dedicate two pages to their interpretation of *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) ("*Schwab*"), Defs. Br. at 14-16, even though *Schwab* was the centerpiece of the Court's personal jurisdiction analysis.  *See* Or. at 18, 20, 21, 29 (citing the decision *five times*).  Defendants similarly make repeated references to other authorities that the Court carefully considered:  *Walden v. Fiore*, 571 U.S. 277 (2014), *see* Defs. Br. at 13, 16, also cited at Or. at 17; *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018), *see* Defs. Br. at 13, 15, 17, 19, also cited at

---

[9]    *Accord Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 634 (7th Cir. 2002) ("If [defendant] participated in a cartel . . . then it is jointly and severally liable for the cartel's entire overcharge.  That the plaintiffs did not buy from [defendant] . . . at all, does not matter."); *Bogosian v. Gulf Oil, Co*., 561 F.2d 434, 452 (3d Cir. 1977), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("The fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all for each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser."); *see also In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 112 (S.D.N.Y. 2010) (stating that "the great weight of authority in price-fixing conspiracy cases . . . holds that the victim of one alleged co-conspirator is adequate [under Fed. R. Civ. P. 23(a)(4)] to prove liability for victims of all co-conspirators"); *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 372-73 (S.D.N.Y. 2011) (holding that plaintiffs had antitrust standing to sue Amex even where they were not Amex cardholders).

[10]    Although this Court dismissed Boston Retirement System because each Defendant it traded with was dismissed, Plaintiffs reserve their right to amend the TAC to cure the issues identified by the Court.

Or. at 26; and *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219 (S.D.N.Y. 2019) ("*SSA Bonds II*"), *see* Defs. Br. at 15, 17, 18, 19, also cited at Or. at 42.

Far from bringing overlooked case law to the Court's attention, Defendants simply seek to persuade the Court that it was wrong on personal jurisdiction in the July 23 Order. Because the "Court discussed many of the same cases upon which [Defendants] now rely in their motions for reconsideration," their arguments fail to satisfy the reconsideration standard. *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 00975 (RPP), 2013 WL 787970, at \*4 (S.D.N.Y. Mar. 4, 2013) ("Under Local Rule 6.3, this type of relitigation is not permitted."). Defendants also misapply these and other controlling decisions.

### A.   The TAC Alleges that Defendants Undertook Suit-Related Conduct in the Forum

The conspiracy alleged by Plaintiffs consists not only of Defendants' agreement to fix EGB prices, but also of the acts undertaken to implement the agreement and derive illicit profits from unwitting EGB counterparties. *See* ¶181 ("For their European Government Bond business to be profitable, each Defendant needed to, and did, recoup the costs of colluding in the European Government Bonds auctions by charging collusively set and artificially inflated prices to investors in the secondary market."). Defendants' EGB transactions were not ***incidentally*** related to their conspiracy, but rather served as its essential profit mechanism, and the TAC alleges that Defendants executed these transactions within the United States in order to fulfill the aims of the conspiracy. *See* ¶26 (alleging that Defendants collected "overcharges from their price-fixing conspiracy, from customer accounts located in the United States"); ¶27 (alleging that Defendants "charged fixed prices in the United States market to investors located here"). Defendants therefore misinterpret the TAC in arguing that it "do[es] not allege that Natixis or NIP traders engaged in any manipulative or conspiratorial acts in the U.S." Defs. Br. at 13.

The Court correctly applied controlling Second Circuit precedent. "Generally, a defendant that directly transacts financial instruments in a forum has purposefully availed itself of the forum, and may thus be subject to personal jurisdiction for claims arising from those transactions." Or. at 18 (citing *Schwab*, 883 F.3d at 82-83). The Court's holding that personal jurisdiction over Natixis and NIP is consistent with constitutional due process accords with *Schwab*'s central holding: allegations of in-forum transactions "easily make out a prima facie showing of personal jurisdiction for claims relating to those transactions." 883 F.3d at 82. And it is well established that antitrust claims for restraint of a domestic market are related to a defendant's sales of price-fixed products in the forum. *See, e.g.*, *U.S. v. Trenton Potteries Co.*, 273 U.S. 392, 294 (1927); *Sonterra*, 277 F. Supp. 3d at 594-95. Indeed, it is Defendants' EGB sales **in this forum** that constitute the restraint of domestic trade on which Plaintiffs' claims are based. *See* ¶265 ("Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating the prices of European Government Bonds sold in the United States.").

Defendants' reliance on *Schwab*'s dismissal of a single California state law fraud claim is misplaced. Defs. Br. at 12. First, the dismissal of that fraud claim cannot control the analysis with respect to Plaintiffs' antitrust claim because personal jurisdiction must be evaluated in the context of the specific claim asserted. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). Second, the court dismissed that claim only because the facts before it showed that the claim was based "solely" on defendants' allegedly fraudulent false LIBOR interest rate submissions to a trade association in London – *i.e.*, the claim did not depend on any restraint of trade in the forum. *Schwab,* 883 F. 3d at 83. In contrast, "where the complaint plausibly alleges a profit-motive, as here, the U.S.-based trading is properly alleged to have been a part of the conspiracy and to be

related to the overseas manipulation." *See, e.g.*, Or. at 20-21; *SIBOR II,* 2018 WL 4830087, at *8.[11]

Defendants' argument with respect to NIP's jurisdictional contacts similarly fails.  In the July 23 Order, the Court recognized two constitutionally sufficient bases for personal jurisdiction over NIP:  its agency relationship with its New York-based affiliate NSI, and its own direct contacts.  *See* Or. at 28 ("[NIP] clearly knew of, benefitted from, and had some control over NSI's sales of the EGBs that it acquired at auction.  The TAC also alleges that [NIP] directly transacted EGBs in the forum.").  Contrary to Defendants' assertion, NSI's contacts with the forum are suit-related.  Plaintiffs allege that multiple NSI employees based in New York sold and marketed EGBs whose prices were fixed by NIP to U.S. investors.  ¶¶72-74.  *See also Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 386 (S.D.N.Y. 2019) ("[C]ontacts with individuals in a certain forum can certainly translate to contact with the forum itself if, as here, the defendant is taking action that affects the forum through his contacts with the individuals.") (Marrero, J.).

**B.    New York State's Long-Arm Statute Provides a Statutory Basis for Personal Jurisdiction over NIP**

The Court held that Plaintiffs adequately pleaded that New York's long-arm personal jurisdiction statute, N.Y. C.P.L.R. §302(a), provides a basis for exercising personal jurisdiction

---

[11]    Although Defendants cite district court decisions that interpret *Schwab*'s jurisdictional holding differently than the Court, Judge Lynch – the author of *Schwab* – recently rejected those interpretations at oral argument in a related appeal.  *See In re Libor-based Fin. Instr. Antitrust Litig*., No. 17-1569 (L), Oral Argument at 28:10-30 (2d. Cir. May 24, 2019), https://www.ca2.uscourts.gov/decisions/isysquery/f6cb80ea-7f40-497d-9cc1-45a4088b36ce/481-490/list/ (last visited Aug. 20, 2020) (distinguishing *Schwab*'s jurisdictional holding from a case in which trading profits are the goal of the very antitrust conspiracy plaintiffs are talking about). Indeed, *Schwab* itself recognized that requiring plaintiffs to show that defendants conspired from within the forum to establish personal jurisdiction is based on an "erroneous rationale."  883 F.3d at 89-90.

over NIP.  *See* Or. at 28 ("[NIP] plainly transacted business in New York within the meaning of Section 302(a), and Plaintiffs' claims regarding price-fixed EGBs substantially arise from such transactions.").  Defendants' argument for reconsideration of this holding nonetheless focuses on the requirements applicable under the Clayton Act, a different statutory basis for jurisdiction. Defs. Br. at 16-19.

The foundation of Defendants' argument appears to be their contention that the Court cannot rely on a state long-arm statute with respect to claims asserted under the Sherman Act or any other federal statute that provides for nationwide service of process.  Defs. Br. at 17.  This is incorrect.  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 167 (2d Cir. 2005) (applying the New York long-arm statute to find personal jurisdiction over Sherman Act defendants).  Indeed, even *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC), 2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012), which Defendants rely on, held that "[a]ntitrust violations are the sort of 'tortious act' that can give rise to personal jurisdiction under Section 302(a)(3) if the violations caused injury in New York that the defendant should reasonably have expected."  *Id.*, at *6, *9.

In support of their position, Defendants also misread the ruling in *Sunward*, 362 F.3d 17. Defendants insert the word "only" – "[only] if the applicable federal statute does not provide for national service of process" – and change the meaning of the Second Circuit's holding.  *Id.* at 22. Plaintiffs are aware of no case interpreting *Sunward* to hold that state long-arm statutes are unavailable to Sherman Act plaintiffs.  As noted above, subsequent Second Circuit precedent directly contradicts Defendants' misreading of *Sunward*.

Defendants also contest Plaintiffs' allegation that NSI served as an in-forum agent for NIP, arguing that Plaintiffs must plead "'that the subsidiary does all the business which [the parent

corporation] could do were it here by its own officials.'"  Defs. Br. at 18 (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998)).  This is not the correct test.  *Jazini* concerned the New York **general** jurisdiction statute.  *Id*.  The Court properly applied the *Schwab* test for imputing an agent's contacts for purposes of **specific** jurisdiction.  Or. at 18 ("The standard for agency in this context, which is the same under Section 302(a), allows for jurisdiction where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principle.'") (quoting *Schwab*, 883 F.3d at 85).  Moreover, while the *Jazini* plaintiffs "conceded that . . . [the defective products] were not marketed or distributed in the United States" (*Jazini*, 148 F.3d at 183), by contrast, "Plaintiffs [here] allege that Foreign Defendants either directly transacted EGBs through their New York trading hubs or indirectly transacted EGBs through New York-based broker-dealer affiliates, who sold the EGBs from Foreign Defendants' inventories at prices set by Foreign Defendants."  Or. at 20.

Finally, Defendants repeatedly suggest that Plaintiffs' personal jurisdiction allegations are insufficient in the absence of "corroborating facts" or "supporting documents."  Defs. Br. at 18-19 (citing *SSA Bonds II*, 420 F. Supp. 3d at 231).  This position is inconsistent with the Second Circuit's longstanding requirement that plaintiffs need only "'include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant.'" *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010); *see also Walden*, 571 U.S. at 281 n.2 ("The alleged affidavit is not in the record. Because this case comes to us at the motion-to-dismiss stage, we take respondents' factual allegations as true, including their allegations regarding the existence and content of the affidavit").[12]

---

[12]      Contrary to Defendants' argument (Defs. Br. at 17-19), the Clayton Act provides an alternative statutory basis for personal jurisdiction because the Defendants "transact[] business" in this District under section 12 of the Clayton Act.  *See Daniel v. Bd. of Emergency Med*, 428 F.3d

Accordingly, because Defendants have offered no facts or controlling authority that the Court overlooked in the July 23 Order, the Court should deny reconsideration of its personal jurisdiction ruling.

### III.   THE COURT DID NOT ERR IN RULING PLAINTIFFS HAVE SUFFICIENTLY ALLEGED FRAUDULENT CONCEALMENT

Defendants cite no controlling law that the Court overlooked its July 23 Order that "might reasonably be expected to alter the conclusion reached by the Court" regarding fraudulent concealment. *See Rutigliano*, 2016 WL 2727317, at *2. Defendants attempt to avoid this outcome by relying on the holding in *Singh*, 918 F.3d at 60 (Defs. Br. at 2, 20-21), and arguing that Defendants' codes of conduct do not provide a basis to toll the limitations period. Because Defendants failed to advance this new code of ethics argument in their pre-motion letter, *see* ECF No. 110 at 2-3, their argument should be rejected. *See Tachiona*, 186 F. Supp. 2d 383, 384-85. Moreover, because *Singh* does not address fraudulent concealment – which Defendants acknowledge in their brief (Defs. Br. at 20) – it is not new controlling authority. *See Glob. View Ltd. Venture Capital*, 288 F. Supp. 2d at 483 (finding defendants failed to satisfy the rigorous standard governing grant of reconsideration where they alleged no "controlling law the Court overlooked in ruling on the underlying motion").

In the July 23 Order, the Court engaged in a detailed analysis of the TAC's fraudulent concealment allegations. Or. at 32-39. Specifically, the Court held that Plaintiffs' allegations of their reliance on Defendants' codes of conduct which prohibited employees from, among other

---

408, 422 (2d Cir. 2005) (quoting 15 U.S.C. §22). Transacting business under the Clayton Act means "'the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character'" and requires a "realistic assessment of the nature of the defendant's business." *Id*. at 429. Defendants are bond dealers that price, sell, and distribute EGBs in this District (*see* Or. at 25-26, 27-29), and thus "transact business" in this District under the Clayton Act.

things, engaging in '"any discussion with competitors of proprietary or confidential information, business plans or topics such as pricing or sales policies'" were sufficient to allege due diligence at the pleading stage.  *Id.* at 34-37.  Defendants argue that *Singh* requires the Court to reconsider its holding on due diligence.  Defs. Br. at 2, 20-21.

In *Singh*, the Second Circuit considered whether plaintiffs in securities fraud litigation alleged a material, false statement by engaging in a "creative attempt to recast corporate mismanagement" by pointing to "banal and vague corporate statements affirming the importance of regulatory compliance."  *Singh*, 918 F.3d at 60.  The generic statements at issue in *Singh* were from defendant's pamphlet titled "Code of Ethics and Principles of Conduct" in which corporate executives stated "that 'it's so important for every employee . . . to handle, maintain, and report on [defendant's financial] information in compliance with all laws and regulations,' and that 'we have a responsibility to act with integrity in all we do, including any and all dealings with government officials.'"  *Id.* at 61.  The court found "such generic statements do not invite reasonable reliance" and "are not, therefore ***materially*** misleading, and so cannot form the basis of a fraud case."  *Id.* at 60 (emphasis in original).  The court reasoned that an alleged misrepresentation is material if "'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'"  *Id.* at 63.  The court concluded that "[a] reasonable stockholder would not 'consider [these statements from defendant's code of ethics] important in deciding whether to buy or sell shares of stock.'  They cannot, therefore, constitute 'material misstatements.'"  *Id.*  Simply put, the Second Circuit's analysis had no bearing on whether statements made in a code of conduct may be considered when analyzing fraudulent concealment.

Even if the Court were to find that *Singh* is applicable to fraudulent concealment, *Singh* did not rule that all statements in a code of conduct qualify as non-actionable "puffery."  Rather,

the *Singh* court expressly stated that "context" bears on materiality. *Id.* at 63. Defendants' statements in their codes of conduct here are not "'general statements about reputation, integrity, and compliance with ethical norms.'" *See id.* For example, the TAC alleges that Natixis's rules of conduct prohibit transactions that "secure, by a person, or persons acting in collaboration, the price of one or several financial instruments at an abnormal or artificial level" and Nomura's code of ethics states that "Nomura People should not take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other unfair-dealing practice." ¶¶260(c), (e). Such statements are concrete rules that Natixis and Nomura purportedly imposed on their employees to prohibit the type of antitrust violations alleged in the TAC. Plaintiffs' reliance on these types of affirmative representations satisfy the due diligence prong of fraudulent concealment under *Hinds Cty., Miss v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 400 (S.D.N.Y. 2010). Or. at 35-37. *Singh* does not alter this holding, and Defendants' argument should be rejected.

## IV. THE COURT DID NOT ERR WHEN IT HELD THAT THE TAC PLAUSIBLY ALLEGES A CONSPIRACY INVOLVING DEFENDANTS

### A. The Court Correctly Applied Controlling Law to the TAC's Factual Allegations in Finding a Plausible Conspiracy

To survive a motion to dismiss, antitrust plaintiffs "must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, ***even if*** the facts are susceptible to an equally likely [alternative] interpretation." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016) (emphasis in original). Facts that suggest an inference of conspiracy include circumstantial evidence, such as: (1) a common motive to conspire; (2) allegations showing that the defendants engaged in conduct against their apparent individual economic self-interest; (3) a high level of interfirm communications; and (4) statistical analysis showing anomalous pricing suggestive of conspiratorial behavior. *Id.* at 781-82. Factual allegations showing that the market

at issue is conducive to collusion also support the inference of conspiracy.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012).

In its July 23 Order, the Court analyzed the factual allegations in the TAC as a whole, *Anderson News*, 680 F.3d at 190, concluding that Plaintiffs had adequately pleaded each of the forms of circumstantial evidence described above.  Or. at 57 ("Plaintiffs' allegations and analysis suggest coordinated action that is at least apparently irrational, and Plaintiffs cite a number of plus factors that tend to support an inference of conspiracy under established law.").  After determining that Plaintiffs had adequately alleged the existence of a conspiracy in the EGB market, the Court next evaluated whether the TAC contained factual allegations connecting individual Defendants to the plausibly alleged conspiracy.  The Court determined that Defendants were plausibly alleged to have participated in the conspiracy based on the statistical analysis in the TAC showing that the EGB spreads quoted by Defendants dramatically declined during the same time period that the European Commission found that the misconduct ended.  Or. at 61.  The Court's approach is both consistent with controlling law (*see* above) and reflects the approach that other courts in this District use when evaluating the sufficiency of complaints in similar antitrust cases involving government bond markets.  *GSE Bonds*, 396 F. Supp. 3d at 365; *Mexican Gov't Bonds*, 412 F. Supp. 3d at 387–88.  Because the Court correctly applied governing law to the facts alleged in the TAC, it did not err when it sustained Plaintiffs' claims against Defendants.

**B.      Defendants Do Not Point to Any Controlling Law that the Court Overlooked**

None of the cases cited by Defendants suggest that the Court erred in sustaining Plaintiffs' claims.  *See* Defs. Br. at 21-25.  For example, Defendants rely on *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010), a non-controlling decision, which held on **summary judgment** that plaintiffs had not provided sufficient evidence demonstrating a conspiracy.  Defs. Br. at 22.  As the Second Circuit has repeatedly held, the analysis for assessing the sufficiency of

an antitrust complaint on a Rule 12(b)(6) motion is qualitatively different from the analysis that applies at summary judgment. *Compare Anderson News*, 680 F.3d 162 (reversing dismissal of an antitrust complaint at the pleading stage), *with Anderson News, L.L.C. v. Am. Media, Inc*., 899 F.3d 87 (2d Cir. 2018) (affirming summary judgment after discovery in the same case). The only binding authority that Defendants identify, *Twombly*, 550 U.S. 544, 570, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013), were each considered and applied by the Court in its July 23 Order*,* and thus could not have been overlooked by the Court. *See* Or. at 14-15, 49-50 (applying the pleading standard set forth in *Iqbal*, *Ashcroft*, and *Mayor & City Council of Baltimore*). Far from overlooking these decisions, the Court expressly applied them to the facts before it to conclude that the TAC plausibly alleged a conspiracy involving Defendants. *See id.*

These cases are, however, inapposite to the issue raised by Defendants in this Motion – whether the TAC adequately connected Defendants to a conspiracy that had already been plausibly alleged. *See* Or. at 50-59. Rather, *Twombly* and *Mayor & City Council of Baltimore* merely hold that allegations of parallel conduct ***alone*** are not sufficient to infer the existence of a conspiracy. *Mayor & City Council of Baltimore*, 709 F.3d at 136 ("[A]lleging parallel conduct ***alone*** is insufficient, even at the pleading stage. This is *Twombly*'s contribution."). Here, the Court did not rely on parallel conduct "alone." It identified additional factual allegations that placed Defendants' conduct in a context suggesting that an agreement was made, which is all that is required at this stage. *See* Part IV.A., above.

C.     **The Court Did Not Err When It Considered and Rejected Defendants' Counterfactual Arguments**

Defendants' remaining counterfactual arguments were properly considered by the Court and rejected in its July 23 Order. *See, e.g*., Or. at 55 ("Plaintiffs correctly note that the Court

cannot pick and choose between inferences at this stage, such as whether the auction cycles are attributable to collusion or not."). The Court's analysis is fully consistent with controlling law. *See, e.g.*, *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 899 F.3d at 184-85) ("'Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. . . . The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.'").

For example, Defendants challenge the Court's determination that the significant pricing changes observed in TAC, Figure 12 coinciding with the end of the conspiracy uncovered by the European Commission's investigation were sufficient to infer Defendants' involvement in the alleged conspiracy. Defs. Br. at 22. But the Court did not overlook these arguments – it considered and rejected them as it was required to under governing law. *Compare* Defs. Br. at 22, 25 (noting that Natixis was not a Primary Dealer for EGBs issued by Italy), *and* Defs. Br. at 23 ("Figure 12 provides alleged changes in average quotes only for Italian EGBs"), *with* Or. at 64 ("While Natixis sold Italian bonds in the secondary market, it was not a Primary Dealer participating in the Italian government bond auctions. . . . However, that is not necessarily preclusive of a conspiracy"), *and id.* at 56 (concluding that the illustrative use of data involving EGBs issued by Italy plausibly supported a broader conspiracy alongside "allegations that the market for EGBs is highly integrated, as the European Central Bank itself observed, that Defendants employed the same set of traders to oversee all EGB auctions and trading, and that those traders shared confidential and commercially sensitive information with each other").

Defendants' other critiques of the analysis in the TAC are equally flawed. *See* Defs. Br. at 23. Defendants' argument that analysis of quote data cannot support an inference of conspiracy

(Defs. Br. at 22) ignores that "an antitrust claim may proceed 'based on the influence that a conspiracy exerts on the starting point for prices.'" *GSE Bonds*, 396 F. Supp. 3d at 362 (quoting *Gelboim*, 823 F.3d at 776).  Their contention that quotes from NIP and NSI narrowed by 27.97% and quotes from Natixis narrowed by 66.42% (Defs. Br. at 22-23), ignores that parallel pricing need not be identical to support the inference of conspiracy[13] and that these abrupt changes in Defendants' quotes from one year to the next are highly significant.  *See GSE Bonds*, 396 F. Supp. 3d at 364 (accepting multi-year analysis of average bid-ask spreads because "[t]he price differences shown in the complaint appear to be relatively large").  Finally, Defendants' contention that there are "obvious alternative explanations" (*e.g.*, Defs. Br. at 24-25) is nothing more than an impermissible attempt to draw inferences in Defendants' favor at the pleading stage.  *See, e.g.*, Defs. Br. at 24 ("bid-ask spreads **could have** narrowed" due to the European debt crisis rather than collusion), *id.* ("individual banks **may have** had risk management motives for quoting more or less aggressively").[14]

The Court was correct to reject such counterfactual interpretations of well-pleaded facts in its July 23 Order.  *See Anderson News*, 680 F.3d at 185; *GSE Bonds*, 396 F. Supp. 3d at 365 (explaining that "fact-bound arguments" such as whether "macroeconomic conditions" caused anomalous pricing patterns are "ill-suited for resolution on the pleadings").

Because Defendants have failed to identify any controlling decisions or data that the Court overlooked, the Court should deny reconsideration of its plausibility ruling.

---

[13]     *See, e.g.*, *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases – or that the price increases were identical – in order to demonstrate parallel conduct.").

[14]     Both of these arguments ignore that Figure 12 in the TAC uses quote data from non-defendant Primary Dealers for Italian EGBs as a control group.  *See* TAC, Figure 12.  There is no reason to believe that only Defendants, but not other EGB dealers, would have been impacted by the European sovereign debt crisis or had risk management motives.

## CONCLUSION

Because Defendants advance no controlling law or factual matters that the Court overlooked in its July 23 Order, the Court should deny Defendants' motion for reconsideration in its entirety.

Dated: August 20, 2020

**LABATON SUCHAROW LLP**

*s/ Gregory S. Asciolla*
GREGORY S. ASCIOLLA
JAY L. HIMES
KARIN E. GARVEY
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile:  212-818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
mperez@labaton.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Christopher M. Burke*
CHRISTOPHER M. BURKE
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

DAVID R. SCOTT
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
david.scott@scott-scott.com

DONALD A. BROGGI
KRISTEN M. ANDERSON
MICHELLE E. CONSTON
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
dbroggi@scott-scott.com
kanderson@scott-scott.com
mconston@scott-scott.com

**LOWEY DANNENBERG, P.C.**

*s/ Vincent Briganti*
VINCENT BRIGANTI
CHRISTIAN LEVIS
ROLAND R. ST. LOUIS, III
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile:  914-997-0035
vbriganti@lowey.com
clevis@lowey.com
rstlouis@lowey.com

CHARLES KOPEL
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: 215-399-4770
Facsimile:  610-862-9777
ckopel@lowey.com

*Interim Co-Lead Counsel for the Class*

### CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*s/ Christopher M. Burke*
Christopher M. Burke
