August 6, 2021

<u>**VIA ECF**</u>

Honorable Victor Marrero
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

      Re:     *In re European Government Bonds Antitrust Litigation*, No. 1:19-cv-2601 (VM)

Dear Judge Marrero:

Plaintiffs in the above-captioned action respond to Defendants' letter (ECF No. 213) about the Second Circuit's recent summary order in *SSA Bonds Antitrust Litigation*, --- Fed. Appx. ----, 2021 WL 3027170 (2d Cir. July 19, 2021) ("*SSA Bonds*").

As a preliminary matter, *SSA Bonds* is an unpublished summary order that lacks "precedential effect" and is not binding on this Court. *See* Second Cir. L.R. 32.1.1; *see also Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 702 n.4 (2d Cir. 2009). The rationale underlying this rule is that summary orders "frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case to make our summary ruling applicable to the new case." *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011). As a result, courts apply summary orders with caution because the "'abbreviated explanations in summary orders might result in distortions of case law.'" *Burgio v. Prudential Life Ins. Co. of Am.*, 253 F.R.D. 219, 230 (E.D.N.Y. 2008) (citation omitted). As explained below, *SSA Bonds* is distinguishable in important respects from the allegations here.[1]

*First*, the question addressed by the Second Circuit in *SSA Bonds* – whether the existence of the alleged conspiracy was plausible – has already been decided in this case. The Court has already determined that the conspiracy Plaintiffs alleged here is plausible. ECF No. 115 at 56-57 (rejecting a similar argument by Defendants regarding the plausibility of a conspiracy across 13 Eurozone countries). *SSA Bonds* does not disturb the cases that the Court relied on in its motion to dismiss opinion or require the Court to reconsider its well reasoned holding on plausibility.[2]

*Second*, Defendants' failure to address the material differences in the quality of Plaintiffs' allegations here from those in *SSA Bonds* underscores the weaknesses in their position. *SSA Bonds* considered an alleged conspiracy to restrain a diffuse "SSA bond market" comprised of bonds issued by disparate "supranational organizations," "sovereign and sub-sovereign borrowers," and

---

[1]    The material factual dissimilarities between *SSA Bonds* and this case, as explained below, thus would not require this Court to "disregard" or "contradict a Second Circuit ruling squarely on point." *U.S. v. Tejeda*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010) (Marrero, J.).

[2]    Indeed, courts routinely decline to reconsider their prior opinions based on unpublished summary orders. *Hastings Dev., LLC v. Evanston Ins. Co.*, No. 14-cv-6203, 2016 WL 3632708, at *4 (E.D.N.Y. June 29, 2016) (collecting cases from district courts in the Second Circuit).

Honorable Victor Marrero
August 6, 2021
Page 2

"agency borrowers" spread across the globe. *See SSA Bonds*, 2021 WL 3027170, at *1.[3]  Unlike SSAs, EGBs are a homogenous, "single class of debt securities."  Fourth Am. Consol. Class Action Compl. ("FAC"), ECF No. 146, ¶¶192-97.  All EGBs are issued by Eurozone member countries, which agree to abide by a uniform monetary policy set by the European Central Bank (the "ECB"), along with common deficit and debt limits. *Id.*, ¶¶193-94.  As a result, the ECB has explained that the EGB market was "highly integrated." *Id.*, ¶197.  The "highly integrated" nature of the EGB market has "caused yields on [EGBs] from the different Eurozone members to 'converge . . . .'" *Id.*, ¶¶195-97.  This integration makes it plausible that manipulation of the price of one type of EGB (*i.e.*, an EGB issued by Germany) would have a price impact on EGBs issued by other Eurozone countries.  By contrast, there were no plausible allegations in *SSA Bonds*, suggesting that manipulation of the price of SSA bonds from one issuer (*e.g.*, the African Development Bank) would have a price impact on SSA bonds from another issuer (*e.g.*, a Canadian province) even though these bonds were alleged to be part of the same "SSA bond market."  *See SSA Bonds*, 2021 WL 3027170, at *1.

*Third*, Defendants' arguments are aimed at allegations Plaintiffs do not make.  In *SSA Bonds*, the Second Circuit affirmed the dismissal of plaintiffs' complaint because it failed to plausibly allege an "antitrust conspiracy involving *all* defendants and affecting *all* trades with the defendants" over a period of seven years.  *SSA Bonds*, 2021 WL 3027170, at *4 (emphasis in original).  Defendants incorrectly claim that Plaintiffs allege that each Defendant conspired "to manipulate the prices of every single EGB purchased on the other side of the Atlantic over a period of six years."  At the pleading stage, Plaintiffs need only plausibly allege Defendants engaged in the conspiracy which injured investors in the EGB market.[4]  Plaintiffs suffered antitrust injuries even if they allege only one trade directly with a Defendant at a supracompetitive price caused by Defendants' collusion.  *See State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury.").

*Fourth*, the mechanism to fix prices alleged in *SSA Bonds* is materially different than that alleged in the FAC.  In *SSA Bonds*, the crux of plaintiffs' claims was that defendant entities and traders "collaborated and shared information such 'that they effectively ceased' operating

---

[3]    For example, the market allegedly restrained in *SSA Bonds* included issuers as diverse as the Asian Development Bank, Canadian provinces, and agencies of the Spanish federal government.  *See In re SSA Bonds Antitrust Litig.*, No. 1:16-CV-03711, ECF No. 506, ¶¶ 115-19 (S.D.N.Y. Nov. 13, 2018).

[4]    In *Gelboim*, the Second Circuit reversed dismissal of antitrust claims alleging a years-long conspiracy among 16 banks to rig U.S. dollar LIBOR, a benchmark that priced various financial products traded globally.  *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 764-69 (2d Cir. 2016).  Because the alleged conspiracy was plausible, the Second Circuit held that "the extent of that [conspiracy's] influence [on prices] and the identity of persons who can sue, among other things, are matters reserved for later." *Id*. at 782-83.  District courts are "required to follow that decision 'unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" *U. S. v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (citation omitted), *aff'd*, 854 F.3d 197 (2d Cir. 2017).

Honorable Victor Marrero
August 6, 2021
Page 3

separately in the USD SSA bond market 'and instead functioned as *a single, unitary 'super-desk.'*" 2021 WL 3027170, at *2 (emphasis added). The Court concluded that these "super desk" allegations were "simply not plausible." *Id.*, at *4. The misconduct alleged in *SSA Bonds* was limited to a small group of traders and failed to connect these allegations to the broader group of defendants named in the complaint, which spanned "twenty entities in different countries." *Id.*; *see also In re SSA Bonds Antitrust Litig.*, No. 1:16-cv-03711, ECF No. 506 at 58-59 (S.D.N.Y. Nov. 13, 2018). In contrast, Plaintiffs here allege bank-wide misconduct in EGBs. The FAC details how Defendants, the world's largest EGB dealers, colluded when acquiring EGBs in the primary market, as well as in the purchase and sale of EGBs in the post-auction secondary market to fix prices of EGBs, including Defendant-specific economic analysis of the secondary market, which the *SSA Bonds* complaint lacked, and which the Court previously found demonstrated the conspiracy's plausibility. ECF No. 115 at 56-57; FAC, ¶¶13, 226-37, 240-44, 249-68. *Cf. SSA Bonds*, 2021 WL 3027170, at *4 ("The SAC . . . fail[ed] to link each of the defendants individually to specific acts of anticompetitive conduct in furtherance of the conspiracy.").

*Finally*, the EGB market is more akin to the market in *GSE Bonds* than *SSA Bonds*. The district court in *SSA Bonds* distinguished the well-pleaded conspiracy in the GSE bonds market, finding that "GSE bonds have a benchmark rate that the defendants allegedly manipulated but SSA bonds do not." *In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711, 2020 WL 1445783, at *5 (S.D.N.Y. Mar. 25, 2020). Like *GSE Bonds*, Plaintiffs allege Defendants conspired to overbid in EGB auctions to maintain control of the EGB primary market and then sold those bonds to investors in the secondary market at artificially high prices. FAC, ¶¶228-29. Further, unlike SSA bonds, EGBs are issued in regularly occurring auctions that served as benchmarks against which all EGBs trade. In particular, the trading prices of EGBs with 10-year maturities were used by dealers and investors alike as pricing benchmarks for EGBs with different maturities. *Id.*, ¶272. Plaintiffs quote chat transcripts showing that Defendants improperly coordinated bids in auctions and EGBs with 10-year maturities. *Id.*, ¶¶240-45, .250-52, 257, 265. These allegations plausibly support an inference that the Defendants' collusion with respect to EGB auctions and 10-year EGBs had effects that went beyond any individual customer trade, again, making collusion on "every one of [plaintiffs'] trades" unnecessary for the conspiracy to function. *See SSA Bonds*, 2021 WL 3027170, at *4. *SSA Bonds*, by contrast, involved *no* primary market manipulation; the allegations there only suggested a *limited* conspiracy involving a *small* group of traders colluding on *certain* bonds by *unrelated* issuers in the secondary market to *specific* customers over a *multi*-year period. *See In re SSA Bonds Antitrust Litigation*, No. 1:16-cv-03711-ER, ECF No. 506, ¶¶32, 115-19, 133-34, 389, 391, 396, 533 (S.D.N.Y. Nov. 13, 2018). Because price impacts from manipulative events are non-transitory and often take time to subside (if at all), resolving questions about the extent and duration of price artificiality on a motion to dismiss is premature. *See Gelboim*, 823 F.3d at 778.

Accordingly, Plaintiffs respectfully submit that *SSA Bonds* is inapplicable to Plaintiffs' allegations here and Defendants' proposed motions to dismiss should be denied.

Honorable Victor Marrero
August 6, 2021
Page 4

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: *s/* Gregory S. Asciolla
GREGORY S. ASCIOLLA
140 Broadway, Floor 34
New York, New York 10005
Tel: (212) 907-0700
gasciolla@labaton.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

By: *s/* Kristen M. Anderson
KRISTEN M. ANDERSON
230 Park Avenue, 17th Floor
New York, New York 10169
Tel: (212) 223-6444
kanderson@scott-scott.com

**BERMAN TABACCO**

By: *s/* Joseph J. Tabacco, Jr.
JOSEPH J. TABACCO, JR.
TODD A. SEAVER (admitted *pro hac vice*)
44 Montgomery Street, Suite 650
San Francisco, California 94104
Tel.: (415) 433-3200
jtabacco@bermantabacco.com
tseaver@bermantabacco.com

*Counsel for San Bernardino County Employees' Retirement Association*

*Interim Co-Lead Counsel*

**LOWEY DANNENBERG, P.C.**

By: *s/* Vincent Briganti
VINCENT BRIGANTI
44 S. Broadway
White Plains, New York 10601
Tel: (914) 997-0500
vbriganti@lowey.com