USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _3/14/2022_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                 :

IN RE EUROPEAN GOVERNMENT BONDS   :   19 Civ. 2601 (VM)
ANTITRUST LITIGATION              :

                                 :   **DECISION AND ORDER**

                                 :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), San Bernardino County Employees' Retirement Association ("SBCERA"), and Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103," and collectively with Ohio Carpenters and SBCERA, "Plaintiffs") bring this putative antitrust class action, on behalf of themselves and all others similarly situated, against defendants Bank of America, N.A. ("BANA"); Merrill Lynch International ("Merrill Lynch"); Natixis S.A. ("Natixis"); NatWest Markets plc ("NatWest Markets"); NatWest Markets Securities Inc. ("NMSI"); Nomura Securities International Inc. ("NSI"); Nomura Securities International plc ("Nomura International"); UBS AG; UBS Europe SE ("UBS Europe"); and UBS Securities LLC ("UBS Securities"); UniCredit Bank AG ("UCB"); UniCredit Capital Markets LLC ("UCM"); Citigroup Global Markets Limited ("CGML"); Citigroup Global Markets Inc. ("CGMI"); JP Morgan Chase Bank, N.A. ("JP Morgan Bank"); J.P. Morgan Securities plc ("JP Morgan plc"); J.P. Morgan Securities LLC ("JP Morgan

LLC"); RBC Europe Limited ("RBCE"); Royal Bank of Canada; RBC Capital Markets ("RBC Capital Markets"); Jefferies International Limited ("JIL"); and Jefferies LLC (collectively with all foregoing defendants, the "Moving Defendants"); and State Street Corporation and State Street Bank and Trust Company (together, "State Street," and collectively with all foregoing defendants, "Defendants").[1]

Plaintiffs purport to represent a class of all persons or entities who purchased or sold European Government Bonds ("EGBs") in the United States directly from Defendants between January 1, 2007 and December 31, 2012 (the "Class Period"), with the exception of Defendants, their employees and affiliates, and the United States government. In their Fourth Amended Consolidated Class Action Complaint, Plaintiffs claim that Defendants conspired to fix EGB prices

---

[1] The defendants have divided themselves into several sub-categories of defendants, to which the Court will refer by the following terms. "Moving Defendants" will refer to all defendants named in the Fourth Amended Complaint except for State Street Corporation and State Street Bank and Trust Company.
  The "Foreign Defendants" are Merrill Lynch; Natixis; NatWest Markets; Nomura International; UBS AG; UBS Europe; UCB; CGML; JP Morgan plc; RBCE; Royal Bank of Canada; and JIL.
  The "TAC Defendants," the defendants against whom the Third Amended Complaint ("TAC") and Fourth Amended Complaint ("FAC") were brought, are BANA; Merrill Lynch; Natixis; NatWest Markets; NMSI; Nomura International; NSI; UBS AG; UBS Europe; UBS Securities; UCB; and UCM.
  The "New Defendants" are CGML; CGMI; JIL; Jefferies LLC; JP Morgan Bank; JP Morgan plc; JP Morgan LLC; RBCE; Royal Bank of Canada; and RBC Capital Markets.

during the Class Period, in violation of 15 U.S.C. Section 1 (the "Sherman Act"). (See "FAC," Dkt. No. 146.)

On April 16, 2021, the TAC Defendants, the New Defendants, and the Foreign Defendants informed Plaintiffs, via letter, of their intent to move to dismiss the FAC. (See "TAC Defendants Letter Motion," Dkt. No. 206-1; "New Defendants Letter Motion," Dkt. No. 206-2; "Foreign Defendants Letter Motion," Dkt. No. 206-3, collectively "Letter Motions.")

All Moving Defendants argue that the FAC is time-barred, inadequately alleges the existence of an agreement to manipulate the EGB market, fails to tie each defendant to the alleged conspiracy, and fails to adequately and plausibly plead an antitrust conspiracy under prevailing Second Circuit case law. The Moving Defendants also argue that Plaintiffs lack antitrust standing. In addition, the Foreign Defendants argue that the FAC does not establish that this Court has personal jurisdiction over any Foreign Defendant. By three letters dated May 17, 2021, Plaintiffs responded to the Letter Motions, refuting all grounds for dismissal. (See "Opposition to TAC Defendants," Dkt. No. 206-4; "Opposition to New Defendants, Dkt. No. 206-5; "Opposition to Foreign

3

Defendants," Dkt. No. 206-6, collectively "Opposition Letters.")

Also before the Court are two letter motions requesting a conference regarding Plaintiffs' intent to file motions for judicial notice. The first pre-motion letter, dated May 26, 2021, asked the Court take notice of a May 21, 2021 European Commission Press Release ("EC Release") that announced the issuance of a decision against "Bank of America, Natixis, Nomura, RBS (now NatWest), UBS, UniCredit, and WestLB"[2] for participation in cartels in the primary and Secondary Market for EGBs. (See "First Request for Judicial Notice," Dkt. No. 203.) The second pre-motion letter, dated November 1, 2021, requests that the Court take judicial notice of the European Commission's Provisional Non-Confidential Decision ("EC Decision") and Summary of the Decision ("EC Summary Decision"). (See "Second Request for Judicial Notice," Dkt. No. 217.) Moving Defendants do not object to either request. (See "First Response," Dkt. No. 206; "New Defendants' Second Response," Dkt. No. 221; "TAC Defendants' Second Response," Dkt. No. 222.)

---

[2] The EC Release does not specify which specific corporate entities these names refer to or whether they refer to the general parent company.

The Court now construes the Moving Defendants' Letter Motions as motions to dismiss the FAC pursuant to Rules 12(b)(2) and 12(b)(6) and the First and Second Requests for Judicial Notice as motions for judicial notice.[3] For the reasons set forth below, the Court will grant the motion to dismiss of defendants Merrill Lynch, BANA, NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, UCM, JP Morgan plc, JP Morgan Bank, JP Morgan LLC, RBCE, RBC Capital Markets, and Royal Bank of Canada. The remaining defendants are directed to answer the FAC within twenty-one days of the date of this Order.

## I.   BACKGROUND[4]

### A.   FACTUAL BACKGROUND

The Court assumes familiarity with the facts underlying this dispute, as detailed in the Court's prior decisions. See In re European Gov't Bonds Antitrust Litig., 19 Civ. 2601, 2020 WL 4273811 (S.D.N.Y. July 23, 2020) ("TAC Decision"). To briefly summarize, EGBs are sovereign debt securities issued by European central governments that have adopted the Euro as

---

[3] Kapitalforeningen Lægernes Invest v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (Mem.) (affirming district court ruling deeming exchange of letters as motion to dismiss).

[4] Except as otherwise noted, the factual background below derives from the FAC and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. Except where specifically quoted, no further citation will be made to the FAC.

their official currency ("Eurozone" countries). EGBs are treated as a single class of debt securities because Eurozone members share common currency, certain "convergence criteria" that aim at the development of an integrated financial market for the Eurozone, and centralized institutions that set common monetary policy, such as the European Central Bank.

EGB markets rely upon large financial institutions like Defendants to act as dealers and market makers. Defendants generally conduct EGB business through their fixed income divisions, which are global in nature and often include employees of multiple entities within a given corporate family. Defendants play multiple roles in the EGB markets, but their most significant role is as primary dealers. Primary dealers[5] acquire EGBs from government issuers in the "Primary Market," and Defendants then trade those EGBs with other investors in the "Secondary Market." Plaintiffs claim that Defendants participated in a price-fixing conspiracy affecting both markets.

---

[5] The "Primary Dealer Defendants" are Merrill Lynch, CGML, JIL, JP Morgan plc, Natixis, NatWest Markets, Nomura International, UBS Europe, State Street Bank and Trust, and UCB. The FAC also lists "UniCredit S.p.A." as a Primary Dealer Defendant, but the Complaint does not list that entity as a party to the suit.

1.   The Primary Market

European government issuers first distribute their EGBs to institutions, including the Primary Dealer Defendants, in the "Primary Market." Distribution typically occurs via auction. Primary dealers bid on EGBs based on price and the volume of EGBs they intend to acquire, and issuers typically favor dealers that pay higher prices and commit to acquiring large volumes of EGBs for resale on the Secondary Market. As a result, the same relatively small group of primary dealers consistently acquire EGBs in the Primary Market, and, similarly, the same dealers tend to be active primary dealers in multiple EGB-issuer countries. The premier trade association for EGBs, the Association for Financial Markets in Europe ("AFME"), listed twenty-five "Primary Dealer Members," including all Primary Dealer Defendants, in 2012. In 2008, members of the AFME's predecessor organization collectively traded over 85 percent of all volume in the EGB market.

Plaintiffs allege that the Primary Dealer Defendants colluded when bidding for EGBs in the Primary Market, purposefully exploiting the United States' EGB market. Because EGB issuers favor dealers who purchase greater amounts of EGBs at higher prices and then successfully resell

those bonds to other investors, the Primary Dealer Defendants allegedly agreed to submit bids above competitive market prices and secure greater EGB inventories. These agreements were allegedly forged through the use of private online chatrooms, in which traders would share confidential and commercially sensitive information about bidding interest and customer orders.

2.   The Secondary Market

According to Plaintiffs, Defendants' alleged wrongdoing did not end with their activity in the Primary Market for EGBs. Plaintiffs contend that in order to counteract the alleged above-market prices that the Primary Dealer Defendants paid to EGB issuers, the Defendants inflated prices in the Secondary Market for EGBs. After primary dealers purchase EGBs via auction in the Primary Market, the bonds are actively traded among investors -- creating the Secondary Market. Because Defendants sell, rather than just buy, EGBs in the Secondary Market, this is the market where they can profit from the EGB trade. Additionally, some countries look at Secondary Market activity when ranking EGB dealers. Thus, robustly participating in the Secondary Market helps primary dealers maintain good standing with the country of EGB issues.

A key figure in the EGB trade is the "bid-ask spread." The "bid" is the price at which a dealer purchases a bond, while the "ask" is the price at which they will sell the EGB. The "bid-ask spread" thus reflects the dealer's profit. A narrow spread reflects more competitive pricing, and dealers will often offer narrower spreads than their competitors in order to gain customers. A wide spread usually represents a lower bid or a higher ask, and it will usually cause customers to deflect to other sellers. Thus, a dealer's bid-ask spreads should be in line with market conditions.

Also significant is the bond's yield. Yield shows an investor's return for holding a bond to maturity. For purposes of this dispute, the important facts about a bond's yield are that the yield has an inverse relationship with the bond's price and that it is a good method of comparing bonds.

### 3. The Alleged Wrongful Conduct

With this backdrop of the dual EGB markets, Plaintiffs allege that Defendants entered into a conspiracy to manipulate both the Primary and Secondary Markets. Plaintiffs claim that Defendants conspired to raise EGB prices, and depress yields, by sharing confidential, sensitive information prior to the Primary-Market EGB auctions. They allege traders employed by Defendants used chatrooms to share

information about their bidding interest, customer orders, and pricing. The shared information allowed the alleged conspirators to outbid other primary dealers, often by raising their bids above market prices. Those inflated auction prices then became benchmark prices in the Secondary Market, so Secondary Market prices were similarly artificially high.

This scheme allowed Defendants to gain control over the supply of newly issued EGBs, which meant they could control the prices in the resale market. Consequently, Defendants are alleged to have then fixed bid-ask spreads in the Secondary Market, again primarily via online chatroom communications. Obtaining confidential client information from competitors enabled dealers to raise their asks or lower their bids and collect additional profit. Plaintiffs contend that, absent an agreement, no individual bank would engage in this behavior because it is incredibly risky. If a lone dealer bids above market in the Primary Market, it may be faced with selling its EGBs at a steep discount -- making the gamble unprofitable. But if that dealer bids far below market in the primary auction, it may be shut out, which means that it would not be able to sell in the Secondary Market without first acquiring EGBs from another primary dealer. Similarly, the

lone dealer could not profitably widen its bid-ask spread without losing customers.

The mechanisms of the market are complex, but Defendants' alleged conspiratorial scheme is not, and the wrongdoing Plaintiffs assert is simple. Allegedly, Defendants conspired and colluded to inflate the prices of EGBs in both the Primary and Secondary Markets, sharing confidential information prior to the primary EGB auctions. Knowing such information allowed all Primary Dealer Defendants to bid above market and win trades of a large volume of EGBs -- collectively, a controlling amount. The information-sharing then enabled all Defendants to similarly widen their bid-ask spreads and gain greater profits in the Secondary Market than Defendants would have gained in an unmanipulated market. As a result, consumers, including Plaintiffs, paid higher prices for EGBs.

A key difference from prior versions of the Complaint is that the FAC extensively quotes these chatroom transcripts. Plaintiffs also heavily rely on statistical data, which will be discussed in further detail below, to argue that a conspiracy existed. They claim that a comparison between the bid yield and bid-ask spreads before, during, and after the

Class Period shows that something was amiss during the Class Period, when the alleged conspiracy was happening.

4.    The European Commission's Investigation

Although the conspiracy Plaintiffs claim ended before 2013, Plaintiffs contend that they learned of it only after the European Commission issued a Statement of Objections on January 31, 2019 (the "Statement of Objections"). In the Statement of Objections, the European Commission published its preliminary view that "eight banks participated in a collusive scheme that aimed at distorting competition when acquiring and trading [EGBs]. Traders employed by the banks exchanged commercially sensitive information and coordinated on trading strategies. These contacts would have taken place mainly -- but not exclusively -- through online chatrooms." (FAC at ¶ 308.) The European Commission did not specify which eight banks were under investigation, but prior to filing the FAC, Plaintiffs identified Defendants based on various media reports and Defendants' own filings.

On May 20, 2021, the European Commission issued the EC Release announcing its finding that "Bank of America, Natixis, Nomura, RBS (now NatWest), UBS, UniCredit, and WestLB" violated European Union antitrust rules by participating in a cartel in the primary and secondary EGB

markets. (See EC Release, Dkt. No. 203, Ex. A.) On October 15, 2021, the European Commission released its non-confidential decision ("EC Decision") and a summary decision ("EC Summary Decision"), detailing its findings. (See EC Decision, Dkt. No. 217, Ex. A; EC Summary Decision, Dkt. No. 217, Ex. B.)

B.   PROCEDURAL BACKGROUND

Ohio Carpenters filed an initial complaint in this putative class action on March 22, 2019. (See "Complaint," Dkt. No. 1.) Following the consolidation of related actions and multiple amendments to the initial Complaint, Plaintiffs filed the Third Amended Complaint on December 3, 2019. (See Dkt. No. 87.) On July 23, 2020, the Court granted in part and denied in part Defendants' motion to dismiss. See TAC Decision, 2020 WL 4273811. Specifically, the Court denied the motion as to Natixis, Nomura International, and NSI, but it granted the motion as to Bank of America, Merrill Lynch, NMSI, UBS AG, UBS Europe, and UBS Securities because Plaintiffs failed to allege an antitrust conspiracy involving those defendants. See id. at *18-20. The Court granted the motion to dismiss of defendant NatWest Markets for lack of personal

13

jurisdiction, and the motions of defendants UCB and UCM for lack of standing.[6] See id. at *5, *14.

On February 9, 2021, Plaintiffs filed the operative FAC, bringing claims against the TAC Defendants and the New Defendants. Consistent with the Court's Individual Practices, by letters dated April 16, 2021, TAC Defendants, New Defendants, and Foreign Defendants each informed Plaintiffs of their intention to move for dismissal. (See Letter Motions.) TAC Defendants and New Defendants, who each joined and incorporated the other's arguments, raise three grounds for dismissing the TAC: (1) failure to plead a plausible antitrust conspiracy; (2) failure to plead antitrust standing; and (3) failure to timely file this action. Foreign Defendants, all of whom are also either TAC Defendants or New Defendants, move for dismissal on the basis of a lack of personal jurisdiction.

Plaintiffs responded to the Letter Motions on May 17, 2021, challenging all four asserted grounds for dismissal. (See Opposition Letters.) Plaintiffs also submitted a letter

---

[6] The Court also granted the motion to dismiss from TAC defendant Bank of America Merrill Lynch International Designated Activity Company, a party not named in the FAC. The TAC Decision also dismissed plaintiff Boston Retirement System from the suit for lack of standing, finding that it was not an efficient enforcer of the antitrust laws. See 2020 WL 4273811, at *20. Boston Retirement System did not replead its allegations in the FAC.

motion dated May 26, 2021 requesting the Court take judicial notice of the EC Press Release announcing a decision against Bank of America, Natixis, Nomura, RBS, UBS, UniCredit, and non-party WestLB. (See First Request for Judicial Notice). Moving Defendants submitted a letter to the Court noting that they did not object to the Court taking judicial notice of the EC Press Release. (See Dkt. No. 206.) Plaintiffs later filed a second letter request for judicial notice, dated November 1, 2021, asking the Court to take notice of the EC Decision and the EC Summary Decision, which found that Bank of America, Natixis, Nomura, RBS/NatWest, UBS, and UniCredit conspired to fix the prices of EGBs. (See Second Request for Judicial Notice.) TAC Defendants and New Defendants filed responsive letters, again stating that they did not oppose the Court taking judicial notice, but they disagreed with Plaintiffs' characterization of the EC Decision. (See Dkt. Nos. 221, 222.)

## II.  **DISCUSSION**

A.  REQUESTS FOR JUDICIAL NOTICE

The Court begins by addressing the First and Second Requests for Judicial Notice. The Court is free to take judicial notice of information that "is not subject to reasonable dispute" because it "can be accurately and readily

15

determined from sources whose accuracy cannot be questioned," and notice can be taken "at any stage of the proceeding." Fed. R. Evid. 201. That includes during the decision whether to grant a motion to dismiss. See Simmons v. Trans Express, 16 F.4th 357, 360 (2d Cir. 2021).

The EC Release, EC Decision, and EC Summary Decision all fall into this category of information subject to judicial notice. Thus, both letter motions requesting that the Court take judicial notice are granted. The Court notes that, as required by the law of this Circuit, it is merely taking notice of the existence of and the facts contained within the EC Release, EC Decision, and EC Summary Decision, but it is not taking notice of those documents for the truth of the matters asserted. See, e.g., Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406,425 (2d Cir. 2008); Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

B.   GENERAL STANDARDS FOR MOTIONS TO DISMISS

The Court addresses Defendants' four proposed grounds for dismissal in the following order: (1) personal jurisdiction; (2) timeliness; (3) antitrust standing; and (4) antitrust conspiracy. Because the Letter Motions are made pursuant to Rule 12(b)(6) for all grounds except for personal

jurisdiction, the Court begins by noting the general standards for that rule.

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

The requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678. In adjudicating a Rule 12(b)(6) motion, a court must confine its consideration "to facts stated on the face of the complaint, in documents

appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Disc. Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

C.   PERSONAL JURISDICTION

The Foreign Defendants move for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) ("Rule 12(b)(2)"), arguing that Plaintiffs failed to establish that this Court has personal jurisdiction over each Foreign Defendant. In the TAC Decision, the Court found Plaintiffs alleged sufficient facts to allow the exercise of personal jurisdiction over Foreign Defendants Merrill Lynch, Natixis, Nomura International, UBS Europe, UBS AG, and UCB (together, the "TAC Foreign Defendants"), but the Court found it lacked personal jurisdiction over NatWest Markets. See TAC Decision, 2020 WL 4273811, at *5. Following the filing of the FAC, the TAC Foreign Defendants and NatWest Markets, joined by new Foreign Defendants CGML, JP Morgan plc, RBCE, Royal Bank of Canada, and JIL, move for Rule 12(b)(2) dismissal.

1. General Legal Standards

Rule 12(b)(2) provides for the dismissal of complaints for lack of personal jurisdiction. At the motion to dismiss stage, Plaintiffs need only make a prima facie showing of

personal jurisdiction. This showing requires "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010) (internal quotation marks omitted). To establish personal jurisdiction, plaintiffs must show proper service on the defendants, a statutory basis for personal jurisdiction, and that the exercise of jurisdiction comports with the constitutional doctrine of due process. See Licci ex rel Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59-60 (2d Cir. 2012). Foreign Defendants do not contest the adequacy of service here. While personal jurisdiction can be either general or specific to satisfy constitutional and statutory requirements, only specific jurisdiction is alleged here.

   a. Statutory Basis for Jurisdiction

   Plaintiffs assert two different statutory bases for personal jurisdiction. The first is Section 12 of the Clayton Act ("Section 12"), which states that a suit under the antitrust laws "against a corporation may be brought . . . in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

15 U.S.C. § 22. The phrase "transacts business" means "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 428 (2d Cir. 2005) (quoting United States v. Scophony Corp., 333 U.S. 795, 807 (1948)).

Section 12 authorizes service of process in any district where the defendant corporation conducts business, which constitutes "Congress' typical mode of providing for the exercise of personal jurisdiction." BNSF Ry. v. Tyrrell, 137 S. Ct. 1549, 1555 (2017). Accord Daniel, 428 F.3d at 424 ("[T]he plain language of Section 12 indicates that its service of process provision applies (and, therefore, establishes personal jurisdiction) only in cases in which its venue provision is satisfied.") Thus, the "transacts business" analysis is key to determining whether Section 12 provides a statutory basis for personal jurisdiction over a particular defendant.

The second statutory ground for exercise of federal court jurisdiction is found in Federal Rule of Civil Procedure 4(k)(1), which establishes personal jurisdiction over a defendant who is subject to jurisdiction in the forum state's courts of general jurisdiction. See Fed. R. Civ. P.

4(k)(1)(A). Here, that state is New York, so the relevant question is whether New York law allows exercise of jurisdiction over the Foreign Defendants under the facts Plaintiffs plead. New York's long-arm statute, C.P.L.R. Section 302(a)(1) ("Section 302(a)(1)"), provides for specific jurisdiction "depending on the foreign defendant's contacts with the state in connection with the cause of action." Knight v. Std. Chtd. Bank, 531 F. Supp. 3d 755, 763 (S.D.N.Y. 2020); see also C.P.L.R. § 302(a)(1) ("[A] court may exercise personal jurisdiction over any non-domiciliary, . . . , who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state.").

The Second Circuit has articulated a two-factor test for determining whether a court has personal jurisdiction over a defendant under Section 302(a)(1): "(1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from the business activity." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) (quoting Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., 450 F.3d 100, 103 (2d Cir. 2006)). Section 302(a)(1) does not require that every element of the claim

have New York contacts, but rather at least one element must arise from the in-state contacts. Id. at 169

When it comes to personal jurisdiction, Section 302(a)(1) is more restrictive than the Fourteenth Amendment's Due Process Clause, meaning that sometimes personal jurisdiction may exist under the Constitution but not under New York law. See Knight, 531 F. Supp. 3d at 763 (citing Energy Brands Inc. v. Spiritual Brands, Inc., 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008) and United States v. Montreal Tr. Co., 358 F.3d 239, 242 (2d Cir. 1966)). Likewise, if the Constitution does not allow the exercise of personal jurisdiction, there will not be personal jurisdiction under New York law. See id. at 765. For this reason, district courts often begin by assessing the constitutional basis for personal jurisdiction.

   b. Constitutional Basis for Jurisdiction

The Fourteenth Amendment's Due Process Clause also limits the cases a court may hear to those in which the court has personal jurisdiction over the defendant. That means a defendant must have "such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial

22

justice.'" <u>Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.</u>, 141 S. Ct. 1017, 1024 (2021) (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316–17 (1945)). The requisite contacts to satisfy specific personal jurisdiction "often go by the name 'purposeful availment,'" <u>id.</u> (quoting <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 475 (1985)), which means that the defendant's contacts with the forum state must be of their "own choice and not 'random, isolated, or fortuitous.'" <u>Id.</u> (quoting <u>Keeton v. Hustler's Magazine</u>, 465 U.S. 770, 774 (1984)).

Similar to New York statutory law, due process requires that "the *suit* must arise out of or relate to the defendant's contacts with the *forum*." <u>Bristol-Myers Squibb Co. v. Superior Ct.</u>, 137 S. Ct. 1773, 1780 (2017) (internal quotations omitted). Put simply, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" <u>Id.</u> (quoting <u>Goodyear Dunlop Tires Ops., S.A. v. Brown</u>, 564 U.S. 915, 919 (2011)).

As the Court noted in the <u>TAC Decision</u>, the Second Circuit has stated that a defendant that directly transacts financial instruments in New York has purposefully availed

itself of New York and may be subject to personal jurisdiction for claims that arise from those financial transactions. See TAC Decision, 2020 WL 4273811, at *6 (citing Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82-83 (2d Cir. 2018)). A defendant who indirectly transacts business in financial instruments may still purposefully avail itself of the forum state if it transacted through an agent who "acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Charles Schwab, 883 F.3d at 85. In order for a Court to find purposeful availment, the agent must be acting for the defendant-principal's benefit, with its knowledge, and under some level of control. Id.

      c. Conspiracy Jurisdiction

As an alternative means of establishing personal jurisdiction, an antitrust plaintiff may show "conspiracy jurisdiction" by alleging that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." TAC Decision, 2020 WL 4273811, at *6 (quoting Charles Schwab, 883 F.3d at 87).

2. Analysis

Plaintiffs re-assert the same grounds for personal jurisdiction that they raised in defense of the TAC: (1) Foreign Defendants are alleged to have marketed, distributed, and sold EGBs in the United States; (2) the claims arise from contact with the forum state because Foreign Defendants used New York-based affiliates to market, distribute, and sell the EGBs to Plaintiffs; and (3) Foreign Defendants conspired with their United States affiliates such that conspiracy jurisdiction provides for personal jurisdiction. (See Opposition to Foreign Defendants at 2-3.)

Generally speaking, the allegations against the new Foreign Defendants closely mirror those brought against the TAC Foreign Defendants. The Foreign Defendants managed an inventory of EGBs and determined pricing for EGB transactions, but they used New York-based affiliates as agents to effectuate the transactions in the United States. Under Charles Schwab, this shows that the Foreign Defendants conducted business in New York, establishing minimum contacts, and an agency relationship can establish purposeful availment of the New York forum.

Plaintiffs' claims are based on the alleged inflation of EGB prices, so their claims arise from the very conduct that

connects Foreign Defendants to the forum state. Further, the Court has identified no reason why the exercise of personal jurisdiction over most Foreign Defendants would offend traditional notions of fair play and substantial justice. The Court's conclusion in the <u>TAC Decision</u> regarding personal jurisdiction remains valid: the interests of Plaintiffs and the forum outweigh any litigation burden on the Defendants. <u>See</u> <u>TAC Decision</u>, 2020 WL 4273811, at *6.

The Court must always assess a defendant's contacts and personal jurisdiction individually. That individual analysis reveals that the above general summation holds for most Foreign Defendants, with one notable exception. The Court finds the FAC failed to establish that defendant NatWest Markets purposefully availed itself of jurisdiction in New York for claims relating to EGB trade. The FAC lacks a connection between NatWest Markets's EGB transactions and the forum state, so the Court lacks personal jurisdiction over NatWest Markets. The Court concludes, however, that it does have personal jurisdiction over Merrill Lynch, Natixis, Nomura International, UBS Europe, ECB, CGML, JP Morgan plc, RBCE, Royal Bank of Canada, and JIL.

a. TAC Foreign Defendants

The TAC Foreign Defendants ask the Court to reassess its prior decision that Plaintiffs had made a prima facie case for personal jurisdiction in light of the Supreme Court's recent decision in Ford Motor Company v. Montana Eighth Judicial District Court, 141 S. Ct. 1017 (2021). Outside of Ford's possible application, the TAC Foreign Defendants reassert the same arguments for dismissal that they made in seeking to dismiss the TAC. Because Ford does not alter the Court's prior finding that the TAC Foreign Defendants are subject to its jurisdiction, the Court finds it has personal jurisdiction over Merrill Lynch, Natixis, Nomura International, UBS Europe, UBS AG, and UCB for the reasons asserted in the TAC Decision.[7] See TAC Decision, 2020 WL 4273811, at *7-10.

In Ford, the Supreme Court rejected the argument that the conduct underlying a plaintiff's claim must be caused by the defendant's contacts with the forum state for the court to exercise personal jurisdiction over that defendant. See Ford, 141 S. Ct. at 1026. The Supreme Court reiterated that

_____

[7] The Court previously found the statutory basis for personal jurisdiction over all TAC Foreign Defendants was rooted in Rule 4(k)(1) and New York Section 302(a)(1). Due to the TAC Foreign Defendants business dealings in New York, they were subject to general jurisdiction in New York courts and did not fall within the realm of Rule 4(k)(2).

the suit must be *either* caused by *or* relate to the defendant's contacts with the forum. See id. The TAC Defendants are correct that Ford clarified that specific personal jurisdiction "requires a 'strong relationship' between the forum and the claims." (Foreign Defendants Motion at 1 (quoting Ford, 141 S. Ct. at 1028).) In fact, the Supreme Court stated that a "strong relationship among the defendant, the forum, and the litigation" is "the essential foundation of specific jurisdiction." Ford, 141 S. Ct. at 1028 (quotations omitted). That standard is met here.

As the Court explained in detail in the TAC Decision, with respect to each specific TAC Foreign Defendant, all TAC Foreign Defendants had strong, intentional contacts with New York. They transacted business, including selling and marketing EGBs, in New York, and they purposefully availed themselves to the jurisdiction of New York courts. See TAC Decision, 2020 WL 4273811, at *7–10. As the TAC Decision detailed, the TAC Foreign Defendants all knowingly transacted business in New York, primarily through affiliates with whom they had an agent-principal relationship. Those New York-based affiliate-agents sold EGBs, at allegedly inflated prices, to members of the purported class, so the TAC Foreign Defendants' contacts with New York are directly linked to the

legal claims underlying this dispute and the litigation
before this Court.

By working with their New York-based agents to sell EGBs
to consumers in the United States, the TAC Foreign Defendants
purposefully availed themselves of jurisdiction in New York.
See Charles Schwab, 883 F.3d at 85. Their business activities
gave them "fair warning" that they could be haled into New
York courts, as required to afford due process. Ford, 141 S.
Ct. at 1025. The Court's exercise of jurisdiction here
comports with notions of fair play and substantial justice.
The Court DENIES the motions to dismiss for lack of personal
jurisdiction of Merrill Lynch, Natixis, Nomura International,
UBS Europe, UBS AG, and UCB.

　　b. NatWest Markets

The Court previously found it lacked personal
jurisdiction over NatWest Markets because Plaintiffs did not
allege with specificity that NatWest Markets conducted
business in New York, rendering Section 302(a)(1)
inapplicable. See TAC Decision, 2020 WL 4273811, at *8. The
Court was similarly unable to conclude that Federal Rule of
Civil Procedure 4(k)(2)[8] provided a basis for jurisdiction,

---

[8] Plaintiffs no longer assert Federal Rule of Civil Procedure 4(k)(2) as
a basis for personal jurisdiction. (See Opposition to Foreign Defendants
at 3.)

and due to other pleading deficiencies, conspiracy jurisdiction did not provide a basis for jurisdiction. Id.

In the FAC, Plaintiffs allege that an unnamed, London-based NatWest Markets EGB trader traveled to New York, as evidenced in chat logs. (See FAC ¶ 54.) Further, Plaintiffs allege NatWest Markets operated a New York branch during the Class Period and "execut[ed] European Government Bond transactions directly with investors located in this District." (FAC ¶¶ 55-56.) The FAC cites data that NatWest engaged in "more than 3,500 transactions" during the Class Period, but provides no breakdown of how many, if any, of those transactions were in EGBs. (FAC ¶ 57.) The FAC establishes that NatWest Markets sold securities, booked corporate loan products, was a Federal Reserve official foreign exchange counterparty, and had a branch office, all in New York during the Class Period.

This is sufficient to satisfy Section 12's venue requirement and, consequently, provides a statutory basis for the exercise of personal jurisdiction over NatWest Markets in New York. The FAC plausibly alleges that NatWest Markets "transacts business" in New York. See Daniel, 428 F.3d at 428. The Clayton Act therefore provides a statutory basis for personal jurisdiction over NatWest Markets.

The exercise of personal jurisdiction must also comply with constitutional requirements of due process. The Supreme Court has repeatedly stated that the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum state. Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1780 (2017). As recently reiterated in Ford, this means that "there must be an affiliation between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation." Ford, 141 S. Ct. at 1025 (internal quotations omitted).

While there is no question that NatWest Markets does business in New York, the FAC does not answer whether they transact *EGB business* within New York State. Unlike the TAC Foreign Defendants, NatWest Markets' local EGB trading affiliate is not located in this District, but in Stamford, Connecticut. (TAC ¶ 48.) The FAC states that NatWest's weekly European trade publication tells "interested investors in the United States to contact fixed-income sales employees located at NatWest Markets Securities Inc. headquarters in Stamford, Connecticut, who were tasked with . . . arranging European Government Bond trades with NatWest." (FAC ¶ 52.) The legal claims here arise from that EGB trading activity. The Court

31

cannot find a sufficient connection between the forum and that activity.

Plaintiff must show a "strong relationship among the defendant, the forum, and the litigation" to establish personal jurisdiction, <u>Ford</u>, 141 S. Ct. at 1028, and here, the last link in that chain is missing. Nothing in the FAC links NatWest Markets, New York, and this EGB antitrust action, so the exercise of personal jurisdiction over NatWest Markets would not comport with "traditional notions of fair play and substantial justice." <u>Int'l Shoe</u>, 326 U.S. at 316. The Court therefore finds it lacks personal jurisdiction over defendant NatWest Markets.[9] NatWest Markets's motion for dismissal pursuant to Rule 12(b)(2) is GRANTED.

c. <u>CGML</u>

Turning to the new Foreign Defendants, the FAC alleges that CGML sold EGBs in the United States through its New York-based broker-dealer affiliate, CGMI, and that both companies operated within the same "Global Markets" business line. (FAC ¶¶ 98-99.) Plaintiffs further allege that CGML employees regularly worked with New York-based CGMI employees who worked on business and pricing strategies for EGB sales during

---

[9] Because the Court finds, below, that Plaintiffs failed to allege a plausible conspiracy involving NatWest Markets, conspiracy jurisdiction does not provide a basis for the Court's exercise of personal jurisdiction over NatWest Markets.

the Class Period. (FAC ¶¶ 100-01.) Plus, CGML allegedly handled the pricing of and inventory for all its New York-based affiliates' EGB transactions. (FAC ¶ 104.)

The Court is satisfied that these allegations amount to a prima facie showing of personal jurisdiction over CGML based on the principles explained in Charles Schwab. The Complaint adequately alleges that CGML had an agency relationship with CGMI. CGML and CGMI employees regularly worked together in Citigroup's "Global Markets" business line, and CGML employees provided pricing and inventory for the EGB sales conducted by CGMI employees in New York. Plaintiffs have shown CGML transacted business in New York and purposefully availed itself of the forum by aiding its New York-based agent in buying and selling EGBs during the Class Period. The FAC supports a finding of personal jurisdiction under either New York's Section 302(a)(1) or the Clayton Act's Section 12. There is a relationship between the litigation, the defendants, and the forum, such that the Court's exercise of personal jurisdiction over CGML comports with due process, as explained in Ford. The Court concludes it has personal jurisdiction over CGML.

d. <u>JP Morgan plc</u>

The Court is similarly persuaded it has personal jurisdiction over JP Morgan plc. The FAC alleges that JP Morgan plc maintained all EGB inventory and priced all EGB trades for New York-based affiliates JP Morgan LLC and JP Morgan Bank. (FAC ¶ 106.) The FAC sufficiently alleges a principal-agent relationship between JP Morgan plc and JP Morgan LLC. Both entities operate within the same "Investment Bank" business segment of parent company JPMorgan Chase & Co. (FAC ¶ 107), and throughout the Class Period, JP Morgan LLC distributed EGB research and pricing information compiled and published by JP Morgan plc. (FAC ¶ 108.)

Again, applying <u>Charles Schwab</u>, these actions show JP Morgan plc purposefully availed itself to jurisdiction in New York. Because JP Morgan plc was intentionally and intimately involved in business related to EGB trading in New York, there is "an affiliation between the forum and the underlying controversy," <u>Bristol-Myers Squibb Co.</u>, 137 S. Ct. at 1780 (quotations omitted), and this suit arises out of or relates to JP Morgan plc's contacts with New York. The Court finds no reason why the exercise of personal jurisdiction over JP Morgan plc would offend traditional notions of fair play and

substantial justice, so the Court concludes it may exercise jurisdiction over JP Morgan plc.

e. JIL

The facts alleged regarding JIL are quite similar to those concerning JP Morgan plc, and the Court concludes JIL is subject to its jurisdiction in this matter. JIL and Jefferies LLC, the New York-based broker-affiliate, operated within the same business segment of Jefferies Financial Group Inc. (FAC ¶ 111.) JIL published marketing materials related to EGBs, and Jefferies LLC distributed those materials in the United States via its New York office. (FAC ¶ 114.) Jefferies LLC acted as an agent of JIL (FAC ¶ 177), and JIL maintained the company's inventory of EGBs and set the pricing for all of Jefferies LLC's EGB transactions during the Class Period. (FAC ¶ 115.)

Taking these facts into consideration, the Court finds Plaintiffs have adequately alleged that, in transacting EGBs in New York, Jefferies LLC was acting to the benefit of JIL, with JIL's knowledge, and JIL, as the entity responsible for pricing all EGBs and in control of the inventory, had some control over Jefferies LLC's actions. Thus, JIL had the requisite minimum contacts with New York and purposefully availed itself of doing business in New York. See Charles

Schwab, 883 F.3d at 85. The Court's exercise of personal jurisdiction over JIL is in line with due process.

### f. RBCE and Royal Bank of Canada

Finally, the Court finds, given the facts alleged in the FAC, it may exercise personal jurisdiction over defendant Royal Bank of Canada and its wholly-owned subsidiary, RBCE. Royal Bank of Canada operates three branches in the United States, located in New York, New York, and is listed on the New York Stock Exchange. (FAC ¶¶ 125-26.) RBCE allegedly distributed EGB marketing materials directly to investors in the United States, and it traded with investors in the United States through a New York-based broker-dealer affiliate, RBC Capital Markets. (FAC ¶ 119). RBC Capital Markets is also a wholly-owned subsidiary of Royal Bank of Canada. (Id.) Both subsidiary companies share a brand name and their employees work together closely to market and trade EGBs to American investors from RBCE's inventory. (FAC ¶ 121.) The FAC states that Royal Bank of Canada managed compliance and internal controls for its subsidiaries, including in the EGB trade. (FAC ¶ 123.) Like many of the other defendants, RBCE priced EGB transactions and maintained EGB inventory for trades conducted by their New York-based affiliate-agent. (FAC ¶ 124.) RBC Capital Markets and Royal Bank of Canada are alleged

36

to have acted as an agent of principal RBCE. (FAC ¶¶ 127, 182, 184.)

Thus, the FAC shows that RBCE and Royal Bank of Canada each conducted business in and maintained substantial contacts with New York. Through both direct action and the actions of RBC Capital Markets -- a wholly-owned subsidiary of Royal Bank of Canada and an agent of RBCE -- both entities purposefully availed themselves of the privilege of doing business in New York. The Court is persuaded that its exercise of personal jurisdiction over these defendants comports with fair play, substantial justice, and due process.

D.   TIMELINESS AND FRAUDULENT CONCEALMENT

Plaintiffs' next argument for dismissal is that the action is untimely under the Sherman Act's four-year statute of limitations. See 15 U.S.C. § 15b. The alleged conspiracy ended in 2012, but this action was first filed in 2019. Plaintiffs argue their suit is not time-barred because the statute of limitations was tolled by Defendants' fraudulent concealment. The Court considered this argument in the TAC Decision and concluded that Plaintiffs had adequately alleged fraudulent concealment. See TAC Decision, 2020 WL 4273811, at *10-12.

37

As the Court explained in its prior decision, fraudulent concealment has three elements that the Second Circuit has described in two different formulations. See id. at *10. Under either formulation the three elements are essentially the same. To toll the statute of limitations, a plaintiff must show (1) wrongful concealment by the defendant (2) that prevented the plaintiff from learning about the wrong during the limitations period (3) despite plaintiff's due diligence in pursuing or learning of the claim. See New York v. Hendrickson Bros. Inc., 840 F.2d 1065, 1083 (2d Cir. 1988); In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 60 (2d Cir. 1998).

This Court previously found Plaintiffs' pleadings satisfied all three elements of this test such that they adequately alleged fraudulent concealment and the action was not untimely. See TAC Decision, 2020 WL 4273811, at *12. The Court found that the first two elements were easily satisfied, and while the third was a closer call, ultimately the pleadings were adequate to satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Id. at *11-12. In the Letter Motions presently before the Court, Moving Defendants do not argue that Plaintiffs failed to meet the first two elements for fraudulent concealment. Rather,

they argue that Plaintiffs did not exercise due diligence. (See New Defendants Letter Motion at 3.)

Because Plaintiffs allege a price-fixing conspiracy, that scheme is "self-concealing" and they "need not show any additional affirmative acts of concealment by the defendants" to establish defendants concealed their wrongdoing. Vincent v. Money Store, 304 F.R.D. 446, 459 (S.D.N.Y. 2015). But as the Court noted in the TAC Decision, that is not enough to excuse an exercise of due diligence. See TAC Decision, 2020 WL 4273811, at *11.

In the FAC, Plaintiffs provide numerous reasons why due diligence could not have revealed the conspiracy prior to the end of the limitations period. (See FAC ¶ 379.) Plaintiffs also cite "active steps [Defendants took] to conceal evidence of their misconduct," namely having public codes of conduct that vowed all trading operations were fair. (FAC ¶ 380.) They directly quote the codes of conduct of Bank of America, Merrill Lynch, Natixis, RBS, Nomura, UBS, UniCredit, State Street, Citigroup, Jefferies, and RBC -- all Defendant families except J.P. Morgan. (See FAC ¶ 380.) As explained in the TAC Decision and in this Court's decision in Hinds County, Mississippi v. Wachovia Bank, N.A., where a plaintiff relies on misrepresentations of above-board behavior, allegations

39

about their reliance on those false reassurances can prove
sufficient due diligence to withstand a motion to dismiss.
See TAC Decision, 2020 WL 4273811, at *11 (citing Hinds Cty.,
Miss. v. Wachovia Bank N.A., 700 F. Supp. 2d 378, 400
(S.D.N.Y. 2010)).

However, the Second Circuit has clarified that district
courts should not require plaintiffs to make a complete and
definite showing of due diligence at the motion to dismiss
stage. See BPP Ill. v. Royal Bank of Scot. Grp. PLC, 603 F.
App'x 57, 59 (2d Cir. 2015) (summary order) ("Although a
plaintiff bears the burden of showing that the discovery rule
tolls the statute of limitations, the statute of limitations
is an affirmative defense and a plaintiff is not required to
plead, in a complaint, facts sufficient to overcome an
affirmative defense." (internal quotations omitted)). Courts
in this district have since found that an argument that
plaintiffs failed to exercise reasonable diligence "may win
another day [later in the litigation], but it does not provide
a basis for dismissal" at the motion to dismiss stage. City
of Phila. v. Bank of Am. Corp., 498 F. Supp. 3d 516, 539
(S.D.N.Y. 2020).

Plaintiffs allege Defendants were part of a self-
concealing scheme that contradicted the public affirmations

and promises they were making to their investors.[10] In cases of fraudulent concealment, there is only so much that "a reasonably diligent plaintiff would or could have known regarding the claim." Stone v. Williams, 970 F.2d 1043, 1049 (2d Cir. 1992). It is unclear what more Plaintiffs could have done here to satisfy their burden of due diligence. Perhaps discovery will reveal they did, indeed, do more. Or, on the other hand, it may reveal that they could have and should have done more prior to the expiration of the limitations period. But given the self-concealment of the wrongdoing, Plaintiffs' lack of knowledge regarding any possible injury,

---

[10] Defendants argue that this Court previously found that "TAC Defendants' public statements about their general compliance with the law excused Plaintiffs' lack of due diligence." (New Defendants Letter Motion at 3.) This is a misrepresentation of the Court's prior holding. The Court did not excuse Plaintiffs from satisfying the due diligence requirement in their establishment of fraudulent concealment, but rather it concluded that "[w]hile Plaintiffs' allegations of due diligence . . . are certainly not extensive, they are adequate at the pleading stage." TAC Decision, 2020 WL 4273811, at *12.

Defendants then cite a recent decision in this District to support their claim that the "public statements pled in the FAC" were insufficient because the recent decision stated "communications to the community at large will not generally support a finding of fraudulent concealment." (New Defendants Letter Motion at 3 (quoting In re Merrill, BofA, & Morgan Stanley Spoofing Litig., 19 Civ. 6002, 2021 WL 827190, at *11 (S.D.N.Y. Mar. 4, 2021)). However, the facts alleged in Merrill have one key, and determinative, distinction: The Court there found Plaintiffs had, at minimum, inquiry notice that they were injured under the Commodity Exchange Act within the limitations period. In re Merrill, 2021 WL 827190, at *7. Plaintiffs did not bring suit during the limitations period because they did not know the identities of the defendants, but they claimed to have exercised due diligence because they relied on the defendants' public representations. Id. at *11. This case differs in that Plaintiffs had no notice they were injured prior to the end of the Class Period, so they had no reason to conduct diligence or disbelieve statements made by the banks and securities dealers from whom they purchased EGBs.

and Defendants' public promises of fair trading, the due diligence question is too fact-intensive to support dismissal at this time. At this stage in the proceeding, the Court is satisfied that the pleadings establish all elements of fraudulent concealment as to defendants Bank of America, Merrill Lynch, Natixis, RBS, Nomura, UBS, UniCredit, State Street, Citigroup, Jefferies, and RBC and the action should not be dismissed as untimely at this time.

While Plaintiffs have adequately alleged fraudulent concealment as to most Moving Defendants, they have not done so as to the J.P. Morgan defendants. Plaintiffs make no allegations that J.P. Morgan made any public statements regarding their trading practices that may have dissuaded Plaintiffs from "undertak[ing] further inquiry." Hinds Cty., 700 F. Supp. 2d at 400. Plaintiffs' fraudulent concealment allegations as to all other defendants were not extensive and just crossed the threshold of being pled with particularity. The absence of a key pleading relating to J.P. Morgan means the FAC does not meet the heightened pleading standard for this group of defendants. Plaintiffs assert that J.P. Morgan should not be dismissed because "its code of conduct was inadvertently not alleged in the FAC," but that code is "judicially noticeable." (Opposition to New Defendants at 3.)

The Court disagrees with that assessment. As discussed above, on a motion to dismiss, this Court may take judicial notice of matters outside the Complaint only if they are "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. Rule of Evid. 201. A page from a company's public website does not qualify for such consideration. Indeed, while the Second Circuit has stated that a court may take notice of public records, it has "stress[ed] that [its] holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings." Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

Plaintiffs cite Roth v. Jennings as support for their assertion that the J.P. Morgan code of conduct is subject to judicial notice, but that decision, which relies on Kramer, refers to "documents filed with the SEC." Roth, 489 F.3d at 509. Roth and Kramer emphasized the importance of judicial notice of public documents when the allegations relied on those documents making certain representations or omissions. See id.; Kramer, 937 F.2d at 774.

43

Here, the FAC does not make any allegations about J.P. Morgan's code of conduct and the Court has no permissible reason to inspect the code to verify whether an alleged statement was indeed made or omitted there. Plaintiffs' request that the Court take judicial notice of this document is essentially a request to supplement the facts alleged in the FAC. The purpose of judicial notice is not to rectify pleading deficiencies, and the Court may not take notice of this document in order to remedy Plaintiffs' failing.[11]

Accordingly, the FAC is dismissed as untimely as to defendants JP Morgan Chase Bank, N.A., J.P. Morgan Securities plc, and J.P. Morgan Securities LLC. Plaintiffs, however, have adequately alleged a claim for fraudulent concealment such that the statute of limitations was tolled from the beginning of the alleged conspiracy until January 31, 2019 -- the date the European Commission first publicly announced its investigation -- as to all other Moving Defendants.

E.   <u>ANTITRUST STANDING</u>

Defendants next argue that named Plaintiffs Ohio Carpenters, SBCERA, and Local 103 lack antitrust standing.

---

[11] Even if the Court could take judicial notice of this document, Plaintiffs ask the Court to take notice of the code of conduct for 2020, though the hyperlink leads to the 2021 code. (<u>See</u> Opposition to New Defendants at 3.) That document significantly postdates the Class Period and could not support an argument that Plaintiffs were misled by the J.P. Morgan defendants during the Class Period.

Defendants argue that Plaintiffs especially lack standing to sue UCM and NSI because the FAC does not allege any trades involving those defendants, that Ohio Carpenters and Local 103 lack standing because they traded through an asset manager, and that all claims fail because "the FAC fails to allege that each Plaintiff was party to a specific transaction in a security affected by the alleged conspiracy with a named Defendant." (TAC Defendants Letter Motion at 3.) The Court previously found that all Plaintiffs suffered an antitrust injury, but that the TAC Plaintiffs lacked standing to sue BAML International, UniCredit Bank, and UCM because Plaintiffs did not transact with those Defendants, meaning Plaintiffs would not be efficient enforcers of the antitrust laws.

To have standing to bring suit, an antitrust plaintiff must (1) have suffered antitrust injury, or injury of the type the antitrust laws were intended to prevent; and (2) be an "efficient enforcer" of the antitrust laws against a given defendant. Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp., 22 F.4th 103, 2021 WL 6143556, at *16–17 (2d Cir. 2021) (hereinafter, "In re LIBOR").

1. Antitrust Injury

Plaintiffs have pled antitrust injury. They allege Defendants were co-conspirators in a horizontal price fixing scheme, "perhaps the paradigm of an unreasonable restraint of trade." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 100 (1984). The Second Circuit has noted that "[g]enerally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Gelboim v. Bank of Am. Corp., 823 F.3d 759, 772 (2d Cir. 2016) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

Moving Defendants nevertheless argue that Plaintiffs did not allege antitrust injury "because the FAC fails to allege that each Plaintiff was a party to a specific transaction in a security affected by the alleged conspiracy with a named Defendant." (TAC Defendants Letter Motion at 3.) Moving Defendants cite In re SSA Bonds Antitrust Litigation, 420 F. Supp. 3d 219, 242 (S.D.N.Y. 2019), only for this heightened requirement. Moving Defendants made this exact argument in seeking to dismiss the TAC, and the Court explained why it was unpersuasive at that time. See TAC Decision, 2020 WL

4273811, at *13. The Court sees no reason, nor do the Moving Defendants point to any new reason, to reconsider that assessment. The Court remains persuaded that the FAC adequately alleges all three Plaintiffs suffered antitrust injury.

    2. <u>Efficient Enforcer Factors</u>

    Even where a party has pled an injury of the type the antitrust laws were meant to prevent, the plaintiff must still establish that it is an efficient enforcer of the antitrust laws. The efficient enforcer analysis asks a court to ensure an antitrust plaintiff is the proper party to bring the lawsuit. There are four factors relevant to the determination of whether a plaintiff is an efficient enforcer: (1) the directness of the injury; (2) whether there is "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;" (3) the extent to which the alleged injury is speculative; and (4) the difficulty of identifying and apportioning damages so as to avoid duplicative recovery. <u>Volvo N. Am. Corp. v. Men's Int'l Tennis Council</u>, 857 F.2d 55, 66 (2d Cir. 1988) (quoting <u>Assoc. Gen. Contractors v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 540–45 (1983)). The first two factors must be met for a plaintiff to

have standing, but the latter two factors carry less weight and typically cannot, on their own, provide a basis for denying standing to a plaintiff who has suffered an antitrust injury. See In re Interest Rate Swaps Antitrust Litig., 261 F. Supp. 3d 430, 491 (S.D.N.Y. 2017).

Plaintiffs allege, and Defendants do not directly contest, that the FAC alleges a direct injury with respect to most defendants. Appendix A to the FAC contains a chart that purports to "display[] the Defendant counterparties with which Plaintiffs directly traded European Government Bonds with during the Class Period." (FAC ¶ 38 n.3.) With that chart and the allegations elsewhere in the FAC, Plaintiffs have alleged that at least one named plaintiff transacted directly with nearly every defendant or that defendant's agent. There are three notable exceptions, two of which are relevant here: NSI and UCM.[12]

Focusing first on the defendants with whom Plaintiffs have alleged direct transactions, the Court re-asserts its finding in the TAC Decision that the named plaintiffs have alleged they directly purchased financial instruments with artificially inflated prices. See 2020 WL 4273811, at *14.

---

[12] The third defendant with whom no named plaintiff is alleged to have transacted is State Street Corporation, which has not moved for dismissal.

Hence, Plaintiffs are direct victims, with non-speculative injuries, to whom damages could easily be apportioned. So it appears that they are efficient enforcers with regards to most defendants.

Moving Defendants argue that such conclusion is false as to Ohio Carpenters and Local 103 because those plaintiffs traded through an asset manager and thus were not "direct" purchasers. Moving Defendants do not cite any authority for that proposition, and courts in this District have rejected the argument that an investor's use of a broker or investment manager, without further information about the investment relationship, renders such a plaintiff an "indirect purchaser." See In re NASDAQ Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 505 (S.D.N.Y. 1996) (finding that brokers were not "distinct economic entities" but instead buy and sell securities on behalf of a client, so use of a broker does not divest the client of a direct injury under the antitrust laws).

Ohio Carpenter and Local 103's asset managers were acting on behalf of Ohio Carpenter and Local 103. The asset managers did not suffer the same injury as the entities on whose behalf they were buying EGBs. While discovery may reveal further information about the role of those asset managers,

their employment by Plaintiffs is not enough alone to defeat standing at the pleading stage.

Next, the Moving Defendants argue that the FAC alleges no trades with NSI and UCM, so those two parties should be dismissed from the action. (See TAC Defendants Letter Motion at 3.) That characterization is not entirely accurate. Appendix A does not show that any named Plaintiff transacted with NSI or UCM. (See FAC Appendix A.) Elsewhere in the FAC, however, Plaintiffs allege that NSI "transacted European Government Bonds directly with investors in this District, including" named plaintiffs Local 103 and SBCERA. (FAC ¶ 149.) NSI is alleged to have been Nomura's U.S.-based broker-dealer and the entity that sold EGBs directly to investors in the United States during the Class Period. (See FAC ¶ 148.) These facts seem to contradict the omission of any transactions between NSI and a named plaintiff from Appendix A. Given this dispute of fact, the Court will draw a reasonable inference and resolve any doubt in favor of Plaintiffs and find the allegations regarding NSI are sufficient to support a plausible case that NSI had direct EGB dealings with Local 103 and SBCERA.

The same cannot be said about the FAC's allegations regarding UCM. Plaintiffs allege that UCM is UniCredit's

U.S.-based broker-dealer that handles "Fixed Income distribution of foreign securities to US institutional qualified investment buyers," (FAC ¶ 92) and "UniCredit Bank AG . . . distributed European Government Bonds into the U.S. to . . . its wholly-owned, domestic subsidiary, UniCredit Capital Markets LLC." (FAC ¶ 157.) The Court finds these allegations do not give rise to a sufficient agency relationship between UCB and UCM, as the FAC states that UCB distributed EGBs *to* UCM, but not that UCM acted on UCB's behalf or as its EGB agent. Further, allegations tying UCM to any named plaintiff are notably absent. The FAC does not allege UCM transacted with a named plaintiff, either indirectly or directly. Thus, any alleged injury caused by UCM is indirect and could lead to speculative assessment of injury or difficulties in computing damages.

As the Court explained in the TAC Decision, courts in this District have repeatedly found plaintiffs were not efficient enforcers when they did not directly transact with a defendant. See TAC Decision, 2020 WL 4273811, at *14 (collecting cases). The same reasoning holds true here, and the FAC should be dismissed against UCM for lack of antitrust standing. That the FAC contains no allegations plausibly tying UCM to the claimed conspiracy bolsters this conclusion.

51

Cf. NASDAQ Mkt.-Makers, 169 F.R.D. at 508 ("Because antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of a conspiracy has standing to represent a class of individuals injured by any of the Defendant's *co-conspirators*." (emphasis added)).

F.   ANTITRUST CONSPIRACY

Finally, the Moving Defendants seek dismissal under Rule 12(b)(6), arguing that Plaintiffs failed to state a claim for relief under the Sherman Act. The Court previously found that Plaintiffs failed to allege an antitrust conspiracy as to all TAC Defendants except Natixis, Nomura International, and NSI because Plaintiffs failed to allege facts specifically tying the other defendants to the alleged conspiracy. See TAC Decision, 2020 WL 4273811, at *14-17.

1. Legal Standard

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To state a claim under Section 1 of the Sherman Act, a plaintiff's complaint must contain sufficient factual matter that, if taken as true, would support an inference that a conspiracy actually existed. See In re Mex. Gov't Bonds

Antitrust Litig., 412 F. Supp. 3d 380, 387–88 (S.D.N.Y. 2019).

To do so, a plaintiff may assert either (1) "direct evidence

that the defendants entered into an agreement in violation of

the antitrust laws"; or (2) conscious parallelism, where the

interdependent parallel conduct is accompanied by

circumstantial evidence and "plus factors" indicative of

conspiracy, such as "a common motive to conspire, evidence

that shows that the parallel acts were against the apparent

individual economic self-interest of the alleged

conspirators, and evidence of a high level of interfirm

communications." Mayor & City Council of Balt. v. Citigroup,

Inc., 709 F.3d 129, 136 (2d Cir. 2013). See also Mex. Gov't

Bonds, 412 F. Supp. 3d at 388.

"To survive dismissal, the plaintiff need not show that

its allegations suggesting an agreement are more likely than

not true or that they rule out the possibility of independent

action, as would be required at later litigation stages such

as a defense motion for summary judgment, or a trial."

Gelboim, 823 F.3d at 781 (internal quotation marks omitted).

Indeed, Rule 12(b)(6) "does not impose a probability

requirement at the pleading stage; it simply calls for enough

fact to raise a reasonable expectation that discovery will

reveal evidence of illegal agreement." Twombly, 550 U.S. at

556.    However,    "[p]ost-<u>Twombly</u>  authorities    overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." <u>Mex. Gov't Bonds</u>, 412 F. Supp. 3d at 388.

### 2. <u>Direct Evidence of Conspiracy</u>

In   the   <u>TAC   Decision</u>,   the   Court   concluded   that "Plaintiffs undisputedly do not allege any direct evidence of a conspiracy." <u>TAC Decision</u>, 2020 WL 4273811, at *15. Unlike the TAC, the FAC contains numerous excerpts of online chatroom transcripts  containing  communications  between  employees  of various Moving Defendants. Plaintiffs argue these transcripts should be considered direct evidence of a conspiracy.

The canonical example of direct evidence is "a recorded phone call in which two competitors agreed to fix prices." <u>United States v. Apple</u>, 791 F.3d 290, 315 (2d Cir. 2015) (quoting <u>Mayor & City Council of Balt.</u>, 709 F.3d at 136). Direct evidence "must evince with clarity a concert of illegal action," <u>N. Am. Soccer League, LLC v. U.S. Soccer Fed'n</u>, 883 F.3d  32,  40  (2d  Cir.  2018)  (quotations  omitted),  and transcripts  of  communications  between  competitors  may sometimes provide direct evidence of an antitrust conspiracy. <u>See, e.g., In re Foreign Exch. Benchmark Rates Antitrust</u>

Litig., 74 F. Supp. 3d 581, 591–92 (S.D.N.Y. 2015) (finding chat transcripts provided direct evidence of a conspiracy where traders shared sensitive information with traders from other firms); In re GSE Bonds Antitrust Litig., 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019) (referring to chats that "unmistakably show traders, acting on behalf of [defendants], agreeing to fix prices at a specific level before bringing the bonds to the Secondary Market" as "the rare smoking gun").

The chat transcripts quoted in the FAC show coordination between bidding strategies and sharing of confidential information involving several Moving Defendants: RBCE (see FAC ¶¶ 240, 243, 253, 262, 264, 265, 267); JP Morgan plc (FAC ¶¶ 243, 253, 262, 267); Nomura International (FAC ¶¶ 244, 250, 254, 255, 263); JIL (FAC ¶¶ 257, 266); CGML (FAC ¶ 259); NatWest Markets (FAC ¶¶ 241, 242, 250, 251, 252, 254, 256); and UBS Europe.[13] (FAC ¶¶ 241, 242, 243, 250, 251, 252, 254, 255, 256, 258, 259, 262, 263, 264, 267.) However, the Court disagrees with Plaintiffs' assertion that these transcripts are "direct evidence that the defendants entered into an agreement in violation of the antitrust laws." Mayor & City

---

[13] The Court notes that the FAC uses UBS Europe's prior name, UBS Limited (see FAC Figure 1 (noting "UBS Europe SE (f/k/a UBS Limited[)]")), in its chatroom transcript quotations. Because Plaintiffs have clearly alleged that UBS Europe is the successor to UBS Limited, the Court finds the allegations related to UBS Limited are relevant to Moving Defendant UBS Europe.

Council of Balt., 709 F.3d at 136. They do not contain any reference, directly or indirectly, to any such agreement.

Nonetheless, the Court does find that the existence of an agreement is implied in these communications, and that they constitute strong circumstantial evidence of the conspiracy Plaintiffs allege. The communications record traders from "competing" banks sharing information in a manner that would be against their respective employers' interests. The Court could reasonably infer that responsible banks, securities dealers, and investment managers would not countenance such improper conduct absent an unlawful agreement or conspiracy of some sort among the defendants charged.

Taking the facts alleged in the FAC as true, as the Court must at this stage, these chatroom transcripts constitute, at minimum, strong circumstantial evidence of some sort of agreement among the persons involved. As will be discussed further below, the FAC's quotation of chats involving traders from RBCE, JP Morgan plc, Nomura International, JIL, NatWest Markets, CGML, and UBS Europe is highly relevant to this Court's determination of whether the FAC satisfied the applicable pleading standards.

3. <u>Parallel  Pricing  and  Plus  Factors  Allowing  an
Inference of a Conspiracy</u>

Because the Court finds the FAC fails to allege direct evidence of an antitrust conspiracy, to survive a motion to dismiss Plaintiffs must allege parallel pricing supported by circumstantial evidence of a conspiracy and "plus factors," as described in this District's jurisprudence.

a. <u>General Allegations of Parallel Pricing</u>

Plaintiffs present statistical data and economic analysis that, they allege, shows anomalous patterns of activity in the prices of French and Italian bonds in the Primary Market during the Class Periods. (<u>See</u> FAC ¶¶ 270–88; <u>see</u> <u>also</u> <u>TAC Decision</u>, 2020 WL 4273811, at *16 (explaining these allegations).) Plaintiffs' allegations regarding parallel pricing in the Secondary Market are also similar to the facts alleged in the TAC. Plaintiffs again include a chart that shows Defendants' average relative bid-ask spread was much higher than that of non-Defendants during the Class Period. (<u>See</u> FAC Figure 11.) After the Class Period, Defendants' average relative bid-ask spread was far narrower than it was during the Class Period. (<u>See</u> <u>id.</u>) As explained above, a narrow bid-ask spread tends to indicate more competitive pricing.

Moving Defendants ask the Court to discredit Figure 11 based on comparisons to its TAC counterpart. (See TAC Defendants Letter Motion at 1.) But on a motion to dismiss, the Court "must accept all facts alleged in the complaint as true and draw all inferences in the plaintiff's favor." New York ex rel. Tzac, Inc. v. New Isr. Fund, 520 F. Supp. 3d 362, 372 (S.D.N.Y. 2021). Only the facts alleged in *this* version of the complaint are relevant to the Court's assessment -- anything alleged in the TAC is inapposite to the motions before the Court today. See GSE Bonds, 396 F. Supp. 3d at 364 (explaining that statistical changes between an earlier complaint and a later amended complaint are "not a reason to discount the current statistics"). Focusing solely on the FAC, the Court finds the statistics raise a reasonable inference that Defendants generally moved in concert to deviate from market prices during the Class Period.

Despite having generally alleged parallel conduct, to survive a motion to dismiss, Plaintiffs must also allege (1) that each specific defendant was involved in this parallel pricing scheme, and (2) plus factors that support a reasonable inference of conspiracy encompassing the named defendants and the conduct factually specified. In line with its focus on

the general prior to the specific, the Court next turns to Plaintiffs' general allegations related to "plus factors."

b. <u>General Allegations of "Plus Factors"</u>

Many of Plaintiffs' general allegations of a price-fixing conspiracy described in the FAC are the same as those alleged in the TAC, which the Court summarized in the <u>TAC Decision</u>. <u>See</u> <u>TAC Decision</u>, 2020 WL 4273811, at *15-16. Plaintiffs allege that the structure of the EGB market lends itself to an inference of concerted action because:

(1) Defendants have enormous power in the EGB market, since power is concentrated in a small number of dealers (FAC ¶ 318-19);

(2) there are high barriers to entry in both the primary and secondary EGB market (FAC ¶¶ 320-21);

(3) the structure of both markets is susceptible to collusion (FAC ¶¶ 322-25);

(4) there is little transparency in the market and non-dealers cannot learn of pricing pre-trade, meaning they rely on their individual dealer (FAC ¶¶ 326-30);

(5) Defendants' conduct was contrary to their own economic interests (FAC ¶ 331);

(6) there were incentives to act collusively, namely the ranking system that influenced primary dealer selection and increasing company and individual profits (FAC ¶¶ 332–34);

(7) sharing proprietary information was contrary to a defendant's own economic interests and violated internal regulatory standards of conduct (FAC ¶¶ 327; 335–36);

(8) the same traders were involved in the primary and Secondary Markets, and those traders maintained a close-knit community (FAC ¶¶ 337–43);

(9) there was a high level of interfirm communications (FAC ¶¶ 344–45); and

(10) membership in industry trade organizations presented an opportunity to collude. (FAC ¶¶ 346–53).

The Court finds all ten of these circumstances to constitute "plus factors" weighing in favor of an adequately pled general conspiracy by Defendants to manipulate the EGB market. See Mayor & Council of Balt., 709 F.3d at 136 (listing examples of plus factors).

### c. Allegations Related to Specific Defendants

To survive a motion to dismiss, "[i]t is not sufficient for the plaintiff to allege that a group has done something wrong unless the allegations give reason to believe that the defendant, as a member of the group, also has committed the

wrong." Litovich v. Bank of Am. Corp., 20 Civ. 3154, 2021 WL 4952034, at *24 (S.D.N.Y. Oct. 25, 2021). In other words, general allegations are not enough and the FAC must support a plausible inference that each individual defendant played a role in the alleged conspiracy. Plaintiffs must show conscious parallelism, circumstantial evidence, and "plus factors" for each defendant. See Mayor & Council of Balt., 709 F.3d at 136.

To begin, the Court addresses an allegation that transformed from general to defendant-specific in the time since the Court's prior decision. In the TAC Decision, the Court noted Plaintiffs' allegations began with the European Commission's Statement of Objections. See TAC Decision, 2020 WL 4273811, at *15. The FAC again begins with the European Commission's investigation into an alleged EGB-trading conspiracy. (See FAC ¶ 13.) However, in the time since the TAC Decision, the European Commission's actions transformed from mere investigation to final decision. With that change, "both the scope and outcome of [that] investigation[] [are] known," In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015), and the findings are no longer speculative.

The conclusion of that proceeding also transformed the allegations regarding the European Commission's investigation from general to specific, as the identity of the investigated persons is now public information and those same parties are named as having committed an anticompetitive wrong in a different jurisdiction entailing the conduct at issue in the action now before this Court. As discussed, the Court has taken judicial notice of the EC Decision which announced that Moving Defendants BANA, Natixis, Nomura International, NMSI, parent company UBS AG, and UCB (see EC Decision at 15-17) distorted competition in the EGB industry. The European Commission's investigation and the subsequent EC Decision "provide non-speculative support for the inference of a conspiracy." In re Foreign Exchange Benchmark Rates, 74 F. Supp. 3d at 592. While the European Commission's investigation alone would be insufficient to support an allegation of a plausible conspiracy, it constitutes circumstantial evidence and a "plus factor" bolstering Plaintiffs' allegations against each defendant named in the EC Decision, and the Court will credit such showing in its defendant-specific analysis below.

Before moving to that analysis, the Court also notes that it is unable to discern any individual defendant

implicated by large swathes of Plaintiffs' economic analysis, particularly that related to fluctuating yield-to-market rates. Plaintiffs never reference any individual defendant's data being involved in the analysis presented in Figures 7, 8, 9, or 10. (See FAC ¶ 270—88.) Consequently, those statistics alone do not allow the Court to infer a plausible conspiracy with regards to any Moving Defendant.

Concerning the bid-ask spread data, the FAC states that "nine Defendants are primary dealers of Italian government bonds. The remaining Defendants also actively quoted prices to investors for [EGBs] issued by Italy during the Class Period from their respective [EGB] trading desks . . . . Accordingly, the data included millions of price quotes specifically attributable to each Defendant (except for State Street and RBC Europe)." (FAC ¶ 294.) Plaintiffs fail to specifically mention which nine Defendants are primary dealers of Italian bonds, but the Court is able to infer Plaintiffs used data from Merrill Lynch, Natixis, NatWest Markets, Nomura International, UBS Europe, UCB, CGML, JP Morgan plc, and JIL, the non-excepted entities defined as

Primary Dealer Defendants earlier in the FAC.[14] (See FAC ¶ 23.)

Plaintiffs subsequently identify Merrill Lynch, Nomura International, UCB, Natixis, CGML, JIL, and JP Morgan plc in Figure 12, which shows the change in bid-ask spreads for each entity from 2012 to 2013. (See FAC Figure 12.) The graph shows that each defendant narrowed its bid-ask spreads in 2013, which is contrary to how non-defendant dealers behaved in the same time period. (See FAC ¶¶ 301-02.) Plaintiffs assert that this information shows a parallel narrowing of spreads by Defendants following the end of the Class Period -- that is, the end of the period during which they allegedly agreed to maintain wider-than-market bid-ask spreads. (FAC ¶ 304.) In simpler terms, Plaintiffs allege that this evidence and analysis support a plausible showing of conscious parallelism.

These entity-specific statistics allow the Court to infer a conspiracy involving some defendants, but the Court

---

[14] Plaintiffs state the data comes from "each Defendant (except for State Street and [RBCE]" and the Court infers "each Defendant" to mean "each Primary Dealer Defendant," with the exception of the two specifically excluded. The Court does note that the FAC is unclear regarding whether RBCE is a primary dealer. Paragraph 23 of the FAC lists all "Primary Dealer Defendants," and RBCE -- and any other Royal Bank of Canada entity -- is absent from that list. (FAC ¶ 23.) Then, a few paragraphs later, RBCE is listed as an "AFME Primary Dealer Member" in Figure 1. (See FAC Figure 1.)

must evaluate each defendant family individually to determine whether Plaintiffs met their pleading standard as to each.

### i.   BANA and Merrill Lynch

Defendant Merrill Lynch is represented in Plaintiffs' statistical analysis demonstrating the parallel narrowing of bid-ask spreads by Defendants following the Class Period. Figure 12 shows Merrill Lynch's bid-ask spread narrowed by over 39 percent in the year following the Class Period. The Court finds this change bolsters an inference of parallel conduct between Merrill Lynch and the other Figure 12 Defendants. However, as courts in this District have repeatedly noted, allegations of conscious parallelism are not enough to create an inference of a conspiracy; they must be accompanied by circumstantial evidence and "plus factors". See Mayor & Council of Balt., 709 F.3d at 136 ("Generally, however, alleging parallel conduct alone is insufficient, even at the pleading stage."). Focusing on defendant Merrill Lynch, the Court cannot identify other allegations that meet this standard. Thus, the Court concludes that, as it relates to Merrill Lynch, the FAC fails to supplement its allegations

of parallel pricing with sufficient circumstantial evidence and plus factors.

On the other hand, Defendant BANA is referenced in the EC Decision, listed as the employer of an EGB trader whose actions implicated Bank of America in the conspiracy. (See EC Decision at 15.) The Court credits the European Commission's findings as a plus factor, but Plaintiffs have failed to allege parallel conduct as to BANA, so the presence of plus factors is irrelevant.

The FAC alleges Merrill Lynch engaged in parallel pricing conduct, and it provides circumstantial evidence about BANA that provides a "plus factor" supporting the inference of a conspiracy. But these two halves do not make a whole, as the FAC fails to tie these two defendants together such that the Court can infer the existence of a conspiracy as to either individual defendant. Defendants BANA and Merrill Lynch are both wholly-owned subsidiaries of Bank of America Corporation, but that is the only connection between these entities apparent from the FAC. The Court is unable to draw any inference that an agency relationship existed between these entities. The FAC has failed to adequately

allege BANA and Merrill Lynch were involved in the price-fixing conspiracy, and the FAC must be dismissed against them.

    ii.   <u>Natixis</u>

The FAC readily satisfies the pleading requirements to state a claim against Natixis. Figure 12 and Plaintiffs' economic analysis show that Natixis's bid-ask spread narrowed by over 66 percent at a time when other Defendants' spreads were also narrowing, but non-defendants' spreads were widening. (<u>See</u> Figure 12.) The Court finds this data is probative of parallel conduct and supports an inference that Natixis was acting in concert with the other defendants referenced in Figure 12 when it narrowed its spreads following the end of the Class Period.

Unlike the case of Merrill Lynch, the FAC alleges circumstantial evidence and plus factors about Natixis's involvement in the alleged conspiracy. Most notably, Natixis is named in the EC Decision as a party to the EGB cartel, and the FAC alleges Natixis was one party subject to the European Commission investigation. (<u>See</u> FAC ¶ 311.) When considered in combination with Plaintiffs' general allegations set forth in the FAC, the Court finds these specific allegations adequately tie Natixis to the alleged conspiracy. The Court is able to infer a price-fixing conspiracy involving Natixis

from the facts alleged in the FAC, so Natixis's motion to dismiss is denied.

### iii. <u>NatWest Markets and NMSI</u>

The specific allegations regarding NatWest Markets and NMSI fail to state a claim for reasons similar to those related to BANA and Merrill Lynch. Plaintiffs fail to adequately allege parallelism because the only evidence of such parallel pricing is that data from NatWest Markets is included in Figure 11's aggregated statistics. But as the Court noted in the <u>TAC Decision</u>, "aggregate statistics do not *alone* suffice to impute wrongful conduct to any particular defendant." <u>TAC Decision</u>, 2020 WL 4273811, at *17 (citing <u>Mex. Gov't Bonds</u>, 412 F. Supp. 3d at 390). Based only on aggregate statistics, the Court is unable to infer whether NatWest Markets was actually adjusting its prices in concert with its alleged co-conspirators.

NatWest Markets's traders are quoted several times in the chatroom transcripts, (<u>see</u> FAC ¶¶ 241, 242, 250, 251, 252, 254, 256), but these transcripts reflect only a sharing of information, not conscious parallelism. <u>See</u> <u>Mayor & Council of Balt.</u>, 709 F.3d at 136) (listing "evidence of a high level of interfirm communications" as a plus factor that, "when viewed in conjunction with parallel acts" can allow a

factfinder to infer a conspiracy). To survive a motion to dismiss, adequately alleging parallel conduct is the first prerequisite for an antitrust plaintiff lacking direct evidence.

So, despite Plaintiffs' allegations that employees from NatWest Markets communicated with competitors, and that NMSI, an affiliate of NatWest Markets, is named in the EC Decision, the Court cannot conclude that Plaintiffs stated a plausible claim for relief. Plaintiffs have failed to allege specific actions that allow an inference that NatWest Markets (over which the Court also found that it lacks personal jurisdiction) or NMSI consciously mirrored the pricing decisions of their co-defendants. The FAC must be dismissed as to both parties.

    iv.   Nomura International and NSI

The FAC provides ample support allowing the Court to infer Nomura International and its New York-based affiliate and agent, NSI, were involved in a conspiracy to restrain trade in the EGB market. As is the case with Natixis, Plaintiffs have specifically alleged Nomura International narrowed its bid-ask spreads following the Class Period. Nomura International's bid-ask spreads were nearly 28 percent narrower in 2013 than they were in 2012. (See FAC Figure 12.)

Figure 12 shows several other Defendants saw similar significant positive changes in this time period, so the Court finds this examination of Nomura-specific data, in conjunction with the more general allegations, is sufficient to support an inference of conscious parallelism at this point in the proceedings.

The FAC further includes specific circumstantial evidence and plus factors related to Nomura International. Nomura International is named in the EC Decision, (see EC Decision at 15; FAC ¶ 311), and its traders were very active in the interfirm chatroom communications. (See FAC ¶¶ 244, 250, 254, 255, 263.) It is easy for the Court to infer a conspiracy involving Nomura International from the FAC. And, as the Court explained in the TAC Decision, Plaintiffs have adequately alleged an agency relationship between Nomura International and NSI, wherein the two affiliates work together in the primary and secondary EGB markets. See TAC Decision, 2020 WL 4273811, at *19. The allegations explaining the relationship between Nomura International and its U.S.-based affiliate NSI allow the Court to further infer, at this stage in the proceeding, NSI's involvement in the alleged conspiracy. The motion to dismiss the case against Nomura International and NSI is denied.

v.   UBS AG, UBS Europe, and UBS Securities

The allegations against UBS AG, UBS Europe, and UBS Securities fail to allege a plausible conspiracy for the same reasons the claims against NatWest Markets and NMSI failed. Plaintiffs use only aggregate statistics, with no further supporting UBS-specific allegations, to tie the UBS parties to the parallel pricing scheme. As explained, this is insufficient to create an inference that the UBS parties were individually involved in any conscious parallelism. Without direct evidence or parallel conduct, Plaintiffs have failed to allege an antitrust conspiracy. This conclusion holds despite Plaintiffs' allegations about UBS Europe's participation in online chatrooms or its being named in the EC decision.

vi.   UCB and UCM

The Court next concludes that the FAC adequately alleges an antitrust conspiracy against UCB, but not UCM, against whom the Court has determined above that Plaintiffs lack antitrust standing. As discussed in the Court's discussion of antitrust standing, the FAC does not assert that UCB and UCM maintained an agency relationship.

While the allegations against UCM are lacking, those against UCB are robust. Figure 12 shows UCB's bid-ask spreads

saw a 65.92 percent change between 2012 and 2013, which gives rise to an inference of parallel pricing. (See FAC Figure 12.) In addition to Plaintiffs' general allegations of circumstantial evidence and plus factors, UCB is named in the EC Decision as an investigated party. (See EC Decision at 15.) Though the case against UCB is slightly weaker than that against other Moving Defendants due to UCB's absence from the chatroom transcripts, the Court nevertheless concludes it is able to draw a plausible inference that UCB was a member of the alleged conspiracy. The FAC must be dismissed against UCM, but cannot be dismissed against UCB.

vii. CGML and CGMI

Plaintiffs sufficiently allege an antitrust conspiracy against CGML and its New York-based agent-affiliate, CGMI. Figure 12 shows CGML's bid-ask spreads narrowed by over 54 percent from 2012 to 2013, supporting an inference of parallel conduct with other alleged co-conspirator Defendants recording similarly narrowed spreads. (See FAC Figure 12.) Providing further support for an inference of conspiracy are the allegations that a CGML trader shared pricing information with traders from competitor firms, as evidenced through chatroom transcripts. (See FAC ¶ 259.) This strong, individualized piece of circumstantial evidence combines with

Plaintiffs' generalized allegations to create a plausible inference that CGML and its agent CGMI were involved in the alleged conspiracy. Accordingly, CGML and CGMI's motion to dismiss must be denied.

  viii. JP Morgan plc, JP Morgan Bank, and JP Morgan LLC

  Because the Court has already determined that the suit against the JP Morgan defendants is time-barred, the Court declines to assess the allegations directed at this group of defendants.

  ix.  RBCE, Royal Bank of Canada, and RBC Capital Markets

  The FAC fails to adequately allege a conspiracy against defendants RBCE, Royal Bank of Canada, and RBC Capital Markets because it contains no allegations that any of these defendants engaged in parallel pricing. RBCE is specifically omitted from the aggregate statistics supporting Figure 11 (see FAC ¶ 294), and Plaintiffs present no individual data regarding RBCE, Royal Bank of Canada, or RBC Capital Markets in Figure 12. The Court is unable to discern any other individual-focused allegations of parallel pricing from the FAC. As the Court has already stated, binding precedent establishes that, in the absence of direct evidence, conscious parallelism must be plausibly alleged for a Section 1 claim to survive a motion to dismiss. Thus, the action must

be dismissed against RBCE, Royal Bank of Canada, and RBC Capital Markets.

    x.   <u>JIL and Jefferies LLC</u>

Finally, the Court finds that Plaintiffs have alleged a conspiracy involving JIL and Jefferies LLC. Figure 12 shows JIL's bid-ask spreads changed by nearly 44 percent in the year following the Class Period, mirroring dramatic rates of narrowing by its alleged co-conspirators. As was the case with the other defendants, these JIL-specific allegations satisfy Plaintiffs' burden of creating a plausible inference of conscious parallelism. When viewed in totality with Plaintiffs' general allegations and the fact that JIL's traders actively shared information with competitors in the chatrooms (<u>see</u> FAC ¶¶ 257, 266), the Court is able to infer JIL's involvement in the alleged conspiracy. Further, Plaintiffs adequately allege that Jefferies LLC acted as an agent of JIL, so the Court is able to infer Jefferies LLC was similarly involved in the alleged wrongdoing. The motion to dismiss JIL and Jefferies LLC must be denied.

**<u>ORDER</u>**

For the reasons discussed above, it is hereby

**ORDERED** that the motions so deemed by the Court as filed by defendants Bank of America, N.A. ("BANA"); Merrill Lynch

74

International ("Merrill Lynch"); Natixis S.A. ("Natixis"); NatWest Markets plc ("NatWest Markets"); NatWest Markets Securities Inc. ("NMSI"); Nomura Securities International Inc. ("NSI"); Nomura Securities International plc ("Nomura International"); UBS AG; UBS Europe SE ("UBS Europe"); and UBS Securities LLC ("UBS Securities"); UniCredit Bank AG ("UCB"); UniCredit Capital Markets LLC ("UCM"); Citigroup Global Markets Limited ("CGML"); Citigroup Global Markets Inc. ("CGMI"); JP Morgan Chase Bank, N.A. ("JP Morgan Bank"); J.P. Morgan Securities plc ("JP Morgan plc"); J.P. Morgan Securities LLC ("JP Morgan LLC"); RBC Europe Limited ("RBCE"); Royal Bank of Canada; RBC Capital Markets ("RBC Capital Markets"); Jefferies International Limited ("JIL"); and Jefferies LLC to dismiss (Dkt. Nos. 206-1; 206-2; 206-3), the Fourth Amended Consolidated Class Action Complaint of Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), San Bernardino County Employees' Retirement Associate ("SBCERA"), and Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103," and collectively with the foregoing, "Plaintiffs"), (see "FAC," Dkt. No. 143) are **DENIED** as to Natixis, Nomura International, NSI, UCB, CGML, CGMI, JIL, and Jefferies LLC, and **GRANTED** as to Merrill Lynch, BANA, NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, UCM, JP

76

Morgan plc, JP Morgan Bank, JP Morgan LLC, RBCE, RBC Capital Markets, and Royal Bank of Canada. The FAC is hereby dismissed without prejudice against defendants Merrill Lynch, BANA, NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, UCM, JP Morgan plc, JP Morgan Bank, JP Morgan LLC, RBCE, RBC Capital Markets, and Royal Bank of Canada (collectively, the "Dismissed Defendants"); and it is further

**ORDERED** that the letters filed by Plaintiffs so deemed by the Court as motions for judicial notice (Dkt. Nos. 203; 217) are **GRANTED**; and it is further

**ORDERED** that the remaining Defendants are directed to Answer within twenty-one days of the date of this Order.

**SO ORDERED.**

Dated:    New York, New York
          14 March 2022

                                                    _____
                                                        Victor Marrero
                                                           U.S.D.J.

76