**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EUROPEAN GOVERNMENT BONDS ANTITRUST LITIGATION | **ORAL ARGUMENT REQUESTED**<br><br>Lead Case No. 1:19-cv-2601<br><br>Hon. Victor Marrero<br><br>Hon. Sarah Netburn |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO AMEND FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF BACKGROUND AND SUMMARY OF ALLEGATIONS ................... 3

   A.   Factual Background ........................................................................... 3

   B.   Relevant Procedural History ............................................................. 5

III.   ARGUMENT ...................................................................................................... 8

   A.   Leave to Amend Shall Be Freely Given ............................................ 8

   B.   The Allegations Adequately Tie the UBS and NatWest Defendants to the Already
        Plausibly Alleged Conspiracy ........................................................... 9

        1.   The 5AC Alleges Direct Evidence of an Antitrust Conspiracy ................................ 11

        2.   Alternatively, the 5AC Alleges Conscious Parallelism ........................................ 17

   C.   The Alleged Conduct Is Attributable to NatWest Markets, NMSI, UBS AG,
        UBS Europe, UBS Securities, MLI, and BANA ................................ 19

   D.   The Allegations Adequately Establish Personal Jurisdiction over NatWest Markets ...... 21

   E.   Plaintiffs Have Satisfied the Standard for Amending Their Complaint ......................... 23

        1.   The Proposed Amendment Will Not Unduly Prejudice Any Party ........................... 23

             a.   The 5AC Will Not Require the Parties to Expend Significant Additional
                  Resources ........................................................................... 24

             b.   The 5AC Will Not Significantly Delay the Resolution of the Dispute ................ 24

        2.   Plaintiffs Have Not Unduly Delayed Amendment ................................................... 25

IV.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)......................................................................................10

*Block v. First Blood Assocs.*,
  988 F.2d 344 (2d Cir. 1993).........................................................................................9

*Bridgeport Music, Inc. v. Universal Music Grp., Inc.*,
  248 F.R.D. 408 (S.D.N.Y. 2008) .......................................................................9, 23, 24

*C.F.T.C. v. TFS-ICAP, LLC.*,
  415 F. Supp. 3d 371 (S.D.N.Y. 2019).....................................................................21, 22

*Cason-Merenda v. Detroit Med. Ctr.*,
  862 F. Supp. 2d 603 (E.D. Mich. 2012)......................................................................17

*Compass, Inc., v. Real Estate Bd. of New York, Inc.*,
  No. 21-cv-2195 (AJN), 2022 WL 992628 (S.D.N.Y. Mar. 31, 2022)..............................10, 12

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005)........................................................................................22

*Dennis v. JPMorgan Chase & Co.*,
  343 F. Supp. 3d 122 (S.D.N.Y. 2018).........................................................................17

*Duling v. Gristede's Operating Corp.*,
  265 F.R.D. 91 (S.D.N.Y. 2010) ..................................................................................25

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016).......................................................................................17

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010).........................................................................10

*In re Aluminum Warehousing Antitrust Litig.*,
  95 F. Supp. 3d 419 (S.D.N.Y. 2015)...........................................................................17

*In re Blood Reagents Antitrust Litig.*,
  756 F. Supp. 2d 623 (E.D. Pa. 2010) .........................................................................18

*In re Credit Default Swaps Antitrust Litig.*,
  No. No. 13-md-2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014) ..........................17

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ........................................................................18

*In re Eur. Gov't Bonds Antitrust Litig.*,
    No. 19-cv-2601 (VM), 2020 WL 4273811 (S.D.N.Y. July 23, 2020),
    *reconsideration denied*, No. 19-cv-2601 (VM), 2020 WL 7321056 (S.D.N.Y.
    Dec. 11, 2020)............................................................................................5, 10, 22

*In re Eur. Gov't Bonds Antitrust Litig.*,
    No. 19-cv-2601 (VM), 2022 WL 768680 (S.D.N.Y. Mar. 14, 2022),
    *reconsideration denied*, No. 19-cv-2601 (VM), 2022 WL 2168358 (S.D.N.Y.
    June 16, 2022) ................................................................................ *passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13-cv-7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ...............12, 14, 15, 17

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019).............................................................11, 14

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) (Posner, J.) .................................................................17

*In re Int. Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)......................................................................18

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018)......................................................................11

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012)....................................................................................11

*In re Refco Sec. Litig.*,
    No. 07 MDL 1902 JSR, 2013 WL 2035377 (S.D.N.Y. May 9, 2013) ....................25

*In re Salmon*,
    No. 19-21551-CIV, 2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) ........................18

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-MDL-01570-GBDSN, 2021 WL 640257 (S.D.N.Y. Jan. 22, 2021) .........23

*Iowa Pub. Emps' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018)...............................................................16, 18

*United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
    889 F.2d 1248 (2d Cir. 1989)...............................................................................24

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)................................................................................10

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  296 F. Supp. 3d 442 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018)..............................18

*N.H. Ins. Co. v. Total Tool Supply, Inc.*,
  621 F. Supp. 2d 121 (S.D.N.Y. 2009).................................................................................23

*Nat'l Credit Union Admin. Bd. v. HSBC Bank US, Nat'l Ass'n*,
  331 F.R.D. 63 (S.D.N.Y. 2019) .............................................................................................9

*Phx. Light SF Ltd. v. HSBC Bank USA, Nat'l Ass'n*,
  No. 14-cv-10101 (LGS) (SN), 2021 WL 568080 (S.D.N.Y. Feb. 16, 2021) ...........................9

*Sacerdote v. N.Y.U.*,
  9 F.4th 95 (2d Cir. 2021) ......................................................................................................9

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
  22 F.4th 103 (2d Cir. 2021) ................................................................................................22

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) .............................................................................................18

*Starr v. Sony BMG Music Ent.*,
  592 F.3d 314 (2d Cir.2010)................................................................................................17

*Sullivan v. Barclays PLC*,
  No. 13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ..............................15, 16

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)...........................................................................................................23

**Statutes, Rules, and Regulations**

15 U.S.C. §1...................................................................................................................1, 10, 17

Federal Rules of Civil Procedure
  Rule 15(a)(2)......................................................................................................................8
  Rule 16 ..............................................................................................................................9

Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), Electrical Workers Pension Fund Local 103 I.B.E.W. ("Local 103"), and San Bernardino County Employees' Retirement Association ("SBCERA," and collectively with Ohio Carpenters and Local 103, "Plaintiffs") respectfully submit this memorandum in support of their motion for leave to file their proposed Fifth Amended Consolidated Class Action Complaint ("5AC"), a copy of which is filed herewith under seal as Exhibit 1 to the Declaration of Kristen M. Anderson ("Anderson Decl.").[1]

## I.    INTRODUCTION

In its March 14, 2022 Decision and Order, the Court ruled that Plaintiffs' Fourth Amended Consolidated Class Action Complaint (ECF No. 146; hereinafter "4AC") plausibly stated a claim for relief under the Sherman Act against certain of the named Defendants.[2] *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-cv-2601 (VM), 2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ("*EGB III*"), *reconsideration denied*, No. 19-cv-2601 (VM), 2022 WL 2168358 (S.D.N.Y. June 16, 2022) ("*EGB IV*").  The Court, however, dismissed other Defendants because, as relevant here, Plaintiffs had not sufficiently shown that each such Defendant, including entities within the bank-families UBS, NatWest, and Bank of America, "played a role in the alleged conspiracy."  *EGB III*, 2022 WL 768680, at *20.[3]  Specifically, the Court determined that (1) chat transcripts quoted in the 4AC did not constitute "direct evidence that the defendants entered into an agreement in violation of the

---

[1]    A redline against the prior complaint is attached hereto as Exhibit 2.

[2]    Those Defendants are Natixis S.A. ("Natixis"); Nomura Securities International plc ("NIP"); Nomura Securities International Inc. ("NSI"); UniCredit Bank AG ("UCB"); Citigroup Global Markets Limited ("CGML"); Citigroup Global Markets Inc. ("CGMI"); Jefferies International Limited ("JIL"); and Jefferies LLC.

[3]    The Court dismissed Merrill Lynch International ("MLI"); Bank of America, N.A. ("BANA"); NatWest Markets plc ("NatWest Markets"); NatWest Markets Securities Inc. ("NMSI"); UBS AG; UBS Europe SE ("UBS Europe"); UBS Securities LLC ("UBS Securities"); UniCredit Capital Markets ("UCM"); RBC Europe Limited ("RBCE"); RBC Capital Markets; and Royal Bank of Canada for failure to allege their participation in an antitrust conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.  *See EGB III*, 2022 WL 768680, at **22-24.  *Id.* at *17.  Additionally, the Court dismissed claims against UCM for lack of antitrust standing.  *Id.* at *17.  Additionally, the Court dismissed claims against J.P. Morgan Securities plc ("JPMorgan plc"); JP Morgan Chase Bank, N.A. ("JPMorgan Bank"); and J.P. Morgan Securities LLC ("JPMorgan LLC") on timeliness grounds.  *Id.* at *15.

antitrust laws"; and (2) alternatively, although the 4AC showed "circumstantial evidence" and "plus factors," it did not sufficiently show that UBS and NatWest Markets specifically engaged in "conscious parallelism" with other members of the conspiracy. *Id.* at *18, *20.[4] Similarly, while the Court concluded that the 4AC's statistical evidence sufficiently alleged MLI engaged in conscious parallelism and that circumstantial evidence and plus factors support the inference of BANA's involvement in the conspiracy, the 4AC failed to establish "an agency relationship" to "tie these two defendants together." *Id.* at *22. Although Plaintiffs are mindful of the Court's prior statement that "it considers further amendment of the Complaint to be unwarranted" (ECF No. 245), documents obtained after the 4AC was filed now demonstrate these banks' extensive participation in the alleged conspiracy.

Since Plaintiffs' February 2021 filing of the 4AC, the case against the UBS, NatWest, and Bank of America Defendants has grown significantly stronger. *First*, on October 15, 2021, eight months after the filing of the 4AC, the European Commission ("EC") released a redacted version of its May 2021 Provisional Non-Confidential Decision (the "EC Decision"), in which it concluded that certain banks, including UBS, NatWest, and Bank of America, engaged in a "single and continuous infringement" to restrain trade in the primary and secondary markets for European Government Bonds ("EGBs"). ECF No. 217-2, ¶14. The 248-page EC Decision contains hundreds of chatroom communications unequivocally demonstrating this misconduct. *Second*, the Court preliminarily approved a settlement agreement with Defendants JPMorgan plc, JPMorgan Bank, and JPMorgan LLC (collectively, "JPMorgan"). As part of this settlement, Plaintiffs obtained cooperation materials illuminating the roles of the dismissed Defendants in the conspiracy alleged by Plaintiffs. These cooperation materials contain additional chats not included

---

[4]    Unless otherwise noted, citations are omitted and emphasis is added.

in the public version of the May 2021 EC Decision and which involve traders employed by the UBS and NatWest Defendants. *Third*, Plaintiffs have obtained additional evidence in discovery, including chat transcripts that underlie the EC Decision, that are incorporated into the 5AC.

With the benefit of these developments, Plaintiffs are able to significantly bolster allegations of the UBS and NatWest Defendants' role in the plausibly alleged conspiracy. Indeed, these new materials show that UBS and NatWest were central players. Likewise, Plaintiffs allege an agency relationship between BANA and MLI. Finally, as discussed below, this motion is timely and will not cause undue prejudice.

Because Plaintiffs meet the liberal standard for amendment, Plaintiffs respectfully request that the Court grant this motion and allow Plaintiffs to file the 5AC in order to replead their claim against NatWest Markets and NMSI (collectively, "NatWest"); UBS AG, UBS Europe, and UBS Securities (collectively, "UBS"); and MLI and BANA (collectively, "Bank of America").

## II.   STATEMENT OF BACKGROUND AND SUMMARY OF ALLEGATIONS

### A.   Factual Background

As alleged in the operative 4AC, as well as the proposed 5AC, EGBs are sovereign debt issued by governments that have adopted the Euro as their official currency, such as France, Germany, and Italy. ¶2.[5] Given Eurozone members' common monetary policy, currency, and membership criteria – among other common characteristics – EGBs are treated as a single class of debt securities. ¶¶195-201. Eurozone governments issue EGBs through "primary market" auctions (and, less commonly, through syndications). ¶¶202-203. To ensure active participation in the primary market, European governments select a small number of banks to serve as "primary dealers" responsible for purchasing EGBs at auction. ¶¶204-206. After issuance, bond dealers

---

[5]     All "¶_" and "¶¶__" are to the 5AC unless otherwise noted.

and investors – such as Plaintiffs – trade EGBs in the "secondary market." ¶¶123-25, 215.  Primary dealers dominate the secondary market by acting as market makers that provide liquidity to investors and stand ready to buy or sell EGBs whenever an investor wishes.  ¶216.  Eurozone governments track and rank primary dealers' performance in these markets.  ¶¶212, 217.  High-ranking primary dealers receive preferential treatment, including access to lucrative transactions, advisory opportunities, and valuable options on securities.  ¶213.

Defendants and their co-conspirators are among the world's largest dealers and market makers in the primary and secondary markets for EGBs.  ¶¶205, 229.  In a competitive market, Defendants would compete to acquire EGBs during auctions in the primary market, and next to acquire customers seeking to buy and sell EGBs in the secondary market, typically by reducing a dealer's "bid-ask spread."[6]  ¶¶220, 229.  However, Defendants conspired to fix EGB prices from as early as January 1, 2007, through at least December 31, 2012 (the "Class Period").  ¶1.  In the primary market, these banks conspired to artificially inflate EGB prices at auction – thereby raising the benchmark for resale to investors in the secondary market – and otherwise strategically coordinated their auction bidding.  ¶¶230-231.  This provided conspiracy members with significant control over the supply of newly issued EGBs, which they could then resell at a profit in the secondary market while maintaining or even increasing their rankings with Eurozone governments.  ¶232.  In the secondary market, Defendants conspired to fix bid-ask spreads on customer orders for EGBs (thus, increasing their members' profits).  ¶¶233-234.

No dealer could accomplish this manipulation alone; both unilateral over-bidding or under-bidding, as well as unilaterally widening the bid-ask spread, could risk substantial losses, invite

---

[6]     The bid-ask spread is the difference between the price at which a primary dealer will acquire an EGB ("bid") in the secondary market and the price at which it will sell the EGB ("ask") in the secondary market, thereby representing one way in which primary dealers profit.  ¶218.

rivals to take market share, and/or jeopardize a bank's ranking or status as primary dealer. ¶¶236-38. Rather, Defendants' conduct stemmed from a common scheme, coordinated and policed principally, though not exclusively, through persistent chatrooms during the Class Period. ¶¶239-240, 300. Because of the scheme, Plaintiffs and other investors who traded EGBs in the United States with Defendants were damaged. ¶245.

### B. Relevant Procedural History

On December 3, 2019, Plaintiffs filed their Third Amended Consolidated Class Action Complaint ("3AC"), naming as Defendants Bank of America, NatWest (f/k/a RBS), Nomura, UniCredit, Natixis, and UBS. ECF No. 87.[7] On July 23, 2020, the Court granted in part and denied in part Defendants' motion to dismiss the 3AC. ECF No. 115; *see also In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-cv-2601 (VM), 2020 WL 4273811 (S.D.N.Y. July 23, 2020) ("*EGB I*"), *reconsideration denied*, No. 19-cv-2601 (VM), 2020 WL 7321056 (S.D.N.Y. Dec. 11, 2020) ("*EGB II*"). *EGB I* concluded "Plaintiffs have alleged enough facts to suggest a conspiracy to fix EGB prices" between Natixis, NIP, and NSI; however, for the Bank of America, NatWest, and UBS entities, Plaintiffs' allegations were not sufficiently specific to tie these entities to the plausibly alleged conspiracy. 2020 WL 4273811, at *15.[8]

On August 26, 2020, the Court granted leave to amend the 3AC to add new plaintiffs and defendants, and to bolster allegations based on materials received from State Street, which had settled and agreed to cooperate with Plaintiffs. ECF Nos. 128, 133, 136. State Street's cooperation

---

[7] The specific defendants are BANA, Bank of America Merrill Lynch International Designated Activity Company ("BAML International"), MLI, NatWest Markets, NMSI, NSI, NIP, UCB, UCM, Natixis, UBS AG, UBS Europe, and UBS Securities.

[8] Furthermore, the Court held that it lacked personal jurisdiction over NatWest Markets and BAML International and that Plaintiffs lacked antitrust standing against BAML International and the UniCredit entities. *Id.* at *7-*8, *14.

– which includes chatroom communications – enabled Plaintiffs to identify additional members of the conspiracy.  ECF No. 208 at 23-24.  Accordingly, Plaintiffs filed the 4AC on February 9, 2021, listing five additional defendant-bank families: Citigroup, JPMorgan, RBC, Jefferies, and State Street.  ECF No. 146.[9]  The 4AC also added SBCERA as a Plaintiff.  *Id.*  Finally, Plaintiffs renamed each defendant dismissed in *EGB I*, except for BAML International.  *Id.*

Defendants moved to dismiss the 4AC.  While the Court considered these motions, in October 2021, the EC released a redacted version of the EC Decision and Summary of the Decision, reporting the results of its investigation into the EGB market.  ECF Nos. 217-1, 217-2.  Plaintiffs requested that the Court take judicial notice of these documents on November 1, 2021.  ECF No. 217.  The EC Decision concluded, consistent the 4AC, that traders and entities associated with Bank of America, Natixis, Nomura, RBS/NatWest, UBS, UniCredit, and other banks conspired to fix the prices of EGBs from 2007 through 2011.  ECF No. 217-1, ¶1; ECF No. 217-2, ¶1.[10]  Although the EC's investigation focused on just two chatrooms (¶¶242, 294), the 248-page EC Decision details extensive direct and circumstantial evidence of the conspiracy, including quoting from "hundreds of communications" from banks seeking immunity and leniency.  ECF No. 217-1, ¶¶78, 93.  Communications in these persistent Bloomberg chatrooms "occurred regularly, sometimes daily, in particular when EGB came up for auction."  *Id.*, ¶88.  The EC Decision chronicles the conduct of UBS's and NatWest/RBS's traders, who created some of the

---

[9]      The specific additional defendants are CGML, CGMI, JPMorgan plc, JPMorgan Bank, JPMorgan LLC, RBCE, RBC Capital Markets, Royal Bank of Canada, JIL, Jefferies LLC, State Street Corporation, and State Street Bank and Trust Company.  The Court preliminarily approved Plaintiffs' settlement with State Street on June 16, 2021.  ECF No. 212.

[10]     The EC Decision emphasized that "it is not possible to declare with absolute certainty that the infringement has ceased for all participants."  ECF No. 217-1, ¶806.  Thus, the EC Decision is consistent with Plaintiffs' proposed class definition and theory of competitive harm for events occurring in 2012.  For example, Plaintiffs allege chatroom transcripts that provide additional evidence of the conspiracy through late 2012, which was not included in the EC Decision.  *See* ¶¶256-258, 279-282, 291.

offending chatrooms and participated in these chats over the entire length of the period identified by the EC. *Id.*, ¶¶89, 102, 107.  As a result, Defendant UBS AG was fined €172,378,000 ($210.9 million), the largest fine for any bank named in the EC Decision, even though it received a 45% reduction (€140 million or $172 million) for cooperating with the EC, while Defendant NatWest Markets received full immunity for reporting the cartel, thereby avoiding a fine of €260 million ($318.1 million).  ¶305.  To qualify for immunity or leniency, NatWest and UBS admitted their participation in the EGB cartel.  ECF No. 217-1, ¶¶68-70.[11]  While no fines were imposed on Defendant BANA, since the EC found that its conduct fell outside the relevant limitations period, this did not prevent the EC from establishing BANA's infringement of competition law.  ¶305.

On February 14, 2022, Plaintiffs signed a settlement term sheet with JPMorgan.  Upon its execution, JPMorgan began producing cooperation materials to assist Plaintiffs.  To date, JPMorgan has produced over 3,000 chatroom transcripts, in addition to the non-overlapping evidence obtained from State Street and the EC Decision.  The Court preliminarily approved the JPMorgan settlement on May 2, 2022.  ECF No. 258.

On March 14, 2022, the Court decided *EGB III*, granting in part and denying in part Defendants' motion to dismiss the 4AC.  ECF No. 236.  While the Court took judicial notice of the EC Decision, it did not take "notice of those documents" – including chats quoted therein – "for the truth of the matters asserted."  *EGB III*, 2022 WL 768680, at *6.  Rather, the Court credited the EC Decision's naming of certain Defendants – including NatWest Markets, UBS AG, and

---

[11]      *See Notice of immunity from fines and reduction of fines in cartel cases*, 2006 O.J. (C 298) 17, point 8 ("The Commission will grant immunity from any fine which would otherwise have been imposed to an undertaking disclosing its participation in an alleged cartel [. . .]") & points 23-24 ("Undertakings disclosing their participation in an alleged cartel affecting the Community . . . may be eligible to benefit from a reduction of any fine that would otherwise have been imposed.  In order to qualify, an undertaking must provide the Commission with evidence of the alleged infringement [. . .]") (https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52006XC1208(04)&from=EN).

BANA – as circumstantial evidence and a "plus factor" bolstering Plaintiffs' allegations against those Defendants. *Id.* at *21.  Based on this, the Court sustained Plaintiffs' claim against Natixis, NIP, NSI, UCB, CGML, CGMI, JIL, and Jefferies LLC, but dismissed claims against the remaining Defendants, including NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, BANA, and MLI. *Id.* at *25.  Critical to the Court's holding was its determination that, absent direct evidence of conspiracy, Plaintiffs must show "conscious parallelism, circumstantial evidence, and 'plus factors' for each defendant." *Id.* at *20.  While the Court found "strong circumstantial evidence" and plus factors supporting the inference of conspiracy, it held the 4AC did not sufficiently allege that the NatWest and UBS defendants engaged in conscious parallelism. *Id.* at *19, *21-*23.  Furthermore, the Court concluded it lacked personal jurisdiction over NatWest Markets. *Id.* at *11 & n.9.  As for Bank of America, the Court found the 4AC had alleged statistical evidence of parallel pricing as to MLI and circumstantial evidence and plus factors as to BANA, but the 4AC failed to sufficiently demonstrate an agency relationship between these two entities beyond common corporate ownership. *Id.* at *22.

The Court entered a case management plan on July 19, 2022, which provided that Defendants were to produce documents previously produced to the EC by September 16, 2022, and Plaintiffs could move to amend their 4AC by October 17, 2022.  ECF No. 275.  Defendants completed production of EC materials on October 7, 2022.  By uncontested letter-motion, the Court extended the deadline to move to amend the 4AC to November 7, 2022.  ECF No. 298.

## III.   ARGUMENT

### A.   Leave to Amend Shall Be Freely Given

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a pleading should "be freely given when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This is a 'liberal' and

'permissive' standard, and the only 'grounds on which denial of leave to amend has long been held proper' are upon a showing of 'undue delay, bad faith, dilatory motive, [or] futility.'" *Sacerdote v. N.Y.U.*, 9 F.4th 95, 115 (2d Cir. 2021).[12]  The "burden is on the non-moving party to demonstrate the existence of such grounds."  *Nat'l Credit Union Admin. Bd. v. HSBC Bank US, Nat'l Ass'n*, 331 F.R.D. 63, 69 (S.D.N.Y. 2019) (Netburn, Mag.).  *See also Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.").

Here, Plaintiffs submit a timely, good-faith request to amend the 4AC to bolster allegations in support of Plaintiffs' claim against UBS, NatWest, and Bank of America.  The proposed 5AC accomplishes this by incorporating new extensive allegations concerning evidence received from cooperating bank JPMorgan, as well as evidence of conspiracy detailed at length in the EC Decision or produced by current Defendants in this action.  Moreover, the 5AC's agency allegations are sufficient to impute this conduct on each of the renamed Defendants.  The interests of judicial economy also weigh in favor of granting leave to amend because it would be more efficient for these banks to participate in discovery in this action instead of a separate, future action. *See Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 248 F.R.D. 408, 415 (S.D.N.Y. 2008).

By contrast, none of the relevant factors support denying amendment.  Accordingly, under the liberal standards provided by Rule 15, amendment is warranted.

## B.   The Allegations Adequately Tie the UBS and NatWest Defendants to the Already Plausibly Alleged Conspiracy

"Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim[.]"  *Phx. Light SF Ltd. v. HSBC Bank USA, Nat'l Ass'n*, No. 14-

---

[12]     Because this motion is timely under the case management plan (ECF No. 298), the more demanding "good cause" standard provided by Federal Rule of Civil Procedure 16 does not apply.  *Sacerdote*, 9 F.4th at 115.

cv-10101 (LGS) (SN), 2021 WL 568080, at *5 (S.D.N.Y. Feb. 16, 2021) (Netburn, Mag.).

However, a proposed amended complaint is not futile if it can withstand a motion to dismiss.

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  The Court has

already ruled that Plaintiffs plausibly alleged a Sherman Act claim arising from current

Defendants' alleged conspiracy to fix prices in the market for EGBs.  *EGB I*, 2020 WL 4273811,

at *17; *EGB III*, 2022 WL 768680.  Likewise, the Court has held that Plaintiffs have antitrust

standing to assert claims against UBS and NatWest.  *EGB I*, 2020 WL 4273811, at *14; *EGB III*,

2022 WL 768780, at *16.

Although the Court held that Plaintiffs had not alleged sufficient facts to link UBS and

NatWest to the conspiracy, the 5AC includes a substantial number of additional allegations

demonstrating that Plaintiffs have satisfied their pleading burden.  "A §1 complaint must

adequately allege the plausible involvement of each defendant and put defendants on notice of the

claims against them, but it need not be detailed with overt acts by each defendant."  *Hinds Cnty.,*

*Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (Marrero, J.).  Plaintiffs

can allege this in one of at least two ways: (1) "direct evidence that the defendants entered into an

agreement in violation of the antitrust laws"; or (2) "conscious parallelism" accompanied by

"circumstantial evidence and 'plus factors' indicative of conspiracy."  *EGB III*, 2022 WL 768680,

at *18.[13]  Under either standard, the 5AC's allegations, combined with the "strong circumstantial

evidence" and "plus factors" previously identified by the Court, are sufficient.  *Id.* at *19, *21.

---

[13]      Plaintiffs respectfully submit that *EGB III* should not have required proof of conscious parallelism or parallel conduct where other circumstantial evidence and plus factors support the inference of Defendants' involvement in the well-pled conspiracy.  *See Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (noting a horizontal agreement "***may*** be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors."); *see, e.g., Compass, Inc., v. Real Estate Bd. of New York, Inc.*, No. 21-cv-2195 (AJN), 2022 WL 992628, at *9 (S.D.N.Y. Mar. 31, 2022) (Nathan, J.) ("While parallel conduct is a hallmark behavior often used to support the inference of a conspiracy, it is not strictly required[]") (collecting authorities).  Regardless, as demonstrated below, Plaintiffs' proposed supplemental allegations are sufficient even to establish parallel conduct.

### 1.     The 5AC Alleges Direct Evidence of an Antitrust Conspiracy

First, the new allegations in Plaintiffs' 5AC provide direct evidence of UBS's and NatWest's agreement to, and participation in, the alleged conspiracy.  As the Court previously explained, the "canonical example of direct evidence is 'a recorded phone call in which two competitors agreed to fix prices.'"  *EGB III*, 2022 WL 768680, at *18.  In similar cases concerning anticompetitive conduct in financial markets, courts in this Circuit have consistently held that chatroom communications between horizontal competitors evidencing price fixing, coordinated trading, and restriction of supply constitute direct evidence.  *See, e.g.*, *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019) ("Here, we have the rare smoking gun, at least as to the Chatroom Defendants.  The chats unmistakably show traders, acting on behalf of those defendants, agreeing to fix prices at a specific level before bringing the bonds to the secondary market."); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 904 (S.D.N.Y. 2018) ("[I]t is not rational for horizontal competitors to share current pricing information absent the existence of an anticompetitive agreement.").

Even "isolated occurrences of conspiratorial conduct" can "qualify as direct evidence." *GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d at 361.   Thus, even a single incriminating communication can suffice.  *Id.* ("Direct evidence can even be '***a*** recorded phone call in which two competitors agreed to fix prices at a certain level[].'" (emphasis in original)).  But the proposed 5AC now alleges dozens of chats across the Class Period involving traders from both UBS and NatWest that contain "reference, directly or indirectly, to" their unlawful bid-rigging and price-fixing agreement.  *EGB III*, 2022 WL 768680, at *18.  And while the Second Circuit has stated that "[a]ll evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion," *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64

(2d Cir. 2012), the new chats in the 5AC are explicit evidence that UBS and NatWest repeatedly agreed to fix prices and rig bids in the EGB market.

By way of example, below are some chats quoted in Plaintiffs' 5AC demonstrating direct evidence of UBS and NatWest's participation in the alleged EGB conspiracy.

**January 5, 2007**.  Traders from UBS and NatWest, among other banks, created a multi-dealer chatroom known as "Cods & Chips."  ¶318.[14]  From the onset of the Cods & Chips chatroom, traders from NatWest, UBS AG, and another bank, ABN Management Services Limited, began sharing confidential information, such as spreads and "mid-prices" for various EGBs.  ¶364.  On February 28, 2007, these banks created another persistent chatroom, "RBSUBSABN," named for its creators, RBS/NatWest, UBS, and ABN (this chat was later renamed "DBAC"[15]).  ¶318.

**March 6, 2007**.  Traders from UBS, NatWest, and BANA, among other banks, used the RBSUBSABN chatroom to coordinate their overbidding levels in advance of an Austrian auction.  ¶335.  The UBS trader disclosed he was bidding between 14 and 18 cents/basis points over the mid-price.  *Id.*  The other traders disclosed their prices, and the UBS trader explained he "***was just helping ever[y]one***[.]"  *Id.*  The NatWest trader responded with his desired trading volume of 40 million in bonds.  *Id.*  Following the auction, the traders compared results and congratulated one another: "***well done everyone***[.]"  *Id.*

**January 3, 2008**.  Traders from NatWest and UBS agreed to overbid on French bonds at auction, as reflected in the following chat, which is direct evidence of collusion.  ¶338.  After the

---

[14]   "CODS" may mean "Cash on Delivery" or "Close of Day," while "CHIPS" may reference "cheap as chips." *Id.*

[15]   "DBAC" stands for "*Don't Be a C\*\*t,*" a reference to the fact that the traders from these different banks "*try to help each other when we can.*"  ¶¶318, 375.  *See Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 581, 592 (S.D.N.Y. 2015) ("Even the names the FX traders gave their chatrooms – such as 'The Cartel,' 'The Bandits' Club' and 'The Mafia' – support the inference that that the chat rooms were used for anticompetitive purposes.").

UBS trader disclosed his overbidding levels to the NatWest trader, the NatWest trader responded: "***thinking the same***" "***in overbidding***[.]"  *Id.*  Following the auction, the NatWest trader asked: "***everybody ok***" "***?***[,]" to which the UBS trader replied that he had secured his requisite allocation: "***YA***" "***got 50mm***[.]"  *Id.*

      **September 11, 2008**.  Traders from Natixis, NatWest, and UBS – following a successful coordinated effort to overbid for Italian bonds in the primary auction – explicitly agreed to raise prices for Italian bonds in the secondary market by "flattening" the respective yield curve.  ¶320.  Specifically, a NatWest trader asked "***so we going to try and flatten this sh!t now***?" "***think dlads wanted to***[,]" to which the UBS trader responded "***ya***" "***shall we***[.]"  ¶323.  The Natixis trader commented: "***should be like this all the time***."  *Id.*  Accordingly, the UBS trader directed that the traders jointly target those bonds in which other traders had short positions, so that they would "***flatten***" the curve and increase prices: "***wat*** [sic] ***bond everyone short of . . . should bid those***" "***that ll*** [sic] ***get it flatter***."  *Id.*

      **September 12, 2008**.  NatWest and UBS agreed to fix the prices for specific clients in the secondary market.  The NatWest trader agreed to "***show same***" price as the UBS trader to a counterparty.  ¶324.

      **October 15, 2008**.  NatWest, UBS, and Natixis traders colluded to inflate the prices of Spanish bonds on the secondary market.  The NatWest trader directed the group to raise their ask price on Spanish bonds by 25 basis points, "***move them up 25 ticks***[.]"  ¶327.  As the day went on, the NatWest trader urged the UBS and Natixis traders to keep increasing their price, "***poke it***" "***poke it more***[.]"  *Id.*

      **August 13, 2010**.  A UBS trader disclosed that a counterparty was seeking to purchase Dutch bonds from him, and the NatWest trader said he "***just offered 60m dsl28 to same guy***[.]"

¶333.  The UBS trader agreed to inflate the prices for the NatWest trader's sale, "***iam*** [sic] ***bidding it up mate dont*** [sic] ***lose em'***[.]"  *Id.*

      **October 12, 2011**.  NatWest, UBS, Nomura, and UniCredit traders coordinated their overbidding levels for an upcoming auction in the Cods & Chips chatroom.  The Nomura trader asked the group what they were "***overpaying***" and recommended "***plus 25***[.]"  ¶374.  Then, the NatWest and UniCredit traders confirmed that they have aligned their bids to the Nomura trader, to which the Nomura trader wishes "***good luck***[.]"  *Id.*  After the auction, the NatWest, UBS, and UniCredit traders disclose their allocations and the Nomura trader congratulates them, "***well done***[.]"  *Id.*

      **July 20, 2012**.  A UBS trader ▮▮▮▮▮ to JPMorgan and other co-conspirator banks that



▮▮▮▮  ¶281.  The JPMorgan trader ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.*  Immediately, a co-conspirator bank trader ▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.*

      These chats are the proverbial "smoking guns": they demonstrate agreement among competing EGB dealers to rig bids and fix prices to customers.  *See, e.g.*, *GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d at 362 (crediting analogous chatroom transcripts in which traders agree to offer bonds to the market at an agreed price as "blatant price-fixing"); *Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 592 ("specific allegations of chat room participants congratulating each other about the manipulation" constituted direct evidence).

      The chats demonstrate UBS and NatWest were not passive participants in the multi-dealer chatrooms.  As ringleaders, UBS and NatWest invited other banks to participate in the chatrooms that were the focus of the EC Decision, including traders from Defendants Bank of America,

14

Nomura, Natixis, and UniCredit.  *See, e.g.*, ¶¶319, 334-335.  The EC Decision explained: "Access to the chatrooms was based on an expectation that the participants would disclose commercially sensitive information with other competitors within a trusted group of traders."  ¶308.  Indeed, chat evidence indicates the traders expected each other to regularly contribute valuable information and to conceal their actions from outsiders.  ¶¶375-378.  Through "this network of collusive contacts and consistent exchanges of information within a circle of trust, the banks involved informed each other of their positions, prices and strategies and this allowed them to identify, align and coordinate their bidding and trading conduct on the primary and/or secondary markets at times to coordinate prices and/or volumes of [EGBs] issued and traded."  ¶307.  Thus, the EC concluded that "the participating banks coordinated their conduct in [EGBs] and directly or indirectly fixed purchase or selling prices, altered the normal trading conditions of the market and shared the market," which included both the "primary market" and the "secondary market."  ¶309.

Traders from UBS and NatWest furthered the conspiracy in other interbank chats – such as those with JPMorgan – whose participants joined the conspiracy and furthered its objectives to manipulate prices of EGBs in the primary and secondary markets.  For example, on September 4, 2008, NatWest and JPMorgan traders ███████████████████████████████████████ ██████████████████████████████.  ¶276.  ███████████████   NatWest's  ███████████ ████████████  with Natixis and UBS, the JPMorgan trader asked that NatWest ████████████ █████████████████████████████████████████████████████████████████ ██████████████████████████████████████  *Id.*; *see, e.g.*, *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *24 (S.D.N.Y. Feb. 21, 2017) (conspiring Barclays trader's statement that "rbs and ubs are going to do everything to put it [Euribor] to the sk[y]" was sufficient evidence to state antitrust claim against UBS) (second brackets in original).



Likewise, the UBS trader ▓▓▓ to JPMorgan ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ¶¶256-57.  The ▓▓▓ enabled UBS, JPMorgan, and other co-conspirator banks ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ¶256.

Chat members also repeatedly admitted that this conduct amounted to illicit collusion.  On February 7, 2008, one of the banks participating in the chats, ABN-AMRO, reported that the Dutch Debt Management Office accused it of colluding with NatWest in a primary auction for Dutch bonds.  ¶340.  The ABN-AMRO trader told the NatWest trader he "*denied, with a laugh*" to the Dutch DMO, but admitted privately "*we usually do*" collude.  *Id.*  Similarly, when the same trader moved from ABN Management Services Limited to Defendant Natixis in February 2008, he offered to "*lend a hand too*" to UBS's plan to "*destroy*" the February 18th Italian auction.  ¶341.  The UBS trader welcomed the offer: "*excellent, normal service resumed*[,]" meaning the trader would resume manipulating prices for the UBS trader while at his new bank, Natixis.  *Id.* Statements such as these are direct evidence of an agreement.  *See Iowa Pub. Emps' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 318 (S.D.N.Y. 2018).

These examples provided above are just a few of the numerous newly revealed transcripts of chatroom discussions that directly evidence the conspiracy in the primary and secondary EGB markets pleaded in the 5AC.  For convenience, Plaintiffs submit a chart summarizing the dates, banks, bonds, and anticompetitive conduct involved in these additional instances of anticompetitive conduct.  *See* Anderson Decl., ¶2, Exhibit 3.

### 2.  Alternatively, the 5AC Alleges Conscious Parallelism

Even if these communications were not direct evidence, they constitute, at minimum, evidence of conscious parallelism, which – combined with the "strong circumstantial evidence" and plus factors previously identified by the Court (*EGB III*, 2022 WL 768680, at *19, *21) – provides an alternative means to plausibly infer UBS and NatWest's involvement in the conspiracy. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("Even if these conversations themselves did not set spreads or fixes, the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage."). In the Second Circuit, a plaintiff may plead conscious parallelism through a "chronology of 'behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *In re Credit Default Swaps Antitrust Litig.*, No. No. 13-md-2476 (DLC), 2014 WL 4379112, at *10 (S.D.N.Y. Sept. 4, 2014) (quoting *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 322 (2d Cir.2010)).[16] The "law does not require that all conspirators have the same level of involvement in a conspiracy, nor that they be involved at precisely the same time or for the same duration." *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 452 (S.D.N.Y. 2015); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 170-71 (S.D.N.Y. 2018) ("it is not necessary for defendants' interests to be aligned at all times to share a common motive."). Similarly,

---

[16]  Economic evidence of parallel conduct – such as statistical analysis of parallel pricing – is not required. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (Posner, J.). In *Gelboim*, for example, the Second Circuit concluded that plaintiffs' "numerous allegations" of "pack" behavior in setting LIBOR submissions "clear the bar of plausibility" independent of "economic evidence" offered in plaintiffs' pleadings demonstrating defendant UBS's "ability to consistently target the actual published LIBOR rates despite a volatile market." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781-82 & n.20 (2d Cir. 2016) ("Close cases abound on this issue, but this is not one of them."). *See also See Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 626 (E.D. Mich. 2012) ("Nonetheless, this Court is aware of no case law – nor have Defendants identified any – that mandates that a plaintiff's portfolio of circumstantial evidence in a §1 case must include proof of parallel conduct.").

"[u]nanimity of action[] is not required." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017).[17]  Indeed, "[c]onspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping.  And at the pleading stage, before discovery, the failure to allege that a given defendant engaged in a given practice may simply reflect that plaintiffs' information is as-yet incomplete." *Id.*  Even "the presence of some divergent conduct does not negate the allegations of other, parallel conduct." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 320.

Here, the chronology provided in Plaintiffs' 5AC demonstrates, at minimum, that UBS, NatWest, and their co-conspirators acted "similarly," which suffices to establish parallel conduct. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 460 n.26 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018).  The 5AC contains numerous examples of UBS and NatWest aligning their bidding in the primary market and their pricing in the secondary market with each other, as well as other members of the cartel.  *See* Anderson Decl., ¶2, Exhibit 3.  For example, UBS and NatWest agreed to "***show same***" price for the same EGB to the same customer. ¶324.  Moreover, UBS and NatWest paralleled (if not instigated) efforts to conceal the cartel from regulators and the public, such as using mutually understood coded language to discuss the pricing of EGB syndication ahead of published pricing announcements.  ¶¶317, 340, 375-378.

This symmetry cannot be dismissed as simply the result of market conditions, coincidence, or independent stimuli.  Indeed, in one example from September 28, 2011, UniCredit disclosed to

---

[17]     *Accord In re Salmon*, No. 19-21551-CIV, 2021 WL 1109128, at *13 n.23 (S.D. Fla. Mar. 23, 2021) ("Plaintiffs are not required to plead parallel conduct that is simultaneous or identical."); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) (concluding that a rule that conspirators must "move in relative lockstep" would reward defendants that "employed different courses of action" so that "their conspiracy might better avoid detection"); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623 (E.D. Pa. 2010) ("Plaintiffs are not required to plead simultaneous price increases – or that the price increases were identical – in order to demonstrate parallel conduct.").

NatWest, UBS, and Nomura its secondary market pricing for German bonds. ¶334. Unhappy with UniCredit's lower pricing, a UBS trader asks, "*w* [sic] *should go higher*" "*no?*[,]" to which the UniCredit trader agrees. *Id.* In other words, the UBS trader convinced UniCredit to price higher than what it would in a more competitive market so that it would align with other cartel members. This is classic price-fixing behavior.

### C. The Alleged Conduct Is Attributable to NatWest Markets, NMSI, UBS AG, UBS Europe, UBS Securities, MLI, and BANA

The NatWest, UBS, and Bank of America Defendants are liable for the conduct of their traders through traditional agency principles. As with other defendant banking families (such as Nomura or Jefferies), Plaintiffs have alleged agency relationships between (1) NatWest Markets and NMSI; (2) UBS AG, UBS Europe, and UBS Securities; and (3) MLI and BANA. *EGB III*, 2022 WL 768680, at *23, *24. Because these agency allegations suggest that the "affiliates work together in the primary and secondary EGB markets," the Court may infer the affiliates were "similarly involved in the alleged wrongdoing." *Id.*

Specifically, NMSI is the U.S. Dealer Affiliate of NatWest Markets, the AFME Primary Dealer Member[18] for the NatWest bank family. ¶33. NatWest organizes it operations into three global trading "hubs," one of which was located in New York, and later in Connecticut. ¶¶51, 63-65. NatWest affiliates operate by integrated "business lines"; that is, its fixed income sales and trading operations, which include EGB trading, involve staff employed by both NatWest Markets and NMSI. ¶¶52, 145. NatWest Markets employed EGB traders – including those referenced in the EC Decision (ECF No. 217-1, ¶60) and the 5AC (¶154) – that acquired EGBs, distributed them to the United States, and determined prices for EGBs for U.S.-based customers. ¶53. NMSI

---

[18]     Designation as an "AFME Primary Dealer Member" is reserved for only the largest EGB primary dealers by their premier trade association, the Association for Financial Markets in Europe. ¶24.

employees managed customer relationships and arranged for EGB trades with NatWest Markets. ¶55.

Similarly, UBS Securities is the U.S. Dealer Affiliate of UBS Europe, the AFME Primary Dealer Member and wholly-owned subsidiary of UBS AG.  ¶¶33, 154.[19]  UBS AG and UBS Europe (or its predecessors) employed the traders referenced in the EC Decision (ECF No. 217-2, ¶62) and the 5AC (¶156) and traders who marketed EGBs to U.S. investors during the Class Period. ¶83.  EGBs were priced and sourced by UBS Europe (or its predecessors).  ¶¶83, 88.  While UBS AG and UBS Europe both sold directly into the United States, UBS Securities serves as a U.S.-based agent for UBS AG and UBS Europe for EGB transactions.  ¶¶84, 87, 157.  UBS AG oversees UBS Securities' operations, including staffing.  ¶85.  And UBS AG reports total revenue, including revenue stemming from UBS Securities' EGB trading, "as a single economic entity."  ¶86.

Finally, as the 5AC now makes clear, following the 2008 merger between Bank of America Corporation and Merrill Lynch & Co., MLI, the AFME Primary Dealer Member, operates as a division of BANA despite their status as separate legal entities.  ¶¶33, 128-133.  BANA, whose London Branch occupies the same office as MLI's headquarters, exercises significant control over MLI's personnel operating the EGB trading desk.  ¶¶136-139.  The merged bank's EGB trading desk continued operating under MLI's name.  ¶130.  In other words, the desk that widened EGB bid-ask spreads during the conspiracy along with other co-conspirators and then narrowed those spreads when the conspiracy "broke" (*i.e.*, the parallel conduct) is the same desk whose conduct is described in the EC Decision and against which the Court had found the 4AC had pleaded circumstantial evidence and plus factors.  *EGB III*, 2022 WL 768680, at *22.  This is confirmed

---

[19]      UBS Europe is the successor company of UBS Deutschland AG and UBS Limited, which both served as primary EGB dealers during the Class Period.  ¶154.

by the EC Decision, which concluded BANA's "EGB trading was primarily conducted within the EGB desk of Merrill Lynch International, a subsidiary of the merged bank." ¶379. BANA and MLI carried on EGB business together as part of Bank of America's Global Banking and Markets business segment, and both transacted EGBs directly with Plaintiffs. ¶380.

### D.    The Allegations Adequately Establish Personal Jurisdiction over NatWest Markets

In *EGB III*, the Court held that it could not exercise personal jurisdiction over NatWest Markets based on Plaintiffs' 3AC allegations. 2022 WL 768680, at *10-*11. Although the Court recognized that Plaintiffs provided a statutory basis for jurisdiction under the Clayton Act, it nonetheless found that such exercise of jurisdiction would not comport with constitutional due process. *Id.* at *10. Specifically, Plaintiffs' allegations were not sufficient to connect the subject matter of Plaintiffs' claims – NatWest Markets' trading of EGBs – to New York. *Id.* at *11. Rather, the Court found that NatWest Market's U.S.-based EGB business during the Class Period was in Stamford, Connecticut. *Id.*

New allegations in the 5AC demonstrate that New York was the locus of NatWest Market's U.S.-based EGB activities during portions of the Class Period. As Plaintiffs' allegations now make clear, the government bonds trading operation of NatWest Markets' U.S. agent, Defendant NMSI, was headquartered in New York City until its move to Stamford in 2009. ¶¶63-65. This places NatWest Markets' suit-related conduct in this forum during the Class Period and, therefore, suffices to establish personal jurisdiction over NatWest Markets for its conduct throughout the entire Class Period. *See C.F.T.C. v. TFS-ICAP, LLC*., 415 F. Supp. 3d 371, 383 (S.D.N.Y. 2019) (Marrero, J.) ("[T]here is no set time period for which [defendant's] contacts with the forum can be used to support the Court's exercise of personal jurisdiction over [it].").

Moreover, the Court now can and should consider NatWest's contacts with Stamford, Connecticut, in the due process inquiry because Plaintiffs have adequately alleged a statutory basis for personal jurisdiction under the Clayton Act (*EGB III*, 2022 WL 768680, at *10), a federal statute that provides for nationwide service of process. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005). As this Court has held, "[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *TFS-ICAP*, 415 F. Supp. 3d at 381 (quotes omitted). Under the nationwide contacts test, NatWest's EGB marketing, trading, and sales out of its Stamford, Connecticut, trading hub (*see* ¶¶51, 54-56, 64-65) are properly considered in the due process analysis. *See id.* The Court has already held that exercising personal jurisdiction based on such EGB trading activities comports with due process. *See EGB I*, 2020 WL 4273811, at *6.

The Court may also exercise personal jurisdiction over NatWest Markets under a conspiracy theory of personal jurisdiction. "To assert a conspiracy theory of personal jurisdiction, a plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021). The Court previously held that it could not exercise conspiracy jurisdiction over NatWest Markets because Plaintiffs failed to adequately allege NatWest Markets' involvement in the conspiracy. *EGB I*, 2020 WL 4273811, at *8 n.5; *EGB III*, 2022 WL 768680, at *23. But as explained above, Plaintiffs added new allegations demonstrating NatWest Markets' participation in the conspiracy,

satisfying the first and second prongs of the *Schwab* test.  In support of the third prong, the 5AC alleges that NatWest Markets' co-conspirators undertook multiple overt acts in the forum, including Natixis's efforts to boost its New York fixed income sales team during the conspiracy (¶43), Citigroup's New York personnel's pricing of EGBs (¶107), and all Defendants' United States sales of price-fixed EGBs, each of which was undertaken in furtherance of Defendants' collusive objective.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940) ("[T]he conspiracy contemplated and embraced, at least by clear implication, sales to jobbers and consumers in the Mid-Western area at the enhanced prices.  The making of those sales supplied part of the 'continuous cooperation' necessary to keep the conspiracy alive.").

### E.  Plaintiffs Have Satisfied the Standard for Amending Their Complaint

#### 1.  The Proposed Amendment Will Not Unduly Prejudice Any Party

In determining what constitutes prejudice, the Second Circuit considers whether the proposed amendment would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bring a timely action in another jurisdiction."[20]  *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570-GBDSN, 2021 WL 640257, at *12 (S.D.N.Y. Jan. 22, 2021) (Netburn, Mag.); *see also N.H. Ins. Co. v. Total Tool Supply, Inc.*, 621 F. Supp. 2d 121, 123 (S.D.N.Y. 2009) ("'Prejudice may be found, for example, when the amendment is sought after discovery has been closed. . . .  Undue delay [and] bad faith . . . are other reasons for denying a motion to amend.'"); *Bridgeport Music, Inc.*, 248 F.R.D. at 415 ("Moreover, federal courts have consistently granted motions to amend where, as here, 'it appears that new facts and allegations

---

[20]    The third prong of this test is not applicable here, as Plaintiffs are the parties seeking to amend.

were developed during discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings.'").

For the reasons discussed below, no party will be unduly prejudiced by filing the 5AC.

### a.  The 5AC Will Not Require the Parties to Expend Significant Additional Resources

Permitting Plaintiffs leave to amend will not substantially change the discovery landscape in this action.  Discovery is still in its initial stages.  The Court has only recently so-ordered the parties' negotiated ESI protocol and protective order.  ECF Nos. 291-92.  Initial document requests were served on August 19, 2022.  ECF No. 275, ¶6(a).  As a result, the parties are well positioned to integrate the UBS and NatWest Defendants into the proceedings.  That there may be some additional discovery from these entities does not constitute undue prejudice.  *See Bridgeport Music, Inc.*, 248 F.R.D. at 414 ("[e]ven assuming that additional discovery would impose costs on [defendant] and the current defendants, '[a]llegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice.'"); *United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989) ("the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading").  Indeed, given the centrality of UBS and NatWest in the misconduct described by the EC Decision, it is highly likely they would be subject to significant third-party discovery even if they were not named defendants in this case.

### b.  The 5AC Will Not Significantly Delay the Resolution of the Dispute

Similar to the above argument, the 5AC will also not cause a significant delay in the resolution of this action.  The 5AC adds no new plaintiffs or claims.  The defendants Plaintiffs seek to rename have already been served, and the Court has already adjudicated numerous issues

regarding the sufficiency of Plaintiffs' standing to bring claims against UBS, NatWest, and Bank of America in this forum.  While the current parties have exchanged some document discovery, substantial completion in response to the parties' initial document requests is not due until March 24, 2023.  ECF No. 275, ¶6(d)(v).  No depositions have been taken (or even noticed), and fact discovery is not scheduled to close until September 4, 2023.  *Id.*, ¶5(b).

While the addition of the UBS, NatWest, and Bank of America may add to the discovery to be completed, any delay caused by that, when compared to the size and posture of the litigation, does not rise to the level courts have found merits denial of a motion to amend.  *See, e.g.*, *In re Refco Sec. Litig.*, No. 07 MDL 1902 JSR, 2013 WL 2035377, at *2 (S.D.N.Y. May 9, 2013) (permitting amendment after close of fact discovery).

### 2.     Plaintiffs Have Not Unduly Delayed Amendment

Plaintiffs have not unduly delayed in seeking leave to amend.  As noted above, the operative case management plan calls for motions to amend the pleadings to be submitted by November 7, 2022, one month after the current Defendants substantially produced to Plaintiffs the documents underlying the EC Decision.  ECF No. 275.  Since this motion comports with the case management plan, there has been no undue delay.  *See, e.g.*, *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 97 (S.D.N.Y. 2010).

## IV.   CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motion to amend the 4AC.

Dated: November 7, 2022

**DICELLO LEVITT LLC**

 *s/* Gregory S. Asciolla
Gregory S. Asciolla
Matthew J. Perez
Veronica Bosco
485 Lexington Avenue,
Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
mperez@dicellolevitt.com
vbosco@dicellolevitt.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**

 *s/* Kristen M. Anderson
Kristen M. Anderson
Donald A. Broggi
Joseph P. Guglielmo
Michelle E. Conston
Patrick J. Rodriguez
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
kanderson@scott-scott.com
dbroggi@scott-scott.com
jguglielmo@scott-scott.com
mconston@scott-scott.com
prodriguez@scott-scott.com

Daniel Brockwell
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
dbrockwell@scott-scott.com

David R. Scott
Amanda F. Lawrence
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

**LOWEY
DANNENBERG, P.C.**

 *s/* Vincent Briganti
Vincent Briganti
Roland R. St. Louis, III
Jennifer Tembeck
44 South Broadway,
Suite 1100
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile:  914-997-0035
vbriganti@lowey.com
rstlouis@lowey.com
jtembeck@lowey.com

Charles Kopel
One Tower Bridge
100 Front Street
Suite 520
West Conshohocken, PA
19428
Telephone: 215-399-4770
Facsimile:  610-862-9777
ckopel@lowey.com

**BERMAN TABACCO**

 *s/* Joseph J. Tabacco, Jr.
Joseph J. Tabacco, Jr.
Todd A. Seaver
Carl N. Hammarskjold
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: 415-433-3200
Facsimile:  415-433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com

*Interim Co-Lead Counsel for the Class*