**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE EUROPEAN GOVERNMENT BONDS ANTITRUST LITIGATION** | Lead Case No. 19-cv-2601<br><br>Hon. Victor Marrero |

**MEMORANDUM OF LAW**
**IN SUPPORT OF CO-LEAD COUNSEL'S MOTION FOR AWARD OF**
**ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE ........ 4

A. Application of the *Goldberger* Factors Support Awarding 30% of the Settlement Fund as Attorneys' Fees ........ 5

1. Co-Lead Counsel Invested Substantial Time, Labor, and Resources in Prosecuting This Action ........ 5

2. The Magnitude and Complexity of the Action Favors the Fee Request ........ 9

3. The Fee Request is Warranted Based on the Level of Risk Undertaken by Co-Lead Counsel in this Action ........ 11

4. Co-Lead Counsel Provided High-Quality Representation of Class Representatives and the Settlement Class ........ 13

5. The 30% Fee Request is Reasonable in Relation to the Settlement ........ 14

6. Public Policy Supports Approval of the Fee Request ........ 16

B. The Lodestar Cross-Check Confirms the Reasonableness of the Fee Request ........ 17

III. THE REQUEST FOR PAYMENT OF LITIGATION EXPENSES IS REASONABLE AND SHOULD BE GRANTED ........ 21

IV. SERVICE AWARDS FOR THE CONTRIBUTIONS OF NAMED PLAINTIFFS ARE APPROPRIATE ........ 22

V. CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015)....23

*In re Arakis Energy Corp. Sec. Litig.*,
2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001)....21

*In re Auto. Parts Antitrust Litig.*,
2017 WL 7108072 (E.D. Mich. 2018)....18, 19

*Binotti v. Duke University*,
2021 WL 5366877 (M.D.N.C. 2021)....18

*Blum v. Stenson*,
465 U.S. 886 (1984)....17

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)....4

*In re Broiler Chicken Antitrust Litig.*,
2021 WL 5709250 (N.D. Ill. Dec. 1, 2021)....15

*In re Capacitors Antitrust Litig.*,
2020 WL 6544472 (N.D. Cal. Nov. 7, 2020)....15

*In re Citigroup Inc. Bond Litig.*,
988 F. Supp. 2d 371 (S.D.N.Y. 2013)....10

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014)....12

*In re Colgate-Palmolive Co. ERISA Litig.*,
36 F. Supp. 3d 344 (S.D.N.Y. 2014)....16, 17, 22

*In re Credit Default Swaps Antitrust Litig.*,
2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)....16, 20

*In re CRT Antitrust Litig. (CRT I)*,
2016 WL 183285 (N.D. Cal. Jan. 14, 2016)....16

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009)....11

*In re Domestic Drywall Antitrust Litig.*,
2018 WL 3439454 (E.D.Pa. July 17, 2018),....................15, 23

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) ....................4, 20

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ....................19, 20

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ....................4

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2nd Cir. 2000).................... *passim*

*Grice v. Pepsi Beverages Co.*,
363 F. Supp. 3d 401 (S.D.N.Y. 2019)....................4, 18

*Guevoura Fund Ltd. v. Sillerman*,
2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ....................21

*In re High-Tech Employee. Antitrust Litig.*,
2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ....................21

*Laydon v. Mizuho Bank, Ltd.*,
No. 12-cv-3419 (S.D.N.Y. Nov. 10, 2016)....................22

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998)....................17

*In re LIBOR-Based Fin. Antitrust Litig.*,
2018 WL 3863445 (S.D.N.Y. Aug. 14, 2018)....................18

*In re Lithium Ion Batteries Antitrust Litig.*,
2018 WL 3064391 (N.D. Cal. May 16, 2018), ....................16

*Maley v. Del Global Tech. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................10, 20, 21

*Meredith Corp. v. SESAC, LLC*,
87 F. Supp. 3d 650 (S.D.N.Y. 2015)....................10, 21

*In re Merrill Lynch Tyco Rsch. Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ....................14

*Mills v. Electric Auto-Lite Co.*,
396 U.S. 375 (1970)....................21

*Missouri v. Jenkins*,
491 U.S. 274 (1989)....................17

*In re Municipal Derivatives Antitrust Litig. (Muni Derivatives IV)*,
No. 08-cv-2516 (S.D.N.Y. July 8, 2016),....................16

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998)....................9, 11, 18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014)....................12

*Pillsbury Co. v. Conboy*,
459 U.S. 248 (1983)....................16

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
2015 WL 6964973 (E.D.N.Y. Nov. 10, 2015)....................18

*Sanz v. Johny Utah 51 LLC*,
2015 WL 1808935 (S.D.N.Y. Apr. 20, 2015)....................22

*Spann v. AOL Time Warner Inc.*,
2005 WL 1330937 (S.D.N.Y. June 7, 2005)....................22

*Steamship Trade Ass'n of Baltimore-Int'l Longshoremen's Ass'n Pension Fund v. Olo Inc.*,
No. 1:22-cv-8228-JRS (S.D.N.Y. 2022)....................22

*In re Steel Antitrust Litig. (Steel I)*,
No. 08-cv-5214 (N.D. Ill. Oct. 22, 2014),....................15

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011)....................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)....................21

*In re Urethane Antitrust Litig. (Urethane III)*,
2016 WL 4060156 (D. Kan. July 29, 2016),....................19

*In re Vitamin C Antitrust Litig.*,
2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012)....................4, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)....................4

*In re WorldCom, Inc. Secs. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)....................12

*Wright v. Stern*,
553 F. Supp. 2d 337 (S.D.N.Y. 20085)....................23

*Yang v. Focus Media Holding Ltd.*,
2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)....................22

**Statutes**

Sherman Act §1, 15 U.S.C. §1....................7, 9, 16

**Other Authorities**

Fed. R. Civ. P. 12(b)....................7, 8, 9

Fed. R. Civ. P. 23(f)....................15

Fed. R. Civ. P. 23(h)....................22

Davis, Josh Paul and Kohles, Rose, 2021 Antitrust Annual Report: Class Action Filings in Federal Court (May 23, 2022)....................15

Gianluca Semeraro & Silvia Aloisi, *Italy's UniCredit says it is among banks accused of running bond cartel*, REUTERS (Apr. 11, 2019)....................6

Joshua P. Davis, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE U. L. REV. 1269, 1293-95 (2013)....................15

Manual For Complex Litigation (Fourth) (2004)....................4

Newberg on Class Actions (5th ed. 2018)....................23

*Showdown With EU Over Bond Cartel, MLex Reports*, BLOOMBERG (Oct. 25, 2019), https://www.bloombergquint.com/onweb/banks-in-eu-showdown-over-government-bond-cartel-mlex-reports....................7

Theodore Eisenberg et. al., Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. Rev. 937, 952, tlb.4 (2017)....................15

Co-Lead Counsel[1] for Plaintiffs Ohio Carpenters' Pension Fund ("Ohio Carpenters"), Electrical Workers Pension Fund Local 103 I.B.E.W. ("IBEW 103"), and San Bernardino County Employees' Retirement Association ("SBCERA") (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion for Award of Attorneys' Fees, Litigation Expenses, and Service Awards (the "Motion").

## I. INTRODUCTION

After more than five years litigating this complex antitrust class action, Plaintiffs reached a global settlement (the "Settlement") with the twelve remaining Settling Defendants, which together with the prior settlements, would fully resolve the Action if it is approved. Settling Defendants have paid a total of $80 million into the Settlement Fund, which is earning interest in the Escrow Account. This brings the total settlement recovery in the Action to $120 million.[2]

This excellent result reflects the skill, expertise, and hard work of Co-Lead Counsel, and the benefit to the Settlement Class is substantial and concrete, compared to the significant risks of

---

[1] "Co-Lead Counsel" are Scott+Scott Attorneys at Law LLP, DiCello Levitt LLP, Lowey Dannenberg, P.C., and Berman Tabacco. Labaton Sucharow LLP was originally appointed by the Court as co-lead counsel and later substituted for DiCello Levitt. ECF No. 235. Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement with Bank of America, N.A., Merrill Lynch International, NatWest Markets Plc, NatWest Markets Securities Inc., Nomura International plc, UBS AG, UBS Europe SE, UBS Securities LLC, Citigroup Global Markets Inc., Citigroup Global Markets Limited, Jeffries International Limited, and Jeffries LLC ("Settling Defendants"). ECF No. 503-1 ("Stipulation"). Citations to the "Joint Declaration" or "Joint Decl." are to Joint Declaration of Patrick Coughlin, Vincent Briganti, Gregory S. Asciolla, and Todd A. Seaver in Support of Motion for Final Approval of Settlement with Defendants and in Support of Motion for an Award of Attorneys' Fees, Litigation Expenses, and Service Awards ("Joint Declaration" or "Joint Decl."), filed herewith.

[2] The Court previously approved settlements totaling $40 million with the following entities: State Street Corporation and State Street Bank and Trust Company; JPMorgan Chase Bank, N.A., J.P. Morgan Securities PLC (f/k/a J.P. Morgan Securities Ltd.), J.P. Morgan Securities LLC (f/k/a J.P. Morgan Securities Inc.); UniCredit Bank AG; and Natixis S.A., to which the Court granted final approval.

continued litigation. Consistent with fees and expenses awarded in this District and elsewhere, Co-Lead Counsel respectfully requests that the Court award attorneys' fees of 30% of the Settlement Fund ($24 million), payment of litigation expenses of $569,350.84 from the Settlement Fund, plus interest on the awards at the same rate as earned by the Settlement Fund. This request is also consistent with the Court's Order Awarding Interim Attorneys' Fees and Payment of Litigation Expenses in connection with the prior round of settlements, where the Court awarded Co-Lead Counsel 30% of the Settlement Fund ($12 million). ECF No. 487, ¶2.

When, as here, there are successive rounds of settlement and multiple fee awards in a single case, to the extent a lodestar cross check on the reasonableness of the fee percentage is performed, courts appropriately examine the cumulative lodestar from case inception against the cumulative settlement recoveries. The prior fee award was based on work performed by Co-Lead Counsel from the inception of the Action through May 16, 2023 (when the Court preliminarily approved the Natixis and UniCredit settlements). Accordingly, Co-Lead Counsel present both their lodestar from May 17, 2023 through July 18, 2024 (the date the Parties signed the Stipulation with Settling Defendants), as well as their cumulative lodestar from inception of the Action through July 18, 2024.

Cumulatively, from inception of the Action through July 18, 2024, Co-Lead Counsel invested 19,924.60 hours in litigating the Action, valued at $16,232,698.00 in lodestar. Of this cumulative lodestar, $3,985,394.50 was incurred since May 17, 2023 (based on 4,875.8 hours). After the prior round of settlements and first fee award were approved, Co-Lead Counsel continued to heavily invest in the Action without any guarantee that Co-Lead Counsel would receive additional compensation for time or expenses they continued to incur as discovery proceeded apace and the Parties prepared for class certification and summary judgment proceedings. Co-Lead

Counsel continued to assume significant litigation risks, including that the Court could deny Plaintiffs' anticipated motion to certify the Class and grant any *Daubert* motions and/or motions for summary judgment filed by Defendants. Joint Decl., ¶86.

As explained below, based on Co-Lead Counsel's overall investment of time and resources, the complexity of the litigation, the risks Co-Lead Counsel assumed, and the quality of the representation, the requested 30% fee award is fair and reasonable. The fee request is reasonable when compared to the prior fee award in this Action and awards granted in similarly complex antitrust litigation in this District. To the extent the Court performs a lodestar cross-check, the lodestar cross-check further confirms that the fee request is reasonable. Based on a total fee award in this litigation of $36 million ($12 million previously awarded and $24 million requested) and a cumulative lodestar of $16,232,698.00, the lodestar cross check results in a 2.2 multiplier, which is consistent with (if not lower than) fee awards in other cases of similar complexity and magnitude.

In addition, Co-Lead Counsel request payment of unreimbursed litigation expenses, as set forth in the declarations from each of the Co-Lead Counsel firms.[3] These litigation expenses are of the type that attorneys normally bill to paying clients, were reasonably incurred to advance the Action, and should be reimbursed.

Finally, Co-Lead Counsel seek service awards for the three named plaintiffs in the total amount of $150,000 to compensate them for the significant time they devoted to this case and in recognition of the results they were crucial to obtaining.

[3] In addition to the Joint Declaration describing the efforts of Co-Lead Counsel in prosecuting the case over the course of the Action, each Co-Lead Counsel firm has submitted a declaration that details each firm's respective hours, billing rates, and litigation expenses. *See* Exhibits A through D to the Joint Declaration, filed herewith.

## II. THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE

In common fund cases, attorneys that secure a recovery for the class are "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 406 (S.D.N.Y. 2019); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011). This principle applies to class action settlements. *See In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC)(JO), 2012 WL 5289514, at *9 (E.D.N.Y. Oct. 23, 2012) ("Where a class action settlement creates a common fund the plaintiffs' attorneys 'are entitled to a reasonable fee—set by the court—to be taken from the fund.'") (internal citations omitted).

Courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method," although "[t]he trend in this Circuit is toward the percentage method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). The percentage method is preferred as it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Grice*, 363 F. Supp. 3d at 406 (quoting *Wal-Mart Stores*, 396 F.3d at 121); MANUAL FOR COMPLEX LITIGATION (FOURTH) §14.121 (2004) ("Indeed, one purpose of the percentage method is to encourage early settlements by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.").

Courts evaluating whether a fee is "reasonable" must consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (internal citation omitted); *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723 (2d Cir. 2023) (citing the *Goldberger* factors).

Co-Lead Counsel seek a fee award of 30% of the $80 million Settlement Fund ($24 million) and payment of litigation expenses totaling $569,350.84. The application of the *Goldberger* factors confirms the reasonableness of this request. To the extent the Court performs a lodestar cross-check, the requested fee represents a reasonable 2.2 cumulative multiplier taking into account the total fee award and the cumulative lodestar from the inception of the Action. Notably, Co-Lead Counsel will continue to devote significant attorney time to the case in the near term and even after the Settlement is approved, including by submitting reply briefs in support of the pending motions, appearing at the final Settlement Hearing, supervising notice and claims administration, monitoring the investment of the Settlement Fund, communicating with claimants, and moving for and overseeing the distribution of settlement proceeds to Settlement Class Members.

### A. Application of the *Goldberger* Factors Support Awarding 30% of the Settlement Fund as Attorneys' Fees.

#### 1. Co-Lead Counsel Invested Substantial Time, Labor, and Resources in Prosecuting This Action.

Co-Lead Counsel devoted over 19,924.60 hours of attorney and other legal professional time to prosecute this Action from inception of the case through July 18, 2024, the date on which the Parties signed the Stipulation with Settling Defendants; 4,875.8 hours have been incurred since preliminary approval of the UniCredit and Natixis settlements on May 16, 2023. *See* Joint Decl., ¶¶89.

Co-Lead Counsel provided a detailed description of their efforts from the case's inception through May 17, 2023 in their briefing and declarations in support of their prior fee application. ECF No. 422, at 12-19; ECF Nos. 423 (joint declaration), 423-1 through 423-5 (individual firm declarations). To summarize briefly, Co-Lead Counsel:

- Investigated and initiated this case in March 2019 by preparing initial and consolidated class action complaints, triggered by an announcement from the European Commission that it issued a Statement of Objections to eight unnamed banks. Joint Decl., ¶¶4-7.
- Opposed repeated attempts by Defendants to dismiss the case (including motions for reconsideration), culminating in the Third Amended Complaint, filed on December 3, 2019, which the Court concluded on July 23, 2020 stated a plausible antitrust conspiracy among Natixis, Nomura International plc, and Nomura Securities International Inc. (together, "Nomura"). *Id.*, ¶¶10-16, 19.
- Negotiated and finalized a settlement with State Street, which resulted in significant and immediate cooperation incorporated into Plaintiffs' Fourth Amended Complaint ("FAC"), filed on February 21, 2021. *Id.*, ¶¶18, 20-21.
- Opposed attempts by Defendants to dismiss the FAC (including another round of motions for reconsideration), which the Court held on March 14, 2022 stated an antitrust claim against Natixis, Nomura International plc, Nomura Securities International Inc., UniCredit, Citigroup Global Markets Limited and Citigroup Global Markets Inc. (together "Citigroup"), and Jefferies International Limited and Jefferies LLC (together "Jefferies"). *Id.*, ¶¶22, 28-29. 31.
- Negotiated and finalized a settlement with JPMorgan for $13 million and cooperation, moved for preliminary approval of the JPMorgan and State Street settlements, and achieved efficiencies by consolidating notice into a single program. *Id.*, ¶¶25, 30, 40, 80.
- Moved on November 7, 2022 for leave to file a Fifth Amended Complaint ("5AC"), which sought to rename previously dismissed Defendants Bank of America, UBS, and NatWest, relying chiefly on cooperation obtained from JPMorgan, evidence described in the European

Commission's decision on its investigation into the European Government Bond market, and evidence obtained by Plaintiffs in the normal course of discovery. *Id.*, ¶¶38.

- Negotiated and finalized settlements with UniCredit and Natixis, resulting in an additional $27 million in monetary recovery and cooperation for use in this case and the related case *Ohio Carpenters' Pension Fund v. Deutsche Bank AG*, No. 22-cv-10462 (S.D.N.Y.) ("*EGB II*"), against Coöperatieve Rabobank U.A. and Rabo Securities USA, Inc. (together, "Rabobank") and Deutsche Bank AG and Deutsche Bank Securities Inc. (together "Deutsche Bank")[4]. *Id.*, ¶¶40, 45, 65.

After the Court preliminarily approved the UniCredit and Natixis settlements on May 16, 2023 (*id.*, ¶40), the litigation continued apace. While the Court vacated discovery deadlines pending a decision on Plaintiffs' motion to amend and file the 5AC (*id.*, ¶39), Co-Lead Counsel vigorously and efficiently prosecuted the case. On July 11, 2023, Plaintiffs and UniCredit executed an Amended UniCredit Stipulation, and Plaintiffs and Natixis executed an Amended Natixis Stipulation, following the Court's order to remove Rabobank and Deutsche Bank from the definition of "Defendants" in those stipulations. *Id.*, ¶¶44-45 (citing ECF Nos. 375-377). On July 12, 2023, the Court granted preliminary approval of the Amended UniCredit Stipulation and Amended Natixis Stipulation. *Id.*, ¶45 (citing ECF Nos. 381, 382).

Following entry of preliminary approval, Co-Lead Counsel commenced a notice program that required the cooperation of not just Defendants (current, settled, or dismissed), but also non-parties Deutsche Bank and Rabobank. *Id.*, ¶45. Co-Lead Counsel devised a reasonable notice program to ensure direct mailings to potential Settlement Class Members while also protecting the

---

[4] On December 26, 2023, the *EGB II* action was re-assigned to Judge Edgardo Ramos. On August 26, 2024, Judge Ramos dismissed that action, and the plaintiffs voluntarily dismissed the action on September 6, 2024.

confidences of the banks, namely through use of a third-party noticing agent. *Id*. On July 11 and July 18, 2023, Deutsche Bank and Rabobank moved to quash subpoenas issued in service of this notice program on the grounds of relevance, burden, and personal jurisdiction. *Id.*, ¶46 (citing ECF Nos. 378, 386). Co-Lead Counsel filed their opposition on July 20, 2023, *id.*, ¶46 (citing ECF No. 387), and presented oral argument at a hearing before Magistrate Judge Netburn on August 4, 2023. *Id.*, ¶47. That same day, the Court denied the motion to quash and ordered Rabobank and Deutsche Bank to comply with the subpoenas. *Id.*, ¶47. Notwithstanding delays from certain banks in retrieving class member information, Co-Lead Counsel oversaw the efficient issuance of notice to the Settlement Class, addressing issues arising from time to time in the notice and claims administration process. *Id.*, ¶¶45, 47, 53, 61.

Co-Lead Counsel continued moving discovery forward despite the Court's vacatur of discovery deadlines. *Id.*, ¶39 (citing ECF No. 332). Co-Lead Counsel reviewed and analyzed 3,890 documents for a total of 37,816 pages of chat communications produced by Defendants in discovery, which Co-Lead Counsel compared to those presented in (or omitted from) the European Commission Decision to understand and refine the strengths and weakness of Plaintiffs' claims. *Id.*, ¶63. Co-Lead Counsel also orchestrated the collection, review, and analysis of Plaintiffs' documents and trading data to expedite discovery in response to Defendants' requests for production when discovery resumed. *Id.*, ¶62. Co-Lead Counsel worked with experts to interpret trading data produced by certain settling defendants for the purposes of putting forward economic models at class certification and summary judgment. *Id.*, ¶63.

On September 25, 2023, the Court issued its Decision and Order granting Plaintiffs' motion for leave to amend the FAC to rename Bank of America, UBS, and NatWest as Defendants. *Id.,* ¶48. On October 16, 2023, Plaintiffs filed the 5AC. *Id.,* ¶49. Co-Lead Counsel negotiated and

prepared a new civil case management plan and scheduling order, which the Court approved on October 26, 2023. *Id.*, ¶¶49-50. Defendants answered the 5AC on December 15, 2023. *Id.,* ¶55. On December 18, 2023, the Court entered the Parties' stipulated deposition protocol. *Id.,* ¶56 (citing ECF No. 445). On January 16, 2024, the Court entered the Parties' stipulated data privacy order. *Id.,* ¶59 (citing ECF No. 449). Plaintiffs, Bank of America, UBS, and NatWest exchanged and responded to initial document requests in early 2024. *Id.*, ¶¶60, 62-63.

On October 30, 2023, Plaintiffs filed a Motion for Final Approval of the State Street, JPMorgan, UniCredit, and Natixis settlements. *Id.*, ¶51 (citing ECF Nos. 418-423). A final Settlement Hearing for the settlements with State Street, JPMorgan, UniCredit, and Natixis occurred on April 19, 2024, at which time the Court approved each settlement and entered final judgments. *Id.*, ¶65 (citing ECF Nos. 483-87).

On March 20, 2024, Co-Lead Counsel informed the Court under seal that the Parties had reached an agreement in principle to settle all remaining claims in the case. *Id.*, ¶64, (citing ECF No. 464). On April 15, 2024, Plaintiffs and Settling Defendants executed a term sheet agreeing to the material terms of a resolution of the Action. *Id.*, ¶69. The Court vacated the deadline for the Parties to report the status of discovery as they worked to negotiate a stipulation of settlement. *Id.*, ¶64 (citing ECF No. 467). On July 18, 2024, after months of negotiating, the Parties executed the Stipulation. *Id.*, ¶69.

****

The substantial time, labor, and resources Co-Lead Counsel invested in prosecuting this Action demonstrates that the first *Goldberger* factor supports the reasonableness of the fee request.

### 2. The Magnitude and Complexity of the Action Favors the Fee Request.

"[C]lass actions 'have a well deserved reputation as being most complex,'" *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal citation omitted)

("*NASDAQ*"), with antitrust cases standing out as some of the most "complex, protracted, and bitterly fought." *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015). "The upshot is that the magnitude and complexity of the litigation also weigh in favor of a significant award." *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013).

Here, Plaintiffs' claims of collusion in the European Government Bond market, involving thousands of bond issuances and implicating more than a dozen of the world's largest banks, are the very definition of a complex and risky case. While the European Commission's investigation certainly was helpful to Plaintiffs' case, and inevitably supported Plaintiffs' more expansive allegations, the Complaint's more expansive allegations were largely made possible by the cooperation Co-Lead Counsel secured through settlements with State Street, JPMorgan, UniCredit, and Natixis. Far from piggybacking off government investigations, Co-Lead Counsel developed evidence on their own by securing critical cooperation provisions in the prior settlements and developing their own economic and statistical analysis to support Plaintiffs' claim. *Compare Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (recognizing that plaintiffs' counsel did not "piggy back" on prior governmental actions), *with Goldberger*, 209 F.3d at 54 (noting that "the government's prior efforts against [defendants] dramatically increased [plaintiffs'] chances of success"). Indeed, this Action was filed on March 4, 2019, while the European Commission's Decision was not released to the public until October 15, 2021. In addition, Co-Lead Counsel retained experts and consultants, spending considerable time working with them to build on Plaintiffs' liability and damages theories.

If the Settlement had not been reached, Plaintiffs faced significant risks in continuing to litigate their claims against the Settling Defendants. Already, Plaintiffs' claims have been fiercely challenged in multiple motions to dismiss and for reconsideration. Discovery would have been a

substantial task, with difficult negotiations concerning the scope of production and the availability of information due to various factual and legal issues, including foreign data privacy and bank secrecy laws. The chats Co-Lead Counsel reviewed to date were jargon-laden and difficult to understand, requiring consultation with industry experts to help interpret them. Moreover, some of the chats were in foreign languages, requiring interpreters and industry experts who were fluent in those languages. The data Co-Lead Counsel reviewed to date were from different systems, and many variables had meanings specific to the bank that produced the data. Understanding all the variables in the data and normalizing it to put into a single unified database were daunting tasks that would have required dozens of meet and confers between counsel, experts, and business personnel.

Accordingly, complex issues of law and fact were likely to be raised at class certification, and the losing party would likely seek interlocutory review under Rule 23(f). Settling Defendants would have almost certainly brought motions for summary judgment, which the Court could have found meritorious in part or in whole. And even if Plaintiffs overcame these risks and took the case against Settling Defendants to trial, a jury could have found that Plaintiffs failed to meet their burden to prove Settling Defendants participated in the conspiracy or caused any damages. If the Class prevailed against the Settling Defendants at trial, any verdict could have been vacated or reversed on appeal. *See also* Section II.A.3, *infra* (discussing additional litigation risks). In sum, "There can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result." *NASDAQ*, 187 F.R.D. at 477.

### 3. The Fee Request is Warranted Based on the Level of Risk Undertaken by Co-Lead Counsel in this Action.

Second Circuit courts have described assessing the "risk of the litigation" as "perhaps the foremost factor to be considered in determining" a reasonable fee award. *In re Currency*

*Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) (internal citation omitted); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014). The risk of undertaking litigation is "measured as of when the case is filed." *Goldberger*, 209 F.3d at 55.

Co-Lead Counsel took this case on a fully contingent basis and invested significant time, money, and resources to advance Plaintiffs' and the Settlement Class's claims. *See City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM)(GWG), 2014 WL 1883494, at *14 (S.D.N.Y. May 9, 2014) ("The Second Circuit has recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award."). This risk was more significant because this Action involved litigating against well-resourced global financial institutions represented by highly regarded law firms that possessed the financial resources to litigate this case for many years through any trial and appeal process. *See In re WorldCom, Inc. Secs. Litig.*, 388 F. Supp. 2d 319, 357-58 (S.D.N.Y. 2005) (finding that counsel "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country").

As discussed in detail in the accompanying Memorandum of Law in Support of Final Approval of the Settlement, and summarized here, Co-Lead Counsel faced significant *ex ante* litigation risks in this case at every stage. Defendants' arguments raised in their pre-motion letters to dismiss the TAC (ECF No. 110) and FAC (ECF No. 206), and certain Defendants' arguments in their motions for reconsideration (ECF Nos. 120, 239, 241, 243), illustrate the complexity of the Action. For example, Defendants argued that Plaintiffs' economic analysis of bid-ask spreads failed to show that each Defendant conspired for six years across 13 bond-issuing countries. Defendants argued that Plaintiffs' economic analysis of European Government Bond auctions was

the result of ordinary market forces, not manipulation. *See id*. Defendants also argued that the Court should interpret the chatroom transcripts as consistent with ordinary market conduct rather than as evidence of collusion, as Plaintiffs contend. *See id*. Defendants further argued that the European Commission Decision was inconsistent with a finding of conspiracy. *See* ECF Nos. 206-1, 206-2, 206-3.

While Plaintiffs have largely succeeded in sustaining their claims at the pleading stage, at the time of the Settlement, several Defendants had been dismissed for lack of personal jurisdiction, antitrust standing, and connection to the antitrust conspiracy. *See* July 23 Decision and Order; March 14 Decision and Order. And numerous significant obstacles remain. At class certification, Plaintiffs would have to prove, in part through expert testimony, that Defendants' conspiratorial conduct caused class-wide impact and that individual class members' damages could be computed on a common, formulaic basis. While Co-Lead Counsel believe that there would have been sufficient evidence to support a finding of class-wide impact and damages, Settling Defendants had vast combined resources and are represented by top counsel from many of the nation's most prominent law firms. They would have coordinated a substantial attack on Plaintiffs' experts.

#### 4. Co-Lead Counsel Provided High-Quality Representation of Class Representatives and the Settlement Class.

The Settlement Class includes numerous institutional investors with the sophistication and resources to object to the Settlement. While the objection period is ongoing for the Settlement, to date, there have been no objections to Co-Lead Counsel's fee request.[5] The lack of objections to

[5] On September 5, 2024, Terrence Hackett, who is not a member of the Settlement Class and does not have standing to object, filed a letter with the Court purporting to object to Co-Lead Counsel's request for attorneys' fees from the State Street settlement. ECF 508. This objection comes well after the April 10, 2023 deadline to object to the prior fee request. Moreover, the Court awarded attorneys' fees relating to the prior group of settlements on April 19, 2024, and the deadline to appeal has long passed. Accordingly, this putative objection is untimely.

date following robust notice to the Settlement Class[6] is one indication of the quality of the work performed by Co-Lead Counsel on behalf of the Settlement Class. To the extent objections are filed, Co-Lead Counsel will address them on reply.

"[T]he quality of representation is [also] best measured by results," *Goldberger*, 209 F.3d at 55, which are evaluated in light of "the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Rsch. Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008). The Settlement has added $80 million to the Settlement Fund, for a total of $120 million. The Settlement provides the Class a substantial amount of additional funds in terms of recovering a greater portion of their losses. The skill and quality of Co-Lead Counsel's representation in this Action further supports their attorneys' fee request.

#### 5. The 30% Fee Request is Reasonable in Relation to the Settlement.

The fifth *Goldberger* factor, the fee request in relation to the settlement fund, weighs in favor of Co-Lead Counsel's fee request. Comparable cases serve as guideposts against which a court may determine whether a fee request is reasonable. *Grice*, 363 F. Supp. 3d at 407 ("Courts often look to empirical evidence of attorney's fees awarded in similar cases as a starting point for the baseline reasonable fee inquiry").

[6] The Court-approved notice informed all Class Members that Co-Lead Counsel would seek an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and no more than $800,000 in litigation expenses and that the Court would ultimately determine the award. The notice also apprised Class Members that Co-Lead Counsel would ask the Court to approve service awards for Plaintiffs not to exceed $150,000 in total (a request made herein, *see infra*). Class Members were also informed that this Motion will be posted on the case website, https://www.europeangovernmentbondssettlement.com ("the Settlement Website"). Finally, Class Members were notified of their right to object to any aspect of the Settlement, including the fee, expense, and service award requests.

Relevant here is a study of all 1,646 consolidated antitrust class actions filings across all federal district courts in the United States from 2009 through 2021.[7] The study shows that the median award for attorney's fees was about 30% for recoveries up to $249 million. *Id*., at 27. Other studies have also shown 30% as the median attorney fee award for antitrust class actions. *See* Theodore Eisenberg et. al., Attorneys' Fees in Class Actions: 2009-2013, 92 N.Y.U. L. Rev. 937, 952, tlb.4 (2017); *see also* Joshua P. Davis, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE U. L. REV. 1269, 1293-95 (2013) ("[I]n the twenty newer cases counsel tended to recover approximately 30% to 33.3% in cases with recoveries below $100 million and a similar or smaller percentage in cases with recoveries between $100 and $500 million").

Based on these studies, it stands to reason that courts regularly award attorneys' fees in multi-defendant antitrust class action at percentages equivalent to and even higher than the 30% requested by Co-Lead Counsel here. *See, e.g.*, *In re Urethane Antitrust Litig. (Urethane III)*, No. 04-md-1616 (D. Kan. July 29, 2016), ECF 3276 (awarding 33.33% of the $835 million settlement fund as attorneys' fees); *In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD, 2020 WL 6544472, at *2 (N.D. Cal. Nov. 7, 2020) (awarding 30% of the $232 million settlement fund as attorneys' fees); *In re Domestic Drywall Antitrust Litig.*, 13-MD-2437, 2018 WL 3439454, at *20 (E.D. Pa. July 17, 2018) (awarding 33.33% of the $190 million settlement fund as attorneys' fees); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2021 WL 5709250, at *5 (N.D. Ill. Dec. 1, 2021) (awarding 33.33% of the $169.6 million settlement fund as attorneys' fees); *In re Steel Antitrust Litig. (Steel I)*, No. 08-cv-5214 (N.D. Ill. Oct. 22, 2014), ECF 539 (awarding 33% of the

[7] *See* Davis, Josh Paul and Kohles, Rose, 2021 Antitrust Annual Report: Class Action Filings in Federal Court (May 23, 2022), Univ. of San Francisco Law Research Paper, available at SSRN: https://ssrn.com/abstract=4117930.

$164 million settlement fund as attorneys' fees); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420-YGR, 2018 WL 3064391, at *2 (N.D. Cal. May 16, 2018) (awarding 30% of the $139.3 million settlement fund as attorneys' fees); *In re CRT Antitrust Litig. (CRT I)*, No. C-07-5944 JST, 2016 WL 183285, at *2 (N.D. Cal. Jan. 14, 2016) (awarding 33% of the $127.4 million settlement fund as attorneys' fees); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2018 WL 7108072, at *4 (E.D. Mich. 2018) (awarding 30% of the $115 million settlement fund as attorneys' fees); *In re Municipal Derivatives Antitrust Litig. (Muni Derivatives IV)*, No. 08-cv-2516 (S.D.N.Y. July 8, 2016), ECF 2029 (awarding 33.33% of the $101 million settlement fund as attorneys' fees). In addition, the Court previously awarded Co-Lead Counsel 30% in their earlier request for an interim fee award, which is the same percentage requested here. ECF No. 487. In sum, Co-Lead Counsel's request falls in line with the observed attorneys' fees in the District and others in similarly complex cases, further confirming the reasonableness.

**6. Public Policy Supports Approval of the Fee Request.**

Public policy encourages enforcement of the antitrust laws through private civil suits to deter infringing conduct in the future. *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."). Awarding a reasonable percentage of the common fund "provid[es] lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209 F.3d at 51. If attorneys' fees are routinely set too low, particularly in instances where counsel effectively and efficiently litigate a matter, they will be deterred from bringing meritorious cases in the future. *See In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 352 (S.D.N.Y. 2014).

Here, Co-Lead Counsel's work advanced the interest of the antitrust laws and protected investors who might otherwise be without recourse. *See In re Credit Default Swaps Antitrust Litig.*,

No. 13-md-2476 (DLC), 2016 WL 2731524, at *18 (S.D.N.Y. Apr. 26, 2016) ("*CDS Litig*.") ("Our antitrust laws address issues that go to the heart of our economy. Our economic health, and indeed our stability as a nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and transparency of our marketplace."). These investors include many public institutions that guarantee the wellbeing of hardworking civil servants and employee pension funds protecting the pensions of industrious union members. Awarding a reasonable fee will encourage other counsel to further investigate and bring to light any misconduct in financial markets, which will promote more scrupulous industry practices, increased supervision to prevent misconduct, and ultimately lead to a fairer and more efficient market for all participants.

**B. The Lodestar Cross-Check Confirms the Reasonableness of the Fee Request**

When using the percentage method, courts may elect to perform a "'cross check' on the reasonableness of the requested percentage" based on counsels' hours multiplied by their billing rates. *Goldberger*, 209 F.3d at 50 (internal citation omitted). This "lodestar cross check," when used, is meant to be "as a sanity check to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *Colgate-Palmolive*, 36 F. Supp. 3d at 353. To perform the lodestar cross-check, the Court "multiplies the reasonable hours billed by a reasonable hourly rate." *Colgate-Palmolive*, 36 F. Supp. 3d at 347 (citing *Goldberger*, 209 F.3d at 47). The lodestar calculation "should be based on 'prevailing market rates,' . . . and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment…." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (quoting *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) and citing *Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 2469–70, 105 L.Ed.2d 229 (1989)). When used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

Where, as here, there have been successive settlements, the lodestar cross-check is appropriately performed with the cumulative hours from case inception because the reasonableness of a fee request is appropriately measured over the life of the case, as all work undertaken by Co-Lead Counsel relates to its efforts on behalf of Plaintiffs and the Class. *See, e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 11-md-2262, 2018 WL 3863445, *4 (S.D.N.Y. August 14, 2018) (awarding fee based on aggregate lodestar); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08–cv–42 (JG)(VVP), 2015 WL 6964973, at *1, *3, *7 (E.D.N.Y. Nov. 10, 2015) (performing cross-check using cumulative lodestar from case inception through mid-August 2015 in evaluating interim fee request relating to eleven settlements that received preliminary approval from October 2013 through April 2015); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06–MD–1775 (JG)(VVP), 2015 WL 5918273, at *1, *6 (E.D.N.Y. Oct. 9, 2015) (performing cross-check with cumulative lodestar from December 2006 through June 2014 for fourth round/installment of settlements); *NASDAQ*, 187 F.R.D. at 489 (performing lodestar cross-check and noting the "117,199.9 hours of attorney time and 12,428.8 hours of paralegal time invested by the 69 petitioning law firms…over a period of four years."); *see also Binotti v. Duke University,* No. 1:20-CV-470, 2021 WL 5366877, at *3 (M.D.N.C. Aug. 30, 2021) ("Where a settlement is the result of successive cases or successive settlements within the same case, the proper method of performing a lodestar cross-check is to divide the total lodestar for the entire litigation campaign by the aggregate fees requested, including fees previously awarded."); *In re Auto. Parts Antitrust Litig.*, 2017 WL 3525415, at *4 n.2 (E.D. Mich. July 10, 2017) ("The Court rejects the argument . . . that time included with the Round 1 Settlement fee request should not be included in the lodestar cross-check for the Round 2 Settlements. In calculating the lodestar for purposes of the cross-check, it would be impractical to compartmentalize and isolate the work

that [plaintiffs'] counsel did in any particular case at any particular time because all of their work assisted in achieving all of the settlements and has provided and will continue to provide a significant benefit to all of the [plaintiffs] classes.") (collecting authority for approach); *In re Urethane Antitrust Litig.*, No. 04 Civ. 1616, 2016 WL 4060156, at *1, *7-*8 (D. Kan. July 29, 2016) (conducting cross-check on fee award with remaining defendant after settlements with other defendants had been reached and noting that counsel "expended over 193,000 hours in this litigation").

Undertaking this lodestar cross-check from case inception confirms the reasonableness of Co-Lead Counsel's request. Co-Lead Counsel have spent 19,924.60 hours litigating the Action from the inception of the case through July 18, 2024, producing a total lodestar amount of $16,232,698.00, resulting in a multiplier of 2.2 against aggregate settlement recoveries of $120 million. Joint Decl., ¶¶84-89.

The hourly billing rates for attorneys working on this case ranged from $365 to $1,595. *See* Exhibits A-D to the Joint Decl. In this application, counsel is using its 2023 billing rates, which the Court previously approved in Co-Lead Counsels' prior interim fee application. ECF No. 487.[8] Billing rates in the same range have been previously approved as reflective of market rates in New York for work of comparable size and complexity. *See, e.g.*, *In re Foreign Exchange Benckmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), 2018 WL 5839691, at *5 (S.D.N.Y. Nov. 8, 2018) (granting fee award using partner rates up to $1,375 and associate rates of $350 to $700, *see* ECF No. 939 and exhibits); *Steamship Trade Ass'n of Baltimore-Int'l Longshoremen's*

---

8 In one instance, where an attorney was promoted from a senior associate to a partner in 2024, his rate in the instant application increased to a partner rate; however, the firm used its 2023 lower-level partner rate to calculate the lodestar for this attorney for the time period May 17, 2023 through July 18, 2024.

*Ass'n Pension Fund v. Olo Inc*., Case No. 1:22-cv-8228-JRS, ECF No. 128 (S.D.N.Y. 2022) (2024 Order granting fee award using partner rates up to $1975 and associate rates of $560 to $775, *see* ECF No. 123-2).

The number of hours spent on this Action from inception through July 18, 2024 are reasonable, particularly in light of the level of independent investigation conducted by Co-Lead Counsel to understand the market, prepare numerous complaints, oppose four motions to dismiss and two motions for reconsideration, engaging in substantial early discovery, and negotiate five settlements, including obtaining preliminary and final approval in four of them. In addition, as discussed previously, Co-Lead Counsel devoted a significant number of hours working with Plaintiffs' experts and consultants in preparing the case for class certification and summary judgment. Finally, there is substantial work remaining in the Action involving settlement approval, claims administration, and distribution of settlement proceeds to Class Members.

As explained above, awarding a 30% fee would result in a cumulative multiplier of 2.2.[9] Such a multiplier is well within accepted ranges and is warranted here. *See, e.g., Fikes Wholesale*, 62 F.4th at 727 (upholding fee award where the lodestar multiplier was 2.45); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), 2018 WL 5839691, at *5 (S.D.N.Y. Nov. 8, 2018) (approving lodestar multiplier of 1.72 and noting a lodestar multiplier of 1.35 to 2.99 is "common in megafund[s] [cases] over $100 million"); *Credit Default Swaps* 2016 WL 2731524, at *17 (approving a lodestar multiplier of "just over 6"); *Maley*, 186 F. Supp. 2d at 369 (approving lodestar multiplier of 4.65 and noting that figure is "well within the range awarded

---

[9] The Court previously awarded fees of $12 million from the first four settlements, in which Co-Lead Counsel had $12,247,303.50 in lodestar. ECF No. 487. If the Court awards 30% here, the total fees awarded would be $36 million with a total of $16,232,698.00 in lodestar, for an overall multiplier of 2.2.

by courts in this Circuit and courts throughout the country"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL. No. 1827, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) (approving lodestar multiplier of 2.5); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *11, *16 (N.D. Cal. Sept. 2, 2015) (approving lodestar multiplier of 2.2).

## III. THE REQUEST FOR PAYMENT OF LITIGATION EXPENSES IS REASONABLE AND SHOULD BE GRANTED

Under the common fund doctrine, class counsel are entitled to reimbursement of reasonable litigation expenses incurred in the litigation. Fed. R. Civ. P. 23(h); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (recognizing the right to reimbursement of expenses where a common fund has been produced or preserved for the benefit of a class); *Meredith Corp.*, 87 F. Supp. 3d at 671 (the attorneys whose work leads to the creation of "a common settlement fund for a class are entitled to the reimbursement of [reasonable] expenses that they advance to a class"); *In re Arakis Energy Corp. Sec. Litig.*, No. 95 CV 3431 (ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course."). Such costs are "compensable if they are of the type normally billed by attorneys to paying clients." *Guevoura Fund Ltd. v. Sillerman*, No. 1:15-cv-07192-CM, 2019 WL 6889901, at *22 (S.D.N.Y. Dec. 18, 2019). When "a class plaintiff successfully recovers a common fund for the benefit of a class, the costs of litigation should be spread among the fund's beneficiaries." *Maley*, 186 F. Supp. 2d at 369.

As detailed in the individual declarations filed concurrently herewith, Co-Lead Counsel advanced litigation expenses from May 17, 2023 through July 18, 2024 totaling $569,350.84. *See* Joint Decl., ¶¶87, 92-93 and Exs. A-D. These expenses were required, in large part, to engage experts to develop economic models to support Plaintiffs' claims as the case headed toward the class certification and summary judgment stage. Approximately 90% or $509,811 of these costs

were spent on work performed by Plaintiffs' experts and consultants. Joint Decl., ¶93. These expenses were unquestionably "critically important" to the prosecution of this Action and constitute the type of reimbursements that "[c]ourts routinely award." *Colgate-Palmolive*, 36 F. Supp. 3d at 353.

The remaining expenses advanced, comprising approximately 10% of Co-Lead Counsel's reimbursement request, consist of online research, data storage, filing and service fees, copying, mailing, and travel and meal costs. Joint Decl., ¶93. These are all the type of out-of-pocket expenses that are normally billed to paying clients and routinely reimbursed from common funds. *Yang v. Focus Media Holding Ltd.*, No. 11 Civ. 9051 (CM)(GWG), 2014 WL 4401280, at *19 (S.D.N.Y. Sept. 4, 2014) (finding computer research, photocopying, postage, meals, and court filing fees "necessary for Lead counsel to successfully prosecute this case").

## IV. SERVICE AWARDS FOR THE CONTRIBUTIONS OF NAMED PLAINTIFFS ARE APPROPRIATE

Finally, Co-Lead Counsel seek service awards for Plaintiffs to compensate them for the significant time they devoted to this case and in recognition of the results they were crucial to obtaining. "[S]ervice awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *Sanz v. Johny Utah 51 LLC*, 2015 WL 1808935, at *1 (S.D.N.Y. Apr. 20, 2015) (internal citation omitted). Service awards also compensate for and recognize contributions to the advancement of policy goals and class-wide benefits. *See Spann v. AOL Time Warner Inc.*, 2005 WL 1330937, at *9 (S.D.N.Y. June 7, 2005) ("an incentive award may be given to compensate named plaintiffs 'for efforts expended for the benefit of the lawsuit'") (internal citations omitted); *Sullivan v. DB Investments, Inc.*, 667 F.3d

273, 333 n.65 (3d Cir. 2011) (affirming service awards in antitrust case and noting they "reward the public service of contributing to the enforcement" of laws).

Discretionary service awards are routinely made in class actions, including antitrust matters. *See Newberg on Class Actions* §§ 17:1, 17:3 (5th ed. 2018) ("Empirical evidence shows that incentive awards are now paid in most class suits"). The amounts sought here—$50,000 for each Plaintiff—are in line with awards made in other, similar cases.[10] *See Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, Dkt. No. 724, at 2 (S.D.N.Y. Nov. 10, 2016) (approving total award of $580,000 for four named plaintiffs); *Air Cargo*, 2015 WL 5918273, at *5 (approving $90,000 awards to each of six class representatives where they "expended a significant amount of time and incurred substantial burdens in assisting with this litigation"); *In re Domestic Drywall Antitrust Litig.*, 13-MD-2437, 2018 WL 3439454, at *20 (E.D. Pa. July 17, 2018) (awarding $50,000 service awards to each of four named plaintiffs and noting that such awards were "in line with other cases").[11]

Each of the named plaintiffs was actively engaged in the litigation, making invaluable contributions beyond merely lending their names to the lawsuit. Their efforts are detailed in exhibits A (Ohio Carpenters), B (IBEW 103), and D (SBCERA) of the Joint Declaration (see also Joint Decl., ¶94-97). The requested awards would appropriately recognize that Plaintiffs committed a significant amount of time to the case, stood up to a powerful group of Wall Street

[10] The Service Awards requested here amount to 0.125% of the Settlement Fund.

[11] *See also, e.g.*, *Vitamin*, 2012 WL 5289514, at *11 (granting request for $50,000 service award to both class representatives based on their work "responding to discovery requests, including collectively producing over 10,000 pages of documents, sitting for depositions, and agreeing to appear at trial" in a complex and lengthy matter); *Wright v. Stern*, 553 F. Supp. 2d 337, 342-48 (S.D.N.Y. 2008) (approving service awards of $50,000 to each of eleven named plaintiffs).

banks with no guarantee of any recovery, and played a crucial role in vindicating the private enforcement of U.S. antitrust laws.

## V. CONCLUSION

For the reasons set forth above, Co-Lead Counsel respectfully request that this Court award attorneys' fees in the amount of $24,000,000, or 30% of the Settlement Fund, and litigation expenses in the amount of $569,350.84, plus interest earned at the same rate as the Settlement Fund on these awards, and service awards for Plaintiffs totaling $150,000.

Dated: October 18, 2024

*/s/* Gregory S. Asciolla
Gregory S. Asciolla
Noah Cozad
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY, 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
ncozad@dicellolevitt.com

Kristen M. Anderson
Donald A. Broggi
Michelle E. Conston
Patrick J. Rodriguez
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
kanderson@scott-scott.com
dbroggi@scott-scott.com
mconston@scott-scott.com
prodriguez@scott-scott.com

Patrick J. Coughlin
Daniel J. Brockwell
Carmen A. Medici
**SCOTT+SCOTT ATTORNEYS**
**AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
pcoughlin@scott-scott.com
dbrockwell@scott-scott.com
cmedici@scott-scott.com

David R. Scott
Amanda Lawrence
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

Joseph J. Tabacco, Jr.
Todd A. Seaver
Carl N. Hammarskjold
Christina Sarraf
Alex Vahdat
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: 415-433-3200
Facsimile: 415-433-6382
jtabacco@bermantabacco.com
tseaver@bermantabacco.com
chammarskjold@bermantabacco.com
csarraf@bermantabacco.com
avahdat@bermantabacco.com

Vincent Briganti
Geoffrey M. Horn
Christian Levis
Roland R. St. Louis, III
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: 914-997-0500
Facsimile: 914-997-0035
vbriganti@lowey.com
ghorn@lowey.com
clevis@lowey.com
rstlouis@lowey.com

Charles Kopel
**LOWEY DANNENBERG, P.C.**
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: 215-399-4770
Facsimile: 610-862-9777
ckopel@lowey.com

*Co-Lead Counsel for the Class*